SEALED

1  PHILLIP A. TALBERT
   United States Attorney
2  KEVIN P. ROONEY
   Assistant United States Attorney
3  2500 Tulare Street, Suite 4401
   Fresno, CA 93721
4  Telephone:  (559) 497-4000
   Facsimile:  (559) 497-4099
5



FILED

OCT 0 2 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

6  Attorneys for Plaintiff
   United States of America
7

8
                    IN THE UNITED STATES DISTRICT COURT
9
                        EASTERN DISTRICT OF CALIFORNIA
10

11  IN THE MATTER OF THE              CASE NO.
    EXTRADITION OF VLADIMAR BLASKO
12  TO THE SLOVAK REPUBLIC            1: 17 MC 0 0 0 0 6 7 SAB
13

14

15

16                              COMPLAINT

17                          (18 U.S.C. § 3184)

18          I, the undersigned Assistant United States Attorney, being duly sworn, state on information and

19  belief that the following is true and correct:

20  1.      In this matter, I represent the United States in fulfilling its extradition treaty obligations to the

21  Slovak Republic (the "Requesting State").

22  2.      The extradition provisions in force between the United States and Slovakia are found in the Annex

23  to the Instrument on Extradition between the United States of America and the Slovak Republic, as

24  contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and

25  the European Union signed on June 25, 2003, signed on February 6, 2006 – hereinafter "the Treaty."

26  3.      Pursuant to the Treaty, the Requesting State has submitted a request through diplomatic channels

27  for the extradition of Vladimir Blasko ("Blasko" or "the fugitive").

28

COMPLAINT                              1

4.     <u>Foreign charge(s)</u>. Blasko is wanted by the Slovakian authorities so that he can serve a sentence of four years' imprisonment which was imposed on April 15, 2013 and affirmed on appeal on November 7, 2013. The offenses of conviction were abuse of power and assault in violation of Articles 326 and 156, respectively, of the Slovakian Penal Code.

Article II of the Treaty defines extraditable offenses, in part, as those punishable under the laws of both Slovakia and the United States, where the term of imprisonment exceeds one year. In Slovakia, abuse of power, under the facts of this case, is punishable under Article 326 by imprisonment from 4 to 10 years. The corresponding statute for abuse of power in the U.S. is found at 18 U.S.C. Section 242. The maximum term of imprisonment under Section 242, under the facts of this case, is ten years.

Similarly, under Article 156 of the Slovakian Penal Code, the maximum term of imprisonment under the facts of this case is 2 years. The corresponding statutes in the U.S. are found at Cal. Penal Code §§ 243 and 245. Under Cal. Penal Code § 245, assault, under the facts of this case, is punishable by a term of imprisonment of up to 4 years. Battery is also punishable, under the facts of this case, by a term of imprisonment of up to 4 years under Cal. Penal Code § 243.

5.     <u>Foreign arrest warrant</u>. On January 21, 2014, a warrant for Blasko's arrest was issued by the District Court in Nitra, Slovakia. This warrant, a copy of which is included in Government's Attachment 1, Exhibit C to this complaint, remains outstanding.

6.     <u>Facts underlying the foreign conviction</u>.

On July 13, 2007, at around 9:30 p.m., Vladimir Blasko and Michal Krajmer, officers with the Police Force in Nitra, Slovakia, responded to a call for a disturbance at a bar in the village of Stitare. After arriving at the bar, Maria Csulakova, who had been involved in the altercation, pointed Zoltan Peli out to Blasko and his partner as the man with whom there had been an altercation. When Blasko approached Peli and asked him to come with them, Boris Kozma, a friend of Peli's, asked Blasko where they were taking him. Blasko responded that it was none of his business and Kozma repeated his question and identified himself as a "sergeant." Blasko requested proof, and when Kozma provided a card which identified him as a prison officer, Blasko screamed that a prison official was not a policeman and directed Peli to get going. Kozma again asked where they were taking his friend and Blasko responded by striking Kozma on his face and then wrestled him to the ground. Kozma was lying on his stomach, and when he

1   tried to turn, he was struck on the head again and felt someone kicking him.  Blasko thereafter placed

2   Kozma in handcuffs and escorted him to the police car.

3   Kozma sat next to Peli and was bleeding from his nose and mouth.  On the way to the police

4   station, Kozma reiterated that he was a member of the force and requested medical attention. Once they

5   arrived at the station, Blasko took Kozma to a corridor where, after the light was turned off, Blasko started

6   screaming at Kozma and then struck him in the face.  Kozma fell to the ground and Blasko kicked him a

7   few times.  He then placed Kozma inside a cell.

8   Kozma was transported by ambulance from the station to the hospital.  He suffered a brain

9   concussion, bone fractures on his nose, a face contusion in the area of his left eye with subcutaneous

10  bleeding, a cervical spine sprain, and partial damage to nerve fibres in the radial nerve area of his right

11  forearm, and headaches for four weeks.

12  On April 15, 2013, following his trial before the District Court of Nitra, Blasko was found guilty

13  of abuse of power by a public official and  assault and sentenced to a term of imprisonment of four years.

14  On November 7, 2013, following Blasko's appeal, the Regional Court of Nitra affirmed the length of his

15  sentence.

16  7.   Fugitive's presence in the United States.  The fugitive is located in the jurisdiction of this Court.

17  He presently resides at 1039 E Monticello Circle, Fresno, California 93270.  The information was

18  provided by the United States Marshal Service.

19  8.   Fugitive's description.  According to information provided by the Slovakian authorities, Vladimir

20  Blasko was born on January 10, 1983, in Nitra, Slovakia.

21  A copy of Blasko's photograph is appended to this complaint as Attachment 1, Exhibit E.  The

22  declaration of Maria Ondrejova, judge of the District Court Nitra, Slovenia, authenticates this photograph.

23  (See pages 5-6 of Attachment 1)

24  9.   Request for Extradition.  By Diplomatic Note No. 009401/2017-USKU-0076139 dated June 6,

25  2017, the Embassy of the Slovak Republic requested the extradition of Vladimir Blasko so that he can

26  serve the four year sentence of imprisonment which was imposed on April 15, 2013, following his

27  convictions for abuse of power by a public official and misdemeanor assault.

28  10.   Elizabeth M. Kiingi, an attorney in the Office of the Legal Adviser of the U.S. Department of

COMPLAINT                                3

1    State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the

2    diplomatic note by which the request for extradition was made and a copy of the Treaty, stating that the

3    offenses for which extradition is demanded are provided for by the Treaty, and confirming that the

4    documents supporting the request for extradition bear the certificate or seal of the Ministry of Justice, or

5    Ministry or Department responsible for foreign affairs, of Slovakia, in accordance with the Treaty, so as

6    to enable them to be received into evidence.

7    11.    That declaration from U.S. Department of State Attorney Kiingi with its attachments, including a

8    copy of the diplomatic note from Slovakia, a copy of the Treaty, and the certified documents submitted

9    in support of the request (marked collectively as Government's Attachment 2, is filed with this

10   complaint and incorporated by reference herein.

11          WHEREFORE, the undersigned requests that:

12     a.   A warrant for the arrest of Blasko be issued in accordance with 18 U.S.C. § 3184 and the

13          extradition treaty between the United States and Slovakia, so that the fugitive may be arrested

14          and brought before this Court to the end that the evidence of criminality may be heard and

15          considered; and

16     b.   The court find the fugitive extraditable and certify the same to the Secretary of State pursuant

17          to the Treaty and 18 U.S.C. § 3184.

18

19   Dated: September 28, 2017                    PHILLIP A. TALBERT
                                                  United States Attorney
20

21                                       By:    _____
                                                 Kevin P. Rooney
22                                               Assistant United States Attorney

23   Sworn to before me and subscribed in my presence this 28 day of September 2017, AND A WARRANT

24   SHALL ISSUE.

25                                              _____
26                                               United States Magistrate Judge

27

28

COMPLAINT                                    4

# Request from Slovakia for the Extradition
# of Vladimir Blasko

# Table of Contents

Note Verbale (6 June 2017) --------------------------------------------------------------- 1

Letter from Director of Judicial Cooperation (14 February 2017) ----------------------- 2

Declaration of Judge Maria Ondrejova ------------------------------------------------------ 5

Judgment (15 April 2013) ---------------------------------------------------------------- 41

Judgment (7 November 2013) ------------------------------------------------------------ 82

Arrest Warrant (21 January 2014) ------------------------------------------------------- 97

Statutes --------------------------------------------------------------------------------- 104

Photograph ------------------------------------------------------------------------------- 109



EMBASSY
OF THE SLOVAK REPUBLIC

L/LEI

**NOTE VERBALE**

2017 JUN 15 P 2: 57

DEPARTMENT OF STATE

009401/2017-USKU-0076139

The Embassy of the Slovak Republic in Washington, D.C. presents its compliments to the United States Department of State and in accordance with the Instrument on Extradition between the Slovak Republic and the United States of America, as contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America, signed in Washington, D.C. on June 25, 2003 (Bratislava, 6 February 2006) has the honour to deliver the request for extradition of the Slovak national Vladimír BLAŠKO, born on January 10, 1983, residing at Nitra, Slovak Republic, currently in the United States of America.

The Embassy of the Slovak Republic avails itself of this opportunity to renew to the United States Department of State assurances of its highest consideration.

Washington, D.C., June  6  , 2017

Enclosure: 7



United States Department of State
Office of the Legal Adviser
Washington, D.C. 20520

 **MINISTRY**
OF JUSTICE
OF THE SLOVAK REPUBLIC

US State Department
2201 C Street NW
Washington, DC 20520
United States of America

| Your letter Nr./ Dated: | Our Nr.: | Prepared by: | Bratislava |
|---|---|---|---|
|  | 33179/2017/83/K09/SJ | Stanislava Juríčeková | 14 February 2017 |

**RE:** I. **Instrument on Extradition between the Slovak Republic and the United States of America, as contemplated by Article 3 (2) of the Agreement on Extradition between the European Union and the United States of America signed in Washington DC on 25 June 2003 (Bratislava, 6 February 2006)**
II. **Vladimír Blaško, extradition to the Slovak Republic**

The Ministry of Justice of the Slovak Republic has the honor, in accordance with the Instrument on Extradition between the Slovak Republic and the United States of America, as contemplated by Article 3 (2) of the Agreement on Extradition between the European Union and the United States of America signed in Washington DC on 25 June 2003 (Bratislava, 6 February 2006), to request the U. S. Department of Justice for the extradition of the Slovak national:

**Vladimír Blaško, born on 10th January 1983, residing in Nitra, Slovak Republic, currently in the territory of the United States of America,**

on the basis of the Arrest Warrant of the District Court Nitra No. 6T/97/2010 of 21 January 2014 for abuse of power in violation of Article 326 para 1 letter a), para 2 letter a) and Article 138 letter d) of the Slovak Penal Code and infliction of bodily harm in violation of Artice 156 para 1 of the Slovak Penal Code.

Declaration in support of the request for the extradition, International Arrest Warrant, judgments, photo of Mr. Blaško and applicable legal provisions are attached to this letter.

The Ministry of Justice of the Slovak Republic avails itself of this opportunity to express to the US State Department its highest consideration.

Alexander Kunošík
Director of the Judicial Cooperation
in the Criminal Matters Division

Enclosures: 6

EXT BLASKO 002

## VYLÁSENIE NA PODPORU ŽIADOSTI O EXTRADIÁCIU VLADIMÍRA BLAŠKA

Ja, Mária Ondrejová, sudkyňa Okresného súdu Nitra, poskytujem nasledujúce vyhlásenie v nadväznosti na žiadosť predloženú Spojeným štátom americkým o vydanie Vladimíra Blaška na základe dvojstrannej zmluvy o extradícii medzi Spojenými štátmi americkými a Slovenskou republikou.

### Skutkové okolnosti

Vyšetrovanie zo strany slovenských orgánov činných v trestnom konaní preukázalo, že dňa 13. júla 2007 okolo 21.30 hod. Vladimír Blaško, v tom čase príslušník Policajného zboru v Nitre na Slovensku, preveroval telefonické oznámenie o výtržnosti v obci Štitáre. Po príchode do baru a pri overovaní okolností, ktoré viedli k oznámeniu, Blaško fyzicky napadol Borisa Kozmu, hosťa v bare. Blaško zatkol Kozmu a odviedol ho na policajnú stanicu, kde ho druhýkrát fyzicky napadol.

Kozma bol odvezený z policajnej stanice sanitkou do nemocnice. Utrpel otras mozgu, zlomeninu nosových kostičiek, pomliaždenie tváre v oblasti ľavého oka, podvrtnutie krčnej chrbtice, čiastočné poškodenie nervových vlákien v oblasti radiálneho nervu pravého predlaktia s dobou liečenia 31 dní.

### Stíhanie a odsúdenie

Blaško bol obvinený dňa 8. januára 2008 a obžalovaný dňa 3. júna 2010 zo zneužitia právomoci podľa § 326 ods. 1 písm. a), ods. 2 písm. a) a § 138 písm. d) Trestného zákona a z ublíženia na zdraví podľa § 156 ods. 1 Trestného zákona. Blaško odmietol poskytnúť výpoveď a využil svoje právo nevypovedať.

Dňa 15. apríla 2013, v súdnom konaní, v ktorom bol zastúpený advokátom, ale ktorého sa nezúčastnil, bol Blaško Okresným súdom Nitra uznaný za vinného a odsúdený na štyri roky väzenia. Kópia rozsudku je priložená k tomuto vyhláseniu v **prílohe A**.

Prostredníctvom svojho advokáta sa Blaško odvolal. Krajský súd v Nitre dňa 7. novembra 2013, rozsudok Okresného súdu Nitra zrušil (teda pozmenil) v časti týkajúcej sa náhrady škody a právneho základu na určenie výšky trestu. Výška 4-ročného trestu však ostala nezmenená. K tomuto vyhláseniu je pripojená kópia rozsudku Krajského súdu v Nitre v **prílohe B**.

Následne 21. januára 2014 vydal Okresný súd Nitra príkaz na zatknutie Blaška. K tomuto vyhláseniu je pripojená kópia príkazu na zatknutie v **prílohe C**.

<u>Premlčanie a opis osoby</u>

Stíhanie a výkon 4-ročného trestu nie sú premlčané, pretože Blaško sa zdržiaval zahraničí s úmyslom vyhnúť sa trestu. K tomuto vyhláseniu sú v **prílohe D** pripojené kópie § 87, §90, §138, §156 a §326.

Vladimír Blaško sa narodil 10. januára 1983 v Nitre na Slovensku. Meno jeho otca je Vladimír Blaško a meno matky je Marianna Blašková, rod. Godárová. Blaško predtým pracoval ako príslušník Policajného zboru. K tomuto vyhláseniu je v **prílohe E** priložená fotografia Blaška z policajných záznamov, ako osoby stíhanej a uznanej vinou zo zneužitia právomoci a ublíženia na zdraví na Okresným súdom Nitra z 15. apríla 2013, v konaní ktorému som predsedala, ktorý bol pozmenený Krajským súdom v Nitre dňa 7. novembra 2013.

Mária Ondrejová
sudca

**DECLARATION IN SUPPORT OF THE REQUEST FOR THE EXTRADITION OF VLADIMÍR BLAŠKO**

I, **Mária Ondrejová**, judge of the District Court Nitra, provide this statement in support of the request submitted to the United States for the extradition of Vladimír Blaško under the bilateral extradition treaty between the United States and the Slovak Republic.

## Factual Background

An investigation by Slovakian law enforcement authorities established that on 13 July 2007, at around 9:30 p.m., Vladimír Blaško, then an officer with the Police Force in Nitra, Slovakia, responded to a call for a disturbance at a bar in the village of Štitáre. After arriving at the bar, and in the course of verifying the circumstances that had led to the call, Blaško physically assaulted Boris Kozma, a patron at the bar. Blaško arrested Kozma and escorted him to the police station where he physically assaulted him a second time.

Kozma was taken from the police station to the hospital by ambulance. He suffered a brain concussion, bone fracture on his nose, a face contusion in the area of his left eye, a cervical spine sprain, partial damage to nerve fibers in the radial nerve area of his right forearm, with the treatment period of 31 days.

## Prosecution and Conviction

After being accused on 8 January 2008, Blaško was indicted on 3 June 2010 for abuse of power in violation of Articles 326 para 1 letter a), para 2 letter a) and Article 138 letter d) of the Slovakian Penal Code, and infliction of bodily harm in violation of Article 156 para 1 of the Slovakian Penal Code. Blaško declined to provide a statement and asserted his right to remain silent.

On 15 April 2013, following a trial in which he was represented by an attorney but which he did not attend, Blaško was found guilty of both charges and sentenced to four years' imprisonment by the District Court Nitra. A copy of judgment is appended to this declaration at **Exhibit A**.

Through his attorney, Blaško appealed his sentence. Regional Court in Nitra on 7 November 2013 cancelled (that is, modified) the judgment of the District Court Nitra with

respect to compensation and the legal basis for the determination of the level of punishment. The four-year sentence of imprisonment, however, was unchanged. A copy of the judgment of the Regional Court in Nitra is appended to this declaration at **Exhibit B.** Afterward, on 21 January 2014, the District Court Nitra issued a warrant for Blaško's arrest. A copy of the warrant is appended to this declaration at **Exhibit C.**

## Statutes of Limitation and Identification

The prosecution of Blaško, and the enforcement of the four-year sentence of imprisonment, are not barred by the applicable statutes of limitation because he sojourned abroad with the intent to avoid the punishment. Copies of Articles 87, 90, 138, 156, and 326 are attached to this declaration at **Exhibit D.**

Vladimír Blaško was born on 10 January 1983 in Nitra, Slovakia. His father's name was Vladimír Blaško and his mother's name is Marianna Blašková, nee Godárová. Blaško formerly served with the Police Force. Attached to this declaration at **Exhibit E** is a photograph of Blaško from the police files, the person tried and found guilty of abuse of power and bodily harm by the District Court Nitra on 15 April 2013, over which I presided, as modified by the Regional Court in Nitra on 7 November 2013.

Mária Ondrejová
Judge

# EXHIBIT A

| Preklad zo slovenského do anglického jazyka. | The translation from the Slovak into English language. |
|---|---|

| Prekladateľ: | Mgr. Anna Havranová<br>Ďumbierska 9, Nitra<br>Tel. č.: (+421) 0903 220 184 | Translator: | Mgr. Anna Havranová<br>Ďumbierska 9, Nitra<br>Tel. No.: (+421) 0903 220 184 |
|---|---|---|---|
| Zadávateľ: | Okresný súd Nitra<br>Štúrova 9,<br>949 68 Nitra | Customer: | District Court Nitra<br>9 Štúrova Str.<br>949 68 Nitra |

**Názov: Rozsudok 6T/97/2010**

Počet strán: 29
Evidenčné číslo prekladu: 029/2014
Dátum: 10.4.2014

**Title: Judgement 6T/97/2010**

Pages: 29
Translation Registration No: 029/2014
Date: 10 April 2014

EXT BLASKO 008





**IČS 4110010689**

**6T/97/2010-752**



# R O Z S U D O K

## V MENE SLOVENSKEJ REPUBLIKY

Okresný súd Nitra, v senáte zloženom z predsedníčky senátu JUDr. Márie Ondrejovej a z prísediacich Anny Míkušovej a doc. Mgr. Ing. Petra Lazora, PhD., v trestnej veci obžalovaného **Vladimíra Blaška**, pre zločin zneužívania právomoci verejného činiteľa podľa § 326 odsek 1 písmeno a), odsek 2 písmeno a) Trestného zákona s poukazom na § 138 písmeno d) Trestného zákona v jednočinnom súbehu s prečinom ublíženia na zdraví podľa § 156 odsek 1 Trestného zákona, na hlavnom pojednávaní konanom v Nitre dňa 15. apríla 2013 takto

### r o z h o d o l :

Obžalovaný
**Vladimír Blaško :**              narodený 10.01.1983 v Nitre,

                         trvale bytom Nitra, Martinská dolina č. 1,

### s a   u z n á v a   z a   v i n n é h o ,   ž e :

v rozpore najmä s § 8 odsek 1 zákona č. 171/1993 Z.z. o Policajnom zbore v znení neskorších predpisov ako aj s § 48 odsek 3 písmeno e), g), i) zákona č. 73/1998 Z.z. o štátnej službe príslušníkov Policajného zboru, Slovenskej informačnej služby, Zboru väzenskej a justičnej stráže Slovenskej republiky a Železničnej polície v znení neskorších predpisov

v čase výkonu služby, ako verejný činiteľ, v úmysle spôsobiť škodu na zdraví poškodenému Borisovi Kozmovi, dňa 13.07.2007 v čase približne o 21.45 hod. v obci Štitáre na Jeleneckej ulici v bare Relax pritom, ako mal preveriť telefonické oznámenie o priestupku, fyzicky napadol poškodeného Borisa Kozmu, nar. 24.04.1974 po tom, ako tento predložil preukaz príslušníka Zboru väzenskej a justičnej stráže Slovenskej republiky a predstavil sa ako ich kolega a dotazoval sa prečo chcú odviesť jeho spolusediaceho priateľa a to takým spôsobom, že ho obvinený Blaško udrel päsťou do oblasti krku, následne ho stiahol na zem, kde pokračoval v úderoch päsťou do oblasti hlavy aj napriek tomu, že tento nekládol žiaden odpor, potom ho spútal putami na rukách a následne po predvedení poškodeného na Obvodné oddelenie Policajného zboru v Nitre obvinený Blaško tohto znovu bez adekvátneho dôvodu fyzicky napadol úderom do tváre a po páde poškodeného na zem aj následnými údermi do oblasti hlavy a kopmi do trupu, čím poškodenému spôsobil otras mozgu, zlomeninu nosových kostičiek, pomliaždenie tváre v oblasti ľavého oka, podvrtnutie krčnej chrbtice, pomliaždenie prednej brušnej steny vľavo, pomliaždenie oboch zápästí a čiastočné poškodenie senzitívnych nervových vlákien pravého vretenného nervu v oblasti predlaktia s dobou liečenia a práceneschopnosti v trvaní 31 dní,

### teda:

ako verejný činiteľ v úmysle spôsobiť inému škodu vykonával svoju právomoc spôsobom odporujúcim zákonu a tento čin spáchal závažnejším spôsobom konania násilím a súčasne inému úmyselne ublížil na zdraví,

### tým spáchal:

zločin zneužívania právomoci verejného činiteľa podľa § 326 odsek 1 písmeno a), odsek 2 písmeno a) Trestného zákona s poukazom na § 138 písmeno d) Trestného zákona v jednočinnom súbehu s prečinom ublíženia na zdraví podľa § 156 odsek 1 Trestného zákona.

### Za to mu súd ukladá:

Podľa § 326 odsek 2 Trestného zákona, zistiac poľahčujúcu okolnosť podľa § 36 písmeno j) Trestného zákona, zistiac priťažujúcu okolnosť podľa § 37 písmeno h) Trestného

EXT BLASKO 010

zákona, podľa § 38 odsek 2 Trestného zákona, podľa zásady uvedenej v § 41 odsek 1, odsek 2 Trestného zákona **úhrnný trest odňatia slobody vo výmere 4 (štyri) roky.**

Podľa § 48 odsek 2 písmeno a) Trestného zákona sa obžalovaný zaraďuje pre výkon trestu odňatia slobody do ústavu na výkon trestu odňatia slobody **s minimálnym stupňom stráženia.**

Podľa § 287 odsek 1 Trestného poriadku, súd ukladá obžalovanému, aby uhradil poškodenej spoločnosti Dôvera zdravotná poisťovňa, so sídlom Einsteinova 25, 851 01 Bratislava, IČO 35 942 479, spôsobnú škodu vo výške 874,51 eur.

Podľa § 288 odsek 1 Trestného poriadku, súd odkazuje poškodeného Borisa Kozmu, narodeného 24.04.1974, trvale bytom Štitáre, Jeletecká 31/272, s jeho nárokom na náhradu škody na občianske súdne konanie.

## Odôvodnenie

Na základe obžaloby Vojenskej obvodovej prokuratúry Bratislava, sp. zn. OPv 279/07 prejednal Okresný súd Nitra trestnú vec proti obžalovanému Vladimírovi Blaškovi bývalému príslušníkovi Policajného zboru. Súd vykonal hlavné pojednávanie voči obžalovanému ako voči ušlému po splnení zákonných podmienok uvedených v ustanovení § 358 odsek 1 Trestného poriadku za prítomnosti obhajcu obžalovaného. Na hlavnom pojednávaní vykonal dokazovanie prečítaním výpovede obžalovaného Vladimíra Blaška z prípravného konania, prečítaním výpovede poškodeného Borisa Kozmu z prípravného konania, výsluchom svedkov Vladimíra Chovanca, Michala Krajmera, Denisy Lacovej, Márie Csulákovej, Jany Mihalčinovej - Balkovej, prečítaním svedeckých výpovedí z prípravného konania svedkov M. Kozmovej, P.Földešiho, L. Péliho, I. Bratha, M. Barcsu, J. Kasalovej, J. Menta, Z. Péliho, M. Soviša, J. Szoráda, B. Školáka, R. Balkovej, K. Ottingerovej, M. Púchovského, F. Barnáša, M. Gašparoviča, prečítaním znaleckého posudku, oboznámením listinných dôkazov zadovážených v spise, oboznámením pripojeného spisu Okresného súdu Nitra sp. zn. 33 T/ 101/2009 a správ o pátraní po pobyte obžalovaného a poškodeného.

Z výsledkov vykonaného dokazovania bol zistený skutkový stav tak, ako je opísaný vo výrokovej časti tohto rozsudku.

Podľa § 258 odsek 4 Trestného poriadku bola prečítaná výpoveď **obžalovaného Vladimíra Blaška** (ušlý) z prípravného konania, v ktorej využil svoje právo a odmietol k veci vypovedať.

Po vykonaní viacerých neúspešných úkonov na zabezpečenie účasti svedka poškodeného na hlavnom pojednávaní bola podľa § 263 odsek 1 Trestného poriadku na hlavnom pojednávaní prečítaná výpoveď **svedka –poškodeného Borisa Kozmu** zo dňa

17.08.2007 a 24.04.2009 z prípravného konania. Svedok vo výpovedi zo dňa 17.08.2007 uviedol, že dňa 13.07.2007 okolo 20:00 hodiny prišiel k Zoltánovi Pélimu domov dohodnúť sa na postupe ohľadom opravy jeho strechy. Odviezol ho spolu s ďalšími dvomi chlapcami, ktorí mu boli pomáhať do baru, kde prišli okolo 20:30 hodiny. Sadli si vonku na terasu pri druhý stôl odzadu, vypil pivo a dve poldeci. V bare sa strhla slovná prestrelka medzi Zolom, ním a dvomi dievčatami, ktoré tam tiež pili alkohol a sedeli pri prvom stole. Z oboch strán padli vulgárne výrazy a nadávky. Slovná hádka pokračovala, vyostrovalo sa to a tmavovlasá žena Zolovi nemiestne vynadala. Zolo sa postavil, ale čo sa udialo nevidel, lebo sa otočil za chlapcami, čo sedeli za ním. Potom si Zolo sadol a tá čiernovláska vykrikovala, že to bude ešte ľutovať, neskôr sa dozvedel, že Zolo im dal nejaké facky. Potom sa Csuláková otočila k ním a kričala, že keď dostala do basy jedného, dostane aj druhého. Čiernovláska začala urážať jeho, jeho rodinu aj jeho manželku čo ho vyprovokovalo a začal ju naháňať okolo svojho auta. Zavolal kamarátovi Jurajovi Kollárovi, ktorý robil na mestskej polícii a povedal mu, čo sa stalo, chcel od neho zistiť, čo sa s tým dá urobiť. Dievčatá vykrikovali, že zavolali policajtov a zasa došlo k slovnému konfliktu. Videl že Csuláková má vedľa seba psa zabaleného v handre, tak jej povedal, že nemá ho robiť v bare so psom, nech idú s ním domov. Chvíľu bol kľud a potom prišli policajti v čiernych maskáčoch s tomfami v rukách. Vyšší policajt prišiel prvý a Csuláková mu ukázala Zola Péliho. Policajt sa otočil k Zolovi, v ľavej ruke držal tomfu, zaprel ju do Zolovej pravej ruky a povedal: „Poďme". Opýtal sa policajta kam Zola berú, ten zakričal, že čo sa do toho stará, opätovne sa ho pýtal kam Zola berú a pritom policajta oslovil hodnosťou. Ten sa otočil a začal na neho kričať odkiaľ vie, že je nadstrážmajster. Posunul pred neho puzdro so služobným preukazom a povedal, že je príslušník zboru, povedal mu ako sa volá celým menom a že je bachar. Policajt na neho arogantne zakričal, že bachar nie je policajt, otočil sa na Zola a povedal mu, aby išiel s nimi. Opätovne sa policajta opýtal na dôvod, prečo chcú Zola zobrať, ale ako sa to spýtal, dostal ranu do tváre, na nos. Potom ako ho policajt udrel do tváre, zaťal ho ťahať cez lavicu, bil ho, zhodil ho cez lavicu na zem. Keď ležal bruchom na zemi, ľavú ruku mu páčil na páku, kričal na neho, aby dal ruku dozadu, cítil údery do hlavy, keď sa na neho otočil dostal ďalší úder do tváre a cítil, že ho niekto kope do ľavého boku. Potom mu policajt ľavú ruku povolil a spútal mu ruky nad hlavou. Keď sa postavil tiekla mu z nosa a z úst krv, nad okom mu navrela guča a hučalo mu v hlave. Policajt po ňom kričal, že príde o služobák a urážal ho. Žiadal o ošetrenie, lebo bol zranený a zostalo mu zle. Policajt ho zobral k autu, naložili ho na miesto za šoféra, ruky mal spútané vpredu, vedľa neho posadili Zola a išli smerom na Obvodné oddelenie PZ. Vo vozidle niekoľkokrát požiadal o lekárske ošetrenie a zopakoval, že je príslušník zboru. Dostalo sa mu len oplzlých nadávok. Šoféroval vyšší z policajtov ten, ktorý ho prvý udrel do nosa. Ten menší bol ticho. Keď prišli na oddelenie, ten vyšší policajt ho vytiahol z auta a viedol do budovy takým spôsobom, že ho prstami chytil okolo krku. Prešli okolo okienka, zabočili do prvej chodbičky a Zola odviedli dozadu. Ako ho viedli, všimol si že za ním stáli dvaja policajti, ktorých poznal Vlado Chovanec a Fero Barnáš. Potom zhaslo svetlo na chodbe a ten vyšší policajt začal na neho oplzlo kričať, dostal úder do tváre, spadol na zem pred klietku, dostal niekoľko rán do hlavy a kopancov. Stúpil mu na hlavu so slovami: „Ty si skončil, o to sa postarám" a potom ho zavrel ho do klietky. Zistil, že má u seba služobák a mobilný telefón, preto zo svojho mobilu zavolal manželke a na 158-čku, kde sa predstavil a povedal, že je zbitý na obvodnom oddelení a žiada si lekárske ošetrenie. Operačný zo 158-čky mu povedal, aby počkal. Prišiel ten vyšší policajt, oprel ho o stenu, urobil mu osobnú prehliadku a zapol mu ruky dozadu. Potom sa prebral na to, že ho strašne boleli zápästia. Pamätal si, že počul manželkin hlas, vykotúľal sa na chodbu a povedal žene aby volala záchranku. Nato dobehol policajt, začal mu nadávať, otvoril dvere a skopol ho naspäť. Strašne mu hučalo v hlave, všetko ho bolelo, triasli sa mu nohy a nedokázal už vnímať a reagovať. Čo sa týka toho menšieho policajta, ten stál počas incidentu pri múre pri

Zolovi. Ten vyšší policajt mu hovoril „mladý". Pred incidentom s policajtom sedel na lavici, kľudne sa s ním rozprával, určite sa na policajta ani nezahnal, ani negestikuloval. Úderom policajtov sa nebránil, nestihol zareagovať. Nevedel aký mali dôvod na to, že ho zbili aj na oddelení. Policajtom nemohol spôsobiť žiadne zranenia ani ujmy, lebo sa ich nedotkol. Policajtov, ktorí zasahovali v bare nepoznal, nikdy predtým ich nevidel, neprišiel s nimi nikdy do kontaktu.

Pri výsluchu dňa 24.04.2009 svedok – poškodený Boris Kozma uviedol, že k obvineným Vladimírovi Blaškovi a Michalovi Krajmerovi nie je v žiadnom príbuzenskom ani obdobnom vzťahu. Zotrval na svojej predošlej výpovedi. Potvrdil, že ako prvý ho v bare napadol policajt Blaško. Myslí si, že v tom bare nebol pod vplyvom alkoholu tak, aby boli ovplyvnené jeho koordinačné schopnosti, nespomína si, či sa podrobil dychovej skúške. Podľa neho konanie a vystupovanie policajta Blaška bolo neprimerané a agresívne.

Svedok Vladimír Chovanec na hlavnom pojednávaní uviedol, že je policajtom na výsluhovom dôchodku a pracuje ako SBS. V čase keď prišlo ku skutku v roku 2007 nastupoval do nočnej služby. Bol s kolegom v šatni a na chodbe počuli hluk. Borisa Kozmu dávali do klietky predbežne zadržaných kolegovia Krajmer s Blaškom. Pán Péli sedel na stoličke, bližšie k šatni. Po nástupe do služby im príslušník stálej služby povedal, aby Borisa zobrali do nemocnice na ošetrenie. Boris sa v klietke krútil po zemi, že ho dobili. Nerozprávali sa s Borisom o tom kto ho dobil. Borisa poznal 15 rokov ešte ako príslušníka Mestskej polície, potom ako príslušníka ZVJS. Boris nevedel rozprávať, len vzdychal, mal nejaké povrchové oderky a bol krvavý. Zobrali ho na ošetrenie, jeho manželka sa v nemocnici sa k nim pripojila a zúčastnila sa vyšetrenia. Lekár Borisa vyšetril pre podozrenie, či nemá otras mozgu a nechali si ho na pozorovanie v nemocnici. Na izbe ležal, vzdychal, absolútne nekomunikoval. Nevedel uviesť ako Boris prišiel k oderkom, videli ho až keď vyšli zo šatne ako sa zvíja v klietke. Obžalovaného poznal odkedy nastúpil k polícii, mali spolu asi dve služby. S Blaškom mali v službe jeden konflikt, ale až po tejto záležitosti to riešila inšpekcia.

Vzhľadom na rozpory vo výpovedi svedka bola prečítaná jeho výpoveď z prípravného konania v súlade s ustanovením § 264 odsek 1 Trestného poriadku, rozpory svedok vysvetlil časovým odstupom a zotrval na výpovedi ako ju uviedol v prípravnom konaní.

Svedok Michal Krajmer na hlavnom pojednávaní uviedol, že pracuje ako referent 5 čaty PMJ KR PZ Nitra, vykonáva tú istú služobnú činnosť ako vykonával v roku 2007, kedy pracoval ako inšpektor Obvodného oddelenia PZ Nitra. V roku 2007, presný dátum si nepamätal, boli prostredníctvom operačného strediska vyslaní s kolegom Blaškom do obce Štitáre do baru, kde mala čakať nejaká napadnutá slečna. Po príchode na miesto ich na ulici čakali dve ženy, jedna z nich im opísala čo sa stalo, že ju nejaký Péli prefackal a hodil jej o zem psa. Povedala že Péli sedí pri stole ešte s jedným mužom a popíjajú, určila presný stôl a popísala kde Péli sedí. Keď išli k stolu, išli odtiaľ urážky typu, že „už idú machri" a podobne. Vykrikoval ten, čo sedel tvárou k nim(poškodený). Obžalovaný Blaško išiel ku stolu, on ostal stáť pri tých dievčatách a inštruoval ich ako treba podať oznámenie. Keď prišiel ku stolu, jeho kolega už bol v debate s tým, ktorý k nim sedel tvárou a mali nejakú výmenu názorov. Riadne vyzval Péliho aby sa preukázal občianskym preukazom a požiadal ho, aby vyšiel s nimi von, ale ten nereagoval a pasívne tam sedel. Ten čo sedel oproti Pélimu hovoril, že majú Péliho nechať tak, že vie na čo má právo. Kolega Blaško Péliho chytil na plece, alebo za ruku a chcel mu naznačiť, aby sa postavil. Kozma obžalovanému Blaškovi schmatol ruky, na čo sa mu Blaško vytrhol a Kozma vyskočil, zahnal sa na neho a leteli na zem. Snažil sa ich zachytiť, narazil na stôl a zostal zakliesnený o stôl. Spadli na zem, Kozma tvárou k zemi a Blaško sa mu snažil dať ruku dozadu, aby ho spútal, zakričal aj na neho aby

mu s ním pomohol, preto priskočil k nohám a zakvačil Kozmovi nohy, pričom ho tento kopol. Blaško spútal Kozmovi ruky vzadu a vyviedli ho von z krčmy pri služobné auto. Kolega mu spravil bezpečnostnú prehliadku, vysvetlil mu čoho sa dopustil, že zaútočil na verejného činiteľa, potom ho dali do auta a on sa vrátil pre Péliho, ktorý s ním išiel bez problémov. Vysvetlil mu o čo ide, že na neho podali oznámenie o napadnutí, že ho berú na Obvodné oddelenie PZ. Zastavila sa tam ešte druhá žena, ktorá povedala, že ju napadol Kozma, že ju chcel zabiť a že ju vyfackal a ide podať trestné oznámenie. Sadli do auta a keď vychádzali zo Štitár, Kozma sa prebral a začal kričať, že im dá peniaze, že si posral celý život, že ho vyhodia z roboty, potom začal nadávať, že ich vyzlečie z uniformy, že má na to ľudí. Išli na Obvodné oddelenie PZ na Chrenovú, Kozmu umiestnili do klietky pre zadržané osoby. Péliho umiestnili na miesto určené pre zadržaných a on išiel spracovať úradný záznam o predvedení a obmedzení osobnej slobody. Potom sa spýtal Péliho a Kozmu, či sú ochotní podrobiť sa dýchovej skúške. Kozma odmietol, k tomu spísal záznam. Nevedel uviesť ako sa Kozma dostal k zraneniam z obžaloby. Neprišiel s ním do kontaktu ani on ani Blaško. Kozmu sa pýtal, či si žiada lekárske ošetrenie v čase, keď ho priviezli na oddelenie PZ a išiel mu dávať fúkať. V úradnom zázname o použití donucovacích prostriedkov nešpecifikoval aké donucovacie prostriedky voči poškodenému použil, nevedel ako Kozma došiel k otrasu mozgu a k poškodeniam zdravia, ktoré sú uvedené v obžalobe. Nevidel, že by Blaško nejakým spôsobom udieral poškodeného. On Kozmovi len pridržiaval nohy, keď Blaško na ňom kľačal. Pri zákroku sám utrpel zranenia brucha a lakťa, bol ošetrený lekárom podobne ako obžalovaný Blaško. Kozma bol na ošetrení, lebo bola privolaná rýchla zdravotná pomoc, ale nevie z akého dôvodu. Na ošetrení s ním bol Chovanec. Nevedeli, že ide o príslušníka ZVJS. Počas tej výmeny názorov v bare im hodil čiernu peňaženku a vykrikoval, že je kolega, ale žiadnym spôsobom si to neoverili. Situáciu riešil Blaško slovne, že pokiaľ je kolega, tak sa má tak chovať. Nevolali nadriadeného, lebo sa tam strhla mela a nebol na to čas. Jeho totožnosť si neoverovali, pretože prišlo k roztržke medzi Blaškom a poškodeným. Služobný zákrok bol vyhodnotený ich priamym nadriadeným mjr. Bc. Milošom Tomkom. Nevidel, že by obžalovaný zaútočil na poškodeného v rozpore s pravidlami služobného zákroku, ale nebol po celý čas prítomný pri Blaškovi a Kozmovi, lebo spracovával administratívu. Nepočul, že by Blaško vulgárne nadával poškodenému, možno na neho zvýšil hlas, aby ho stímil.

Na odstránenie rozporov vo výpovedi svedka bola prečítaná jeho výpoveď z prípravného konania v súlade s ustanovením § 264 odsek 1 Trestného poriadku s ktorou sa stotožnil tak, ako ju uviedol v prípravnom konaní.

**Svedkyňa Denisa Lacová** na hlavnom pojednávaní uviedla, že policajtov do baru volala ona, lebo Péli ju a slečnu Csulákovú fyzicky napadol, ohľadne malého psíka, ktorého mali so sebou. Péli jej dal dve facky a slečne Csulákovej jednu, Kozma ju slovne atakoval ohľadne psíka a ohľadne toho, že nie je miestna, naháňal ju okolo stola a okolo auta, preto zavolala telefonicky policajtov. Policajti prišli a Blaškovi ukázala tých, s ktorými mala konflikt. Blaško pristúpil k stolu kde sedel Kozma, Kozma niečo vyložil na stôl a počula len, že povedal. „veď sme. kolegovia". Potom videla, ako sa Kozma na toho policajta zahnal dlaňou, videla, že sa policajt vykryl a automaticky chytil Kozmovi ruku, pokúšal sa mu ju dať za chrbát, Kozma spadol na zem a stiahol so sebou aj poháre. Kozma sa policajtovi vzpieral, videla, že sa dorezal a potom ho odviedli do auta. Do auta zobrali aj Péliho, ale ten sa nebránil. Kozmu ani Péliho predtým nepoznala. Ku konfliktu medzi nimi došlo kvôli šteniatku, ktoré mala v bare, lebo im začalo vadiť. Péli šteniatko hodil o zem, Csuláková prišla k nemu a on jej dal facku. Facku dostala aj ona, keď sa proti tomu ohradila. Fyzicky na ňu útočil Péli a slovne Kozma, preto zavolala policajtov. Policajti sa k ním správali kľudne, bez akéhokoľvek násilia. Kozma najprv sedel a vyložil niečo na stôl, policajti ich potom

zobrali preč, takže viac nič nevidela. Nepoznala ani Kozmu, ani Péliho, ale Blaško je jej bývalý spolužiak zo strednej školy. Trestné oznámenie podali na Péliho za fyzickú ujmu, dostal podmienku, súdne pojednávanie bolo v roku 2009.

Vzhľadom na rozpory vo výpovedi svedkyne bola prečítaná jej výpoveď z prípravného konania v súlade s ustanovením § 264 odsek 1 Trestného poriadku, rozpory svedkyňa vysvetlila časovým odstupom a zotrvala na výpovedi ako ju uviedla v prípravnom konaní.

Svedkyňa Mária Csuláková na hlavnom pojednávaní uviedla, že poškodeného poznala z dediny, Blaška nepoznala. V čase skutku bola v pohostinstve s Denisou Lacovou, Radkou Hrabecovou, Ivetou Billovou, Martinom Matušom, Tomášom Hrabecom, sedeli pri jednom stole, keď prišlo k hádke medzi nimi a Kozmom. Ona vtedy sedela chrbtom k poškodenému. Na základe toho incidentu bola privolaná hliadka PZ, ktorá po príchode vyzvala Kozmu, ktorý sedel s Pélim aby sa im preukázal občianskym preukazom čo odmietol so slovami, že sa nemusí preukazovať, lebo sú kolegovia a začala medzi nimi hádka o tie doklady. Videla, ako Kozma zodvihol ruku, jeden policajt ho za tú ruku chytil a snažil sa mu dať ruku za chrbát a nasadiť putá, pripojil sa druhý policajt, zvalili ho na stôl a potom spadli na zem, kde si Kozma na rozbitých pohároch dorezal tvár. Kozma padol tvárou na zem a policajti spadli na neho. Kozma mal porezanú tvár na pravej strane líca, policajti mu dali putá a odviedli ho do auta. Po konfrontácii s fotodokumentáciou zranení poškodeného sa svedkyňa opravila, že si iba myslela, že Kozma je porezaný, lebo videla krv. Nepočula, že by policajti vyzývali poškodeného k nejakej prehliadke, iba k tomu aby im ukázal občiansky preukaz. Nevidela, že by policajti na ňom vykonávali nejaké násilie. Po ich príchode im povedala, že Kozma napadol kamarátku, naháňal ju okolo stola a vyhrážal sa jej. Pre odstup času si viac nepamätala. Policajnú hliadku popísať nevedela, ale vie, že policajti neboli agresívni. Pred týmto incidentom nemala konflikt s Pélim ani s Kozmom.

Vzhľadom na rozpory vo výpovedi svedkyne bola prečítaná jej výpoveď z prípravného konania v súlade s ustanovením § 264 odsek 1 Trestného poriadku, rozpory svedkyňa vysvetlila časovým odstupom a zotrvala na výpovedi ako ju uviedla v prípravnom konaní.

Svedkyňa Jana Balková (rod. Mihalčinová) na hlavnom pojednávaní uviedla, že dátum si nepamätá, ale boli ako partia v Štitároch v krčme, pred nimi sedel Kozma, ktorého poznal jej manžel. Strhla sa tam slovná hádka medzi Kozmom a nejakými dievčatami, potom prišla polícia. Kozma bol zbitý políciou, odviedli ho na policajnú stanicu, išli za ním na políciu a chceli vypovedať, ale nepustili ich tam, bola tam aj manželka p. Kozmu. Kozmu neskôr odviezla sanitka a oni s partiou chceli vo veci svedčiť, bolo ich asi 8-9 na dvoch, alebo troch autách. Na políciu išli preto, lebo sa im to zdalo rozumné, že keď polícia niekoho zbije, aby išli na políciu. Policajti prišli dvaja, jeden bol aktívny a druhý tam postával. Policajt mal v ruke obušok, Kozma spadol z lavičky na zem, videla ako ho policajti držali, odvádzali k autu a natlačili do auta. Detaily si nepamätá, keď vypovedala prvý krát pamätala si viac aj obsah rozhovoru, pri konflikte sedela pomerne blízko. Kozma sa k policajtom správal normálne, sedela od neho asi 1 – 1,5 m. Nevidela žiadny fyzický útok poškodeného na policajta.

Vzhľadom na rozpory vo výpovedi svedkyne bola prečítaná jej výpoveď z prípravného konania v súlade s ustanovením § 264 odsek 1 Trestného poriadku, kde podrobne a rozsiahlo popísala konanie obžalovaného a poškodeného po príchode hliadky. Rozpory svedkyňa vysvetlila časovým odstupom a zotrvala na svojej výpovedi tak, ako ju uviedla v prípravnom konaní.

So súhlasom procesných strán boli podľa § 263 odsek 1 Trestného poriadku prečítané na hlavnom pojednávaní výpovede svedkov, ktorých osobný výsluch súd nepovažoval za potrebný.

Svedkyňa **Ing. Martina Kozmová** vo svojej výpovedi z prípravného konania uviedla, že dňa 13.07.2007 asi o 21:50 hodine jej telefonoval manžel Boris Kozma a prosil ju o pomoc, lebo ho bijú, celý je od krvi, stráca orientáciu, nevládze stáť na nohách a zobrali ho policajti. Povedal, že ho v bare zbili policajti a že má zatelefonovať do jeho roboty o pomoc. Potom sa spojenie prerušilo. Ona išla do baru Relax v Štitároch zistiť čo sa stalo. Tam jej Ladislav Péli, Ivan Brath a ešte nejaké mladé dievčatá, z ktorých vedela identifikovať iba Reginu Balkovú, povedali, že Borisa zbili policajti a asi ho odviedli na ošetrenie k lekárovi, lebo sa ho dožadoval. Potom zavolala do manželovej práce, kde veliteľovi, ktorý mal službu povedala to, čo sa dozvedela, že manžela zbili policajti a odviezli policajným autom. S kamarátkou Valériou Kurucovou išla na policajné oddelenie na Nábrežie mládeže v Nitre. Policajt pri okienku jej povedal, že manžel tam je, ale že ho nemôže vidieť ani ísť za ním, pretože bol zadržaný. Nedovolil jej ísť za ním ani napriek tomu, že povedala že je zranený a prosil ju o pomoc. Informátor jej povedal, že osloví vyšetrovateľa, ktorý jej dá bližšie informácie. Zostala teda čakať pri okienku. Manžel ju zrejme počul, tak na ňu zakričal, že či to je ona. Povedala že áno a manžel sa na kolenách vyklonil z dverí, ktoré boli za mrežami, padol na podlahu na ľavý bok a ešte sa asi pol metra vyplazil, bol strašne dobitý, mal spútané ruky za chrbtom, oblečenie aj tvár mal krvavé, tvár mal opuchnutú na ľavej strane tak, že mu nebolo vidieť ľavé oko. Kričal na ňu, aby mu zavolala záchranku, lebo nevidí a nevládze sa postaviť. Vzápätí ho ďalší policajt v čiernych maskáčoch oboma rukami schytil za ramená, pridvihol si ho nohou a dokopal ho za tie mrežové dvere. Ona tomu policajtovi povedala, že s ním tak nesmie jednať, že je to človek a že má byť ľudský. Nato jej on povedal, že je mu to jedno, že jej manžel je bachar a že mu na stole skoro dolámal kríže. Potom vyšiel informátor, telom toho policajta odtlačil do inej miestnosti a snažil sa ho upľudniť. Naliehala na informátora, že žiada pre manžela lekárske ošetrenie, načo jej povedal, že sanitku v žiadnom prípade nezavolá, ale ak manžel dá súhlas, tak ho odvezú hliadkou na ošetrenie do nemocnice. Potom prišiel ďalší policajt, ktorého žiadala, aby zabezpečil manželovi lekársku pomoc a on jej povedal, že manžel lekárske vyšetrenie odmietol. Ona mu na to povedala, že to chce počuť priamo od manžela, že odmieta lekárske vyšetrenie. Potom išli policajti za ním do cely a viac krát sa ho spýtali, či chce lekárske ošetrenie, načo on odpovedal, že samozrejme že chce. Vyšetrovateľ jej povedal, že manžel bude odvezený na ošetrenie, ale inou hliadkou, pretože s tou, ktorá ho zadržala na ošetrenie ísť nemôže. Mala prísť hliadka z Klokočiny. Čakala vo vestibule, ale nič sa nedialo, znervóznela a zavolala na číslo 155. Prišlo lekárske auto, lekára policajti odprevadili za manželom a znovu ju požiadali, aby opustila budovu. Lekár povedal, že bude nutné ošetrenie v nemocnici a potom videla ako manžela vyniesli na kresle, mal infúziu a jednu botasku mal vyzutú, keď k nemu pristúpila manžel ju nespoznal, iba kričal, že on nič neurobil. Potom ho naložili do sanitky a odviezli. Svedkyňa uviedla, že keď ju policajti prvý krát vykázali z budovy, boli tam nejakí mladí ľudia z ich dediny, spoznala Jozefa Menta, Tomáša Balka s priateľkou a Borisa Školáka. Títo sa rozprávali o tom, čo sa stalo v bare. Z ich rozhovoru zachytila, že nie je normálne, aby policajti tak surovo zbili Borisa. Čo sa v tom bare konkrétne stalo, to nespomenuli, len hovorili, že auto na ktorom došli policajti a na ktorom odviezli Borisa, bolo celé od krvi. Na jej otázku, či si zapamätali evidenčné číslo auta, jej Tomáš Balko povedal, že si ho zapísal do mobilu. Ona sa ho spýtala, či je to EČ: NR-614DB, ktoré si poznačila, keď nástupovali do neho tí dvaja policajti v maskáčoch, ktorí mali predviesť jej manžela. Na otázku vyšetrovateľa uviedla, že videla ten jeden útok policajta na jej manžela vtedy, keď sa vyplazil z dverí, iné útoky nevidela. Podrobnosti o incidente sa dozvedela od kamarátky Valérie, kým čakali na ošetrenie

manžela v nemocnici. Pri incidente Valéria nebola, ale dozvedela sa to od tých mladých ľudí, ktorí stáli pred budovou polície v tú noc. Svedkyňa sa o incidente dopočula, že dvaja policajti v čiernych maskáčoch na služobnom vozidle prišli pred bar v Štitároch, pristúpili s obuškami v ruke k stolu na terase, pri ktorom sedeli mladí ľudia, ktorí boli potom pred budovou polície. Policajti pristúpili k Pélimu a vyzvali ho aby išiel s nimi, na čo sa ozval jej manžel a žiadal od nich vysvetlenie, na čo jeden z policajtov reagoval krikom, že čo je jeho do toho. Manžel sa preukázal služobným preukazom príslušníka ZVJS a nahlas povedal svoje meno, a povedal, že je tiež príslušník. Potom došlo k slovnej potýčke medzi jej manželom a policajtom, pričom jeden z policajtov vyzval jej manžela, aby išiel tiež s nimi. Na otázku manžela, že na akom základe má ísť s nimi neodpovedali, iba ho naďalej vyzývali, že má ísť s nimi. Manžel odmietol a na to jeden z policajtov zareagoval tak, že buchol manžela obuškom zozadu do krku. Nato sa manžel otočil smerom k policajtovi a dostal päsťou do tváre, zvalil sa na zem, prevrhol stôl s pohármi a potom obaja policajti pristúpili k nemu, snažili sa mu dať ruky za chrbát a vyzývali ho, aby sa postavil a neustále ho udierali päsťami a kopali do neho, on mal ruky pod sebou a kryl si tvár. Potom ho zdvihli zo zeme, odviedli k vozidlu a nasadili mu na ruky putá a odviedli preč. Pritom sa manžel stále dožadoval lekárskeho ošetrenia, pretože krvácal. Nevedela sa vyjadriť, čo malo byť podnetom tohto konfliktu, o všetkom vedela iba sprostredkovane.

V ďalšej výpovedi svedkyňa uviedla, že zotrváva na svojej predchádzajúcej výpovedi. Na policajnej stanici došla do kontaktu s p. Blaškom, ktorého v tom čase nepoznala, avšak vedela že bol prítomný pri incidente, lebo jej to sám povedal na polícii. Keď prišla na políciu informovať sa čo je s jej manželom, p. Strapko jej povedal, že manžel je zadržaný za to, že v bare mal nejaký konflikt s dievčatami a za útok na verejného činiteľa. Ten policajt, ktorý brutálnym spôsobom dokopal manžela späť do cely napadol slovne aj ju. Z jeho slov vydedukovala, že to bol jeden z hliadky, ktorá manžela zadržala, nevšimla si však jeho identifikačné číslo, keď vyšší, tmavšej pleti, tmavé oči. Neskôr počas vyšetrovania vydedukovala, že sa jednalo o p. Blaška. K činnosti druhého policajta počas zásahu v bare sa nevedela vyjadriť a poznala ho len z rozprávania. K útoku policajta na policajnej stanici na jej manžela uviedla, že keď komunikovala so služobkonajúcim policajtom, mala výhľad do chodby cez mreže, začula manžela ako sa jej prihovára a volá o pomoc, hlas prichádzal z miestnosti, ktorá bola druhá za mrežami vľavo. Keď sa manžel vyplazil z dverí a povedal jej, aby mu privolala lekára, lebo nevidí, vybehol z prvých dverí policajt v čiernom, mal plnú výzbroj na páse, priskočil k manželovi s krikom čo si to dovoľuje a dva krát ho kopol do brucha, alebo hrudníka. Policajt mal na nohách čierne kanady. Chytil manžela za odev a ťahal ho do tých dverí späť. Celý čas na neho kričala, že nesmie do neho kopať. Potom ho zavrel do tej miestnosti a rozbehol sa k nej s krikom, či jej manžel mohol zaútočiť na neho. Došlo medzi nimi k slovnej roztržke a mala pocit, že keby neboli medzi nimi mreže, že by zaútočil aj na ňu. Potom prišli dvaja jeho kolegovia a odviedli ho preč. Z policajtov, ktorí boli na stanici si pamätala len toho jedného, z ktorého prejavu a slov vydedukovala, že bol aj v Štitároch. Úplne stratil sebakontrolu, lebo inak si jeho správanie vysvetliť nevedela.

Pri výsluchu dňa 22.06.2009 na otázku vyšetrovateľa, aby detailne popísala príslušníka PZ, ktorý mal dňa 13.07.2007 v priestoroch Obvodného oddelenia PZ Nitra fyzicky napadnúť jej manžela uviedla, že bol vyššej športovej postavy, tmavšej pleti, snedý, opálený, oválna tvár, tmavé oči, úplne nakrátko ostrihaný, bez fúzov a brady, bol oblečený v čiernom, vyzeral ako keby bol v maskáčoch, ale čiernej farby, na vrchu mal ešte čiernu vestu, jeho hodnosť si nevšimla, ani to, či mal menovku. Za opaskom mal zastrčený obušok, bol vyšší od nej, mohol mať okolo 180 cm, nevie sa vyjadriť, či by ho spoznala.

Dňa 23.06.2009 bola na KR PZ v Nitre vykonaná rekognícia osoby. Pri prvom opoznávaní svedkyňa Kozmová neoznačila žiadnu osobu spomedzi 5 figurantov a obžalovaného. Pri druhom opoznávaní svedkyňa uviedla, že žiada, aby vystúpila osoba

EXT BLASKO 017

s číslom 6 (obžalovaný), avšak uviedla, že si nie je na 100% istá, ale tá osoba s číslom 6 mala
k nemu najbližšie, ani podľa hlasu ho nedokázala na 100% určiť, čiže neoznačila s istotou
žiadnu z osôb.

Svedok **Patrik Földeši** pri výsluchu v prípravnom konaní uviedol, že dňa 13.07.2007
v čase okolo 22:00 hodiny bol v bare v Štitároch na Jeleneckej ulici, sedeli s kamarátmi pri
zadnom stole. K ich stolu prišli policajti, jeden z nich ukázal na Ladislava Péliho a spýtal sa
nejakej dievčiny, či to je on, tá povedala že nie, že ten, čo je mu chrbtom otočený. Potom
vyšší holohlavý policajt prišiel k Zoltánovi Pélimu, ktorý sedel pri vedľajšom stole a požiadal
ho, aby sa postavil a išiel s nimi. Boris Kozma, ktorý sedel s Pélim pri stole mu povedal, aby
nikam nešiel a spýtal sa policajta prečo ho chcú zobrať, túto otázku zopakoval asi tri krát.
Policajt znervóznel a zaútočil na Borisa takým spôsobom, že ho chytil a hodil na zem, začal
ho biť, búchať do hlavy, asi päť krát ho buchol do hlavy pästou, potom povedal tomu
druhému policajtovi, aby ho začal kopať a ten to aj urobil, začal ho kopať do rebier, nevedel
uviesť, koľko krát ho kopol. Potom ležiaceho Borisa policajti zdvihli zo zeme a videl krv. Išli
s ním k autu, hodili ho do auta, k autu išiel Boris ešte po svojich. Niekto zobral jeho telefón
a doklady, ktoré zostali na stole a podal ich Borisovi. Jeden z policajtov sa vrátil ešte pre
Zoltána Péliho, ktorý sedel pri vedľajšom stole a odviezli ich oboch preč. Svedok v bare sedel
tak, že všetko videl a keď policajti začali Borisa biť, tak sa postavil, aby to videl. Ten vyšší
policajt po tom, ako sa Boris Kozma zastal Péliho, mal konflikt s Borisom v tom zmysle, že
čo si myslí, že kto je a že nie je jeho kolega. Potom sa ten policajt z ničoho nič naštval
a zaútočil na Borisa, ktorý sedel na lavičke, policajt ho chytil za plecia a ťahal po lavičke dolu
na zem. Boris mu povedal, že chce lekára, lebo sa porezal na pohároch, ktoré predtým boli na
stole, zvalil ho medzi lavičku a plot a tam ho bil, búchal ho pästou do tváre asi 4 – 5 krát a ten
druhý policajt ho na jeho výzvu kopal do rebier, asi 3 krát. Boris sa nebránil, len ležal na
bruchu, zakrýval si tvár, nemohol sa zaháňať lebo policajti ho držali na zemi kolenom.
Nepočul, že by sa Boris predstavil, zaregistroval len, že hovorí policajtovi, že tu sú doklady,
pozrite sa. Počas celého rozhovoru mal Boris ruky na stole. Policajt bol na neho arogantný,
kričal na neho ale nevidel, že by sa Boris na policajta zahnal ani nezvyšoval na neho hlas.
Myslí si, že dôvodom útoku policajtov na Borisa bolo iba to, že sa ich spýtal, prečo chcú
zobrať Péliho. Keď policajti prišli do baru, nekontrolovali totožnosť nikoho, ani sa nepýtali čo
sa stalo, len išli rovno za ním. Boris Kozma porezanú ruku a z tváre mu tiekla krv, pri stole
zostala krvavá kaluž, ktorú barmanka zmyla. Policajti nemali žiadne zranenia a ani poškodené
oblečenie. Boris so Zolom mali trochu vypité. Prečo prišli policajti do baru nevie, iba počul že
nejaké dievča zavolalo na nich policajtov. Borisa Kozmu pozná len z dediny, nie sú kamaráti
ani sa nestretávajú, iba sa pozdravia. Zo zasahujúcich policajtov poznal toho holohlavého
vyššieho, ale iba z videnia, chodieval na diskotéky, ale jeho meno nevedel, druhého nepoznal.
Svedok sa pri výsluchu dňa 19.02.2009 pridržal svojej prechádzajúcej výpovede, uviedol, že
s odstupom času si detaily nepamätá, nevie prečo vznikol konflikt v bare, ani kto volal
policajtov. S Borisom Kozmom nesedel pri stole, ten sedel pri vedľajšom stole.

Svedok **Ladislav Péli** v prípravnom konaní uviedol, že dňa 13.07.2007 v čase okolo
20:30 hodiny bol v bare na Jeleneckej ulici v Štitároch, sedel na terase pri poslednom stole,
kde ich sedelo asi 10 až 12, bol otočený chrbtom k dianiu. Za jeho chrbtom sedel Boris
Kozma, Zoltán Péli, Marek Púchovský a pri úplne prvom stole sedeli nejaké dievčatá,
z ktorých poznal iba Máriu Csulákovú. Oni s partiou si nevšímali čo sa okolo nich deje,
všimol si iba nejakú hádku, ktorá sa odohrávala medzi spomínanou partiou a tým prvým
stolom, až po príchode policajtov si všimol, že sa niečo deje. Policajti prišli veľkou
rýchlosťou, lebo zaflekovali pred barom, utekali k nim a jeden z nich sa cestou jednej
z dievčat pýtal, že ktorý to bol. Boli oblečení v čiernom, ako na zásah, všimol si iba prvého,

EXT BLASKO 018

že držal v pravej ruke tomfu, pristúpil k nemu a spýtal sa toho dievčaťa, či to bol on, načo ona odpovedala že nie, že to bol ten o stôl bližšie. Pristúpil k Zoltánovi Pélimu, chytil ho za ruku a povedal mu že ho predvedie na stanicu. Boris Kozma sa spýtal úplne kľudne policajta, prečo chcú Péliho odviesť. Keď to policajt počul, zostal agresívny, začal na Borisa kričať, ako si to predstavuje, prečo sa ozýva a či má odviesť aj jeho. Boris svoju otázku zopakoval a ten policajt stále na neho kričal, či je on jeho kolega, Boris vytiahol peňaženku, položil na stôl, povedal že sa volá Boris Kozma a pracuje vo väzení, načo mu policajt povedal, že jeho to nezaujíma a zasa sa ho opakovane pýtal, či má predviesť aj jeho, doslova na neho vrešťal. Boris mu kľudným hlasom povedal, aby ho teda odviezli. Vzápätí ho ten policajt v amoku napadol, obušok pustil na zem a päsťou pravej ruky Borisa buchol do krku, zvalil sa na Borisa, chcel mu vykrútiť ruku, ako ho zvalil tak sa prevalili až na druhú stranu stola a pritom rozbili poháre a na tých pohároch sa Boris dorezal. Pýtal sa lekára a keď to policajt počul, začal ho udierať do hlavy asi 4-5 krát päsťou a potom prikázal druhému policajtovi, ktorý sa dovtedy len pozeral, aby Borisa kopol, ten ho začal kopať do rebier asi 4 krát. Potom mu nasadili putá a odviedli ho k autu, kde ho policajt silno buchol o auto, až tak že spravil kolenom preliačinu na zadnom blatníku. Ľudia keď to videli, kričali že treba Borisovi zobrať telefón a peňaženku, všetci sa zľakli policajtov a nikto tie veci nechcel zobrať, tak ich zobral on a dal Borisovi všetky jeho veci do vačku. Celý ľavý blatník bol od Borisovej krvi. Keď Borisa dávali do auta, policajt čo ho bil dal príkaz tomu menšiemu policajtovi, aby išiel pre Zoltána Péliho, dali ho do auta a odviezli ich preč. Asi o pol hodinu prišla jeho manželka, povedala, že jej telefonoval Boris zo stanice, že ho tam bijú a nech príde pre neho na stanicu. On potom odišiel domov. Čo sa týka toho, prečo prišli policajti do baru, uviedol, že keď si šiel zobrať do baru kofolu, jedno z tých dievčat (čiernovlasá) pri prvom stole telefonovalo, zdalo sa mu, že nevolala priamo 158, ale tomu policajtovi a tykala si s ním, ale nevie, prečo mu volala. Konflikt medzi Borisom a policajtom vznikol preto, že Boris povedal Zoltánovi Pélimu, že podľa zákona sa nemusí nechať predviesť, načo si Péli sadol späť a nič nepovedal. Boris sa viac krát spýtal policajtov, prečo chcú Péliho odviesť, ale nerobil policajtom žiadne problémy, iba sa pýtal. Policajt bol rozčúlený, asi tri krát sa spýtal Borisa, či má odviesť aj jeho, načo mu on kľudne odpovedal, že nech sa páči, tu sú moje doklady, predstavil sa menom aj priezviskom a povedal, že robí vo väznici. Zo strany policajtov nebola žiadna výzva v tom zmysle, že berú Borisa na policajnú stanicu, iba sa ho ten policajt viac krát spýtal, že či má zobrať aj jeho, načo mu nakoniec Boris povedal, že „nech sa páči, odveďte ma", potom ho policajt napadol, to bola asi príčina toho útoku policajta. Boris bol kľudný, policajt na neho kričal a ako kričal, bol nahnutý na neho a prskal na neho, Boris ho vtedy požiadal, aby na neho neprskal, avšak ruku nezdvihol, ruky mal položené na stole. Boris nekládol policajtovi žiaden odpor, ani vtedy, keď ho policajt bil, nevykrýval jeho údery, nemohol nič robiť, lebo policajt na ňom ležal, priľahol ho celým telom a pravú ruku mu chcel vykrútiť dozadu, ľavú mal priľahnutú. Celá bitka trvala asi 25 sekúnd a po ich odchode zostala na kameňoch kaluž krvi. Policajti nemali žiadne zranenia, nemali sa kde zraniť a nemali nič roztrhnuté ani poškodené, čo sa týka oblečenia. Či mal Boris vypité, to nevedel, nebolo to na ňom vidieť, mohol vypiť asi dve pivá aj to desiny. Viac piť nemohol, pretože keď chodí na auté nepije. Policajti s tými dievčatami ani nehovorili, tie počas bitky sedeli pri stole. On bol počas incidentu hneď vedľa, pretože sedel pri vedľajšom stole chrbtom a ako sa otočil, videl všetko, čo sa deje, bol svedkom celého incidentu, až pokým policajti neodišli preč. Borisa Kozmu pozná len z dediny z videnia, nie sú kamaráti a nie je s ním v žiadnom vzťahu ani príbuzenskom pomere. Čo sa týka policajtov, pozná iba toho vyššieho, ktorý celý čas komunikoval a napadol Borisa, robil s ním na krajskom úrade, kde brigádoval, pozná ho aj z diskoték, sem-tam sa porozprávali. Jeho konaním v bare bol prekvapený, nečakal to od neho. Takéto správanie policajtov ešte nezažil.

EXT-BLASKO 019

Svedok **Ivan Brath** v prípravnom konaní vypovedal, že v inkriminovaný deň bol v miestnom bare s partiou kamarátov, sedeli pri poslednom stole, pri predposlednom sedel Boris so Zolom. Pri úplne prvom stole sedela Mária Csuláková s kamarátkou, ktorú nepoznal. Medzi tými dvomi stolmi vznikla slovná hádka, ale nepoznal jej dôvod, nezaujímal sa o to. O 21:30 hodine prišla pred bar policajná hliadka, vystúpili dvaja policajti, mali v rukách tomfy a prišli na terasu medzi nich dozadu, teda medzi ich stôl a stôl, pri ktorom sedel Boris Kozma. Jeden z policajtov ho vyzval, aby išiel s ním, Boris sa ich spýtal, čo chcú robiť s tými tomfami a oni si ich na to schovali. Boris sa ich pýtal, na základe čoho ho chcú predviesť, ale oni mu na to neodpovedali, len ho viac krát vyzvali, aby išiel s nimi. Policajt sa ho spýtal kto je, na to Boris vytiahol z vrecka služobný preukaz a puzdro s dokladmi, položil ich na stôl. Policajti sa ho spýtali, či robí u nich, on im povedal svoje meno a priezvisko a povedal, že robí vo väznici. Potom sa policajt otočil na Zola a tiež mu povedal, aby išiel s nimi. Boris sa opakovane pýtal policajtov na základe čoho ich chcú predviesť. Policajt ho chytil pod pazuchu za pravú ruku, Boris sedel pri stole, ruky mal na stole. Policajt ho chcel podvihnúť, pritiahol ho k sebe, potom ho od seba odstrčil a spolu spadli cez lavicu a poháre na zem. Boris spadol na brucho, policajt ho pritlačil o zem a povedal mu, aby si dal ruky za chrbát. Boris sa opakovane pýtal, na základe čoho ho chcú predviesť, nato ho policajt udrel pästʼou do tváre. Potom sa Boris schúlil k zemi a povedal policajtom, že ho musia zobrať na ošetrenie. Ten policajt povedal tomu druhému policajtovi, aby ho kopol, čo tento aj urobil asi 3 – 4 krát do rebier zboku. Boris sa nijako nebránil, počas celého zákroku ležal na bruchu, potom ho policajti spútali, zdvihli a Boris po vlastných nohách prešiel k ich autu. Boris krvácal z nosa alebo z úst, krv bola pri stole, na ceste aj na policajnom aute. Policajti neboli vôbec zranení a ani nemali poškodené uniformy. Keď Borisa naložili do auta, druhý policajt išiel pre Zola, vyzval ho, aby išiel s ním a ten bez problémov išiel. Ani Boris nekládol žiaden odpor. Potom ich zobrali preč. Na celý incident dobre videl, lebo sedel pri vedľajšom stole tvárou k nim a tiež dobre počul, o čom sa Boris s policajtom rozprávali. Boris so Zolom mali pred sebou pivo, či však mali vypité nevedel. Boris sedel v kľude za stolom, iba sa pýtal policajtov a odpovedal im, nezahnal sa na policajta, ale policajt s ním jednal so zvýšeným hlasom. Nevedel sa vyjadriť čo bolo dôvodom toho, že tam prišla policajná hliadka, bol tam hluk, bolo tam minimálne 20 ľudí, nejaká hádka, ale on jej nevenoval pozornosť.

Svedkyňa **Jana Kasalová** v prípravnom konaní uviedla, že dňa 13.07.2007 bola v bare v Štitároch, sedela pri poslednom stole so svojím priateľom Ladislavom Pélim a ďalšími kamarátmi, pri vedľajšom stole sedel Boris, ktorého vtedy nepoznala, so strýkom jej priateľa Zolom a sedeli pri nich ešte nejakí starší páni, ktorých ona nepoznala. Pri prvom stole sedeli nejaké dievčatá, z ktorých poznala iba jednu z videnia. Potom začula ako sa hádali Zolo s Borisom s tými dievčatami. O nejaký čas prišli do baru policajti, ako vošli, jedno z dievčat ukázalo prstom na niekoho a ten policajt išiel rovno za jej priateľom, ale to dievča mu povedalo, že to nie je on, že ten druhý. Policajt išiel za Zolom, chytil ho za ruku a povedal mu aby šiel s ním, Boris sa spýtal že prečo má ísť s ním, na základe čoho, načo mu policajt povedal: „drž hubu". Boris sa opakovane pýtal, prečo chcú Zola zobrať, policajt potom prišiel k nim bližšie a začal na neho kričať, že kto je on. Boris mu povedal svoje meno a priezvisko a predložil mu doklady, ktoré si vybral z vrecka, zároveň povedal, že je bachar. Na otázku policajta, či je jeho kolega, Boris povedal že nie, len chce vedieť na základe čoho chcú Zola zobrať. Potom policajt vykrútil Borisovi ruku a stiahol ho na zem cez stôl, na ktorom sa porozbíjali poháre. Boris sa na nich porezal, kričal že je porezaný a žiada aby mu zavolali lekára. Ako policajt stiahol Borisa na zem, začal ho udierať pästʼou do tváre alebo do krku, potom mu povedal aby si dal ruky za chrbát, Boris mal ruky pred tvárou a ten policajt čo ho udieral povedal svojmu kolegovi, aby Borisa kopol, ten tak aj urobil asi 3 – 4 krát do rebier, potom mu policajti založili putá a zobrali k autu. Boris krvácal, jeho krv bola aj na zadných

dverách policajného auta, bola aj na mieste, kde ho zbili aj na ceste pri policajnom aute. Potom ten druhý policajt prišiel pre Zola, ten mu dobrovoľne dal ruky, policajt mu založil putá a nasadli do auta a odviezli ich preč. Potom asi za hodinu prišli ďalší policajti v civile a chceli nafotiť tú krv. Pýtali sa, kde sú tie zlomené lavičky, ale žiadne zlomené lavičky tam neboli. Potom sa Tomáš (jeho priezvisko nevedela)chcel toho policajta spýtať na ten útok, či môže tak policajt zaútočiť keď nevie čo sa stalo, ale ten policajt mu na to povedal, že sa s ním o tom nebude rozprávať pri pive a keď sa nám nepáči, môžeme ísť vypovedať na políciu. Ivan Brath ukázal policajtovi na ceste tú krv, ten hodil ramenom a odišiel preč. Potom aj oni išli na políciu do Nitry, pred policajnou stanicou už bola Borisova manželka s kamarátkou a tie im povedali, že ich nechcú pustiť dovnútra. Zazvonili pri dverách, prišiel nejaký policajt a povedali mu, že chcú ísť vypovedať, ten im povedal, že to si riadi vyšetrovateľ a zavrel dvere. Zostali vonku a Borisova žena zavolala sanitku. V ten večer vôbec nevypovedali ani si nenapísali ich kontaktné údaje. Svedkyňa uviedla, že niekto si na mobilný telefón natáčal celý incident, ako policajti v bare zasahovali. Keď čakali pred policajnou stanicou, videla tam policajné auto, na ktorom policajti odviezli Borisa a Zoľa, bolo celé od prachu, špinavé, ale na tom mieste pri dverách ako Boris nastupoval, bolo už umyté, toto Tomáš odfotil do svojho mobilu. Prečo prišli policajti do baru nevedela, asi preto že sa Boris so Zoľom hádali s tými dievčatami, jedno z tých dievčat vulgárne nadávalo Borisovi alebo Zoľovi a tí sa na tom smiali. Keď prišli policajti, boli už nahnevaní, ten vyšší mal v ruke obušok. Pristúpil najskôr k jej priateľovi a keď mu tá dievčina povedala, že to nie je on, odišiel k stolu, za ktorým sedel Boris so Zoľom. Ten menší policajt stál obďaleč a ten vyšší zastal pri Zoľovi a začal ho ťahať, že nech ide s ním. Policajti nekontrolovali totožnosť nikoho, len Boris vytiahol doklady, ale policajt si ich neskontroloval. Policajt, ktorý chcel odviesť Zoľa sa správal agresívne, už taký došiel, ani sa neopýtal čo sa stalo a pritom už keď tam prišli bola situácia upokojená, Boris so Zoľom sa s tými dievčatami už nerozprávali. Policajti napadli Borisa preto, že sa pýtal na to, z akého dôvodu chcú zobrať Zoľa, žiadny iný podnet im na to Boris nedal. Policajt vykrútil ruku Borisovi, stiahol ho na zem a začal ho udierať päsťou do hlavy, bolo to viac krát. Ten druhý policajt sa len prizeral a až na podnet prvého policajta začal Borisa kopať. Boris sa nijako nebránil, iba si dal ruky pred tvár, nekládol žiaden iný odpor. Vie, že Boris krvácal lebo kričal, že chce lekárske ošetrenie, ale či krvácal aj z nosa alebo úst, to nevedela. Policajti nemali žiadne zranenia, ani nemali mať aké, lebo Boris sa ich ani nechytil, oblečenie taktiež nemali poškodené, to vie naisto, lebo keď boli pri policajnej stanici, tak si ich poriadne obzreli keď išli okolo nich. Zoľo vyzeral opitý, ale Boris sa jej nezdal opitý. Policajti na Kozmu zaútočili bezdôvodne.

Svedok **Marián Barcsa** v prípravnom konaní vo svojej výpovedi uviedol, že dňa 13.07.2007 okolo 21:00 hodiny bol s kamarátmi v bare Relax v Štitároch, sedel vonku na terase pri poslednom stole vzadu. Pri vedľajšom stole sedel Boris Kozma s kamarátmi a bavil sa tam s nejakou dievčinou, ktorá sedela pri prvom stole na terase s kamarátkami, z ktorých poznal iba Mariku Csulákovú zo Štitár. Nevšímal si ich, takže sa k incidentu, ku ktorému malo dôjsť medzi Borisom Kozmom a tým dievčaťom nevie vyjadriť. Videl iba ako prišlo policajné auto a jedno z tých dievčat utekalo za policajtmi. Tí prišli k ich stolu, Laca Pélího sa pýtali, či to bol on, to dievča povedalo že nie on, ale ten o jeden stôl bližšie. Policajti sa postavili pri stôl, kde sedel Boris s kamarátmi, chceli zobrať jedného z nich, pritom nepovedali ani prečo má ísť s nimi, len prišiel k stolu a chcel ho zobrať. Boris sa ho opýtal, prečo ho chce zobrať, ten mu neodpovedal. Boris chcel ukázať svoje doklady, položil ich pred policajta, povedal ako sa volá celým menom a povedal, že je bachar. Policajt mu na to povedal: „vy čo ste môj kolega, alebo čo?" a vrieskal pritom na Borisa. Nevie presne či policajt najprv Borisa udrel, alebo sa len prevrátil cez lavičku, ale keď bol na zemi, začal Borisa biť päsťou do hlavy minimálne dva krát, lebo raz ho udrel zozadu do oblasti hlavy

a druhý krát keď sa Boris otočil, dostal úder do tváre. Pri tom páde sa Boris aj porezal, lebo sa rozbili nejaké poháre. Pýtal si lekárske ošetrenie. Ten menší policajt, ktorý dovtedy stál bokom Borisa začal kopať do rebier alebo do brucha, kopol ho určite aspoň tri krát. Potom ho zdvihli zo zeme a zobrali ho k autu. Niekto zdvihol zo zeme Borisove doklady a zobral mu ich k policajnému autu. Potom sa policajti vrátili po Borisovho kamaráta, ktorý stále sedel na lavičke, naložili ich oboch do auta. Oni potom večer spolu s kamarátmi išli na policajnú stanicu do Nitry, ale dovnútra ich nevpustili, potom prišla pre Borisa sanitka, ktorá ho odviezla a oni odišli preč. Potom ako policajti odviedli Borisa s jeho kamarátom, prišli do baru nejakí policajti fotiť a tí im povedali, že keď chcú, majú ísť na policajnú stanicu vypovedať, tak preto tam išli. Myslí si že policajtov do baru zavolala tá dievčina, oni si však ten incident nevšímali, pred príchodom policajtov sa nikto v bare nebil, ani si vzájomne vulgárne nenadával. Ten vyšší policajt sa s Borisom bavil stále zvýšeným hlasom, ten druhý s nikým nekomunikoval. Všetko to začalo na základe tej Borisovej otázky, že prečo chcú odviesť jeho kamaráta. Boris vôbec nezaútočil na policajta, celý čas mal ruky voľne položené na stole, keď už ležal na zemi a bili ho, on údery neopätoval, len tam ležal, nemykal so sebou. Svedok uviedol, že sedel tvárou k nim vo vzdialenosti dva metre, celý incident dobre videl, nikto mu nezakrýval výhľad. Nezdalo sa mu, žeby mali Boris so Zolom vypité. Zasahujúcich policajtov nepoznal, Borisa poznal iba z videnia z dediny. K zraneniam Borisa uviedol, že videl ako mu tiekla krv, bol krvavý na tvári, policajti zranení neboli a ani nemali poškodené oblečenie. Počas toho, čo policajt bil na zemi Borisa, Zolo iba sedel za stolom. Nevie, či policajti bili Borisa aj na stanici, ale keď išiel Boris zo Štitár, tak išiel po svojich a z policajnej stanice ho viezla sanitka.

Svedok **Jozef Ment** v prípravnom konaní vypovedal, že dňa 13.07.2007 okolo 21:15 hodiny bol v bare Relax v Štitároch na Jeleneckej ulici, sedel s kamarátmi pri zadnom stole, pri vedľajšom stole sedeli Boris Kozma, Marek Púchovský a Zolo. Policajti prišli s tomfami v rukách pri ich stôl, ani sa nepozdravili, nezisťovali čo sa stalo, len na nich drzo vyleteli a pýtali sa kamaráta Laca, či to bol on, oni povedali že nie a jedno dievča, čo predtým sedelo pri prvom stole pribehlo a ukázalo na Zola. Policajt k nemu drzo pristúpil a povedal mu, aby išiel s nimi. Boris Kozma sa policajta spýtal, na základe čoho ho predvádza, policajt mu povedal, že čo je jeho do toho a Kozma sa ešte ráz opýtal, prečo ho predvádza. V tom policajt stratil nervy, spýtal sa Borisa čo si o sebe myslí, že kto je on, nato mu Boris povedal svoje meno a priezvisko, vytiahol doklady, avšak policajt si doklady ani nepozrel, začal na Borisa kričať a zhodil ho z lavičky, na ktorej Boris sedel, pričom sa rozbili nejaké poháre, na ktorých si Boris pozeral ruku. Keď ležal na zemi, povedal policajtom, že je zranený, aby ho zobrali do nemocnice, policajt na neho zareval, aby držal hubu a trikrát ho udrel pasťou do hlavy a tomu druhému policajtovi povedal, aby ho kopol a ten ho 4 – krát kopol do rebier. Potom Borisa spútali, ruky mal pred sebou a odviedli ho do auta a ten druhý policajt sa vrátil pre Zola a odviedli ich. Boris z baru do auta odchádzal po vlastných nohách. Asi o pol hodinu išli na policajnú stanicu, kde chceli vypovedať, ale odmietli ich. Potom prišlo policajné auto, vystúpili z neho policajti, ktorí zbili Borisa, neboli nijako zranení a nemali ani roztrhaný odev. Asi o 10 minút Borisa odviezla sanitka na kresle, Boris nevnímal okolie. Na otázky vyšetrovateľa svedok uviedol, že nevedel na základe čoho prišli policajti do baru. Boris policajtov nijako neprovokoval, správal sa k nim kľudne, nezvyšoval hlas ani sa na nich nezaháňal. Nevie prečo policajt napadol Borisa, ten mu na ten útok nedal žiadny dôvod. Pri útoku dal policajt Borisovi úder do krku, stiahol ho na zem tak, že ho chytil za šaty a pred sebou ho tlačil po lavičke k zemi, kázal mu dať ruky dozadu, pričom kľačal na jeho chrbte. Boris ležal na bruchu, ruky mal pod sebou, nijakým spôsobom sa nebránil ani nereagoval na fyzický útok, len tak ležal. Potom mu policajt dal údery na tvár, prvý úder dostal na tvár tak ako bol vykrútený na policajta, potom si dal ruky na tvár, aby si ju chránil, potom ho ten

6T/97/2010

- 15 -

druhý policajt na pokyn toho prvého začal kopať. Svedok uviedol, že bol pri zadnom stole asi 2.5 – 3 metre od nich a stále stál, mal dobrý výhľad. Nevie, či mal Boris a Zolo vypité. Borisovi tiekla krv z úst aj z nosa, mal zranenú ruku, tiekla mu z nej krv. Potom ako ho odvážala sanitka Borisovi tiekla krv z úst, oči mal opuchnuté, aj celú tvár a hlavu, nevnímal okolie, šaty mal celé krvavé. Pri opätovnom výsluchu dňa 24.06.2009 svedok zotrval na svojej predchádzajúcej výpovedi a zopakoval, že policajti zaútočili bez príčiny, pretože Boris neprejavoval žiadnu agresivitu aj napriek tomu ho ten vyšší policajt ako prvý napadol. Nevie, či sa ten nižší policajt slovne zapájal, ale konal na základe toho, ako mu to nariadil jeho vyšší kolega a kopal do Borisa keď ležal na zemi. Borisa Kozmu poznal len tak, že je z dediny, policajtov vôbec nepoznal.

Svedok **Boris Školák** v prípravnom konaní uviedol, že dňa 13.07.2007 asi okolo 21:00 hodiny sedel pri poslednom stole na terase baru Relax v Štitároch spolu s kamarátmi. Nezaregistroval, že by sa medzi Borisom Kozmom alebo tým druhým chlapom, a tými dievčatami odohrala nejaká hádka alebo, že by napadli nejaké dievča. Videl, že prišla policajná hliadka, z auta vystúpili dvaja policajti a mali v rukách obušky. Pristúpili k ich stolu a pýtali sa, ktorý to bol, kto napadol tie dievčatá, oni im povedali, že o ničom nevedia. Potom dievča, ktoré on nepoznal, bola to kamarátka Csulákovej, povedalo policajtom, že to nie oni, ale tí čo sedia o stôl bližšie a ukázalo prstom na chlapa, čo sedel s Borisom Kozmom pri stole a volá sa Zolo. Bez akýchkoľvek otázok policajt chytil Zola a povedal mu, že má ísť nimi. Vtedy sa Kozma opýtal policajta, že na akom základe chcú zobrať Zola. Policajt sa podráždeným zvýšeným hlasom opýtal, že kto je on, načo Kozma vytiahol svoje doklady a povedal im, nech si ich pozrú. Policajt opätovne vyzval Zola, aby išiel s ním, Boris sa opakovane spýtal na akom základe ho chcú predviesť a policajt vtedy napadol Borisa Kozmu päsťou na krk, potom sa zvalili, policajt stiahol Borisa na stôl, pritlačil ho k stolu a zošmykli sa dole na zem. Pritom zo stola padali poháre a rozbili sa a Kozma si na nich poranil ruku, povedal policajtom že je zranený a že ho musia odviesť na ošetrenie. Pritom ho policajt ešte udieral päsťou do tváre asi 3 – 4 krát, a prikázal tomu druhému policajtovi, aby ho kopol smerom na brucho. Ten tak urobil a kopol ho asi 4 krát do brucha. Vtedy Borisovi nasadili putá a odviedli k autu, bez toho, že by si zobrali jeho doklady, ktoré im predtým predložil, ani si ich nepozreli. Boris stále opakoval, že ho musia zobrať do nemocnice, lebo je zranený. Potom sa ešte vrátili pre Zola, ktorý zostal sedieť pri stole a jeden z kamarátov vzal zo stola Borisove doklady a zaniesol mu ich k policajnému autu. Naložili oboch do auta a odišli preč. Ich služobné auto bolo na vodičovej strane nad zadným kolesom zakrvavené. Potom spolu s kamarátmi išli k policajnej stanici do Nitry, chceli vypovedať, ale nevpustili ich ani na chodbu a aj s Borisovou manželkou čakali vonku. Neskôr prišla zdravotná pomoc, ktorú zavolala Borisova manželka, tá išla ošetriť Borisa na policajnú stanicu a po asi 10 – 15 minútach vyniesli Borisa na vozíku celého dobitého s opuchmi tváre, dotrhaným tričkom, zaliatymi očami, pričom vravel manželke, že nič nevidí a naložili ho do sanitky. Potom s kamarátmi odišiel preč. Všetko toto videl na vlastné oči, aj čo sa týka toho incidentu medzi policajtmi a Borisom, bol pri vedľajšom stole a mal dobrý výhľad, lebo keď policajt napadol Borisa, on sa postavil, odstúpil od stola a pozeral sa na celú bitku zo vzdialenosti 2 – 3 metre, mal to priamo pred očami. Boris Kozma pri komunikácii s policajtmi sedel pri stole, ruky mal voľne položené na stole, rozprával sa s policajtom kľudne, keď potom policajt začal byť agresívny, Boris tiež mierne zvýšil hlas, ale stále kládol policajtovi tú istú otázku, že na základe čoho chcú Zola predviesť. Policajt nato však reagoval len protiotázkou na Borisa, že čo je on zač. Policajt ako prvý napadol Borisa úderom päste smerujúcej na krk, pri tomto údere sa Boris zvalil na stôl a policajt ho ešte pritlačil. Boris sa len bránil, nijakým spôsobom policajta nenapadol, ani po tom údere čo mu dal policajt. Príčinou toho prvého úderu bola podľa jeho názoru otázka Borisa smerujúca na policajta, že na akom základe predvádzajú

Zola. Policajt bol k Borisovi agresívny, udieral ho na tvár, pričom Boris si len kryl rukami tvár, jednu ruku mal pod sebou a tou druhou si kryl tvár. Policajt na neho stále kričal a Boris sa dožadoval lekárskeho ošetrenia, pretože je zranený, nato prišiel ten druhý policajt, a na výzvu svojho kolegu ho kopal do rebier, po tomto zostal Boris nehybne ležať. Potom ho policajti zdvihli, Boris sa stále dožadoval ošetrenia, lebo bol zranený. Policajti nemali žiadne zranenia, nemali mať prečo. Keď vynášali Borisa z policajnej stanice záchranári, bol totálne zbitý, celý krvavý, mal dotrhané tričko a veľmi ťažko hovoril, že nič nevidí. Čo sa týka Borisa, toho osobne nepoznal, stretával ho v Štitároch, neboli priatelia, Zola nepoznal skoro vôbec, vídaval ho len v bare. Policajtov taktiež nepoznal, videl ich prvý krát v živote. Policajt, ktorý napadol Borisa bol pevnejšej postavy, bol úplne vystrihaný, bol vyšší z nich. Druhý policajt, čo Borisa kopal, bol nižšej postavy, toho si nevšímal, nespomína si na neho, pripadal mu, že je z celej akcie prekvapený. Ten vyšší policajt bol agresívnejší, komunikoval s Borisom a začal ho biť. Ten druhý policajt sa počas celej akcie len prekvapene pozeral, až kým ho ten prvý policajt nevyzval, aby začal Borisa kopať. On bez akýchkoľvek námietok Borisa kopal, iným spôsobom sa do akcie nezapájal. Čo sa týka toho, z akého dôvodu policajti do baru prišli nevedel, bol vnútri v bare a vyšiel von na terasu práve vtedy keď prichádzali policajti, iba sa dopočul, že ich zavolala Csulákovej kamarátka. Pri príchode policajtov videl, že toto dievča s policajtmi prichádzalo, takže s nimi musela ísť už od auta. Pri opakovanom výsluchu dňa 24.06.2009 svedok zotrval na svojej predchádzajúcej výpovedi a vedel povedať k tomu iba toľko, že zásah policajtov bol bezdôvodný a neprimeraný.

Svedok **Zoltán Péli** v prípravnom konaní uviedol, že dňa 13.07.2007 v čase okolo 21:00 hodiny sedel spolu s Borisom Kozmom a Marekom Púchovským na terase baru Relax v Štitároch, mal vypité. Dve dievčatá Marika Csulláková s kamarátkou, ktorú on nepoznal ich provokovali, preto jednej z nich dal dve facky a druhej jednu. Niektoré z dievčat zavolalo políciu. Prišli dvaja policajti, podišli k ich stolu a chceli od nich preukazy, p. Kozma vytiahol služobný preukaz, položil ho na stôl a v tom momente ho začali mlátiť. Zbili ho a potom im nasadili putá a odviezli ich na policajnú stanicu do Nitry. Kozma si pýtal lekárske ošetrenie, čo mu však policajti odmietli. Povedali mu: „Ty špinavý bachar, ty si už skončil", nadávali mu. Keď prišli na policajnú stanicu, jeho priviazali o radiátor a zhasli svetlo na chodbe. Kam odviedli Borisa, to nevedel, či ho aj zbili, tiež nevedel, ale potom ho priviedli na chodbu, kde bol pripútaný aj on, takže bol od neho pripútaný asi 5 – 6 metrov. Keď Boris hovoril, že vidí trojmo, zavolal jeho manželke, bolo to o 22:.43 hodine, povedal jej, kde sa nachádzajú a aj to, že policajti odmietli Borisovi poskytnúť lekárske ošetrenie. Následne o 23:05 hodine zavolal na číslo 150 záchranku pre Borisa. (Vyšetrovateľovi pri výsluchu svedok predložil svoj mobilný telefón, tieto hovory sú v ňom zaznamenané). Potom ho zavreli do tej klietky, čo je tam na policajnej stanici, prišla záchranka a videl. ako následne Borisa tlačili na stoličke, bol napojený na infúziu. Čo sa týka incidentu v bare, k nemu policajti agresívni neboli. nevie z akého dôvodu napadli Borisa Kozmu, keď im predložil služobný preukaz, nevie, či na to mali nejaký osobný dôvod. Bola to sekunda, policajt napadol Borisa, prekotil ho cez lavicu. na ktorej sedel a začal ho mlátiť. Po príchode policajtov bol Boris kľudný, z jeho strany neboli žiadne narážky, ničím ich neprovokoval, nezaháňal sa rukami ani negestikuloval, jediný jeho pohyb bol len ten. že vytiahol z vrecka svoj služobný preukaz, inak mal ruky voľne položené na stole. Nepamätá si, či zo strany policajta zazneli nejaké výzvy smerom k nemu. V bare na terase bol v čase príchodu policajtov kľud, nikto sa s nikým nehádal ani nebil. ten incident, na základe ktorého dievčatá zavolali policajtov bol už urovnaný. Dievčatá sedeli za svojím stolom a oni za svojím, vôbec sa o ne nezaujímali. Policajti po príchode nezisťovali, na základe čoho boli privolaní, iba rovno prišli k nim. Policajt bil Borisa. kde ho zasiahol, mlátil ho hlava – nehlava, k jeho zraneniam sa nevedel vyjadriť, tiekla mu krv z nosa. Čo sa týka policajta, tomu nič nebolo. Boris po tom, ako ho jeden z policajtov stiahol

cez lavicu na zem, ležal na bruchu, alebo na boku, nijakým spôsobom sa nebránil, ani mu neopätoval údery. Videl, ako policajt na ňom kľačal a mlátil ho pästami. Ten druhý policajt tomu prvému pomáhal tak, že Borisa držal na zemi a možno ho aj kopol do rebier. Nevedel, ako vyzeral ten policajt, čo bil Borisa, nevie opísať ani toho druhého, nepoznal ich. Nevedel koľko tá bitka trvala, ale skončilo sa to tak, že mu nasadili putá a odviedli ho k autu. On počas bitky sedel len za stolom, ani sa nepohol, potom ako odviedli k autu Borisa, prišli aj po neho á odviedli aj jeho. V čase, keď policajti napadli Borisa, sedeli pri stole iba on s Borisom, Marek Púchovský bol na WC a zobrať v bare pivo. Čo sa týka toho, či mal vypité, uviedol, že v bare si dal dve pivá a dve vodky a pil aj cez deň. Boris pred tým ako prišiel do baru nepil, lebo jazdil na aute a v bare si dal dva koňaky a dve malé pivá, nebol opitý. Keď ich s Borisom policajti posadili do auta, Boris sa opätovne domáhal lekárskeho ošetrenia, nato mu ten policajt, ktorý šoféroval, ten istý, čo ho mlátil, povedal, aby držal hubu, že je špinavý bachar. Zo strany Borisa neboli žiadne vyhrážky voči policajtom. Po príchode na policajnú stanicu jeho priviazali o radiátor na chodbe, zhasli svetlo na chodbe. Kde odviedli Borisa, to nevedel. Trvalo to asi 5 – 10 minút, potom Borisa dovliekli taktiež na chodbu a priviazali ho asi 5 – 6 metrov od neho. Z auta vystúpili spolu, ale kde Borisa odviedli nevedel, ale keď ho priviedli na chodbu, vyzeral ako dobitý človek, bol krvavý akurát, čo mu rozbili nos. Nevedel či Boris alebo policajti mali nejako poškodený odev. Boris bol pri predvádzaní na oddelenie kľudný, poslúchal všetky výzvy od policajtov, nevzpieral sa. Policajti ich hneď pri aute prehliadli, museli si všetko vyložiť z vreciek, všetky svoje veci mal on potom pred sebou na stoličke. Čo sa týka Borisa, k tomu sa vyjadriť nevie. Na polícii jeho zavreli do klietky, potom prišiel vyšetrovateľ, dal mu fúkať a povedal, že keď nafúka, nemôže vypovedať. Na neho policajti nekričali, ani ho nebili. Čo sa týka Borisa, k tomu sa vyjadriť nevedel, toho zobrala záchranka. Čo sa na tej chodbe, kde zostal Boris Kozma priviazaný udialo nevedel, lebo jeho medzitým dali do klietky, čo sa odohrávalo ďalej, nevedel. Čo sa týka incidentu s tými dievčatami, presne si naň nespomínal. Tie dievčatá mali tiež vypité. Csuláková povedala, že keď dostala do basy jedného, tak dostane aj druhého. Nevie však, či to bolo adresované jemu, alebo Borisovi. Toto ho vyprovokovalo a preto im dal facky. Boris sa to tohto incidentu zapletol preto, lebo tie dievčatá urážali jeho ženu.

Svedok **František Barnáš** v prípravnom konaní uviedol, že na dátum si presne nespomína, vie že mal nočnú službu od 22:00 hodiny do nasledujúceho rána do 06:00 hodiny so psovodom na Mostnej ulici. Keď prišiel na oddelenie asi o 21:45 hodine, už bol Kozma v klietke. On potom so psovodom odišiel slúžiť pešiu hliadku na Mostnú ulicu. Okolo polnoci ich operačný stiahol z Mostnej ulice do Fakultnej nemocnice v Nitre, kde mali Kozmu strážiť, lebo bol hospitalizovaný v nemocnici. Keď pred službou prišiel na oddelenie, videl v klietke Kozmu, pýtal sa kolegu prečo tam je, ten mu povedal že za útok na verejného činiteľa, viac sa o to nezaujímal, s Kozmom neprišiel do kontaktu. Kozma v nemocnici hral mŕtveho chrobáka. Nevie o tom, že by niektorý z jeho kolegov napadol Kozmu, vie, že Kozma napadol ich hliadku. Vlado Blaško mal na uniforme roztrhané vrecko. Obaja kolegovia, Vlado aj Mišo boli na lekárskom ošetrení, lebo jeden z nich sa sťažoval na nejaké rebrá, alebo brucho a druhý mal niečo s rukou, mal tam spadnúť na nejaký stôl. Meno Kozmu si pamätá preto, lebo ho bol v nemocnici strážiť, tvár si nepamätal. Vlado Chovanec, psovod, s ktorým vtedy slúžil mu povedal o Kozmovi, že je bachar v ženskej väznici a keď si vypije, je agresívny hlupák. Ku Kozmovým zraneniam sa vyjadriť nevedel, lebo ho poriadne ani nevidel.

Svedok **MUDr. Miloš Gašparovič** v prípravnom konaní uviedol, že presný dátum si nepamätá, bolo to vo večerných hodinách, vykonával službu rýchlej lekárskej pomoci a ako sestra vtedy bola s ním p. Kováčiková. Dispečingom boli vyslaní na výjazd, pričom nemali bližšie špecifikované o koho sa jednalo, ani o aký stav sa jednalo, len dostali adresu policajnej

stanice na Nábreží mládeže v Nitre. Pri ich príchode poškodená osoba bola v polosede na zemi na chodbe. Ten človek bol opretý o stenu v prítomnosti policajta. Poškodený mal krvnú podliatinu pod okom, opuch sa zväčšoval a sťažoval sa na bolesť brucha a dolnej končatiny, lebo jednu mal vystretú a druhú pokrčenú v kolene. V rámci medicínskeho procesu prebehla kontrola vitálnych funkcií, čiže kontrola tlaku, pulzu, saturácie krvi kyslíkom, kontrola zraku, bola mu podaná infúzia a nejaké analgetikum od bolesti. Následne ho previezli do nemocnice v sprievode policajta na traumatologické oddelenie. Keď pacienta ošetroval, tento neustále opakoval, že bol napadnutý, resp. zbitý a že sa aj legitimoval ako príslušník ZVJS. Policajt, ktorý bol pri poškodenom pacientovi na obvodnom oddelení im nejako do vyšetrovacieho procesu nezasahoval, neregistroval, že by sa nejako hrubo alebo urážlivo správal voči pacientovi. Potom tam pribehla jeho manželka. Ako ho vynášali von, bola tam väčšia skupina ľudí a poškodený tejto pani hovoril, kde sa nachádzajú kľúče, alebo mobil. Pacient bol prevezený do nemocnice s podozrením na pomliaždenie okolia oka a hlavy, potom nejaké vnútro brušné poranenia, ktoré sa nedalo pri vonkajšom ošetrení špecifikovať. Ako ho dvíhali, museli ho podopierať, išiel na sedačku. Pacient vysvetlil iba, že bol napadnutý policajtmi, bližšie okolnosti nevysvetľoval, ani neoznačil policajtov, ktorí to mali byť. Pacient neudával presne, či bol napadnutý aj v čase keď už bol na policajnej stanici, spomínal nejaký bar alebo krčmu, že policajti, ktorí tam prišli ho napadli. Čo sa týka jeho zranení, opuch okolo oka bol čerstvý, to zranenie mohlo vzniknúť tupým predmetom, možno úderom, to oko nekrvácalo, len bolo masívne opuchnuté.

Svedok **Marián Soviš** v prípravnom konaní uviedol, že na dátum si nespomína, bolo to cez leto, vo večerných hodinách sedel v bare Relax v Štitároch spolu s kamarátmi. Vznikla tam roztržka medzi Kozmom, Pélim a nejakými dievčatami. Išlo o slovnú roztržku, nevidel, že by sa tam niekto bil. Jedno z tých dievčat zavolalo policajtov. Pamätal si, že z úst jedného z tých dievčat padli slová, že jedného chlapa už do basy dostala a môže dostať aj jeho. Asi o 5 – 10 minút prišli policajti a prišli k ich stolu, pýtali sa dievčat, ktorý to je, tie ukázali smerom na ich stôl. Nepamätal si, či tomu predchádzal aj nejaký rozhovor, pamätal si, ako jeden z tých policajtov, ten vyšší, stál pri stole, ten nižší policajt stál vedľa neho, a hovoril p. Kozmovi, že pôjde s nimi. Kozma sa snažil zistiť od nich, na základe čoho má ísť s nimi a hodil aj nejaké doklady na stôl, policajti si tie doklady nevšímali. Potom sa tam viac krát zopakovali slová, že Kozma pôjde s nimi a on sa zasa niekoľko krát opýtal, na základe čoho má ísť s nimi. Potom sa tam strhla tá bitka. Nevedel ako to začalo, zaregistroval len, ako sa prevalili cez stôl na druhú stranu stola na zem. Ten vyšší policajt bol vlastne tak, že Kozma bol na zemi a on bol nejako nad ním, vyzeralo to ako keby kľačal nad ním. Ten policajt ho pár krát udrel päsťou do hlavy, potom si pamätal ako Kozma hovoril, že ho porezal. Potom sa mu ten vyšší policajt snažil nasadiť putá a z nejakého dôvodu povedal tomu nižšiemu policajtovi, aby ho kopal. Ten ho potom kopol viac ako raz do oblasti rebier. Potom mu policajti dali putá, zdvihli ho zo zeme a odviedli k autu, kde stál chvíľu opretý. Musel byť o auto opretý, lebo na aute boli stopy krvi. Potom aj Pélimu dali putá a naložili ho do auta a odišli preč. Nevedel čo tomu incidentu predchádzalo, ani ako sa Kozma s tým policajtom zvalili na zem, iba zaregistroval, ako sa na zem už valia. Nepamätal si pred týmto zvalením žiadne výzvy policajtov. Kozma s policajtmi komunikoval kľudne, nebol agresívny, skôr ten vyšší policajt pôsobil agresívnym dojmom. Došiel tam ako najväčší frajer. On sedel chrbtom ku Kozmovi, nepozeral na nich celý čas, len sa raz za čas smerom k nim otočil. Potom ako sa oni zvalili na zem, sa postavili a sledovali už celý incident. Keď spadli na zem Kozma bol na bruchu a kryl si hlavu rukami, zo strany toho policajta hneď nasledovali údery päsťou do oblasti hlavy Kozmu, tých úderov bolo viac, Kozma sa len kryl, iným spôsobom sa nebránil. Potom ten policajt prikázal tomu nižšiemu kolegovi, aby ho kopol, ten jeho výzvu uposlúchol, kopol ho do oblasti rebier. Potom Kozmovi nasadili putá, zdvihli ho a odviedli k autu, ktoré mali

zaparkované na ulici. Policajtov ktorí tam zasahovali nepoznal, iba si pamätal, že jeden bol vyšší a druhý nižší. Aktívnejší a agresívnejší bol ten vyšší, ten druhý len sledoval situáciu a po príkaze kolegu kopol Kozmu. Toho nižšieho si vôbec nevedel vybaviť, ten vyšší bol mladší, mohol mať do 30 rokov. Borisa Kozmu poznal z videnia z baru, osobne ho nepoznal. Nevidel, že by policajti mali nejaké zranenia, ani roztrhané uniformy.

Svedok **Jozef Szórád** v prípravnom konaní uviedol, že v tom čase bol v bare Relax v Štitároch, sedeli vonku na terase, kde sú 4 stoly a každý stôl má dve lavice. Sedel s kamarátmi Lacom Pélim, Tomášom Balkom, Mariánom Sovišom, s priateľkou Jankou a Ivanom Brathom pri poslednom stole. Vedľa ich stola sedel Marek Púchovský s otcom, Zoltánom Pélim a Borisom Kozmom. Pri prvom stole sedela Marika Csuláková s nejakými kamarátkami. Zoltán Péli a tie dievčatá sa medzi sebou pohádali, do tej hádky sa pridal aj Boris Kozma. Potom Zoltán Péli dal facku najprv jednej z nich a potom dal facku aj Csulákovej. Predtým ešte jedna dievčina, ktorú on nepoznal, volala policajtov, ktorí prišli asi 10 minút na to. On bol v tom čase vo vnútri v bare pri výčape, videl policajtov vchádzať do dvora s pelendrekmi v ruke. Išli hneď smerom na terasu, lebo dievčatá ich vonku čakali. Čo sa dialo po príchode policajtov na terasu nevedel, keď sa vrátil na terasu, videl ako jeden z policajtov kľačal na Borisovi Kozmovi, ktorý ležal tvárou k zemi a ruky mal pod hlavou, nejako pod sebou, ležal na bruchu. Policajt mu kázal založiť si ruky za chrbát, čo Boris hneď neposlúchol a dostal päsťou do temena. Boris krvácal a vravel tomu policajtovi, že teraz ho musí odviesť na ošetrenie do nemocnice. Druhý policajt len sledoval situáciu. V čase keď on incident sledoval, nevidel, že by sa ten druhý policajt do toho zapájal. Keď Borisovi nasadili putá, odviedli ho k autu, tam na neho ten policajt stále kričal, nech je ticho. Ten druhý policajt potom išiel na príkaz svojho kolegu pre Zoltána Péliho. Ešte sa ten policajt pýtal toho druhého, prečo nezaložil putá aj Zoltánovi Pélimu. Zolo išiel dobrovoľne. Potom ich oboch policajti odviezli. Čo sa týka zasahujúcich policajtov, jeden bol vyšší, druhý nižší. Ten vyšší policajt na zemi bil Borisa Kozmu, ten nižší sa len prizeral. Boris Kozma krvácal, aj policajné auto bolo od krvi. Policajti nemali žiadne viditeľné zranenia. Tých policajtov nepoznal, Borisa Kozmu poznal, hrávali spolu futbal na dedine. Ešte čo sa incidentu týka, na začiatku tam nebol, bol vnútri v bare, ten vyšší policajt bol agresívnejší, Kozma voči policajtom agresívny nebol. Ten nižší policajt pomohol postaviť Borisa Kozmu, nevidel, že by sa nejakým spôsobom do toho zapájal. Dozvedel sa, že niekto ten incident točil aj na mobilný telefón asi Jožo Fehér.

Svedkyňa **Regína Balková** v prípravnom konaní uviedla, že dňa 13.07.2007 sedela pred barom Relax v Štitároch. Nevidela hádku, ktorá mala byť medzi Kozmom a Denisou, nevenovala tomu pozornosť. Potom videla ako Denisa vybehla s telefónom v ruke na ulicu a niekam telefonovala, ale nepočula čo hovorila do telefónu. O nejakých 15 – 20 minút prišla policajná hliadka a Denisa hneď utekala za nimi a išla s nimi dozadu na terasu. Po príchode policajtov sa začala zaujímať o to, čo sa vlastne deje, tak sa postavila a išla sa pozrieť na terasu. Policajti boli dvaja, jeden vyšší, jeden nižší. Ten vyšší išiel za Ivanom Brathom, chytil ho za plece, pričom Denisa vykríkla, že to nie je on, že ten o stôl ďalej. Policajti sa presunuli k stolu, kde sedel Boris Kozma a Zoltán Péli, sedeli tam ešte dvaja alebo traja starší páni, ale nevedela kto to bol. Ten vyšší policajt povedal Pélimu, aby išiel s nimi, Péli sa postavil, že ide, medzitým sa p. Kozma opýtal, na základe čoho ho berú. Ten vyšší policajt sa ho spýtal, kto je, tak Boris Kozma vytiahol peňaženku s dokladmi a povedal, že patrí do justičnej stráže. Ten vysoký policajt začal na neho kričať, že či on je jeho kolega, zopakoval to asi 3 – 4 krát a potom udrel Borisa päsťou do tváre. Boris sa nijako nebránil, ani slovne, ani fyzicky. Potom policajt Borisa sotil tak, že popadali poháre zo stola a rozbili sa. Sácal ho dovtedy, kým ho úplne nevytlačil až na zem. Keď bol Boris na zemi, bol schúlený na boku, ten vysoký policajt

si nad neho kvokol a začal ho päsťou udierať do tváre, potom sa ten policajt postavil, Boris bol stále na zemi a ten vyšší policajt povedal tomu nižšiemu policajtovi, aby ho začal kopať. Nižší povedal že nie a ten vysoký mu povedal, nech robí čo mu hovorí, tak ten nižší Borisa niekoľko krát kopol medzi rebrá. Nakoniec ho zdvihli a brali do auta, Boris bol celý krvavý, pretože sa porezal na porozbíjaných pohároch. Opreli ho o auto, kopli do oboch nôh, nech sa rozkročí. Vzadu na strane vodiča boli dvere špinavé od krvi. Potom Borisa dali do auta a išli pre Péliho, ten s nimi išiel dobrovoľne. Keď prišli policajti k stolu, kde sedel Zoltán Péli s Borisom Kozmom, povedali Pélimu, že pôjde s nimi. Kozma sa len spýtal na dôvod, prečo ho chcú predviesť, povedal to normálnym hlasom, nezvyšoval hlas. nevidela, že by nejakým fyzickým spôsobom bránil policajtom zobrať Péliho. Ten policajt začal kričať a následne biť Borisa iba preto, že sa spýtal na dôvod, prečo chcú Péliho zobrať. Žiadny podnet Boris Kozma nedal policajtovi na to, aby na neho fyzicky zaútočil. Policajt udieral Borisa päsťou do tváre, resp. do hlavy, bolo to viac krát. Ten druhý policajt nerobil nič, pokiaľ mu ten prvý neprikázal, aby začal Borisa kopať. Na policajtoch, najmä na tom vyššom, bolo vidno hneď po príchode, že je agresívny, išiel ako najväčší frajer. Boris bol kľudný, iba sa s nimi rozprával, ani slovne ani fyzicky ich nenapádal. Policajtov nepoznala, nikdy predtým ich nevidela. Borisa Kozmu poznala, ale nie dobre. Po tomto incidente mal Boris Kozma porezané ruky od skla, na tvári mu nebolo nič vidieť, pokiaľ ho odvádzali do auta, nevedela či mu z nosa tiekla krv. Policajti nemali žiadne zranenia ani poškodené uniformy. Vie o tom, že tento incident mal byť niekým natočený na mobilný telefón. Pri zásahu bol dominantnejší ten vyšší policajt, ten nižší nerobil skoro nič, len stál pri tom druhom a pozoroval. Boris nedal žiadnu zámienku na to, aby ho policajt napadol, ten policajt ho napadol bezdôvodne.

Svedkyňa **Katarína Ottingerová** v prípravnom konaní vypovedala, že v deň, keď sa incident stal, išla za kamarátkami do baru Relax v Štitároch, kamaráti tam už sedeli, ona do baru prichádzala až vtedy, keď tam bola hliadka a niečo riešila. Vošla do baru a keď vyšla von, policajti už niekoho viedli preč. Čo sa tam stalo sa následne dozvedela od ostatných, videla, že ten človek, ktorého viedli bol zakrvavený. Žiadny incident však nevidela a ani nevedela z akého dôvodu prišli policajti do baru. Vtedy nevedela, kto bol ten človek, čo ho odvádzali policajti, ale od ostatných sa dozvedela, že to bol Boris Kozma, ktorého poznala z dediny. Policajti normálne viedli Borisa do auta a išli preč. Niečo si vzájomne vykrikovali Kozma s tým vyšším policajtom, druhý policajt sa do komunikácie nezapájal. Ona osobne nevidela, že by niektorý z policajtov Borisa Kozmu bil či už pri tom, ako ho predvádzali do auta, alebo potom ako ho usadili do auta. Boris sa nijako nebránil, keď ho zbadala, mal dolu hlavu, fyzicky sa nebránil, skôr možno slovne. Ako reagoval nižší policajt, to si nevšímala.

Svedok **Marek Púchovský** v prípravnom konaní uviedol, že nevie presne kedy sa to stalo, bolo to v bare Relax v Štitároch, sedel vonku na lavičke, došlo tam k slovnej výmene názorov medzi Borisom Kozmom a Csulákovou. Potom sa to utíšilo, išiel dovnútra a zobral ešte po jednom pive chlapcom, vnútri sa zdržal, lebo sa rozprával s barmankou. Ako sa pozrel von, videl že policajti odnášajú Borisa Kozmu do auta. Nevie, na základe čoho policajti prišli. Keď bol vnútri v bare nepočul, že by sa vonku niečo dialo, hrala tam hlasná hudba. Keď vyšiel von, opýtal sa chlapcov, čo sa stalo, podľa ich reči sa dozvedel, že policajt zbil Borisa. V ten deň, keď sa to stalo, on spolu s otcom a Zoltánom Pélim robili celý deň krov u Zoltána Péliho, navečer prišiel Boris a spolu s ním išli do toho baru. sedeli vonku pri stole on, vedľa neho jeho otec, alebo Zolo a tiež tam sedel Boris. O celom incidente nič nevedel.

Na hlavnom pojednávaní vykonal súd dokazovanie aj prečítaním znaleckého posudku v súlade s ustanovením § 268 odsek 2 Trestného poriadku.

EXT BLASKO 028

Zo záverov **Znaleckého posudku číslo 17/2007** vypracovaného znalcom MUDr. Jánom Zelenákom z odboru zdravotníctvo a farmácia, odvetvie chirurgia a traumatológia, zo dňa 30.09.2007 vyplynulo že poškodený dňa 13.07.2007 v bare Relax utrpel otras mozgu, pomliaždenie tváre v oblasti ľavého oka s podkožným krvným výronom, zlomeninu nosových kostičiek, podvrtnutie krčnej chrbtice, pomliaždenie prednej brušnej steny vľavo, pomliaždenie oboch zápästí, čiastočné poškodenie senzitívnych nervových vlákien pravého vretenného nervu v oblasti predlaktia, k zraneniam poškodeného došlo v dôsledku tupého úrazového mechanizmu a boli spôsobené tupým zraňujúcim predmetom pri použití tlaku, ťahu a nárazu, znalec pripustil možnosť, že k zraneniam mohlo dôjsť spôsobom ako to popísal poškodený a zároveň k zraneniam senzitívnych nervových vlákien pravého vretenného nervu v oblasti predlaktia mohlo dôjsť aj použitím donucovacích prostriedkov. K prípadným trvalým následkom zranení by sa bolo možné vyjadriť až po uplynutí jedného roka od poranenia. Poškodený po poranení trpel bolesťami hlavy štyri týždne, užíval lieky proti bolesti, tri týždne sa nevedel rozpamätať na udalosti, sústrediť sa na akúkoľvek činnosť, pociťoval nespavosť, nevoľnosť a závraty, dva týždne pociťoval bolesti krku, prednej brušnej steny a zápästí, trpel poruchou vyprázdňovania a pociťoval poruchy kožnej citlivosti na chrbte pravej ruky. Doba liečenia od 14.07.2007 do 14.08.2007 je primeraná prekonaným poraneniam.

Podľa § 269 Trestného poriadku súd na hlavnom pojednávaní oboznámil prečítaním listinné dôkazy, nachádzajúce sa v spise.

V súvislosti s neprítomnosťou **obžalovaného Vladimíra Blaška** na území Slovenskej republiky počas hlavného pojednávania si súd zabezpečoval informácie o jeho pobyte v zahraničí aj v súčinnosti s Vojenskou obvodovou prokuratúrou. Z **odpovede** na žiadosť o poskytnutie informácie ohľadom Vladimíra Blaška z Veľvyslanectva Kanady zo dňa 29.09.2010 bolo zistené, že v súlade s kanadským Zákonom o ochrane informácií, nemôže súdu zastupiteľský úrad poskytnúť žiadne informácie o vízach, pobyte či pohybe osôb.

Zo **správy Vojenskej obvodnej prokuratúry** Bratislava 3 bolo zistené, že obžalovaný Vladimír Blaško doterajšie vlastné trvalé bydlisko na adrese Nitra, Martinská ulica č.1 zrušil, pričom nie je evidovaný v žiadnej inej pobytovej evidencii. Pri previerkach jeho pobytu u jeho rodinných príslušníkov bolo zistené, že sa nezdržiava na území SR, ale so svojou priateľkou sa má zdržiavať v USA v časti Kalifornia v meste Fresno, avšak bez uvedenia bližšej adresy. Žiadnymi inými lustráciami v dostupných evidenciách sa jeho súčasný pobyt zistiť nepodarilo. Veľvyslanectvá USA a Kanady neposkytli na žiadosť o súčinnosť žiadne informácie ohľadom pobytu Vladimír Blaška na ich území.

Podľa **správy Ministerstva vnútra SR**, Sekcia VS, odbor VVS, oddelenie matrík a hlásenia pobytu, osobitná matrika, žiadny sobáš Vladimíra Blaška nie je registrovaný v osobitnej matrike.

Zo **správy Ministerstva vnútra SR**, Sekcia kontroly a inšpekčnej služby zo dňa 21.06.2010 bolo zistené, že vykonané pokusy o predvedenie osoby Vladimíra Blaška boli bezúspešné, opätovne boli vyťažení jeho rodičia, ktorí uviedli že ich syn je mimo územia SR a nachádza sa v USA, jeho presnú adresu nevedeli. Synovi zrušili doterajšie trvalé bydlisko na adrese Nitra, Martinská č. 1. V systéme REGOB boli tieto informácie potvrdené, trvalý pobyt mal zrušený a mal hlásený pobyt bezdomovca s miestom Nitra, bez udania ulice alebo presného miesta pobytu. Na základe zistených okolností bolo na žiadosť vyšetrovateľa Sekcie kontroly a inšpekčnej služby po Vladimírovi Blaškovi vyhlásené pátranie.

Z **úradného záznamu** Ministerstva vnútra SR, Sekcia kontroly a inšpekčnej služby zo dňa 23.03.2010 bolo zistené, že bolo vykonané šetrenie zamerané na doručenie zásielok Vladimírovi Blaškovi a na zistenie jeho súčasného pobytu. Na adrese Nitra, Martinská 1 otec

menovaného uviedol, že syn nie je doma, že v mesiaci február 2010 odišiel mimo územia SR so svojou priateľkou Martinou a má sa zdržiavať v USA v časti California v meste Fresno, bližšiu adresu nevedel uviesť a taktiež nevedel uviesť ani priezvisko priateľky jeho syna Vladimíra Blaška, uviedol, že táto v uvedenom meste niečo študuje. V kontakte so synom nie je. Uviedol, že skôr ako za jeden rok jeho syn domov nepríde. Súd oboznámil aj satelitnú mapu, na ktorej je zobrazená časť USA - California a mesto Fresno.

Z **úradného záznamu** Ministerstva vnútra SR, Sekcie kontroly a inšpekčnej služby zo dňa 17.06.2010 bolo zistené, že boli vykonané opakované šetrenia za účelom zistenia pobytu a doručenia zásielok Vladimírovi Blaškovi, avšak bezvýsledne. Na adrese Nitra, Martinská dolina č. 1181/1 na zvonenie nikto neotváral. Pri telefonickom rozhovore s jeho matkou táto uviedla, že syn sa nachádza mimo územia SR, mal by sa zdržiavať v USA, bližšie informácie nevedela. Otec menovaného pri telefonickom rozhovore zopakoval to isté, ako jeho manželka, že syn Vladimír Blaško je mimo územia SR a mal by sa zdržiavať v USA.

Zo **správy Okresného riaditeľstva** Policajného zboru v Nitre zo dňa 30.09.2010 bolo zistené, že po Vladimírovi Blaškovi je vedené pátranie po pobyte Krajským riaditeľstvom PZ Nitra. V minulosti bolo po ňom vyhlásené pátranie po pobyte dňa 16.03.2010 Okresným riaditeľstvom Policajného zboru v Dunajskej Strede, ktoré bolo odvolané dňa 06.05.2010, hľadaný sa má zdržiavať v USA, San Francisco, kde priletel dňa 26.02.2010 a má študovať na univerzite v Kalifornii, kde má študentské vízum F1.

Z **informácie Vojenskej obvodnej prokuratúry** Bratislava 3 bolo zistené, že v zmysle poskytnutých informácií diplomatického predstaviteľa zastupiteľského úradu USA by sa mal Vladimír Blaško od mesiaca február 2010 nepretržite zdržiavať na univerzite vo Fresne, USA. Z listu Nadriadeného špeciálneho agenta Ministerstva zahraničných vecí USA, Úradu diplomatickej ochrany Richarda Loefferta, adresovaného vyšetrovateľke Sekcie kontroly a inšpekčnej služby MV SR Mjr. Ing. Zuzane Dubajovej, bolo zistené, že Blaško požiadal o študentské víza a dňa 18.02.2010 ich aj obdržal, platnosť víz bola stanovená do 7. mája 2010, na mieste vstupu, ktorým bolo San Francisco v Kalifornii, uviedol Blaško adresu pobytu na území USA: 1717 South Chestnut Avenue, Fresno, California 93702-4709. Táto adresa má byť adresou Pacifickej univerzity vo Fresne. K 30. septembru 2010 neexistuje žiaden záznam o tom, že by opustil USA. S ohľadom na tieto skutočnosti sa zdá, že Vladimír Blaško je stále v USA.

Z **listu Ministerstva vnútra** SR, Prezídia Policajného zboru, Úradu medzinárodnej policajnej spolupráce, národná ústredňa Interpol Bratislava zo dňa 14.02.2012 bolo zistené, že v súvislosti s pátraním po osobe Vladimír Blaško, na ktorého vydal Okresný súd Nitra medzinárodný zatýkací rozkaz, že Interpolu Washington prijali správu o tom, že k osobe Vladimír Blaško majú pozitívnu lokalizáciu a plánujú jeho zadržanie pre jeho nelegálny pobyt na území USA a následné vyhostenie do Slovenskej republiky, kde je voči nemu vedené trestné stíhanie. Zároveň požiadali súd o poskytnutie jeho odtlačkov prstov a preloženého zatýkača do anglického jazyka.

V súvislosti so zabezpečením účasti **svedka poškodeného Borisa Kozmu** na hlavnom pojednávaní boli vykonávané úkony na vypátranie jeho pobytu a jeho predvedenie na hlavné pojednávanie.

Zo **správy Krajského riaditeľstva** Policajného zboru Nitra, odbor kriminálnej polície o výsledku pátrania po poškodenom Borisovi Kozmovi bolo zistené, že bolo vykonaných viacero previerok na adrese jeho trvalého bydliska. Jeho otec Rudolf Kozma uviedol, že sa tam syn zdržiava, ale v čase previerok nebol doma. Nechali mu telefonický kontakt a od otca si vyžiadali telefonický kontakt na syna Borisa. Viac krát mu volali, ale telefón bol stále vypnutý. Jeho otec uviedol, že syn nechce chodiť na pojednávania, nakoľko sa tam už hanbí chodiť. Takisto otec uviedol, že syn Boris o termíne pojednávania vie. Prisľúbil, že keď bude

EXT BLASKO 030

**6T/97/2010**

Boris doma, dá polícii vedieť telefonicky. Uviedol, že syn nie vždy príde večer domov, ale kde chodieva a kde prespáva, to nevie, nepracuje nikde. Matka Borisa Kozmu uviedla, že syna nevidela a nerozprávala sa s ním už tri roky, mal by bývať u svojho otca. Takisto u jeho bývalej manželky Martiny Kozmovej sa nepodarilo zistiť, kde sa Boris Kozma nachádza, na jej telefonáty nereaguje. V Sociálnej poisťovni bolo zistené, že je živnostník. V obci Dolné Obdokovce a na Obecnom úrade Dolné Obdokovce bolo zistené, že na adrese Dolné Obdokovce č. 80 prevádzkoval bar U BORA, ale už nepodniká dva roky a za prenájom baru zostal obecnému úradu dlžný. Na ďalšom telefónnom čísle, získanom v obci Štitáre sa nepodarilo s ním skontaktovať. Dňa 05.12.2012 v deň pojednávania bola vykonaná v ranných hodinách previerka v mieste jeho trvalého bydliska, kde im nikto neotváral. Opätovne preto kontaktovali príslušníci Borisa Kozmu telefonicky na všetkých dostupných telefónnych číslach, avšak bezvýsledne. Poslali mu SMS správu, aby im zavolal, ale na túto správu taktiež nereagoval. Jeho otec pri telefonickom kontaktovaní príslušníkmi polície uviedol, že nie je doma, že je u lekára a že syn Boris v noci doma nespal, ale že o termíne pojednávania vie, ale na súd nepríde a že namiesto syna Borisa na pojednávanie príde on. Bývalá manželka pri telefonickom kontaktovaní taktiež uviedla, že mu volala, ale telefón nezdvíhal a následne jej poslal SMS správu, že teraz nemôže, potom mu poslala správu, že ho hľadá polícia ohľadne pojednávania, ktoré sa má konať, po tejto správe sa však už neozval. Z vykonaného šetrenia bolo zistené, že svedok – poškodený Boris Kozma sa úmyselne vyhýba súdnemu konaniu.

Z **rozpisu úkonov spojených s liečbou** svedka – poškodeného Borisa Kozmu súd zistil, že celková suma vynaložená na ošetrenie a liečbu poškodeného predstavovala sumu 874,51 eur (26.345,40 Sk).

Dňa 16.07.2007 o 11:00 hodine bola vo Fakultnej nemocnici v Nitre, traumatologické oddelenie spísaná **zápisnica o prehliadke tela Borisa Kozmu**, z dôvodu zistenia, či na jeho tele sú stopy alebo následky trestného činu. Boris Kozma súhlasil s vykonaním prehliadky a túto vykonal pplk. Milan Varga z Úradu inšpekčnej služby PZ. Prehliadka bola fotograficky zdokumentovaná a bol pri nej prítomný splnomocnenec poškodeného JUDr. Jozef Uj. Na hlave prehliadajúceho boli zistené odlupeniny pod oboma očami, zasušená rana o rozmeroch 0,5 cm x 0,3 cm v tvare kvapky na zadnej časti hlavy vľavo, na vnútornom zápästí ľavej ruky rana o rozmeroch 0,1 cm x 2 cm, na pravej ruke odtlačok a chrasta na vonkajšom zápästí, na vnútornej strane nad zápästím sú 3 pásiky od dĺžke 1,5 cm – 3 cm, šírka 0,1 cm, brucho bez zranení, chrbát bez zranení, dolné končatiny bez zranení. Boris Kozma uviedol, že všetky prehliadkou zistené zranenia utrpel po útoku policajtov v nočných hodinách dňa 13.07.2007. Iné časti tela zranené nie sú. Z prehliadky bolo vyhotovených 12 digitálnych snímkov.

Z **fotokópie knihy podaných oznámení** súd zistil, že dňa 13.07.2007 Denisa Lacová a Mária Csuláková oznámili vulgárne nadávky a urážky na ich osobu ako aj fyzické napadnutie. Zoltánovi Pélimu a Borisovi Kozmovi bola obmedzená osobná sloboda dňa 13.07.2007 o 22:15 hodine. Ako čas prepustenia alebo odovzdania príslušnému orgánu je u oboch uvedený dátum 13.07.2007 o 23:50 hod.

Taktiež bola súdom oboznámená **fotokópia jednej strany knihy fonogramov a hlásení** OO PZ Nitra zo dňa 13.07.2007 a prehľad služieb na deň 13.07.2007 od 07:00 hodiny do 07:00 hodiny dňa 14.07.2007. Súd oboznámil úradný záznam o obmedzení osobnej slobody podozrivej osoby Borisa Kozmu a Zoltána Péliho zo dňa 13.07.2007 o 22:15 hodine a o výsledok dychovej skúšky, vykonanej u Zoltána Péliho dňa 14.07.2007 o 06:14 hod. (1,48 mg/l) a o 06:42 hod. (0,92 mg/l).

Zo **záznamu zo služby** zo dňa 13.07.2007 bolo zistené, že nstržm. Michal Krajmer a nstržm. Vladimír Blaško vykonávali hliadku v čase od 13.07.2007 od 19:30 hodiny do 01:30 hodiny dňa 14.07.2007 a okrem iných činností bola táto hliadka vyslaná o 21:45 hodine do obce Štitáre, do krčmy, kde mala byť fyzicky napadnutá Denisa Lacová osobami Zoltán Péli a Boris Kozma. Pri služobnom zákroku sa zranila hliadka, zadržaným osobám bola po predvedení obmedzená osobná sloboda.

Z **lekárskej správy** zo dňa 13.07.2007 bolo zistené, že v zdravotníckom zariadení bol vyšetrený Michal Krajmer a bolo u neho zistené pohmoždenie a krvná podliatina v oblasti lakťa vpravo, ľahké zranenie s predpokladanou dobu PN asi 8 dní. V ten istý deň bol vyšetrený aj Vladimír Blaško a bolo u neho zistené pohmoždenie a krvná podliatina v oblasti pravého lakťa, taktiež išlo o ľahké zranenie s predpokladanou dobou PN asi do 8 dní.

**Uznesením** vyšetrovateľa Okresného riaditeľstva Policajného zboru, Úradu justičnej a kriminálnej polície zo dňa 13.07.2007, **ČVS: ORP-922/1-OVK-NR-2007** bolo začaté trestné stíhanie voči Zoltánovi Pélimu, obvinenému za prečin výtržníctva podľa § 364 odsek 1 písmeno a) Trestného zákona a voči Borisovi Kozmovi, obvinenému za prečin výtržníctva podľa § 364 odsek 1 písmeno a) Trestného zákona a za zločin útoku na verejného činiteľa podľa § 323 odsek 1 písmeno a), odsek 2 písmeno a) Trestného zákona.

**Uznesením** Vojenskej obvodnej prokuratúry Bratislava zo dňa 14.01.2009 číslo OPv 271/07 bolo podľa § 215 odsek 1 písmeno b) Trestného poriadku zastavené trestné stíhanie obvineného bývalého príslušníka Zboru väzenskej a justičnej stráže Borisa Kozmu, stíhaného uznesením vyšetrovateľa Okresného riaditeľstva Policajného zboru, Úradu justičnej a kriminálnej polície zo dňa 13.07.2007, 7 **ČVS: ORP-922/1-OVK-NR-2007** za prečin výtržníctva podľa § 364 odsek 1 písmeno a) Trestného zákona a za zločin útoku na verejného činiteľa podľa § 323 odsek 1 písmeno a), odsek 2 písmeno a) Trestného zákona.

Z **Úradného záznamu,** spísaného Úradom inšpekčnej služby Policajného zboru Ministerstva vnútra, inšpekčný odbor Západ Bratislava, detašované pracovisko Nitra dňa 14.07.2007 bolo zistené že dňa 14.07.2007 podala Ing. Martina Kozmová trestné oznámenie pre podozrenie z trestných činov ublíženia na zdraví a zneužívania právomoci verejného činiteľa, ktorých sa mali dopustiť príslušníci PZ zaradení na Obvodnom oddelení PZ Nitra tak, že dňa 13.07.2007 v čase od 20:30 hod. do 21:45 hod. v Štitároch, na ul. Jeleneckej, v bare RELAX bezdôvodne fyzicky napadli poškodeného Borisa Kozmu a mali mu spôsobiť bližšie neuvedené zranenia. Z **prílohy k úradnému záznamu** zo dňa 17.07.2007 ČVS: UJS-176/TOZ-V-2007 bolo zistené, že na operačnom stredisku boli v systéme REDAT vyhľadané hovory, ktoré sa týkajú danej veci a tie boli následne uložené nahrávkou na audio kazetu. Ďalšiu prílohu tvorí záznam z mobilného telefónu na CD nosiči. Z fotokópie z príslušnej strany z operačného denníka zo dňa 13.07.2007 bolo zistené, že operačný dôstojník nezapísal udalosť týkajúcu sa výtržnosti v bare Relax v Štitároch.

Na hlavnom pojednávaní bol prečítaný **prepis hovoru zo systému RADAT** zo dňa 13.07.2007 v čase od 21.25:52 hodiny medzi operačným dôstojníkom a oznamovateľkou Denisou Lacovou, prepis hovoru zo dňa 13.07.2007 v čase od 21:27:45 hodiny medzi operačným dôstojníkom a hliadkou, a v čase od 21:44:13 hodiny medzi operačným dôstojníkom a hliadkou, prepis hovoru zo dňa 13.07.2007 v čase od 21:50:00 hodiny medzi operačným dôstojníkom a stálou službou OO PZ Nitra, prepis hovoru zo dňa 13.07.2007 v čase od 21:52:27 hodiny medzi operačným dôstojníkom a Borisom Kozmom, prepis hovoru zo dňa 13.07.2007 v čase od 21:53:01 hodiny medzi operačným dôstojníkom a stálou službou

OO PZ Nitra. Taktiež bolo oboznámená magnetofónová kazeta so záznamom hovorov zo systému REDAT.

Z **fotodokumentácie z miesta rekognície**, konanej v kancelárii č. 260 na Krajskom riaditeľstve Policajného zboru v Nitre, na Kalvárskej ulici č. 2, zo dňa 23.06.2009 bolo zistené, že opoznávajúcej osobe Ing. Martine Kozmovej boli predložené dva fotoalbumy, jeden s jednou fotografiou a jeden s dvomi fotografiami s piatimi figurantmi a Vladimírom Blaškom.

Z **uznesenia** Vojenskej obvodnej prokuratúry Bratislava zo dňa 22.07.2009, číslo OPv 279/07 bolo zistené, že podľa § 215 odsek 1 písmeno b) Trestného poriadku bolo zastavené trestné stíhanie nstržm. Michala Krajmera, obvineného zo spáchania zločinu zneužívania právomoci verejného činiteľa v súbehu s prečinom ublíženia na zdraví, spáchaných formou spolupáchateľstva. Proti tomuto uzneseniu podal poškodený Boris Kozma sťažnosť dňa 04.08.2009 a uznesením Vyššej vojenskej prokuratúry Trenčín zo dňa 04.09.2009, číslo VPt 113/09-6 bolo uznesenie o zastavení trestného stíhania zrušené a vrátené na ďalšie konanie a rozhodnutie. **Uznesením** Vojenskej obvodnej prokuratúry Bratislava zo dňa 19.01.2010, číslo OPv 279/07 bolo podľa § 215 odsek 1 písmeno b) Trestného poriadku opätovne zastavené trestné stíhanie nstržm. Michala Krajmera. Proti tomuto uzneseniu podal poškodený Boris Kozma sťažnosť dňa 27.01.2010, táto bola uznesením Vyššej vojenskej prokuratúry Trenčín zo dňa 03.03.2010, číslo Vpt 113/09-12 zamietnutá.

Z **pripojeného spisu Okresného súdu Nitra sp. zn. 33T/101/2009** bolo zistené, že dňa 25.06.2009 podal okresný prokurátor v Nitre obžalobu na Zoltána Péliho, nar. 10.10.1966 pre pokračovací prečin výtržníctva podľa § 364 odsek 1 písmeno a) Trestného zákona na tom skutkovom základe, že pod vplyvom alkoholu dňa 13.07.2007 v čase asi o 21:30hodine v obci Štitáre, na terase baru Relax na Jeleneckej ulici v prítomnosti ďalších osôb poškodenej Denise Lacovej povedal, čo vyskakuje, že nie je miestna, či ju má prefackať a fyzicky ju napadol tým spôsobom, že jej dal dve facky otvorenou dlaňou na tvár, preto telefonicky zavolala políciu a následne na výčitky poškodenej M. Csulákovej, že čo si o sebe myslí, sa jej obvinený Zoltán Péli spýtal, či chce aj ona jednu a po jej odpovedi, nech skúsi, potom uvidí, ju fyzicky napadol tým spôsobom, že jej dal jednu facku otvorenou dlaňou na tvár. Vo veci bol vydaný trestný rozkaz dňa 26.06.2009, proti ktorému podal prokurátor odpor. Rozsudkom Okresného súdu Nitra, sp. zn. 33T/101/2009-77 zo dňa 09.10.2009, ktorý nadobudol právoplatnosť dňa 09.10.2009 bol Zoltán Péli uznaný vinným zo spáchania prečinu výtržníctva podľa § 364 odsek 1 písmeno a) Trestného zákona a bol mu uložený peňažný trest vo výmere 200,- eur, ktorý zaplatí v štyroch splátkach po 50,- eur, najneskôr do jedného roka odo dňa právoplatnosti rozsudku. Pre prípad, že by výkon peňažného trestu mohol byť úmyselne zmarený, bol mu stanovený podľa § 57 odsek 3 Trestného zákona náhradný trest odňatia slobody vo výmere dva mesiace. Zoltán Péli peňažný trest uhradil v dvoch splátkach po 100,- eur a to 02.09.2010 a 01.10.2010.

Podľa **pracovného posudku Vladimír Blaško** bol v čase vypracovania posudku služobne zaradený na Obvodnom oddelení Policajného zboru Nitra, v služobnom pomere príslušníka PZ bol od 01.07.2004 po ukončení Strednej odbornej školy Policajného zboru v Pezinku, od 01.07.2005 nastúpil na OO PZ Vráble do funkcie starší inšpektor s ÚOZ a od 01.04.2006 bol prevelený na OO PZ Nitra do funkcie inšpektor, kde pôsobil aj v čase vypracovania posudku. Mal požadované znalosti právnych a iných predpisov, osobnú a miestnu znalosť si sám zdokonaľoval. Mal občas výbušnú povahu, v kolektíve bol menej obľúbený. niekoľko krát bol finančne ohodnotený a taktiež sa počas krátkeho obdobia

viackrát dopustil disciplinárnych previnení (dňa 19.01.2005 zníženie služobného platu o 15% na dobu 3 mesiacov, dňa 20.10.2005 zníženie služobného platu o 5% na dobu 1 mesiaca, dňa 06.04.2007 písomné pokarhanie – zahladené dňa 26.4.2007, dňa 17.07.2008 zníženie služobného platu o 5% na dobu 2 mesiace. Z doplnenia pracovného posudku na Vladimíra Blaška vypracovaného riaditeľom Obvodného oddelenia PZ Nitra bolo zistené, že Vladimír Blaško bol na základe Služobného hodnotenia príslušníka PZ podľa § 27 odsek 6 písmeno b) Zák. č. 73/1998 Z.z. o štátnej službe v znení neskorších predpisov, so záverom „nespôsobilý vykonávať' akúkoľvek funkciu v štátnej službe" podľa § 27 odsek 4 písmeno c) citovaného zákona dňa 20.10.2009 prepustený.

Z **Personálneho rozkazu** riaditeľa Krajského riaditeľstva Policajného zboru v Nitre zo dňa 19.10.2009 číslo 268 bolo zistené. že Vladimír Blaško bol prepustený podľa § 192 odsek 1 písmeno d) Zákona č. 73/1998 Z.z. v znení neskorších predpisov zo služobného pomeru príslušníka Policajného zboru a jeho služobný pomer skončil dňom doručenia rozhodnutia.

Z **odpisu z Registra trestov** zo dňa 16.06.2009, 02.12.2009, 15.04.2013 bolo zistené, že Vladimír Blaško nemá záznam v registri trestov. Podľa **správy z Obvodného úradu** Nitra, odbor všeobecnej vnútornej správy, oddelenie priestupkové zo dňa 21.06.2012 a zo dňa 08.11.2012 Vladimír Blaško nemá žiadny záznam v evidencii priestupkov.

Z **výsledku lustrácie** v systéme REGOB zo dňa 25.10.2010 bolo zistené, že osoba s menom Vladimír Blaško sa v evidencii nenašla a z výsledku **lustrácie** v Zbore väzenskej a justičnej stráže zo dňa 26.10.2010 bolo zistené, že osoba s menom Vladimír Blaško sa nenachádzala v evidencii ÚZVJS.

Zo **správy Úradu práce, sociálnych vecí a rodiny** v Nitre bolo zistené, že Vladimír Blaško nepoberá dávku v hmotnej núdzi a príspevky k dávke. Sociálna poisťovňa ústredie Bratislava na žiadosť súdu oznámila priebeh evidencie poistení Vladimíra Blaška v systéme Sociálnej poisťovne. Posledná evidencia je od 03.12.2009 do 30.06.2010 ako zamestnanec – dohodár vo firme ReMax Courier Service spol. s r.o..

**Okresným súdom Nitra** bol dňa 29.10.2010 pod číslom 4Tp/305/2010 vydaný medzinárodný zatýkací rozkaz na Vladimíra Blaška. Obvodné oddelenie Policajného zboru Nitra súdu oznámilo, že **výpis zoznamu** na osobu Vladimír Blaško s IS DVS (informačný systém denníka vyšetrovacích spisov) nie je dostupný, nakoľko ho rieši Odbor inšpekčnej služby SKIS. Z informácie v systéme **AVÍZO** zo dňa 26.06.2012 bolo zistené, že Vladimír Blaško je trestne stíhaný.

Zo správy **Okresného riaditeľstva** Policajného zboru v Nitre zo dňa 18.12.2012 bolo zistené, že podľa výpisu z centrálneho registra Avíza a OTE je Vladimír Blaško v súčasnej dobe trestne stíhaný a má záznam F – 1. Je obvinený Odborom inšpekčnej služby a je na neho vydaný zatýkací rozkaz, pričom je na pátraní a v súčasnej dobe by sa mal nachádzať v Spojených štátoch amerických.

Z **lustrácie v evidencii Ministerstva spravodlivosti** SR bolo zistené, že voči Vladimírovi Blaškovi je aktuálne vedené na Okresnom súde Nitra súdne konanie pod sp. zn. 6T/97/2010 a taktiež na Okresnom súde Nitra bolo právoplatne zastavené trestné stíhanie pod sp. zn. 1T/27/2009.

EXT BLASKO 034

Po vykonaní dokazovania súd zhodnotil dôkazy podľa svojho vnútorného presvedčenia, založeného na starostlivom uvážení všetkých okolností prípadu jednotlivo aj v ich súhrne, nezávisle od toho, či ich obstaral súd, orgány činné v trestnom konaní alebo niektorá zo strán, rešpektujúc pri tom základné zásady Trestného poriadku.

Na základe vykonaného dokazovania súd rozhodol tak, že uznal obžalovaného Vladimíra Blaška za vinného zo spáchania zločinu zneužívania právomoci verejného činiteľa podľa § 326 odsek 1 písmeno a), odsek 2 písmeno a) Trestného zákona s poukazom na § 138 písmeno d) Trestného zákona v jednočinnom súbehu s prečinom ublíženia na zdraví podľa § 156 odsek 1 Trestného zákona podľa obžaloby Vojenskej obvodovej prokuratúry sp. zn. OPv 279/2007 s úpravou skutkovej vety v časti subjektívnej stránky trestného činu, pri zachovaní totožnosti skutku a spôsobeného následku, nakoľko bolo dostatočným spôsobom a bez dôvodných pochybností preukázané, že skutok sa stal, má znaky žalovaných trestných činov a že tieto spáchal obžalovaný, ktorí svojim konaním po stránke objektívnej aj subjektívnej naplnil všetky zákonné znaky skutkovej podstaty zažalovaných trestných činov. Protiprávne konanie obžalovaného spočívalo v tom, že ako verejný činiteľ v úmysle spôsobiť inému škodu vykonával svoju právomoc spôsobom odporujúcim zákonu, tento čin spáchal závažnejším spôsobom konania, násilím a súčasne inému úmyselne ublížil na zdraví.

Obžalovaný svojím úmyselným protiprávnym konaním, porušil záujem chránený zákonom, ktorým je záujem spoločnosti na riadnom výkone právomoci verejných činiteľov a na výkone práv a povinností fyzických a právnických osôb a zároveň porušil aj záujem chránený zákonom, ktorým je ľudské zdravie. Objektívna stránka konania obžalovaného spočívala v tom, že vykonával právomoc verejného činiteľa v rozpore s ustanoveniami zákona o Policajnom zbore č. 173/1993 Z.z. a zákona o štátnej službe príslušníkov Policajného zboru č. 73/1998 Z.z. Právna kvalifikácia v odseku 2 je daná závažnejším spôsobom konania obžalovaného uvedeným v § 138 písmeno d) Trestného zákona (použitie násilia), lebo pri výkone právomoci verejného činiteľa voči poškodenému použil obžalovaný fyzické násilie smerované proti jeho telesnej integrite a to pôsobením fyzickej sily na jeho telo, proti jeho vôli. V dôsledku úmyselného konania obžalovaného spôsobom odporujúcim zákonu bolo poškodenému spôsobené ublíženie na zdraví s dobou liečenia a práceneschopnosti v trvaní 31 dní (§ 123 odsek 2 Trestného zákona).

Podľa vykonaného dokazovania obžalovaný V.Blaško ako člen zasahujúcej policajnej hliadky počas výkonu služby v bare Relax, kde preveroval telefonické oznámenie o priestupku, bezdôvodne fyzicky napadol poškodeného Borisa Kozmu, príslušníka ZVJS po tom, ako sa mu predstavil ako kolega, ktorý žiadal vysvetlenie, prečo chce odviesť jeho spolusediaceho Zoltána Péliho. Obžalovaný udrel poškodeného do oblasti hlavy a po páde na zem ho päsťou udieral do hlavy napriek tomu, že poškodený nekládol žiadny odpor a po predvedení na Obvodné oddelenie PZ ho opätovne napadol úderom do hlavy a kopmi do tela, čím mu takto spôsobil zranenia s dobou liečenia a práceneschopnosťou v trvaní 31 dní.

V rámci vykonaného dokazovania na hlavnom pojednávaní po splnení zákonných podmienok boli prečítané výpovede obžalovaného V. Blaška z prípravného konania, ktorý využil svoje právo a nevypovedal a výpoveď svedka poškodeného B. Kozmu, ktorý v svojich výpovediach podrobne popísal okolnosti zažalovaného skutku a konanie obžalovaného policajta V.Blaška v bare Relax a na Obvodnom oddelení PZ, kde bol spolu so Zoltánom Pélim predvedený. Poškodený v svojej výpovedi poprel akýkoľvek útok alebo aktívny odpor smerom k zasahujúcemu policajtovi. Uviedol, že napriek zraneniam, ktoré mu spôsobil obžalovaný, ani na jeho výslovnú žiadosť mu nebolo zabezpečené službukonajúcimi

EXT BLASKO 035

policajtmi lekárske ošetrenie o čom podporne svedčí aj prepis hovoru poškodeného na linku 158. Na hlavnom pojednávaní boli vypočutí svedkovia: Krajmer (druhý člen hliadky), ktorý bol v tejto trestnej veci pôvodne spoluobvinený a svedok Chovanec (policajt na OO PZ), ktorý zabezpečoval dohľad nad poškodeným po prevoze do nemocnice. Boli tiež vypočuté svedkyne Csuláková a Lacová, ktoré mali v bare Relax konflikt so Zoltánom Pélim a poškodeným Borisom Kozmom a privolali policajnú hliadku a svedkyňa Balková (r. Mihalčinová), ktorá celý skutok spolu so svojou partiou pri stole videla. Po splnení zákonných podmienok so súhlasom procesných strán boli prečítané výpovede svedkov z prípravného konania menovite P. Földešiho, L. Péliho, I. Bratha, M. Barcsu, J. Kasalovej, J. Menta. Z. Péliho, J Szoráda, B. Školáka, R. Balkovej, teda svedkov, ktorí priamo videli celý priebeh skutku v bare Relax, svedkov K. Ottingerovej, M. Púchovského a M.Soviša, ktorí mali ku skutku len sprostredkované a neúplné informácie, svedka F. Barnáša (policajt OO PZ), ktorý slúžil spolu so svedkom Chovancom v hliadke, svedka MUDr. M. Gašparoviča, lekára, ktorý bol privolaný ako lekárska služba prvej pomoci na Obvodné oddelenie PZ k poškodenému a svedkyne Ing. Kozmovej manželky poškodeného, ktorá opísala správanie a postup policajtov na Obvodnom oddelení PZ po predvedení poškodeného, ale ku skutku v bare mala len sprostredkované informácie.

Základnou výpoveďou usvedčujúcou obžalovaného zo spáchania skutku, ktorý sa mu kladie za vinu v obžalobe je výpoveď poškodeného Kozmu ale aj výpovede svedkov, ktorí svojimi zmyslami priamo pozorovali a následne podrobne opísali celý priebeh skutku v bare Relax, Jany Balkovej(Mihalčinovej), P. Földešiho, L. Péliho, I. Bratha, M. Barcsu, J. Kasalovej, Z. Péliho, J Szoráda, B. Školáka, R. Balkovej. Svedkovia takmer zhodne popísali zásah policajnej hliadky v bare a aktivitu najmä vyššieho z policajtov (obžalovaný Blaško) pri zásahu voči poškodenému. Svedkovia potvrdili výpoveď poškodeného v tom zmysle, že na policajtov nezaútočil, nebránil im fyzicky ani slovne v služobnom výkone, predstavil sa im ako príslušník ZVJS a napriek tomu bol bezdôvodne pri výkone právomoci verejného činiteľa fyzicky napadnutý obžalovaným a odvezený na policajné oddelenie. Viacerí zo svedkov ihneď po skutku prejavili záujem vo veci vypovedať na polícii, ale zo strany službukonajúcich policajtov na policajnej stanici im to nebolo umožnené. Svedkovia zhromaždení pred políciou opísali aj fyzický stav poškodeného, v akom bol odvážaný sanitkou z policajného oddelenia. Zároveň títo svedkovia opísali laxný prístup policajtov vyslaných k zdokumentovaniu miesta činu po skutku. Svedkyňa Kozmová videla osobne iba časť konania obžalovaného voči poškodenému na policajnom oddelení, kde po márnom naliehaní na policajtov privolala sama poškodenému zdravotnú pomoc. Informácie o konaní v bare mala táto svedkyňa len sprostredkované od svedkov sledujúcich zásah policajtov v bare. Jej výpoveď zapadá do skutkového deja ako ho popísal poškodený spolu so svedkami a dopĺňa komplexne celé protiprávne konanie obžalovaného. Svedkyňa pri rekognícii síce so 100% istotou neopoznala obžalovaného, ale označila ho ako osobu, ktorá by mohla najbližšie zodpovedať osobe policajta, ktorý napadol poškodeného na oddelení a práve táto označená osoba je totožná s osobou obžalovaného policajta, ktorý vykonával služobný zákrok v bare Relax voči poškodenému. Tvrdenia poškodeného a hore uvedených svedkov boli podporené aj výsledkami znaleckého dokazovania z odboru zdravotníctvo. Znalec vo svojom znaleckom posudku popísal zranenia poškodeného a mechanizmus ich vzniku, ktorý korešpondoval s popisom mechanizmu zranení ako ich opísal poškodený a svedkovia. V záveroch znalec skonštatoval, že práceneschopnosť poškodeného v trvaní 31 dní bola adekvátna vzniknutým zraneniam. K zraneniam poškodeného sa vo svojej výpovedi vyjadroval a tieto konštatoval aj zasahujúci lekár privolanej sanitky MUDr. Gašparovič, ktorý nariadil jeho prevoz do nemocnice, ale neviedel označiť osobu, ktorá mala poškodenému spôsobiť predmetné zranenia, ani uviesť iné skutočnosti na objasnenie skutku.

EXT BLASKO 036

V protiváhe na druhej strane existujú dôkazy svedčiace v prospech obžalovaného najmä výpovede svedka Krajmera, Csulákovej a Lacovej, teda osôb priamo zainteresovaných na skutku. Svedok Krajmer bol pôvodne v procesnej pozícii spoluobvineného ako druhý člen hliadky, ktorý mal fyzicky- kopmi ublížiť na zdraví poškodenému v bare Relax čo potvrdili svedkovia sledujúci priebeh zákroku polície. Následne bolo trestné stíhanie voči jeho osobe právoplatne zastavené podľa § 215 odsek 1 písmeno c) Trestného poriadku s odôvodnením vyplývajúcim z uznesenia, že konal len podľa pokynov veliteľa hliadky obžalovaného Blaška v domnení, že jeho konanie je súčasťou dôvodného zákroku voči osobe poškodeného. Pre nedostatok úmyslu a z dôvodu, že následok na zdraví poškodeného v oblasti brušnej steny mohol vzniknúť jednak pádom na zem a jednak kopancami obvineného Blaška, bolo konanie Michala Krajmera vyhodnotené ako disciplinárne previnenie. Pasivitu svedka Krajmera pri zákroku obžalovaného a konanie svedka Krajmera len na pokyn obžalovaného V. Blaška potvrdili aj ostatní svedkovia, ktorí zákrok obžalovaného pozorovali. Svedok Krajmer však vo svojej výpovedi tvrdil, že bol v bare pri stole poškodeného a videl ako poškodený aktívne odporoval obžalovanému a zahnal sa na neho. Toto však žiadny iný svedok v bare nevidel. Svedkyne Csuláková a Lacová síce podporili tvrdenie svedka Krajmera, keď vypovedali zhodne, že videli zdvihnutú ruku poškodeného, ale následne napriek ich fyzickej prítomnosti v bare žiadne násilie páchané zo strany policajtov na poškodenom nevideli. Obe svedkyne uviedli, že sa pri zákroku policajtov otočili k nemu chrbtom. Tieto svedectvá sú však v rozpore s viac ako desiatkou výpovedí svedkov, ktorí zákrok sledovali a naopak tvrdili, že poškodený na obžalovaného nezdvihol ruku, ruky mal na stole, ale bol bez dôvodu napadnutý a zbitý obžalovaným. Súd vyhodnotil výpovede svedkýň Csulákovej a Lacovej ako nepresvedčivé, lebo uvádzali skutočnosť, ktorú žiadny z desiatych svedkov nezaregistroval (útok obžalovaného) a pokiaľ sa svedkyne mali vyjadrovať ku konaniu obžalovaného počas zákroku, zhodne uviedli, že sa práve vtedy otočili chrbtom k deju. Výpoveď svedka Krajmera súd vyhodnotil ako účelovú v snahe pomôcť obžalovanému ako kolegovi policajtovi a zmierniť tak charakter jeho protiprávneho konania. Vo veci vypovedali aj policajti Chovanec a Barnáš, ktorí k skutku samotnému nevedeli uviesť nič podstatné, nastupovali do služby v čase predvádzania poškodeného a svedka Péliho na policajné oddelenie a zabezpečovali stráženie poškodeného v nemocnici. Obaja poškodeného poznali, ale na oddelení nevideli nikoho z policajtov , kto by mu spôsobil zranenia.

Policajti Obvodného oddelenia PZ vykonávajúci služobný zákrok po prijatí oznámenia a pri podozrení z porušenia zákona boli povinní konať v súlade so zákonom a v medziach zákona tak, aby nedošlo k žiadnej ujme na právach akéhokoľvek občana, teda ani osôb podozrivých z protiprávneho konania. Povinnosťou zasahujúcich policajtov v bare Relax bolo, dôsledne vyťažiť oznamovateľku, ktorá privolala hliadku tak, aby nedošlo k zámene podozrivého s inou osobou, boli povinní zdokumentovať osobné údaje podozrivého a poučiť ho o jeho právach, overiť jeho totožnosť a totožnosť osôb, ktoré by mohli podať vysvetlenie k veci a prípadne zdokumentovať miesto činu. Po zistení, že podozrivá osoba podlieha disciplinárnej právomoci boli policajti povinní vyrozumieť príslušný služobný orgán. Použitie donucovacích prostriedkov pri zákroku voči podozrivým osobám malo byť odôvodnené a náležité vzhľadom k vzniknutej situácii. V tejto súvislosti dáva súd do pozornosti výpovede svedkov v tom zmysle, že v čase príchodu hliadky polície už v bare žiadny konflikt nehrozil a pôvodní aktéri konfliktu (Péli, Kozma, Csuláková, Lacová) sa už venovali len svojim známym pri stoloch. Všetky hore popísané zásady a pravidlá postupu príslušníkov PZ pri preverovaní oznámenia vyplývali z ustanovení zákona o policajnom zbore. O neprofesionalite a najmä protiprávnosti služobného zákroku obžalovaného v bare Relax svedčal celý jeho priebeh ako ho popísali svedkovia a poškodený. Obžalovaný ako zasahujúci policajt v bare

Relax najskôr ani  presne nevedel identifikovať kto je vlastne podozrivá osoba, potom bez
príslušnej zákonnej výzvy a poučenia nepŕofesionálne oslovil jedného z podozrivých aby ho
nasledoval, neoveroval totožnosť prítomných osôb pri stole ani osôb, ktoré by mohli k veci
podať vysvetlenie a neskôr pri konfrontácii s namietaným porušením práv dotknutých osôb
bezdôvodne fyzicky napadol osobu poškodeného, ktorá sa mu predstavila ako príslušník
ZVJS a kolega a spôsobil mu ujmu na zdraví.

Obžalovaný  pri  výkone  právomoci  verejného  činiteľa  postupoval  v rozpore
s ustanovením § 8 odsek 1 zákona č. 171/1993 Z.z. o Policajnom zbore, nedbal pri výkone
služobnej činnosti na česť, vážnosť a dôstojnosť poškodeného a pripustil aby v súvislosti
s jeho činnosťou došlo u poškodeného k bezdôvodnej ujme na zdraví, napriek povinnosti dbať
na to, aby zásah do jeho práv a slobôd neprekročil mieru nevyhnutnú na dosiahnutie účelu
sledovaného služobnou činnosťou. Obžalovaný porušil aj ustanovenie § 48 odsek 3 písmeno
e),g),i) zákona o štátnej službe príslušníkov PZ, SIS, ZVJS a ŽP podľa ktorého je policajt pri
výkone štátnej služby povinný dodržiavať pravidlá služobnej zdvorilosti a správať sa slušne k
štátnym zamestnancom a v služobnom styku aj k ostatným občanom, v štátnej službe aj mimo
štátnej služby zdržať sa konania, ktoré by mohlo narušiť vážnosť policajného zboru, alebo
ohroziť dôveru v tento zbor a vykonávať štátnu službu nestranne.

Konanie obžalovaného ako verejného činiteľa v rozpore so zákonom o Policajnom
zbore a o štátnej službe príslušníkov PZ jednak spôsobilo  následok na zdraví poškodeného
a na  strane  druhej  poškodilo vážnosť Policajného zboru a dôveru občanov  v nestrannosť
výkonu policajnej služby. Obžalovaný konal pri výkone právomoci nielen protiprávne
a spôsobom odporujúcim zákonu, ale aj v rozpore so základnými morálnymi zásadami, ktoré
ako príslušník PZ bol sám povinný chrániť a dodržiavať. Medzi konaním obžalovaného ako
verejného činiteľa a vzniknutou ujmou na zdraví a právach poškodeného existovala príčinná
súvislosť. Pre vyvodenie trestnej zodpovednosti obžalovaného ako verejného činiteľa boli
kumulatívne splnené podmienky požadované zákonom, obžalovaný vykonával právomoc
verejného činiteľa a v súvislosti s týmto výkonom spáchal trestný čin.

Z vyššie uvedeného mal súd za jednoznačne preukázané, že obžalovaný naplnil všetky
zákonné znaky skutkovej podstaty zločinu zneužívania právomoci verejného činiteľa podľa §
326 odsek 1 písmeno a), odsek 2 písmeno a) Trestného zákona s poukazom na § 138 písmeno
d) Trestného zákona v jednočinnom súbehu s prečinom ublíženia na zdraví podľa § 156 odsek
1 Trestného zákona.

Z hľadiska konania obžalovaného dospel súd k záveru, že obžalovaný sa svojim
protiprávnym konaním dopustil  trestného činu vyššej závažnosti a konal v priamom úmysle
podľa § 15 písmeno a) Trestného zákona, lebo chcel svojím konaním porušenie alebo
ohrozenie záujmu chráneného zákonom spôsobiť a zároveň vedel, že svojím konaním
následok spočívajúci v porušení a ohrození chráneného záujmu spôsobí. Táto úvaha súdu
vyplýva z aktívneho konania obžalovaného voči poškodenému (vôľa) a zároveň z jeho
profesného postavenia a tomu zodpovedajúcich znalostí a skúseností (vedomosť).

Pri úvahách o druhu a výmere trestu postupoval súd v zmysle ustanovení § 34 odsek 1
až odsek 4 Trestného zákona a bral tak do úvahy spôsob spáchania trestného činu, jeho
následok, zavinenie,  pohnútku, priťažujúce okolnosti, poľahčujúce okolnosti, osobu
obžalovaného ako aj možnosť jeho nápravy.

EXT BLASKO 038

Súd prihliadol pri ukladaní trestu u obžalovaného **Vladimíra Blaška** na jeho osobné pomery a zistenie, že síce nebol doposiaľ súdne trestaný, podľa správ o osobe neboli u neho zistené negatívne prejavy v občianskom živote, preto mu súd priznal z poľahčujúcich okolností uvedených v § 36 Trestného zákona okolnosť uvedenú pod písmenom j), že viedol riadny život. Z priťažujúcich okolností uvedených v § 37 Trestného zákona súd zistil u obžalovaného priťažujúcu okolnosť uvedenú pod písmenom h), že spáchal viac trestných činov. Táto priťažujúca okolnosť sa vzťahuje aj na jednočinný súbeh a je dôsledkom absorbčnej zásady pri trestaní súbehu. Postupom po zistení poľahčujúcich a priťažujúcich okolností v pomere 1:1, aplikoval súd zásadu uvedenú v § 38 odsek 2 Trestného zákona. Pri aplikácii zásady pre ukladanie úhrnného trestu uvedenej v § 41 odsek 1 Trestného zákona vychádzal súd zo základnej trestnej sadzby taxatívne uvedenej v § 326 odsek 2 Trestného zákona v rozmedzí štyri roky až desať rokov, po aplikácii § 41 odsek 2 Trestného zákona bola horná hranica trestnej sadzby trestného činu najprísnejšie trestného zvýšená o jednu tretinu. Takto súd vypočítal trestnú sadzbu pre ukladanie trestu v rozmedzí štyri roky až trinásť rokov a štyri mesiace a ukladal mu trest odňatia slobody vo výmere 4 roky na spodnej hranici vypočítanej trestnej sadzby. Súd pri ukladaní trestu zohľadnil všetky okolnosti prípadu (výkon právomoci za použitia násilia), následok (poškodenie zdravia a zneužitie právomoci), ale aj postoj obžalovaného k spáchanej trestnej činnosti, ktorý nekriticky a v rozpore so skutočnosťou označil poškodeného ako agresora v snahe zlegalizovať tak svoje protiprávne konanie. Obžalovaný na tento účel využil aj svoje postavenie veliteľa hliadky a zainteresoval tak do konania aj svojho kolegu. Súd nezistil žiadne skutočnosti spočívajúce v okolnostiach prípadu alebo v osobe páchateľa odôvodňujúce použitie mimoriadneho zmierňovacieho ustanovenia v § 39 Trestného zákona. Obžalovaného súd zaradil na výkon trestu odňatia slobody do ústavu na výkon trestu odňatia slobody s minimálnym stupňom stráženia rešpektujúc tak ustanovenie § 48 odsek 2 písmeno a) Trestného zákona, pretože obžalovaný nebol doposiaľ vo výkone trestu odňatia slobody za úmyselný trestný čin..

Súd dospel k záveru, že účel trestu podľa § 34 Trestného zákona tak v oblasti generálnej ako aj individuálnej prevencie bude v prejednávanej veci u obžalovaného vzhľadom na všetky okolnosti dosiahnutý uložením hore uvedeného trestu s presvedčením, že takto uložený trest je zákonný, spravodlivý a primeraný, plní nielen výchovnú funkciu smerom k obžalovanému a jeho náprave ale aj ochrannú funkciu smerom k spoločnosti.

V súvislosti s trestným činom obžalovaného vznikla škoda poškodenému a zdravotnej poisťovni. Podľa § 288 odsek 1 Trestného poriadku, súd odkázal poškodeného Borisa Kozmu s nárokom na náhradu škody na občianske súdne konanie, pretože nárok na náhradu škody si poškodený síce v prípravnom konaní uplatnil, ale jeho výšku nespresnil ani nešpecifikoval. Podľa § 287 odsek 1 Trestného poriadku súd uložil obžalovanému, aby nahradil poškodenej spoločnosti Dôvera zdravotná poisťovňa, spôsobnú škodu vo výške 874,51 eur spočívajúcu vo vynaložení zdravotnej starostlivosti v prospech poškodeného. Táto výška škody bola riadne a včas uplatnená a v priznanej výške aj listinnými dôkazmi bez pochybností preukázaná.

**P o u č e n i e :**     Proti tomuto rozsudku je možné podať odvolanie na súde, proti ktorého rozsudku smeruje (Okresný súd Nitra), a to do 15 (pätnásť) dní odo dňa oznámenia rozsudku. O odvolaní rozhoduje Krajský súd v Nitre. Oznámením rozsudku je jeho vyhlásenie v prítomnosti toho, komu treba rozsudok doručiť. Ak sa rozsudok vyhlásil v neprítomnosti

takejto osoby, oznámením je až doručenie rozsudku. V písomne podanom odvolaní treba uviesť, proti ktorým výrokom smeruje a či smeruje aj proti konaniu, ktoré rozsudku predchádzalo. Odvolanie musí byť odôvodnené tak, aby bolo zrejmé, v ktorej časti sa rozsudok napáda a aké chyby sa vytýkajú rozsudku alebo konaniu, ktoré rozsudku predchádzalo. Odvolanie možno oprieť o nové skutočnosti a dôkazy. Právo podať odvolanie nemá ten, kto sa tohto práva výslovne vzdal.

**V Nitre dňa 15. apríla 2013**

**JUDr. Mária  O n d r e j o v á**

**predsedníčka senátu**

Za správnosť vyhotovenia:
Jaroslava Svoreňová

This is the translation from the Slovak into English language.

6T/97/2010

**File No. 411001010689**
**6T/97/2010-752**

This **Judgement** is enforceable
and executable together with the
Decision of the Regional Court.
In Nitra No. 4T0/97/2013
on: 07 November 2013
District Court Nitra, sec. 6T
on: 24 February 2014 *an illegible signature*

State symbol

## JUDGEMENT
### IN THE NAME OF THE SLOVAK REPUBLIC

The District Court Nitra, by the Panel of Judges consisting of the Chairman of the Panel LLD Mária Ondrejová and co-judges Anna Mikušová and doc. MA. MSc. Peter Lazor, PhD., in the criminal matter of the accused person **Vladimír Blaško**, for the criminal offence of abuse of power by a public official in accordance with Art. 326 Sect. 1 subsect. a), sect. 2 subsect. a) Criminal Code with a reference to Art. 138 subsect. d) Criminal Code in single-action concurrence with the misdemeanour of bodily harm in accordance with Art. 156 Sect. 1 Criminal Code, at the main trial held in Nitra on 15 April 2013

#### has decided as follows:

The accused person
**Vladimír Blaško:**

born on 10 January 1983,
permanent address Nitra, Martinská dolina No. 1

#### has been found guilty of the following:

Contrary to especially Art. 8 Sect. 1 Act No. 171/1993 Coll. on Police Force as amended as well as to Art. 48 Sect. 3 subsect. e/, g/, i/ Act No. 73/1998 Coll. on Public Service of the Police Force Members, of the Slovak Information Service, the Corps of Prison and Court Guard of the Slovak Republic and Railway Police as amended, during the performance of his duty, as a public official, with the intent to cause bodily harm to the aggrieved person Boris Kozma, on 13 July 2007 at about 9.45 pm in the village Štitáre in Jelenecká Street in the bar Relax, he attacked the aggrieved person Boris Kozma, born on 24 April 1974 physically when he was to verify the telephone notification of a minor offence, after he submitted the service ID card of a Corps of Prison and Court Guard of the Slovak Republic member, he introduced himself as their colleague and enquired them why they wanted to take his friend sitting with him away in such a way that the accused person Blaško hit him with his fist in the neck area, then he pulled him down on the ground where he went on hitting him in the head area also despite the fact that he did not put up any resistance, than he handcuffed his hands and subsequently, after having the accused person brought to the District Department of the Police Force in Nitra, the accused Blaško attacked him again with no adequate reason physically hitting him in his face and after he fell down also hitting him in the head area and kicking him in the trunk subsequently, by which he caused concussion, fracture of the small nose bones, face contusion in the area of the left eye, cervical spine sprain, contusion of the front abdominal wall on the left, contusion of both wrists and partial damage of sensitive nerve fibres of the right radial nerve in the area of the forearm with the treatment period and sickness leave of 31 days to the aggrieved person,

1

This is the translation from the Slovak into English language.

6T/97/2010

**therefore:**

as a public official he executed his powers in a manner contrary to law with the intent to cause harm to another person and he committed the act in a more serious manner by a violent act and he also caused bodily harm to another person intentionally,

**by which he committed:**

the criminal offence of abuse of power by a public official in accordance with Art. 326 Sect. 1 subsect. a), Sect. 2 subsect. a) Criminal Code with a reference to Art. 138 subsect. d) Criminal Code in single-action concurrence with the misdemeanour of bodily harm in accordance with Art. 156 Sect. 1 Criminal Code.

**The Court has sentenced him to the following for that:**

in accordance with Art. 326 Sect. 2 Criminal Code, finding the attenuating circumstance in accordance with Art. 36 subsect. j) Criminal Code, finding the aggravating circumstance in accordance with Art. 37 subsect. h) Criminal Code, I accordance with Art. 38 Sect. 2 Criminal Code, according to the principle stated in Art. 41 Sect. 1, Sect. 2 Criminal Code the **aggregate imprisonment sentence with the length of 4 (four) years.**

The accused person has been classified for imprisonment in the institution for punishment execution **with a minimum level of guarding** in accordance with Art. 48 Sect. 2 subsect. a) Criminal Code.

The Court has ordered the accused person to pay the caused damage in the amount of EUR 874.51 to the aggrieved company Dôvera Health Insurance company having the registered office Einsteinova 25, 851 01 Bratislava, CRN 35 942 479, in accordance with Art. 287 Sect. 1 Criminal Procedure Code.

The Court has referred the aggrieved person Boris Kozma, born on 24 April 1974, permanent address Štitáre, Jelenecká 31/272, to the civil trial with his claim for compensation of damage in accordance with Art. 288 Sect. 1 Criminal Procedure Code.

**Reasoning:**

Upon the indictment of the Military District Prosecutor Bratislava, file ref. OPv 279/07, the District Court Nitra heard the criminal case against the accused person Vladimír Blaško, former member of the Police Force. The Court carried out the main trial against the accused person as against the person in absentia having met the statutory conditions stated in the provision of Art. 358 Sect. 1 Criminal Code in the presence of the accused person's barrister. Evidence was taken at the main trial by reading the testimony of the accused person Vladimír Blaško from the pre-trial proceeding, by reading the testimony of the aggrieved person Boris Kozma from the pre-trial proceeding, by hearing the witnesses Vladimír Chovanec, Michal Krajmer, Denisa Lacová, Mária Csuláková, Jana Mihalčinová – Balková, by reading the witness testimonies from the pre-trial proceeding of the witnesses M. Kozmová, P. Földeši, L. Péli, I. Brath, M. Marcsa, J. Kasalová, J. Ment, Z. Péli, M. Soviš, J. Szorád, B. Školák, R. Balková, K. Ottingerová, M. Púchovský, F. Barnáš, M. Gašparovič, by reading the expert's opinion, by familiarization with documentary evidence provided in the file, by familiarization with the attached file of the District Court Nitra, file ref. 33 T/101/2009 and with the reports on searching for the stay of the accused person and of the aggrieved person.

The issue of facts as described in the statement part of the Judgement was found from the results of the evidence taken.

In accordance with Art. 258 Sect. 4 Criminal Code the testimony of the **accused person Vladimír Blaško** (person in absentia) from the pre-trial proceeding was read, where he used his right to remain silent in the matter.

After several unsuccessful attempts to ensure the presence of the witness of the aggrieved party at the main trial the testimony of **the witness – the aggrieved person Boris Kozma** dated 17 August 2007 and 24

2

This is the translation from the Slovak into English language.

6T/97/2010

April 2009 from the pre-trial proceeding was read at the mail trial in accordance with Art. 263 Sect. 1 Criminal Code. The witness stated in his testimony dated 17 August 2007 that on 13 July 2007 at about 8:00 pm he came to Zoltán Péli´s home to agree the process of the repair of his roof. He took him, together with two other guys who had helped him, to the bar, where they arrived at about 8:30 pm. They sat out on the terrace to the second table from the back, he drank a beer and two shots. A word fight started in the bar between Zolo, himself and two girls, who were also drinking alcohol and were sitting at the first table. Dirty and foul expressions were used by both sides. The word argument went on, it escalated and the dark-hair women called Zolo names. Zolo stood up, but he did not see what happened because he turned to the guys who were sitting behind him. Then Zolo sat down and the black-hair woman shouted that he would regret that, later on he learned that Zolo had given them some slaps. Csuláková them turned to them and shouted that when she had brought one to prison, she would get there another one too. The black hair woman started to offend him, his family and his wife, which provoked him and he started to chase her around his car. He called his friend Juraj Kollár, who worked at the municipal police and told him what had happened, he wanted to find out from him what to do with that. The girls shouted that they had called the Police and the word conflict recurred. He saw that Csuláková had a dog wrapped in cloth next to her so he told her she could not stay with the dog in the bar and told her to go home with the dog. Then there was silence for a while and then the policemen wearing black camouflage uniform with side-handle batons in their hands came. A taller policeman came first and Csuláková showed him Zolo Péli. The policeman turned to Zolo, holding the side-handle baton in his left hand, he pried it to Zolo´s right hand and said: "Let's go". He asked the policeman where they were taking Zolo, and he shouted that it was not his business, he asked him again where they were taking Zolo and he addressed him saying his rank. He turned to him and started to shout at him how he knew that he was a senior sergeant. He shifted a case with the service ID card to him and said that he was a member of the Force, he told him his full name and that he was a prison warder. The policeman shouted at him in arrogant way that a prison warder was not a policeman, he turned to Zolo and told him to go with him. He asked the policeman again about the reason why they wanted to take Zolo but as he asked it, he was hit in his face, on his nose. After the policeman hit him in his face, he started to pull him over the bench, he hit him, he threw him on the ground over the bench. When he was lying with his belly on the ground, he pried his left arm, he shouted at him to put his arm to the back, he could feel hitting in his head, when he turned to him, he got another hit to his face and he could feel that someone was kicking him in his left side. Then the policeman released his left hand and he handcuffed his hands above his head. When he stood up, he was bleeding from the nose and mouth, he got a swell above his eye and he could hear roaring in his head. The policeman shouted at him that he would lose his service ID card and he offended him. He asked for examination because he was injured and he felt sick. The policeman took him to the car, he put him on the seat behind the driver, with the hands handcuffed in the front, they sat Zolo next to him and they went towards the District Department of the Police Force. He asked for medical examination for a few times in the car and he repeated that he was a member of the Force. He received only foul abuse. The taller policeman was driving, the one who hit him in his nose first. The shorter one was quiet. When they came to the department, the taller policeman pulled him out of the car and led him to the building by holding him around his neck by fingers. They passed a counter, they turned to the first corridor and they took Zolo to the back part. As they were taking him there, he noticed that two policemen who he knew were standing behind him Vlado Chovanec and Fero Barnáš. Then the light in the corridor was switched off and the taller policeman started to shout at him in a foul way, he was hit in his face, he fell down on the ground in front of the cage, he was beaten in his head and kicked for a few times. He stepped on his head saying: "You have finished, I will take care about that" and then he closed him to the cage. He found out that he had his service ID card and his mobile phone with so he called his wife and number 158 from his mobile phone, he introduced himself and said that he was beaten at the District Department and that he asked for medical examination. The officer at the 158 told him to wait. The taller policeman came, he leaned him on the wall, he did him personal inspection and he handcuffed him at the back. Then he came round with horrible pain in his wrists. He remembered that he could hear his wife's voice, he rolled out to the corridor and told his wife to call the ambulance. Then the policeman ran in, he started to sweat at him, he opened the door and kicked him back. He had horrible roar in his head, everything hurt him, his legs were shaking and he could not perceive and react. Regarding the shorter policeman, he was only standing at the wall at Zolo during the incident. The taller

3

This is the translation from the Slovak into English language.

6T/97/2010

policeman called him "young". Before the incident with the policeman he was sitting on the bench, he was talking to him calmly, he definitely did not raise his hand to the policeman and he did not gesture. He did not defend himself against the policemen's hits, he was not able to react quickly. He did not know what reason they had to beat him also at the department. He could not have caused any injuries or harm to the policemen because he did not touch them. He did not know the policemen who did the action in the bar, he had never seen them before, he had never come across them.

In the questioning on 24 April 2009 the witness – the aggrieved person Boris Kozma stated that he was not in any family or similar relationship with the accused persons Vladimír Blaško and Michal Krajmer. He persisted in his previous testimony. He confirmed that the policeman Blaško attacked him first in the bar. He thinks he was not influenced by alcohol to such extent that his coordination abilities would have been affected, he does not remember whether he underwent breath alcohol test. In his opinion the conduct and behaviour of the policeman Blaško was inadequate and aggressive.

**Witness Vladimír Chovanec** stated at the main trial that he was a policeman in retirement pension and he works in a private security service. He was starting his night duty at the time when the act happened in 2007. He was in a changing room with his colleague and they heard noise in the corridor. The colleagues Krajmer and Blaško were putting Boris Kozma to the cage for preventive detention . Mr Péli was sitting on a chair, closer to the changing room. After they started the duty the permanent service officer told them to take Boris to the hospital for examination. Boris was squirming on the ground in the cage that they had beaten him. They did not talk to Boris on who had beaten him. He had known Boris for 15 years, as a member of the Municipal Police then, later as a member of the CPCG. Boris could not talk, he was only sighing, he had some surface abrasions and he was covered in blood. They took him for the examination, his wife joined them in the hospital and took part in the examination. The doctor examined Boris for suspicion if he had concussion of the brain and kept him in hospital for monitoring. He was lying in the room, sighing, he did not communicate at all. He could not state how Boris got the abrasions, they saw him only after they left the changing room as he was squirming in the cage. He had known the accused person since he joined the Police, they had served about two duties together. They had one conflict with Blaško at work but the inspection solved it only after this matter.

With regard to the discrepancies in the witness's testimony his testimony from the pre-trial proceeding was read in accordance with the provision of Art. 264 Sect. 1 Criminal Procedure Code, the witness explained the discrepancies by lapse of time and he persisted in the testimony as stated in the pre-trial proceeding.

**Witness Michal Krajmer** stated at the main trial that he worked as an officer of unit 5 PMJ of the Regional Head Office of the Police Force Nitra, he is doing the same service as he was doing in 2007, when he worked as an inspector of the District Department of the Police Force Nitra. In 2007, he did not remember the exact date, they were sent to the bar to the village Štitáre with his colleague Blaško by the operating centre where an attacked lady was assumed to be waiting. When they came to the place two women were waiting for them in the street, one of them described them what had happened, that Péli slapped her and threw her dog on the ground. She said that Péli was sitting at the table with one man and they were drinking, she specified the table and described where Péli was sitting. As they were coming to the table, they could hear the outrages such as "machers are coming" etc. from there. The man sitting face to them (the aggrieved person) was shouting. The accused person Blaško went to the table, he stopped at the girls and instructed them how to file a complaint. When he came to the table, his colleague had already been talking to the man sitting face to them and they were having an opinion exchange. He asked Péli to identify himself with his ID card properly and asked him to go out, however, he did not react and he was sitting there passively. The man sitting opposite Péli told them to let Péli be, that he knew what rights he had. The colleague Blaško caught Péli by his shoulder or arm and wanted to sign him to stand up. Kozma grabbed Blaško's hands, after which Blaško got out of his hands quickly and Kozma jumped up, he raised his hand to him and they fell down on the ground. He tried to catch them, he hit the table and remained trapped at the table. They fell down, Kozma with his face towards the ground and Blaško tried to get his hand behind his back to handcuff him, he also shouted at him to help

4

This is the translation from the Slovak into English language.

6T/97/2010

him with him, therefore he jumped to his legs and fixed Kozma´s feet, while he kicked him. Blaško handcuffed Kozma´s hands at his back and they took him out of the pub to the police car. The colleague carried out a safety inspection, explained him what he had committed, that he had attacked a public official, then they put him in the car and he went back for Péli, who went with him without any problems. He explained him what was going on, that a complaint of attack had been filed against him, that they were taking him to the District Department of the Police Force. The other woman stopped there to say that Kozma attacked her, that he wanted to kill her and that he gave her slaps and that she was going to file a complaint. They sat in the car and as they were leaving Štitáre, Kozma came round and started to tell them that he would give them money, that he had fucked up his life, that he would be sacked from work, then he started to swear that he would take them off their uniforms, that he knew the people. They went to the District Department of the Police Force to Chrenová, they put Kozma to the cage for detained persons. Péli was placed to the place for detained and he left to prepare an official record of bringing and limitation of personal freedom. Then he asked Péli and Kozma, if they were willing to undergo an alcohol breath test. Kozma refused, he wrote a record on that. He could not state how Kozma got the injuries from the indictment. Neither he nor Blaško was in contact with him. He asked Kozma whether he wanted medical examination at the time when they brought him to the Police Force Department and wanted alcohol breath test from him. In the official record on the use of enforcement means he did not specify what enforcement means he used against the aggrieved person, he did not know how Kozma got the concussion of the brain and bodily harm stated in the indictment. He did not see Blaško beating the aggrieved person. He was only holding Kozma´s feet when Blaško was kneeing on him. After the action he himself sustained the injuries to his belly and elbow, he was examined by the doctor similarly as the accused person Blaško. Kozma went to the examination because the ambulance was called, but he does not know the reason. Chovanec was with him at the examination. They did not know that he was a member of CPCG. During the argument in the bar he threw a black wallet to them and shouted that he was a colleague, however, they did not verify that in any manner. Blaško solved the situation saying that if he was a colleague, he should behave like that. They did not call the superior because a hustle occurred there and there was no time for that. They did not verify his identity because a dispute occurred between Blaško and the aggrieved person. The service action was assessed by their immediate superior Mjr. BA Miloš Tomka. He did not see that the accused person would attack the aggrieved person in contrary to the service action rules, however, he was not present at Blaško and Kozma all the time since he was preparing papers. He did not hear that Blaško would swear at the aggrieved person in a foul way, he may have spoken up to moderate him.

The testimony from the pre-trial proceeding was read to eliminate discrepancies in the witness's testimony in accordance with provision Art. 264 Criminal Procedure Code and he identified himself with it as he stated in the pre-trial proceeding.

**The witness Denisa Lacová** stated at the main trial that she had called the policemen to the bar because Péli attacked her and Miss Csuláková physically, regarding the small dog which they had with. Péli gave her two slaps and one to Miss Csuláková. Kozma attacked her verbally regarding the small dog and regarding the fact that she was not local, he chased her around the table and around the car, therefore she called the Police by telephone. The policemen arrived and showed Blaško the men who she had had a conflict with. Blaško came to the table where Kozma was sitting. Kozma put something on the table and she could only hear that he said "Indeed we are colleagues". Then she saw Kozma raising his hand to him, she saw that the policeman was able to hide and caught Kozmos hand automatically, he tried to get it behind his back, Kozma fell down on the ground and pulled glasses down with him. Kozma tried to resist the policeman, she saw that he had cut himself and then they took him to the car. They took also Péli to the car but he did not resist. She had not known Kozma and Péli before. The conflict between them occurred because of the puppy she had in the bar, they started to mind it. Péli threw the puppy on the ground, Csuláková came to him and he gave her a slap. Also she got a slap when she protested against it. Péli attacked her physically and Kozma verbally, therefore she called the policemen. The policemen approached calmly to them, without any violence. Kozma was sitting at first and he put something on the table, the policemen took them away then so she did not see anything more. She did not know Kozma and Péli, but Blaško is her former classmate from the secondary

5

This is the translation from the Slovak into English language.

6T/97/2010

school. They lodged a complaint against Péli for a physical harm, he got a suspended sentence, the trial was held in 2009.

With regard to the discrepancies in the witness's testimony her testimony from the pre-trial proceeding was read in accordance with the provision of Art. 264 Sect. 1 Criminal Procedure Code, the witness explained the discrepancies by lapse of time and she persisted in the testimony as stated in the pre-trial proceeding.

**The witness Mária Csuláková** stated at the main trial that she had known the aggrieved person from the village, she had not known Blaško. At the time of the act she was in the pub with Denisa Lacová, Radka Hrabecová, Iveta Billová, Martin Matuš, Tomáš Hrabec, they were sitting at one table when the argument between them and Kozma started. She was sitting back to the aggrieved person. Based on that incident the police patrol was called which asked Kozma, who was sitting with Péli, to identify himself by his ID card after they had arrived, which he rejected saying that he does not have to identify himself because they were colleagues and the argument about the documents started between them. She saw Kozma raising his hand, one policeman caught that hand and tried to put it behind his back to handcuff him, another policeman joined him, they toppled him on the table and then they fell down on the ground where Kozma cut his face on the broken glasses. Kozma fell down the face on the ground and the policemen fell on him. Kozma had a cut face on the right cheek, the policemen handcuffed him and took him to the car. After the confrontation with the photo-documentation of the aggrieved person's injuries the witness corrected herself that she had only thought that Kozma was cut because she had seen blood. She did not hear that the policemen would ask the aggrieved person for some inspection, only to show them his ID card. She did not see that the policemen would apply violence against him. After they had arrived she told them that Kozma had attacked her friend, he had chased her around the table and made a threat against her. For the time lapse she did not remember more. She could not describe the police patrol but she knows that the policemen were not aggressive. She had not had a conflict with Péli and with Kozma before this incident.

With regard to the discrepancies in the witness's testimony her testimony from the pre-trial proceeding was read in accordance with the provision of Art. 264 Sect. 1 Criminal Procedure Code, the witness explained the discrepancies by lapse of time and she persisted in the testimony as stated in the pre-trial proceeding.

**Witness Jana Balková (neé Mihalčinová)** stated at the main trial that she did not remember the date, but they were in a pub in Štitáre as a group of friends, Kozma, whom her husband had known, was sitting in front of them. A verbal argument between Kozma and some girls started there, then the Police arrived. Kozma was beaten by the Police, they took him to the police station, she followed him to the police station and they wanted to make their statement but they did not let them in, Mr Kozma's wife was there too. An ambulance took Kozma away later on and they wanted to give evidence in the matter together with friends, they were about 8-9 of them in two or three cars there. They went to the Police because it seemed reasonable to them to go to the police station if the Police beat someone. Two policemen came there, one was active and another one was standing there. The policeman had a baton in his hand, Kozma fell down of the bench on the ground, she saw how the policemen were holding him, how they took him to the car and pushed him into the car. She does not remember the details, when she testified for the first time, she could remember more, also the contents of the conversation, she was sitting quite close to them during the conflict. Kozma behaved in a normal way to the policemen, she was sitting about 1 -1.5 m far from him. She did not see a physical attack of the aggrieved person on the policeman.

With regard to the discrepancies in the witness's testimony her testimony from the pre-trial proceeding was read in accordance with the provision of Art. 264 Sect. 1 Criminal Procedure Code, where she described acting of the accused person and of the aggrieved person after the patrol had arrived widely in detail. The witness explained the discrepancies by lapse of time and she persisted in the testimony as stated in the pre-trial proceeding.

6

This is the translation from the Slovak into English language.

6T/97/2010

The testimonies of the witnesses the separate hearing of which the Court did not consider to be necessary were read at the main trial upon the consent of the parties to the procedure in accordance with Art. 263 Sect. 1 Criminal Procedure Code.

The witness **Ing. Martina Kozmová** stated in her testimony from the pre-trial proceeding that her husband Boris Kozma called her on 13 July 2007 at about 9:50 pm and asked her for help because they were beating him, he was completely covered in blood, he was loosing orientation, he could not stand on his legs and the policemen had taken him. He said that the policemen had beaten him in the bar and that she should call to his work for help. Then the connection was interrupted. She went to the bar Relax in Štitáre to find out what had happened. Ladislav Péli, Ivan Brath and some young girls, of which she could identify only Regina Balková, told her that policemen had beaten Boris and they had probably taken him to the doctor for examination because he had asked for it. Then she called to her husband's work and she told the commander in service what she had learnt, that policemen had beaten her husband and they took him away by the police car. She went to the Police Department to Nábrežie mládeže in Nitra with her friend Valéria Kurucová. The policeman at the counter told her that her husband was there but she could not see him and go to him because he had been detained. He did not let her go to him despite the fact that she had told him that he had been injured and had asked her for help. The officer told her that he would contact the interrogator who would give her more information. So she stayed at the counter waiting. Obviously her husband could hear her so he shouted at her if that was her. She said yes and her husband leaned out of the door behind the bars on his knees, he fell down on the floor on the left side and he crawled about half a meter out, he was horribly beaten, he had his hands handcuffed behind his back, his clothes and his face were covered in blood, his face was swollen on the left side so that it was not possible to see his left eye. He shouted at her to call an ambulance because he could not see and could not stand up. In a moment another policeman in black camouflage uniform grabbed his arms by both hands, he lifted him by his foot and kicked him back behind the doors with the bars. She told the policeman that he could not treat him that way, that he was a man and he should be human. He replied that he did not mind it, that her husband was a prison warder and that he had almost broken his lower back on the table. Then the informant came out, he pushed the policeman by his body to another room and tried to calm him down. She urged the informant that she wanted medical examination for her husband and he replied that at any case he would not call the ambulance, but if her husband gives his consent, they would take him to the hospital for examination by the patrol. Then another policeman came and she asked him to provide medical help for her husband and he told her that her husband had refused medical examination. But she told him that she wanted to hear that directly from her husband that he had refused medical examination. Then the policemen went to him to the cell and they asked him a few times whether he wanted medical examination, he replied that of course he wanted. The interrogator told her that her husband would be taken for the examination but by a different patrol because he could not go there with the patrol which had detained him. A patrol from Klokočina was supposed to come. She was waiting in the entrance hall but nothing was happening, she became nervous and she called the number 155. An ambulance arrived, the policemen accompanied the doctor to her husband and asked her again to leave the building. The doctor said that the examination in hospital would be required and then she saw them taking her husband on a chair, he was having an infusion and one sneaker taken off, when she approached to him, her husband did not recognize her, he only shouted that he had not done anything. Then they loaded him to the ambulance and took him away. The witness stated that when the policemen ordered her to leave the building for the first time, there were some young people form their village there, she recognized Jozef Ment, Tomáš Balko with his girlfriend and Boris Školák. They were talking about what had happened in the bar. She caught from their discussion that it was not normal that the policemen had beaten Boris so brutally. They did not mention what particularly had happened in the bar, they only said that the car which the policemen arrived by and which they took Boris away by was completely covered in blood. When she asked if they remembered the license plate of the car Tomáš Balko said that he had noted it in his mobile phone. She asked if it was the license plate NR-614DB, which she noted down when the two policemen wearing camouflage uniform, who were supposed to bring her husband in, were getting on it. Upon the interrogator's question she stated that she had seen the policeman's attack on her husband when he had crawled out of the door, she did not see other attacks. She learnt the details on the incident from her

7

This is the translation from the Slovak into English language.

6T/97/2010

friend Valéria while they were waiting for the husband's examination in the hospital. Valéria was not present at the incident, but she learnt it from the young people who were standing in front of the police building that night. The witness heard about the incident that two policemen wearing black camouflage uniforms came in front of the bar in Štitáre by the police car, with the batons in their hands they approached the table on the terrace where the young people who were then in front of the building sitting. The policemen came to Péli and asked him to go with them, which her husband reacted to and asked for explanation from them, to which one of the policemen responded shouting that was not his business. Her husband identified himself with a service ID card of a CPCG member and said his name loudly and said that he was also a member. Then a verbal argument started between her husband and the policeman and one of the policemen asked her husband to go with them too. They did not answer her husband's question that based on what he should go with them, they only wend on asking him to go with them. Her husband refused and one of the policemen reacted by hitting her husband from the back to his neck by the baton. Upon that her husband turned towards the policeman and he received a hit by a fist in his face, tumbled on the ground, he overthrew the table with glasses and then both policemen approached him, they tried to put his hands behind his back and asked him to stand up and they still beat him with fists and kicked him, he had his hands in front of him and protected his face. Then they lifted him up from the ground, took him to the car, handcuffed his hands and took him away. Her husband asked for medical examination permanently because he was bleeding. She could not say what the motion of the conflict was, she had it all intermediated.

In her further testimony the witness stated that she persisted in her previous testimony. She came across Mr Blaško, whom she did not know then, at the police station; however, she knew he was present at the incident because he had said it to her himself at the police. When she came to the police to get the information on her husband, Mr Strapko told her that her husband had been detained because he had had a conflict with girls in a bar and for the assault on a public official. The policeman who kicked her husband brutally back to the cell attacked also her verbally. She deduced from his words that he was one of the patrol that had detained her husband, however, she did not notice his identification number, he was rather tall, dark skin, dark eyes. Later on, during the interrogation, she deduced that it was Mr Blaško. She could not say anything about the activity of another policeman during the action in the bar and she knew him only from what others said. Regarding the assault on her husband at the police station she stated that when she communicated with the policeman in service, she could see the corridor through the bars, she could hear her husband talking to her and calling for help, the voice was coming from the room which was the second one behind the bars on the left. When her husband crawled out of the door and told her to call the doctor because he could not see, a policeman in black run out of the first door, fully armoured around his waist, he jumped to her husband shouting how could he afford that and kicked him twice in his belly and chest. The policeman was wearing black combat boots. He grabbed her husband for his clothes and pulled him back to that door. She was shouting at him all the time that he must not kick him. Then he closed him in that room and run to her shouting if her husband could assault him. A verbal argument started between them and she had a feeling that if there were not bars between them, he would have attacked also her. Then two his colleagues came and took him away. Of the policemen who were at the station she remembered only that one, from whose words she deduced that he had been in Štitáre too. He lost self-control completely, she could not explain his conduct in a different way.

During the hearing on 22 June 2009 she replied to the interrogator's question to describe the PF member who was supposed to attack her husband physically in the premises of the District Department of PF Nitra on 13 July 2007 in detail that he had a rather tall sporty figure, rather dark complexioned, an oval face, dark eyes, complete short haircut, no moustache or beard, dressed in black, he looked as if he was wearing camouflage uniform but black colour, he was wearing also a black vest on the top, she did not notice his rank and whether he had his name plate. He had a baton behind the belt, he was taller than her, he could be about 180 cm tall, she cannot state whether she would recognize him.

Recognition of a person was executed on 23 June 2009 at the Regional Head Office of the PF in Nitra. In the first identification the witness Kozmová did not mark any person of 5 figurants and the accused person. EXTBLASKE: old identification the witness asked a person number 6 (the accused person) to come forward, but

8

This is the translation from the Slovak into English language.

6T/97/2010

she stated she was not 100% sure but the person with number 6 was the closest to him, even according to his voice she could not state it for 100%, thus she did not mark any of the persons with surety.

The witness **Patrik Földeši** stated at the hearing in the pre-trial that on 13 July 2007 at about 10:00 pm he was in the bar in Štitáre in Jelenecká street, they were sitting at the rear table with some friends of him. Policemen came to their table, on of them pointed at Ladislav Péli and asked a girl if that was him, she said no, that one turned by his back to him. Then the taller bald policeman came to Zoltán Péli, who was sitting at the next table and asked him to stand up and go with him. Boris Kozma, who was sitting with Péli at the table, told him not to go anywhere and asked the policeman why they wanted to take him away, he repeated this question about three times. The policeman got nervous and attacked Boris grabbing him and throwing on the ground, he started to beat him, hit his head, he hit him about five times in his head by his fist, then he told the other policeman to start kicking him and that one did it, he started to kick him in the ribs, he could not state how many times he had kicked him. Then the policemen lifted lying Boris up from the ground and he saw blood. They went to the car with him, they threw him in the car, Boris still went on foot to the car. Somebody took his telephone and documents which were left on the table and gave them to Boris. One of the policemen came back to take Zoltán Péli, who was sitting at the next table and took them both away. The witness was sitting in the bar so that he could see everything and when the policemen started to beat Boris, he stood up to see it. After Boris Kozma stood up for Péli, the taller policeman had a conflict with Boris on something like who he thought he was and he was not his colleague. Then suddenly the policeman got angry and attacked Boris, who was sitting on the bench, the policeman grabbed shoulders and pulled him on the bench down on the ground. Boris told him he wanted a doctor because he had cut himself on the glasses which had been on the table before, he tumbled him between the bench and the fence and he beat him there, he hit him in his face by his fist about 4-5 times and the other policeman kicked him in his ribs upon his order about 3 times. Boris did not defend himself, he was only lying on his belly, hiding his face, he could not raise his hand to them because the policemen were holding him on the ground by the knee. He did not hear Boris introducing himself, he only noticed that he was telling the policeman that there were the documents, have a look. Boris had his hands on the table during the entire discussion. The policeman was arrogant to him, he shouted at him, but he did not see Boris raising his hand to the policeman or speaking up at him. He thinks that the only reason of the policemen's attack on Boris was the fact that he had asked them why they wanted to take Péli away. When the policemen came to the bar, they did not identify anyone, they did not ask what had happened, they went directly to him. Boris Kozma had a cut hand and his face was bleeding, a blood puddle remained at the table, the barmaid washed it. The policemen did not have any injuries and damaged clothes. Boris and Zolo were slightly drunk. He does not know why the policemen came to the bar, he only heard that a girl had called the policemen for them. He knows Boris Kozma only from the village, they are not friends and they do not meet each other, they only say hello to each other. He had known the taller bald one of the policemen in action, but only visually, he used to go to the discos, but he did not know his name, he did not know the other one. The witness adhered to his previous testimony during the hearing on 19 February 2009, he stated that he did not remember the details after the lapse of time, he did not know why the conflict started in the bar and who had called the policemen. He was not sitting with Boris Kozma at the table, he was sitting at the next table.

The witness **Ladislav Péli** stated in the pre-trial proceeding that on 13 July 2007 at about 8:30 pm he was in the bar in Jelenecká street in Štitáre, he was sitting on the terrace at the last table, there were about 10 to 12 of them there, he was sitting back to the scene. Boris Kozma, Zoltán Péli, Marek Púchovský were sitting behind his back and some girls were sitting at the very first table. He knew only Mária Csuláková of them. He and his friends did not notice what was happening around them, he only noticed an argument between the mentioned group and the first table, only after the arrival of the policemen he noticed that something was happening. The policemen came in a hurry because they braked suddenly with a drift in front of the bar, they run to them and one of them asked one of the girls which one was that on the way. They were dressed in black, as for an action, he noticed only the first one, that he was holding a side-handle baton in the right hand, he approached to him and asked the girl if that had been him, to which she replied no, it had been that one a table nearer. He approached to Zoltán Péli, he caught his hand and told him he would bring him to the police station. Boris Kozma asked the policeman very calmly why they wanted to take Péli away. When the policeman heard

9

This is the translation from the Slovak into English language.

6T/97/2010

that, he became aggressive, he started to shout at Boris how he imagined it, why he was not quiet and if he should take also him away. Boris repeated his question and the policeman was still shouting at him, if he was his colleague, Boris took out his wallet, put it on the table and said his name was Boris Kozma and he worked in the prison which the policeman replied to that he was not interested in it and he asked him again if he should take also him in, literally he screamed at him, Boris told him with calm voice to take him away then. Suddenly the policeman in amok attacked him, he dropped the baton on the ground and he hit Boris by the fist of his right hand in his neck, he tumbled on Boris, he wanted to screw his arm, as he was tumbling, they rolled to the other side of the table and they broke glasses doing that and Boris cut himself on those glasses. He wanted a doctor and when the policeman heard that, he started beating him in his head about 4-5 times by his fist and then he ordered the other policeman, who had been only watching by then, to kick Boris, he started to kick him in his ribs about 4 times. Then they handcuffed him and took him to the car where the policemen hit him to the car strongly, he even made a dent on the rear mudguard by his knee. People saw it, they shouted that they should give Boris his telephone and a wallet, everybody had fear of the policemen and no one wanted to take those items, so he took them and gave Boris all his items to his pocket. The entire left mudguard was covered in Boris's blood. When they were putting Boris to the car, the policeman, who had been beating him, ordered the shorter policeman to go to get Zoltán Péli, they put him in the car and took them away. About a half an hour later his wife arrived, she said that Boris had called her from the station that they had been beating him there and told her to come to take him from the station. He left for home then. Regarding the fact why the policemen had come to the bar he said that when he went to the bar to get Kofola, one of the girls (black-haired one) at the first table was calling, it seemed to him that she did not call 158 directly, but she called that policeman, she used his first name, but he does not know why she was calling him. The conflict between Boris and the policeman started because Boris had told Zoltán Péli that according to the law he did not need to have him brought in, upon which Péli sat down back and said nothing. Boris asked the policemen several times why they wanted to take Péli away, but he did not cause any troubles to the policemen, he only asked. The policeman was mad, he asked Boris about three times whether he should take also him away, to which he answered calmly here you are, here are my documents, he introduced by his name and surname and said that he worked in the prison. The policemen did not mention any call on taking Boris to the police station, the policeman only asked him several times if he should take also him, to which Boris finally answered "here you are, take me away", then the policeman attacked him, that might have been the reason of the attack of the policeman. Boris was clam, the policeman shouted at him and as he was shouting, he was leaning to him and sputtered at him. Then Boris asked him not to sputter at him, but he did not raise his hand to him, he had his hands put on the table. Boris did not put up resistance, even when the policeman beat him, he did not hide against his hits, he could not do anything because the policeman was lying on him, he laid on him with all his body and he wanted to screw his right hand to the back, the left hand was under thy lying body. The whole fight took about 25 seconds and a blood puddle remained on the stones after they had left. The policemen did not have any injuries, they did not have where to get injured and they did not have anything torn or damaged in their clothes. He did not know if Boris was drunk, it was not visible at him, he could have drank about two beers, but only 10%. He could not have drunk more, because he does not drink when he drives. The policemen even did not talk to the girls, they were sitting at the table during the fight. He was just next to it during the incident because he was sitting at the next table to his back and as he turned, he could see everything happening there, he was the witness of the entire incident, until the policemen left. He knows Boris Kozma only visually from the village, they are not friends and they are not in any relationship or family relationship together. Regarding the policemen he knows only the taller one, who communicated all the time and attacked Boris, he worked with him at the Regional Office where worked as a temp, they chatted at times. He was surprised by his conduct in the bar, he had not expected that from him. He had never experienced such conduct of policemen.

The witness **Ivan Brath** stated in the pre-trial proceeding that he was in the local bar with a group of friends of him on the specified date, they were sitting at the last table, Boris and Zolo were sitting at the one before the last. Mása Csulákobá with a friend, who he did not know, were sitting at the very first table. A verbal argument started between those two tables but he did not know the reason of it, he was not interested

6T/97/2010

in it. The police patrol came in front of the bar at 9:30 pm, two policemen got out of the car, carrying side-handle batons in their hands, and they came to the terrace to the back part to them, between them and the table where Boris Kozma was sitting. One of the policeman asked him to go with him, Boris asked them what they wanted to do with the side-handle batons and they hid them then. Boris asked then based on what they wanted to bring him in but they did not answer, they just asked him a few times to go with them. The policeman asked him who he was, upon which Boris took out his service ID card and a case with documents from his pocket, he put them on the table. The policemen asked him where he worked at them and he told them his name and surname and he said he worked in the prison. Then the policeman turned to Zolo and told also him to go with them. Boris asked the policemen repeatedly based on what they wanted to bring them in. The policemen caught his armpit of his right arm, Boris was sitting at the table, hands on the table. The policeman wanted to lift him up, he pulled him to himself, then he pushed him away from him and they fell together down over the bench and glasses on the ground. Boris fell down on his belly, the policeman pushed him to the ground and told him to put his hands behind his back. Boris asked repeatedly based on what they wanted to bring him in, upon which the policeman hit him in his face by his fist. Boris then curled up on the ground and told the policemen that they would have to take him for medical examination. The policeman told the other policeman to kick him, which he did about 3-4 times to his ribs from the side. Boris did not defend himself at all, he was lying on his belly during the whole action, then the policemen handcuffed him, lifted him and Boris went to their car on his feet. Boris nose or mouth was bleeding, the blood was at the table, on the road and also on the police car. The policemen were not injured at all and they did not have damaged uniforms. When they loaded Boris to the car, the other policeman went to take Zolo, he asked him to go with him and he went without any problems. Boris did not offer resistance too. Then they took them away. He could see the whole incident well because he was sitting at the next table face to them and he could also hear well what Boris and the policeman were talking about. Boris and Zolo had beer in front of them but he did not know whether they were drunk. Boris was sitting calmly at the table, he was only asking and answering the policemen, he did not raise his hand to the policeman, but the policeman spoke up with them. He could not state what the reason that the police patrol came there was, it was noisy there, there were at least 20 people there, an argument, but he did not pay attention to it.

The witness **Jana Kasalová** stated in the pre-trial that she was in the bar in Štitáre on 13 July 2007, she was sitting at the last table with her friend Ladislav Péli and other friends, Boris was sitting at the next table, she had not know him by then, with her friend's uncle Zolo and some older men, who she did not know, were sitting at them too. Some girls were sitting at the first table, she had known only one of them visually. Then she heard Zolo and Boris arguing with the girls. Some time later policemen entered the bar, as they entered, one of the girls pointed her finger at somebody and the policeman went directly to her friend, but the girl told him it was not him, the other one. The policeman went to Zolo, caught his arm and told him to go with him. Boris asked him why should he go with him, based on what, upon which the policeman told him "shut up". Boris asked repeatedly why they wanted to take Zolo, the policeman came closer to them and started to shout at him that who he was. Boris told him his name and surname and submitted him the documents which he had taken out of his pocket and he also said that he was a prison warder. To the policeman's question whether he was his colleague Boris said no, he only wanted to know based on what they wanted to take Zolo away. Then the policeman screwed Boris's arm and pulled him down on the ground over the table on which they broke the glasses, Boris cut himself on them, he shouted he had been cut and he asked to have a doctor called. As the policeman pulled Boris on the ground, he started to hit his face or neck by his fist, then he told him to put his hands behind his back, Boris had his hands in front of his face and the policeman who was beating him told his colleague to kick Boris, he did it about 3-4 times to his ribs, then the policemen handcuffed him and took him to the car. Boris was bleeding, his blood was also on the back door of the police car, it was also at the place where they had beaten him and also on the road at the police car. Then the other policeman came to take Zolo, he gave him his hands voluntarily, the policeman handcuffed him and they sat in the car and they took them away. Then after about an hour other policemen dressed in civil clothes came and they wanted to take pictures of the blood. They asked where the broken benches were, but there weren't any broken benches. Then Tomáš (she did not know his surname) wanted to ask the policeman about the attack, if a policeman could attack that

11

This is the translation from the Slovak into English language.

6T/97/2010

way when he did not know what happened, but the policeman answered him that he would not talk to him about it at beer and if he did not like anything, he could go to make a statement to the Police. Ivan Brath showed the policeman the blood on the road, he shrugged his shoulders and left. Then also they went to the police to Nitra, Boris's wife and a friend of hers had already been in front of the police station and they told them they did not want to let them in. They rang at the door, a policeman came and they told him they wanted to make a statement, he told them that an interrogator manages this and closed the door. They stayed outside and Boris's wife called an ambulance. They did not make a statement that night, they even did not write down their contact data. The witness said that somebody was shooting the entire incident on a mobile phone as the policemen were doing the action in the bar. As they were waiting in front of the police station, she saw the police car there which took Boris and Zolo away, it was all dirty of dust, dirt, but at the point near the door as Boris was getting on it had already been washed, Tomáš took a picture of this in his mobile phone. She did not know why the policemen had come to the bar, perhaps because Boris and Zolo had argued with the girls, one of the girls swore at Boris and Zolo and they laughed at it then. When the policemen arrived, they had already been angry, the taller one had a baton in his hand. They approached to her friend at first and when the girl told him that was not him, he went to the table where Boris and Zolo were sitting. The shorter policeman was standing further and the taller one stopped at Zolo and started to pull him to go with him. The policemen did not identify anyone, only Boris took out his documents, but the policeman did not check them. The policeman who wanted to take Zolo away behaved in aggressive way, he had already arrived like that, he even did not ask what had happened and when they arrived, the situations had already been calm. Boris and Zolo did not talk to the girls. The policemen attacked Boris because he had asked them what the reason was to take Zolo away, Boris did not give them any other reason for that. The policeman screwed Boris's hand, pulled him down on the ground and started to hit his head with his fist, it was several times. The other policeman was only watching and only upon the first policeman's stimuli he started to kick Boris. Boris did not defend in any way, he only put his hands in front of his face, he did not offer any resistance. She knows that Boris was bleeding because he shouted that he wanted a medical examination but she did not know whether he was bleeding from his nose or mouth. The policemen did not have any injuries, they could not have any because Boris did not touch them, they did not have even damaged clothes, she knows it with surety, because when they were at the police station, they noticed them thoroughly when they were passing them. Zolo looked drunk but Boris did not seem to be drunk to her. The policemen attacked Kozma with no reason.

The witness **Marián Barcsa** stated in his testimony at the pre-trial proceeding that he was in the bar Relax in Štitáre with his friends on 13 July 2007 at about 9:00 pm. He was sitting outside on the terrace at the last rear table. Boris Kozma with friends were sitting at the next table and he was talking to a girl who was sitting at the first table with some friends of which he had known only Marika Csuláková from Štitáre. He did not notice them so he cannot make a statement on the incident which was supposed to occur between Boris Kozma and the girl. He only saw a police car coming and one of the girls run to the policemen. They came to their table, they asked Laco Péli if it was him but the girl said that not him but that man one table nearer. The policemen stood to the table where Boris was sitting with friends, they wanted to take one of them and they did not even say why he should go with them, he only came to the table and wanted to take him away. Boris asked him why he wanted to take him away and he did not answer. Boris wanted to show his documents, he put them before the policeman, he said his full name and that he was a prison warder. The policemen responded: "are you a colleague of mine or what?" and screamed at Boris. He did not know exactly whether the policeman hit Boris at first or he only rolled down over the bench, but when he was on the ground, he started to hit Boris's head by his fist at least twice, because once he hit him to the head area from back and the second time, when Boris turned, he was hit in his face. Boris cut himself as he was falling down because some glasses fell down too. He asked for a medical examination. The shorter policeman who had only been standing aside by then started to kick Boris in his ribs or in his belly, he kicked him surely at least three times. Then they lifted him up from the ground and took him to the car. Somebody picked up Boris's documents from the ground and took them to the police car. Then the policemen came back to Boris's friend, who was still sitting on the bench, they loaded them both to the car. Then they went to the police station in Nitra together with friends, but they did not let them in, then an ambulance came to take Boris, it took him away and they

12

6T/97/2010

left. After the policemen took Boris and his friend away, some policemen came to the bar to take pictures and they told them that if they wanted, they should go to make a statement to the police station, therefore they went there. He thinks that the girl called the police to the bar, however, they did not watch the incident, before the policemen arrived there was nobody fighting in the bar and nobody swearing at each other. The taller policeman was always speaking up to Boris, the other one did not communicate. It all stared upon the Boris's question – why they wanted to take his friend away. Boris did not attack the policeman at all, he had his hands put on the table freely, when he was lying on the ground and he was beaten, he did not give the hits back, he was only lying there, he was not shaking. The witness stated that he was sitting face to them in the distance about two meters, he could see the entire incident well, nobody covered his view. It did not seem to him that Boris and Zolo were drunk. He did not know the policemen in action. He had known Boris only visually from the village. Regarding the Boris's injuries he stated that he could see him bleeding, he was covered in blood on his face, the policemen were not injured and they did not have damaged clothes. During the time the policeman was beating Boris on the ground, Zolo was only sitting at the table. He does not know whether the policemen beat Boris also at the station, but when Boris was leaving Štitáre, he went on foot and an ambulance took him from the police station.

Witness **Jozef Ment** stated in the pre-trial proceeding that he was in the bar Relax in Štitáre in Jelenecká street on 13 July 2007 at about 9:15 p.m., he was sitting at the rear table with friends, Boris Kozma, Marek Púchovský and Zolo were sitting at the next table. The policemen with side-handle batons in their hands came to their table, they even did not greet them, they did not ask what had happened, they only asked their friend Laco rudely whether it had been him, they said no and a girl who had been sitting at the first table run there and pointed at Zolo. The policeman approached him rudely and told him to go with them. Boris Kozma asked the policeman based on what he was bringing him in, the policeman responded that it was not his business and Kozma asked again why he was bringing him in. Then the policeman lost his temper, asked Boris who he though he was, upon which Boris told him his name and surname, he put out his documents, however, the policeman did not even check the documents, he started to shout at Boris and knocked him down from the bench where Boris had been sitting, some glasses broke down and Boris cut his hand on them. As he was lying on the ground, he told the policemen that he was injured and asked them to take him to the hospital, the policeman screamed at him to shut up and hit his head with his fist three times and told the other policeman to kick him and he kicked him 4 times to his ribs. Than they handcuffed Boris with hands in front of him and took him to the car and the other policeman came back to take Zolo and they took them away. Boris left the bar on his own feet. About a half an hour later they went to the police station where they wanted to make a statement but they were rejected. Then a police car arrived, the policemen who beat Boris got out of it, they were not injured at all and they did not have their clothes torn. In about 10 minutes an ambulance took Boris away on a chair. Boris did not perceive the surrounding. Upon the interrogator's questions the witness stated that he did not know why the policemen came to the bar. Boris did not provoke the policemen in any manner, he behaved calmly to them, he did not speak up and did not raise his hand to them. He does not know why the policeman attacked Boris, he did not give have a reason for the attack. During the attack he hit Boris's neck, pulled him down on the ground grabbing his clothes and pushing him in front of him on the bench to the ground, he ordered him to put his hands to the back while kneeing on his back. Boris was lying on the ground, hands in front of him, he did not defend himself in any manner and he did not respond to the physical attack, he was only lying. Then the policeman hit his face, he received the first hit as he was turned to the policeman, then he put his hands on his face to protect it, then the other policeman started to kick him upon the first one's instruction. The witness stated that he was at the rear table about 2.5 - 3 meters far from them and he was standing all the time, he had a good view. He does not know if Boris and Zolo were drunk. Boris was bleeding from the nose and mouth, he had his hand injured, bleeding also from it. As the ambulance was taking him away, he was bleeding from his mouth, his eyes were swollen, and also the face also head, he did not perceive the surrounding, clothes completely covered in blood. In the repeated hearing on 24 June 2009 the witness persisted in his previous testimony and repeated that the policemen attacked with no reason because Boris did not show any aggression and despite that the taller policeman attacked him as the first. He does not know whether the shorter policeman joined it verbally, but he followed the instructions of his taller colleague and

13

This is the translation from the Slovak into English language.

6T/97/2010

kicked Boris when he was lying on the ground. He knew only that Boris Kozma was from the village, he did not know the policemen at all.

The witness **Boris Školák** stated in the pre-trial proceeding that he was sitting at the last table on the terrace of the bar Relax in Štitáre together with friends on 13 July 20017 at about 9:00 pm. He did not notice that an argument occurred between Boris Kozma or that other man and the girls or that they would attack a girl. He saw that the police patrol arrived, two policemen got out of the car and they had batons in their hands. They approached their table and asked who it was, who had attacked the girls, they told them they did not know anything about it. Then the girl who he did not know, it was Csuláková´s friend, told the policemen that those were not them, but the ones sitting one table nearer and she pointed her finger at a man sitting with Boris Kozma at the table and his name is Zolo. Without any questions the policeman grabbed Zolo and told him to go with them. Then Kozma asked the policeman that upon what basis they wanted to take Zolo. The policeman asked by irritated louder voice that who he was, upon which Kozma put out his documents and told them to look. The policeman asked Zolo to go with them again, Boris asked again upon what basis they wanted to bring him in and then the policeman attacked Boris Kozma with his fist on the neck, then they tumbled, the policeman pulled Boris on the table, pushed him to the table and they slid down. Glasses were falling down at it and they got broken and Kozma hurt his hand on them, he told the policemen that he was injured and they had to take him for medical examination. The policeman beat him about 3-4 times more with his fist in his face and ordered the other policeman to kick him to the belly area. He did so and kicked him about 4 times in his belly. Then they handcuffed him and took him to the car without taking his documents which he had submitted them before, they did not even look at them. Boris repeated all the time that they had to take him to the hospital because he was injured. Then they came back to take Zolo, who remained sitting at the table and one of friends took Boris's documents from the table and took them to him to the police car. They loaded them both to the car and went away. Their service car was covered in blood on the driver's side above the rear wheel. Then they went to the police station to Nitra with friends, they wanted to make a statement, but they did not let them in, even to the corridor and they were waiting outside with Boris's wife. Later on an ambulance, which Boris's wife had called, arrived, they went to the police station to treat Boris and after about 10-15 minutes they brought Boris out on a wheelchair, completely beaten with swollen face and torn T-shirt, swollen eyes, he was telling his wife he could not see anything and they loaded him to the ambulance. Then he went away with his friends. He saw this all with his eyes, also regarding the incident between the policemen and Boris, he was at the next table and he was watching the whole fight from the distance of about 2-3 meters, he had it all in front of him. Boris Kozma was sitting at the table calmly during the communication with the policeman, his hands freely put on the table, he was talking to the policeman calmly, when the policeman started to be aggressive, Boris also spoke up slightly, but he still asked the policeman the same question, based on what they wanted to bring Zolo in. However, the policeman responded to it only with a counter-question for Boris, that who he was. The policeman attacked Boris by a fist hit directed to his neck first, with this hit he tumbled Boris on the table and the policeman pushed him even more. Boris only defended himself, he did not attack the policeman in any manner, even after the hit received from the policeman. In his opinion Boris's question to the policeman that upon what basis they were bringing Zolo in was the cause of the first hit. The policeman was aggressive to Boris, he beat him in his face, Boris protected his face only with his hands, one hand under him and covering his face by another hand. The policeman was still shouting at him and Boris required medical examination because he was injured, then the other policeman came and upon the order of his colleague he kicked him in his ribs, after which Boris remained laying with no movement. Then the policemen lifted him up, Boris still asked for medical examination because he was injured. The policemen did not have any injuries, there was no reason to have them. As the rescuers were carrying Boris from the police station, he was completely beaten, covered in blood, his T-shirt was torn and he was saying very hard that he could not see anything. Regarding Boris, he did not know him personally, he met him in Štitáre but they were not friends, he did not know Zolo almost at all, he saw him only in the bar. He did not know the policemen as well, he had seen them for the first time. The policeman who attacked Boris was rather chubby, completely short cut hair, he was taller than them. The other policeman, who kicked Boris, was rather short, he did not notice him, he does not remember him, he seemed to him to be surprised of all that action. The taller

14

This is the translation from the Slovak into English language.

6T/97/2010

policeman was more aggressive, he communicated with Boris and started to beat him. The other one was only watching the whole action surprisingly, until the first policeman asked him to start to kick Boris. He kicked Boris without any comments, otherwise he did not join the action. Regarding the reason why the policemen had arrived to the bar, he did not know, he only heard that a fried of Csuláková called them. After the policemen's arrival he saw the girl coming with the policemen so she must have gone with them already from the car. In the repeated hearing on 24 June 2009 the witness persisted in his previous testimony and he could say only that the policemen's action was unreasonable and inadequate.

The witness **Zoltán Péli** stated in the pre-trial proceeding that he was sitting on the terrace of the bar relax in Štitáre together with Boris Kozma and Marek Púchovský on 13 July 2007 at about 9:00 pm, he was drunk. Two girls, Marika Csulláková and her friend who he did not know, provoked them, he gave two slaps to one of them and one slap to another one. One of the girls called the Police. Two policemen arrived, they came to their table and they wanted ID cards from them, Mr Kozma took out his service ID card, put it on the table and in that moment they started to beat him. They beat him and handcuffed them and took them to the police station in Nitra. Kozma asked for a medical examination, which the policemen refused. They told him: "You fucking warder, you have finished", they swore at him. When they came to the police station, they bound him to the heater and turned off the light in the corridor. He did not know where they took Boris, he did not know if they beat him too, but then they brought him to the corridor where he was bound too, so he was bound about 5-6 meters far from him. When Boris said that he saw in triple, he called his wife, it was about 10:43 pm, he told her where they were and that the policemen refused providing medial examination to Boris. Then at 11:05 pm he called number 150 for an ambulance for Boris (the witness provided the interrogator with his mobile phone during the hearing, the calls are recorded in it). Then they closed him to the cage which is there at the police station, the ambulance arrived and he saw as they pushed Boris on a chair, he was connected to an infusion. Regarding the incident in the bar, the policemen were not aggressive to him, he does not know what the reason was that they attacked Boris Kozma when he submitted them his service ID card, he does not know if they had a personal reason for that. It was a second, the policeman attacked Boris, threw him over the bench where he was sitting and started to beat him. After the policemen arrived Boris was calm, he did not say any comments, anything to provoke them, he did not raise his hands to them and he did not gesture, the only movement he did was when he took his service ID card out of his pocket, otherwise his hands were freely put on the table. He does not remember if the policeman asked anything from him. At the time of the policemen's arrival the bar was calm, nobody was arguing or fighting, the incident based on which the girls called the police had been settled. The girls were sitting at their table and they were sitting at their table, they were not interested in them at all. The policemen did not try to find out upon what they had been called, they just went directly to them. The policeman beat Boris everywhere he hit him, he beat him anywhere, he could not make a statement on his injuries, his nose was bleeding. Regarding the policeman, they did not have any injuries. After one policeman pulled him over the bench on the ground, Boris was lying on the belly, or on the side, he did not defend himself in any manner, he did not give the hits back. He saw the policeman kneeing on him and beating him with fists. The other policeman helped the first one by holding Boris on the ground and he perhaps kicked him in his ribs. He did not know how the policeman who beat Boris looked like and he cannot describe the other one too, he did not know them. He did not know how long the fight took, but it ended up by handcuffing him and taking him to the car. During the fight he was only sitting at the table, he did not even move, after they took Boris to the car, they came to take him too and took him away. At the time when the policemen attacked Boris only he and Boris were sitting at the table, Marek Púchovský was in the rest room and he went to get some beer to the bar. Regarding what he had drunk he stated that he had two beers and two vodkas in the bar and he had also been drinking during the day. Boris had not drunk before he came to the bar because he had been driving and he had two cognacs and two small beers in the bar, he was not drunk. When the policemen sat them in the car, Boris asked for medical examination again, upon which the policeman who was driving, the same who had beaten him, told him to shut up, that he was a fucking warder. Boris did not say any threats to the policemen. After the arrival to the police station they bound him to the heater in the corridor, switched off the light in the corridor. He did not know where they took Boris. It took about 5- 10 minutes, then they brought Boris to the corridor too and bound him about 5-6 meters far from him. They got out of the car together, but

15

Case 1:17-mc-00067-DAD-SAB Document 1 Filed 10/02/17 Page 63 of 133
This is the translation from the Slovak into English language.

6T/97/2010

he did not know where they took Boris, but when they brought him to the corridor, he looked like a beaten man, he was covered in blood only from the nose that they had broken him. He did not know whether Boris or the policemen had damaged clothes. Boris was clam during bringing in the department, he obeyed any orders from the policemen, he did not resist. The policemen inspected them immediately at the car, they had to take everything out of the pockets, he had all his belongings in front of him on the chair. Regarding Boris, he cannot make statement on it. They closed him in the cage at the police, then the interrogator came, carried out alcohol breath test and told him if there is a content of alcohol in his breath, he cannot make a statement. Policemen did not shout at him and did not beat him. Regarding Boris, he cannot make statement on it, the ambulance took him away. He did not know what happened in the corridor where Boris Kozma stayed bounded because meanwhile he was put to the cage, what happened then, he did not know. Regarding the incident with the girls, he did not remember it exactly. The girls were also drunk. Csuláková said that if she could get one to prison, she would get there another one too. However, he does not know if it was addressed to him or Boris. This provoked him and he gave them the slaps. Boris got engangenged the incident because the girls offended his wife.

The witness **František Barnáš** stated in the pre-trial proceeding that he did not remember the exact date, he knows that he served a night duty from 10:00 pm until the following morning to 6:00 a.m. with a dog handler in Mostná street. When he came to the department at about 9:45 pm, Kozma had already been in the cage. Then he left to serve a walking patrol in Mostná street with the dog handler. At about midnight the operating officer withdrew them from Mostná street to the Faculty Hospital in Nitra, where they were to guard Kozma because he was admitted to the hospital. When he came to the department before the service, he saw Kozma in the cage, he asked his colleague why he was there, he told him an assault on a public official, he was not interested in it any more, he did not get in contact with Kozma. Kozma acted a dead bug in hospital. He does not know about the fact that any of his colleagues would have attacked Kozma, he knows that Kozma attacked their patrol. Vlado Baško had a pocked on the uniform torn. Both colleagues, Vlado and Mišo, went to medical examination because one of them had complained about some ribs or belly and the other one had something with his hand, he was supposed to have fallen there on a table. He remembers Kozma's name because he guarded him in the hospital, he did not remember his face. Vlado Chovanec, the dog handler who he was serving then with, told him about Kozma that he was a warder in women's prison and when he drank, he was an aggressive idiot. He could not make statement on Kozma's injuries because he did not see him well.

Witness **MD Miloš Gašparovič** stated in the pre-trial that he did not remember the exact date, it was in the night hours, he was having a duty in urgent medical assistance and Ms Kováčikova was with him as a nurse. They went sent to an action by the dispatching, they did not get a specification of a person or a condition, they only got the address of the Police Station in Nábrežie mládeže in Nitra. Upon the arrival the aggrieved person was half-sitting on the floor on the corridor. The man was leaned on the wall in the presence of a policeman. The aggrieved person had blood suffusion under his eye, the swelling got bigger and he complained about pain in his stomach and lower limb because he had one leg stretched and one leg bended in the knee. Within the medical procedure the vital functions were checked, i.e. blood pressure check, pulse check, blood saturation by oxygen check, sight check, he was administered infusion and some painkillers. Subsequently he was transferred to hospital, accompanied by a policeman, to the traumatology department. When he treated the patient he still repeated that he had been attacked and beaten and that he had also identified himself as a CPCG member. The policeman, who was with the aggrieved patient at the District Department, did not interfere in the examination procedure in any manner, he did not notice that he would have behaved rudely or offensively to the patient. Then his wife ran in. As they were carrying him out, there was a bigger group of people and the aggrieved person told the woman where the keys or mobile phone were. The patient was transported to the hospital with suspicion of the eye area and head contusion, then some intra-abdomen injuries which could not be specified by external examination. As they were lifting him up, they had to support him, he went to the chair. The patient only explained that he had been attacked by the policemen, he did not explain more details, he did not identify the policemen who did it. The patient did not mention if he had been attacked also during the time at the police station, he mentioned a bar or a pub, that

16

This is the translation from the Slovak into English language.

6T/97/2010

the policemen who came there, attacked him. Regarding the injuries, the swelling around the eye was new, it could have been caused by a blunt item, maybe a hit, the eye did not bleed, it was only largely swollen.

The witness **Marián Soviš** stated in the pre-trial proceeding that he did not remember the date, it was in the summer, he was sitting in the bar Relax in Štitáre with his friends in the evening hours. An argument started between Kozma, Péli and some girls. It was a verbal argument, he did not see anyone fighting there. One of the girls called policemen. He remembered that one of the girls said that she had already got one man to prison, she could get there him too. In about 5-10 minutes the policemen arrived and they came to their table, they asked the girls which one it was, they pointed at their table. He did not remember if a discussion preceded it, he only remembered one policeman, the taller one, standing at the table, the shorter one standing next to him, telling Mr Kozma to go with them. Kozma tried to find out based on what he should go with them, he also threw some documents on the table, the policemen did not notice the documents. The words that Kozma would go with them were repeated a few times and he asked a few time based on what he should go with them. Then the fight started. He did not know how it started, he only noticed how they tumbled over the table to the other side of the table on the ground. The taller policeman was in a position that Kozma was on the ground and he was somehow above him, it looked as if he was kneeing on him. The policeman beat him to his head by his fist a few times, then he remembered Kozma saying that he had cut himself. Then the taller policeman tried to handcuff him and due to some reason he told the shorter policeman to kick him. He kicked him more than once to the area of the ribs then. Then the policemen handcuffed him, lifted him from the ground and took him to the car where he was standing leaning for a while. He must have leaned on the car because there were the prints of blood on the car. Then they handcuffed Péli too and loaded him to the car and left. He did not know what preceded the incident and how Kozma tumbled on the ground with the policeman, he only notice them tumbling on the ground. He did not remember any orders of the policemen before the tumbling. Kozma communicated calmly with the policemen, he was not aggressive, rather the taller policeman made an aggressive impression. He came there as a big boss. He was sitting back to Kozma, he did not watch all the time, he turned to them only at times. After they tumbled on the ground they stood up and watched the whole incident. When they fell down, Kozma was on his belly and he protected his head by hands, the hits by fist in the head area followed from the policeman immediately, there were more of such hits, Kozma only covered himself, otherwise he did not defend himself. Then the policeman ordered the shorter colleague to kick him, he obeyed his order, kicked him in the rib area. Then they handcuffed Kozma, lifted him up and took him to the car, which they had parked in the street. He did not know the policemen who did the action, he only remembered that one was taller and one was shorter. The taller one was more active and more aggressive, the other one only watched the situation and kicked Kozma upon the colleague's order. He could not remember the shorter one at all, the taller one was younger, he could be about 30 years old. He knew Boris Kozma visually from the bar, he did not know him personally. He did not see that the policemen would have some injuries or torn uniforms.

The witness **Regína Balková** stated in the per-trial proceeding that she was sitting in front of the bar Relax in Štitáre on 13 July 2007. She did not see the argument which was supposed to be between Kozma and Denisa, she did not pay attention to it. Then she saw Denisa running out on the street with a telephone in her hand and she was calling somewhere, but she did not hear what she was saying on the phone. In about 15-20 minutes a police patrol arrived and Denisa run to them immediately and she went to them to the back to the terrace. After the policemen's arrival she started to be interested in what was happening, so she stood up and went to look at the terrace. There were two policemen there, one was taller and one shorter. The taller went to Ivan Brath, he caught his shoulder and Denisa screamed it was not him, that the one a table farther. The policemen moved to the table where Boris Kozma and Zoltán Péli were sitting, two or three older men were sitting there too, but she did not know who they were. The taller policeman told Péli to go with them, Péli stood up to go, meanwhile Boris Kozma asked based on what they were taking him. The taller policeman asked him who he was so Boris Kozma took out his wallet with documents and said he belonged to the Court Guard. The taller policeman started to shout at him, if he was his colleague, he repeated it about 3-4 times and then he hit Boris in his face by his fist. Boris did not defend himself in any manner, neither verbally nor physically. Then the policeman thrust Boris so that the glasses from the table fell off the table and they broke down. He

17

This is the translation from the Slovak into English language.

6T/97/2010

thrust him until he pushed him up to the ground. When Boris was on the ground, he was huddled on the side, the tall policeman squatted down over him and started to hit his face with his fist, then the policeman stood up, Boris was still on the ground and the taller policeman told the shorter policeman to start kicking him. The shorter one said no and the taller one told him to do what he said so the shorter one kicked Boris to the ribs a few times. Finally they lifted him and took him to the car, Boris was covered in blood because he cut himself on the broken glasses. They leaned him on the car, kicked to both legs to straddle. The rear door on the driver's side was dirty of blood. Then they put Boris to the car and went to take Péli, he went with them voluntarily. When the policemen came to the table where Zoltál Péli and Boris Kozma were sitting, they told Péli to go with them. Kozma only asked about the reason why they wanted to bring him in, he said that by normal voice, he did not speak up, she did not see him physically preventing the policemen from taking Péli. The policeman started to shout and then beat Boris only because he had asked about the reason why they wanted to take Péli. Boris Kozma did not give any stimuli to the policeman to attack him physically. The policeman beat Boris by his fist to his face and head, it was a few times. The other policeman did not do anything, unless the first one ordered him to start to kick Boris. It was possible to see on the policemen, especially on the taller one, that he was aggressive immediately at their arrival, he was walking as a big boss. Boris was calm, he was only talking with them, he did not attack them verbally or physically. She did not know the policemen, she had never seen them before. She knew Boris Kozma, but not well. After the incident Boris Kozma had cut hands from the glass, nothing was visible on his face until they took him to the car, she did not know if his nose was bleeding. The policemen did not have any injuries or damaged uniforms. She knows that the incident should be shot on a mobile phone by someone. The taller policeman was predominating at the action, the shorter one did almost nothing, he was only standing and the other one and watching. Boris did not give any reason for the policeman's attack, the policeman attacked him with no reason.

Witness **Katarína Ottingerová** stated in the pre-trial proceeding that on the day when the incident happened she went to the bar Relax in Štitáre, the friends had already been sitting there, she came to the bar only when the patrol had already been there and they were solving something. She entered the bar and when she came out, the policemen were taking someone away. What had happened there she learned from the others, she saw that the man they were taking away was covered in blood. However, she did not see any incident and she did not know the reason why the policemen had come to the bar. She did not know then that the man who the policemen were taking away was Boris Kozma, whom she knew from the village. The policemen were taking Boris to the car normally and went away. Kozma with the taller policeman shouted something at each other, the other policeman did not join the discussion. She personally did not see any of the policemen beating Boris Kozma while putting him in the car or after they sat him in the car. Boris did not defend in any manner, when she noticed him, he had his head down, he did not defend himself physically, maybe rather verbally. She did not notice how the shorter policeman reacted.

Witness **Marek Púchovský** stated in the pre-trial proceeding that he did not know exactly when it happened. It was in the bar Relax in Štitáre, he was sitting outside on the bench, a verbal argument between Boris Kozma and Csuláková occurred. Than it calmed down, he went inside and got some beer for boys, he stayed inside a bit longer because he talked to a barmaid. As he looked out, he saw policemen taking Boris Kozma to the car. He does not know based on what the policemen came. When he was inside in the bar, he did not hear that something was happening outside, there was loud music playing there. When he came out, he asked the boys what had happened, he learned that a policeman beat Boris. On that day when it happened, he together with his father and Zoltán Péli worked on the Zoltán Péli's roof, Boris came in the evening and they went to the bar together with him, they were sitting outside at the table, his father next to him, or Zolo and Boris was sitting there too. He did not know anything about the incident.

The Court took evidence also by reading the Expert's Opinion in accordance with the provision of Art. 268 Sect. 8 Criminal Procedure Code at the main trial.

The conclusion of the **Expert's Opinion number 17/2007** prepared by the expert MD Ján Zelenák in the specialization Health Care and Pharmacy, branch Surgery and Traumatology, dated 30 September 2007

18

6T/97/2010

stated that the aggrieved person sustained concussion of the brain, face contusion in the area of the left eye with a subcutaneous bleeding, fracture of the small nose bones, cervical spine sprain, contusion of the front abdominal wall on the left, contusion of both wrists, partial damage of sensitive nerve fibres of the right radial nerve in the area of the forearm. The injuries of the aggrieved persons were caused by a blunt injury mechanism and they were caused by a blunt injuring item using pressure, pulling and stroke. The expert admitted a possibility that the injuries may have happened in a way as described by the aggrieved person and also the injuries of sensitive nerve fibres of the right radial nerve in the area of the forearm may have been caused using the enforcement tools. Potential permanent consequences of the injuries may be commented only after the lapse of a one year period after the injury. After the injury the aggrieved person suffered from headache for four weeks, he took painkillers, he could not remember the events for three weeks, he could not focus on any activity, he suffered from insomnia, nausea and dizziness, he had pain in his neck, in his front abdominal wall and wrists for two weeks, he suffered from bowel emptying failure and he could feel skin sensitivity failure on the back side of the right hand. The treatment period from 14 July 2007 to 14 August 2007 is adequate to the injuries sustained.

In accordance with Art. 269 Criminal Procedure Code the Court familiarized with the documentary evidence in the file by reading them at the trial.

In connection with the fact that the **accused person Vladimír Blaško** is not present in the territory of the Slovak Republic during the main trial the Court has provided the information on his stay abroad also in cooperation with the Military District Prosecution. The response to the request for provision of information regarding Vladimír Blaško from the Canadian Embassy dated 29 September 2010 states that in accordance with the Canadian Act on Information Protection the consular office may not provide any information on the visa, residence or moving of persons.

The **Report of the Military District Prosecution** Bratislava 3 stated that the accused person Vladimír Blaško has cancelled his current own permanent residence at the address Nitra, Martinská street No. 1 and he is not registered in any residential register. In searching for his stay at his family relatives it has been found out that he is not staying in the territory of the Slovak Republic and he is supposed to be staying in the USA, part California, city Fresno with his girlfriend, however, not specifying more detailed address. Finding of his current stay was not successful in any searching in available registers. The US and Canadian embassies did not provide any information on the stay of Vladimír Blaška in their territories upon the request for cooperation.

According to the **Report of the Ministry of Interior of SR**, Section of Public Administration, Division of General Public Administration, Department of Registers and Residence Reporting, Special Registry, no marriage of Vladimír Blaško has been registered in the special registry.

The **Report of the Ministry of Interior of SR**, Section of Check and Inspection Service dated 21 June 2010 states that the attempts carried out to bring in the person Vladimír Blaško were unsuccessful, his parents were inquired repeatedly, they stated that their son was out of the Slovak territory and that he was in the USA, they did not know his exact address. They cancelled their son's current permanent address on the address Nitra, Martinská No. 1. This information has been confirmed in the REGOB system, his permanent address has been cancelled and he has status of a homeless reported with the location Nitra, not specifying the street or exact place of stay. Based on the found circumstances a search for Vladimír Blaško has been declared upon the request of the investigator of the Section of Check and Inspection Service.

The **Official Record** of the Ministry of Interior of SR, Section of Check and Inspection Service dated 23 March 2014 stated that investigation was carried out focused on servicing the mail for Vladimír Blaško and on finding his current stay. On the address Nitra, Martinská 1 the father of the above mentioned person stated that his son was not at home, that he left out of the Slovak territory with his girlfriend Martina in February 2010 and he was supposed to stay in the USA, in part California, city Fresno, he could not state a more detailed address and he also could not state his son Vladimír Blaško's girlfriend's surname, he stated that she was studying something in the above mentioned city. He is not in touch with his son. He stated his son would not

19

This is the translation from the Slovak into English language.

6T/97/2010

come back home sooner than in one year. The Court also introduced a general map, where a part USA - California and the city Fresno are shown.

The **Official Record** of the Ministry of Interior of SR, Section of Check and Inspection Service dated 17 June 2010 stated that repeated investigations had been carried out in order to find the stay and service of mail to Vladimír Blaško, but with no result. Nobody opened the door upon ringing on the address Nitra, Martinská dolina No. 1181/1. In the telephone call with his mother she stated that her son was out of the Slovak territory, he was supposed to be staying in the USA, she did not know further information. The father of the above mentioned person repeated the same as his wife in the phone call, that his son Vladimír Blaško was out of the Slovak territory and he was supposed to stay in the USA.

The **Report of the District Headquarters** of the Police Force in Nitra dated 30 September 2010 found out that search for stay of Vladimír Blaško had been carried out by the Regional Headquarters of the Police Force Nitra. Search for his stay was launched in the past on 16 March 2010 by the District Headquarters of the Police Force in Dunajská Streda, which was cancelled on 6 May 2010, the searched person is supposed to stay in the USA, San Francisco, where he arrived on 26 February 2010 and he is supposed to study at the university in California where he has student visa F1.

The **Information of the Military District Prosecution** Bratislava 3 stated that in terms of the information provided by the representative of the consular office USA Vladimír Blaško is supposed to have been staying at the university in Fresno, USA since February 2010 continuously. The letter of the Superior Special Agent of the Department of State USA, Diplomatic Protection Office Richard Loeffert, addressed to the investigator of Section of Check and Inspection Service of the Ministry of Interior of SR Mjr. MSc. Zuzana Dubajová states that Blaško applied for the student visa and he received it on 18 February 2010, the visa validity was until 7 May 2010, in the place of entry, which was San Francisco in California, Blaško stated the address of his stay in the territory of the USA: 1717 South Chesnut Avenue, Fresno, California 93702-4709. The address is supposed to be the address of the Pacific University in Fresno. As of 30 September 2010 there is not any record that he would leave the USA. With regard to these facts it seems that Vladimír Blaško is still in the USA.

The **Letter of the Ministry of Interior** of SR, The Police Force Presidium, Bureau of International Police Cooperation, National Centre Interpol Bratislava dated 14 February 2014 states that in connection with the search for Vladimír Blaško, for whom an International Arrest Warrant has been issued by the District Court Nitra, they received a report that they have positive location of Vladimír Blaško and they were planning his arrest for his illegal stay in the US territory and subsequent deportation to the Slovak Republic, where criminal prosecution is being conducted against him. They also asked the Court to provide his fingerprints and the Arrest Warrant translated to the English language.

In connection with ensuring the participation of the **witness the aggrieved person Boris Kozma** at the main trial the acts to search for his stay and his bringing in to the main trial have been carried out.

The **Report of the Regional Head Office** of the police Force in Nitra, department of Criminal Police on the result of the search for the aggrieved person Boris Kozma states that several visits at the address of his permanent residence have been made. His father Rudolf Kozma stated that his son was staying there but he was not at home at the time of the visits. They gave him the telephone number and they asked the father for his son Boris's telephone number. They called him a few times but they phone was always off. His father stated that the son did not want to go to the proceedings since he was already ashamed of going there. He also stated that his son Boris knows about the date of the trial. He promised that he will inform the Police by phone when his son Boris was at home. He stated that his son did not always come home at night, but he did not know where he went and where he stayed overnight. He does not work anywhere. Boris Kozma´s mother stated that she had not seen and talked to her son for three years, he was supposed to live at his father. It was also not successful to find out where Boris Kozma was, with his ex-wife Martina Kozmová, he did not respond to her phone calls. It was found out in the Social insurance Company that he was self-employed. It was found out in

20

This is the translation from the Slovak into English language.

6T/97/2010

the village Dolné Obdokovce and at the municipality office Dolné Obdokovce that he operated a bar U BORA in Dolné Obdokovce No. 80, but he has not been running the business for two years and he still owes the rent for the bar to the municipal office. It was impossible to contact him even on another telephone number obtained in the village Štitáre. On 5 December 2012 on the date of the trial a visit to the place of his permanent residence was made in early morning hours and nobody opened. The officers tried to contact Boris Kozma at all available telephone numbers repeatedly, but no results. They sent him a message to call them, however, he did not reply to this message too. When contacted by the police officers by telephone his father stated that he was not at home, he was at the doctor and that Boris had not slept at home, but he knew about the about the date of the trial but he would not come to the Court and that he would come to the trial instead of his son Boris. His ex-wife also stated on the phone that she had called him but he had not answered the phone and then he sent her a message that he could not answer then, then she sent him a message that Police were looking for him regarding the trial which was going to be held but he had not responded this report any more. It has been found out from the investigation performed that the witness – the aggrieved person Boris Kozma avoids the trial intentionally.

The Court found out from the **quotation of the acts connected with the treatment of the witness -** the aggrieved person Boris Kozma that the total amount spent on the examination and treatment of the aggrieved person amounted EUR 874.51 (SKK 26,345.40),

**Minutes on the inspection of the body of Boris Kozma** was made in the Faculty Hospital in Nitra, Traumatology Department on 16 July 2007 at 11:00 am in order to find out whether there are some prints or consequences of a criminal offence on his body. Boris Kozma agreed with the execution of the inspection and Lt. Col. Milan Varga from the Inspection Service Office of the Police Force carried out the inspection. The inspection was documented by photographs and the aggrieved person's attorney LD Jozed Uj was present at it. On the inspected person's head the haematomas under both eyes and a dried wound size 0.5 cm x 0.3 cm with a drop shape were found, on the internal wrist of the left hand a wound size 0.1 cm x 2 cm, on the right hand a pressure mark and a scab on the external wrist, on the internal side above the wrist there are three lines 1.5 cm – 3 cm long, 0.1 cm wide, the belly with no injuries, the back with no injuries, the lower limbs with no injuries. Boris Kozma stated that he sustained all injuries found in the inspection after the policemen's attack in night hours on 13 July 2007. Other parts of the body are not injured. 12 digital pictures were made in the inspection.

The Court found out from the **photocopy of the book of filed notices** that Denisa Lacová and Mária Csuláková gave a notice of foul swear words and insults at them as well as a physical attack. Zoltán Péli and Boris Kozma´s personal freedom was limited on 13 July 2007 at 10:15 pm. The date 13 July 2007 at 11:50 pm is the time of release or hand-over to the competent authority.

**A photocopy of one page of a Phonogram and Report Book** of the District Department of the Police Force Nitra dated 13 July 2007 and a summary of duties on 13 July 2007 from 7:00 am to 7:00 on 14 July 2007 was made familiarized too. The Court familiarized with the official record on the personal freedom limitation of the suspect Boris Kozma and Zoltán Péli dated 13 July 2007 at 10:15 pm and a result of a breath alcohol test carried out in Zoltán Páli on 14 July 2007 at 6:14 am (1.48 mg/l) and at 6:42 am (0.92 mg/l).

The **Record of the Duty** on 13 July 2007 stated that senior sergeant Michal Krajmer and senior sergeant Vladimír Blaško carried out a patrol from 13 July 2007 from 7:30 pm to 14 July 2007 1:30 am and besides other activities the patrol was sent to the village Štitáre to the pub at 9:45 pm, where Denisa Lacová was supposed to be attacked physically by Zoltán Péli and Boris Kozma. The patrol got injured during the service action, personal freedom of the arrested persons was limited upon bringing in.

A **Medical Report** dated 13 July 2007 stated that Michal Krajmer was examined in the medical facility and contusion and haematoma in the right elbow area was found in him, minor injury with the expected sick leave period for about 8 days. Also Vladimír Blaško was examined on the same day and contusion and

21

This is the translation from the Slovak into English language.

6T/97/2010

haematoma in the right elbow area was found in him, minor injury with the expected sick leave period for about 8 days.

A criminal prosecution against Zoltán Péli, charged with a misdemeanour of disorderly conduct in accordance with Art. 364 Section 1 subsect. a) Criminal Code and against Boris Kozma, charged with a misdemeanour of disorderly conduct in accordance with Art. 364 Section 1 subsect. a) Criminal Code and with a criminal offence of an assault on a public official in accordance with Art. 323 Sect. 1 subsect. a), Sect. 2 subsect. a) Criminal Code was commenced upon a **Resolution** of the interrogator of the District Headquarters of the Police Force, Justice and Criminal Police Office dated 13 July 2007, **Investigation File No.: ORP-922/1-OVK-NR-2007**.

The criminal prosecution of the accused former member of the Corps of Prison and Court Guard Boris Kozma, prosecuted by the Resolution of the interrogator of the District Headquarters of the Police Force, Justice and Criminal Police Office dated 13 July 2007, **Investigation File No.: ORP-922/1-OVK-NR-2007**, for a misdemeanour of disorderly conduct in accordance with Art. 364 Section 1 subsect. a) Criminal Code and for a criminal offence of an assault on a public official in accordance with Art. 323 Sect. 1 subsect. a), Sect. 2 subsect. a) Criminal Code was suspended by the **Resolution** of the Military District Prosecution Bratislava dated 14 January 2009, number OPv 271/07 in accordance with Art. 215 Sect 1 subsect. b) Criminal Procedure Code.

It has been found out from the **Official Record** written by the Inspection Service Office of the Police Force of the Ministry of Interior, Inspection Department West Bratislava, the detached workplace Nitra dated 14 July 2007 that on 14 July 2207 MSc. Martina Kozmová filed a criminal complaint for a suspicion of the criminal offences of bodily harm and abuse of power of a public official, which were supposed to have been committed by the Police Force members seated at the District Department of the Police Force Nitra so that on 13 July 2007 at the time from 8:30 pm to 9:45 pm in Štitáre in Jelenecká street, in the bar RELAX they attacked Boris Kozma physically with no reason and they were supposed to have caused him the injuries not specified further. It has been found out from the **Annex to the Official Record** dated 17 July 2007, investigation file No.: UIS-176/IOZ-V-2007 that the phone calls related to the matter concerned were searched for at the operational centre in the REDAT system and they were saved as a record on an audio cassette subsequently. The record from the mobile phone on a CD carrier forms another annex. It has been found out from the photocopy of the operation log book dated 13 July 2007 that the operating officer did not register the event related to the disorder in the bar Relax in Štitáre.

The **transcript of the phone call from the RADAT system** dated 13 July 2007 at 9:25:52 pm between the operating officer and the informant Denisa Lacová, the transcript of the phone call dated 13 July 2007 at 9:27:45 pm between the operating officer and the patrol and at 9:44:13 pm between the operating officer and the patrol, the transcript of the phone call dated 13 July 2007 at 9:50:00 pm between the operating officer and a non-stop service of the District department of the Police Force Nitra, the transcript of the phone call dated 13 July 2007 at 9:52:27 pm between the operating officer and Boris Kozma,  the transcript of the phone call dated 13 July 2007 at 9:53:01 pm between the operating officer and the non-stop service of the District department of the Police Force Nitra were read at the main trial. A tape cassette with the record of phone calles from the RADAT system was notified too.

It was found out from the **photo-documentation from the place of recognition**, held in the office No. 260 at the Regional Headquarters of the Police Force in Nitra, Kalvárska street No. 2 on 23 June 2009 that the identifying person Msc. Martina Kozmová was presented with two photo albums, one with one picture and one with two pictures with five figurants and Vladimír Blaško.

It was found out from the **Resolution** of the Military District Prosecution Bratislava dated 22 July 2009, number OPv 279/09 that criminal prosecution of senior sergeant Michal Krajmer, charged with a criminal offence of misuse of powers of a public official in concurrence with the misdemeanour of bodily harm, committed in form of joint participation was suspended in accordance with Art. 215 Sect. 1 subect. b) Criminal Procedure Code. The aggrieved person Boris Kozma filed a complaint against the Resolution on 4 August 2009

22

This is the translation from the Slovak into English language.

6T/97/2010

and the Resolution on suspension of the criminal prosecution was cancelled by the resolution of the Supreme Military Prosecution Trenčín dated 4 September 2009, number VPt 113/09-6 and it was given back for further proceeding and decision. The criminal prosecution of senior sergeant Michal Krajmer was re-suspended by the Resolution of the Military District Prosecution Bratislava dated 19 January 2010 No. OPv 279/07 in accordance with Art. 215 Sect. 1 subsect. b) Criminal Procedure Code. The aggrieved person Boris Kozma filed a complaint against the Resolution on 27 January 2010, which was rejected by the Resolution of the Supreme Military Prosecution Trenčín dated 3 March 2010, No. Vpt 113/09-12.

It was found out from the attached file of the District Court Nitra, file ref. 33T/101/2009 that a district prosecutor filed a complaint on against Zoltán Péli, born on 10 October 1966 on 26 June 2009 for a continuous misdemeanour of disorderly conduct in accordance with Art. 364 Sect. 1 subsect. a) Criminal Code based on the matter of fact that on 13 July 2007 at about 9:30 pm in the village Štitáre, on the terrace of the bar Relax in Jelenecká street, at the presence of other persons, he, affected by alcohol, told Denisa Lacová to keep her head down, she was not local, if he should slap her and he attacked her physically by giving her two slaps on her face with a flat part of his hand, therefore she called the Police, and then, upon the reproach of the aggrieved person M. Csuláková who had told him what he thought about himself, the accused person Zoltán Péli asked her is also she wanted one and upon her response to try he attacked her physically so that he gave her one slap on her fact with a flat part of his hand. A criminal order was issued in the matter on 26 June 2009, against which an objection was raised by the prosecutor. Zoltá Péli was found guilty of committing a misdemeanour of disorderly conduct in accordance with Art. 364 Sect. 1 subsect. a) Criminal Act by the Judgement of the District Court Nitra, file ref. 33T/101/2009-77 dated 9 October 2009, which became valid on 9 October 2009 and he was imposed a monetary punishment amounting EUR 200 to be settled in four instalments per EUR 50, no later than within one year of validity of the Judgement. In case the execution of the monetary punishment was frustrated intentionally, he was set an alternative imprisonment sentence of two month of imprisonment in accordance with Art. 57 Sect. 3 Criminal Code. Zoltán Péli settled the monetary punishment in two instalments per EUR 100, on 2 September 2010 and 1 October 2010.

In accordance with the Employee Assessment Vladimír Blaško was seated at the District Department of the Police Force Nitra at the time of preparation of the Assessment, he had been employed as a Police Force member from 1 July 2004 after graduation at the Secondary Vocational School of the Police Force in Pezinok, from 1 July 2005 he joined the District Department of PF Vráble in the position of a senior inspector with the territorial and structural responsibility and from 1 April 2006 he was moved to the District Department of the PF Nitra in the position of the inspector, where he operated also at the time of the assessment preparation. He has the required knowledge of legal and other regulations, he improved his personal and local knowledge himself. He was impulsive sometimes, he was less popular in the team of colleagues, he was financially awarded a few times and he also committed disciplinary misconduct several times during a short period (on 19 January 2005 service pay lowered by 15% for 3 months, on 20 October 2005 service pay lowered by 5% for 1 month, on 6 April 2007 a written reprimand – expunged on 26 April 2007, on 17 July 2008 service pay lowered by 5% for 2 months). It was found from the amendment to the Employee Assessment for Vladimír Blaško prepared by the Director of the District Department of PF Nitra that Vladimír Blaško was discharged on 20 October 2009 based on the Service Assessment of the PF Member in accordance with Art. 27 Sect. 6 subsect. b) Act No. 73/1998 Coll. on Public Service as amended with the conclusion "incapable of execution of any position in public service" in accordance with Art. 27 Sect. 4 subsect. c) of the quoted Act.

It was found out from the Personnel Order of the District Headquarters of the Police Force in Nitra dated 19 October 2009 number 268 that Vladimír Blaško was discharged from the service employment of a Police Force member in accordance with Art. 192 Sect. 1 subcest. D) Act 73/1998 Coll. as amended and his service employment was terminated on the date of delivery of the decision.

It was found out from the Copy of the Criminal Record dated 16 June 2009, 2 December 2009, 15 April 2013 that Vladimír Blaško does not have any record in the Criminal Record. According to the Report of the

This is the translation from the Slovak into English language.

6T/97/2010

**District Office** Nitra, Section of General Interior Administration, Infringement Department dated 21 June 2012 and dated 8 November 2012 Vladimír Blaško does not have any record in the Register of Infringements.

It was found out from the **Screening Result** in the REGOB system dated 25 October 2014 that the person with the name Vladimír Blaško was not found in the registry and the Screening Result in the Corps of Prison and Court Guard dated 26 October 2010 showed that the person with the name Vladimír Blaško is not in the registry of the PCGF.

It was found out from the **Report of the Labour, Social Affairs and Family Office** in Nitra that Vladimír Blaško does not take a social assistance benefit (in material and social deprivation) and contributions to the benefit. The Social Insurance Company, the Head Office Bratislava notified of the course of insurance registration of Vladimír Blaško in the system of the Social Insurance Company upon the request of the Court. The last registration is from 3 December 2009 to 30 June 2010 as an employee – agreement holder in the company ReMax Courier Service spol. s r.o.

An International Arrest Warrant was issued for Vladimír Blaško on 29 October 2010 number 4Tp/305/2010 by the **District Court Nitra**. The District Department of the Police Force Nitra notified the Court of the fact that the Extract from the List for the Person Vladimír Blaško with IS DVS (Information system of Investigation Files Log Book) is not available, as it is being solved by the Inspection Service Department SKIS. It was found out from the information in the AVÍZO system dated 26 June 2012 that Vladimír Blaško is subject to a criminal prosecution.

It was found out from the **Report of the District Headquarters** of the Police Force in Nitra dated 18 December 2012 that according to the extract from the Central Register Avízo and OTE Vladimír Blaško is currently subject to a criminal prosecution and he has a record F – 1. He has been charged by the Inspection Service Department and an arrest warrant has been issued for him, he is being searched for and currently he is supposed to be in the United States of America.

It was found out from the **Screening of the Register of the Ministry of Justice** SR that a legal proceeding against Vladimír Blaško is currently being conducted at the District Court Nitra file ref. 6T/97/2010 and also at the District Court Nitra a criminal proceeding file ref. 1T/27/2009 has been finally suspended.

After taking evidence the Court assessed the evidence according to their internal best believe based on careful consideration of any circumstances of the case individually and in aggregate, independently from the fact whether it was obtained by the Court, criminal proceeding authorities or any party, respecting the basic principles of the Criminal Procedure Code.

Based on the evidence taken the Court had decided so that it has found the accused person Vladimír Blaško guilty of committing a criminal offence of abuse of power by a public official in accordance with Art. 326 Sect. 1 subsect. a), Sect. 2 subsect. a) Criminal Code with a reference to Art. 138 subsect. d) Criminal Code in single-action concurrence with the misdemeanour of bodily harm in accordance with Art. 156 Sect. 1 Criminal Code according to indictment made by the Military District Prosecution file ref. OPv 279/2007 modifying the factual sentence in part of a subjective aspect of the criminal offence, preserving the identity of the act and caused consequence, as it has been proved sufficiently and without any reasonable doubts that the act has happened, it bears the signs of charged criminal offences and that the accused person committed them, who, by his act from objective and subjective point of view has met all legal signs of the matter of fact of the charged criminal offences. The illegal conduct of the accused person was in the fact that he, as a public official, intending to cause harm to another person, executed his power contrary to law, he committed the act in a more serious manner by a violent act and he also intentionally caused bodily harm to another person.

By his intentional illegal act the accused person violated the interest protected by law, which is the interest of the society on proper execution of powers of public officials and in the execution of rights and obligations of natural persons and legal entities and he also violated the interest protected by law, which

24

This is the translation from the Slovak into English language.

6T/97/2010

human health is. The objective aspect of acting of the accused person was in the fact that he executed the power of a public official contrary to the provisions of the Act on Police Force 173/1993 Coll. and Act on Public Service of the Police Force Members 73/1998 Coll. The legal classification in Sect. 2 is stated as the accused person's more serious manner of act stated in Art. 138 subsect. d) Criminal Code (use of violence), because in the execution of powers of a public official he used physical violence against the aggrieved person directed against his body integrity applying physical strength on his body, against his will. As a consequence of the intentional act of the accused person in a manner contrary to law bodily harm with a treatment and sick leave period of 31 days was caused to the aggrieved person (Art. 123 Sect. 2 Criminal Code).

Within the evidence taken at the main trial, having met the statutory conditions, the testimonies of the following persons were read: the testimony of the accused person Vladimír Blaško from the pre-trial proceeding, who used his right and remained silent and the testimony of the witness - the aggrieved person B. Kozma, who had described the circumstances of the prosecuted act and the conduct of the accused policeman V. Blaško in the bar Relax and at the District Department of PF where they were brought up together with Zoltán Péli, in detail. The aggrieved person denied any attack or active resistance against the acting policeman in his testimony. He stated that despite the injuries, which he had caused him, the serving policemen did not provide him with medical examination even upon his express request, which is proved also by the supporting transcript of the phone call of the aggrieved person to the line 158. The following witnesses were heard at the main trial: Krajmer (the other member of the patrol) who had originally been co-accused in this criminal matter and the witness Chovanec (the policeman at the District Department of PF), who provided supervision of the aggrieved person after his transportation to hospital. The witnesses Csuláková and Lacová, who had a conflict with Zoltán Péli and with the aggrieved person Boris Kozma and who called the police patrol and the witness Balková (neé Mihalčinová), who had seen the entire act together with her friends at the table, were heard too. Having met the statutory conditions, upon the consent of the procedural parties the testimonies of the following witnesses from the pre-trial proceeding were read: P. Földeši, L. Péli, I. Brath, M. Barcsa, J. Kasalová, J. Ment, Z. Péli, J. Szorád, B. Školák, R. Balková, i.e. the witnesses who had seen the course of the act in the bar Relax directly, the witnesses K. Ottingerová, M. Púchovský and M. Soviš, who had only intermediated and incomplete information on the act, the witness F. Barnáš (the policeman of the District Department of PF), who was serving together with the witness Chovanec in the patrol, the witness MD M. Gašparovič, the doctor, who had been called as a first aid medical assistance to the District Department PF to the aggrieved person and the witness MSc. Kozmová, the aggrieved person's wife, who had described the behaviour and conduct of the policemen at the District Department of PF after bringing the aggrieved person in and who had only intermediated information on the act in the bar.

The basic testimony incriminating the accused person of committing the act which he is charged of in the indictment is the testimony of the aggrieved person Kozma as well as the testimonies of the witnesses, who were observing the entire course of the act in the bar Relax by their senses directly and subsequently described it in detail - Jana Balková (Mihalčinová), P. Földeši, L. Péli, I. Brath, M. Barcsa, J. Kasalová, J. Ment, Z. Péli, J. Szorád, B. Školák, R. Balková. The witnesses almost identically described the action of the police patrol in the bar and the activity of especially the taller policeman (the accused person Blaško) at the action against the aggrieved person. The witnesses confirmed the aggrieved person's testimony in the fact that he did not attack the policemen, he did not resist physically and verbally in their service performance, he introduced himself as a member of CPCG and despite that he was attacked by the accused person physically with no reason in execution of his power of a public official and he was taken to the Police Department. Several witnesses wanted to make statement in the matter at the Police immediately after the act, however, the servicing policemen at the police station did not allow them doing so. The witnesses gathered in front of the police station described also the physical condition of the aggrieved person in which he was transported by an ambulance from the police station. The witnesses also described a lose approach of the policemen sent to document the scene of the crime after the act. The witness Kozmová could see only a part of acting of the accused person to the aggrieved person at the Police Department personally, where she personally called medical assistance for the aggrieved person after vain effort to ask the policemen to do so. This witness had only intermediated information on the action in the bar from the witnesses observing the policemen's action in

EXT BLASKO 065

6T/97/2010

the bar. Her testimony fits in the story of the facts as described by the aggrieved person together with the witnesses and completes complex illegal conduct of the accused person. Despite the fact that the witness did not know the accused person with 100% surety in the recognition procedure, she marked him as the person who could correspond with the accused policeman performing the service action in the bar relax against the aggrieved person the most. The claims of the aggrieved person and the above mentioned witnesses were supported by the results of taking expert's evidence in the specialization of Health Care. The expert described the injuries of the aggrieved person and the mechanism of their occurrence in his Expert's Opinion as described by the aggrieved person and by the witnesses. The expert stated in the conclusions that the 31-day long sick leave was adequate to the injuries sustained. Also the acting doctor of the called ambulance MD Gašparovič, who ordered his transport to hospital, made a statement and comments on the injuries of the aggrieved person in his testimony, but he could not identify a person who was supposed to cause the injuries in question to the aggrieved person and he could not state any other facts for clarification of the act.

As a counterweight on the hand there is the evidence proving in favour of the accused person, especially the testimonies of the witnesses Krajmer, Csuláková and Lacová, i.e. the persons directly engaged in the act. The witness Krajmer had originally been in the procedural position of a co-accused person as the other member of the patrol, who was assumed to have caused the aggrieved person's bodily harm physically – by kicks in the bar Relax, which was confirmed by the witnesses observing the course of the police action. Subsequently the criminal prosecution against him was finally suspended in accordance with Art. 215 Sect. 1 subsect. c) Criminal Procedure Code with the reasoning resulting from the resolution that he had acted only upon the instructions of the commander of the patrol, the accused person Blaško believing that his act is a part of a reasonable action against the aggrieved person. Due to the lack of intent and due to the fact that the aggrieved person's health consequence could have been caused either by fall on the ground or by the kicks of the accused person Blaško, the acting of Michal Krajmer was evaluated as a disciplinary misconduct. Also other witnesses, who observed the action of the accused person, confirmed passivity of the witness Krajmer in the accused person's action and acting of the witness Krajmer only upon the order of the accused person V. Blaško. However, the witness Krajmer claimed in his testimony, that he was in the bar at the table of the aggrieved person and he saw the aggrieved person resisting the accused person actively and raising his hand to him. However, no other witness in the bar saw this. Although the witnesses Csuláková and Lacová supported the statement of the witness Krajmer when they stated identically that they could see the aggrieved person's hand risen, but subsequently despite their physical presence they did not see any violence committing by the policemen on the aggrieved person. Both witnesses stated that they turned back to the action of the policemen. However, their testimonies are in conflict with more than ten testimonies of the witnesses watching the action who claimed that the aggrieved person had not raised his hand to the accused person, he had his hands on the table and had been attacked and beaten by the accused person with no reason. The Court evaluated the testimonies of the witnesses Csuláková and Lacová as non-persuasive because they stated the fact which none of ten witnesses had noticed (the accused person's attack) and when the witnesses were to make statement on the acting of the accused person during the action, they stated identically that they turned back to the scene right then. The testimony of the witness Krajmer was evaluated as purposeful to help the accused person as a colleague policeman and to mitigate the nature of his illegal conduct by the Court. Also policemen Chovanec and Barnáš testified in the matter but they could not state anything substantial to the act, they started their duty at the time of bringing the aggrieved person and the witness Péli to the Police Department and they provided guarding of the aggrieved person in hospital. Both of them had known the aggrieved person but they did not see any policemen who would have caused his injuries at the Department.

Upon receipt of the notice and in suspicion of breach of law the policemen of the District Department of PF executing the service action were obliged to act in accordance with law and in the limits of law in order to prevent from any harm of the rights of any citizen, i.e. also the persons suspicious of an illegal act. The policemen acting in the bar Relax were obliged to enquire the informant who had called the patrol thoroughly so that no exchange of the suspect with another person occurred, they were obliged to document personal data of the suspect and to instruct them of their rights, to check their identity and the identity of persons who could have provided the clarification of the matter and to document the scene of a crime if applicable. Upon

26

the finding that the suspect is subject to a disciplinary power the policemen were obliged to notify a relevant service authority. The use of enforcement tools in the action against the suspects should have been reasonable and adequate regarding the situation occurred. In connection with this the Court points out the testimonies of the witnesses with regard to the fact that at the time of the police patrol arrival there was no threat of any conflict in the bar any more and the original conflict parties (Péli, Kozma, Csuláková, Lacová) were talking only to their acquaintances at the tables then. All above mentioned principles and rules of conduct of the PF members in verification of the notice follow the provisions of the Act on Police Forces. The entire course of the action as described by the witnesses and the aggrieved person proved non-professional and illegal nature of the service action of the accused person in the bar Relax. The accused person as an acting policeman in the bar relax could not identify who the suspect was in fact at first, then with no statutory demand and instruction addressed one of the suspects to follow him non-professionally, he did not identify the persons present at the table and the persons who could have provided the clarification of the matter and later on in confrontation with violating of the rights of the persons concerned he attacked the aggrieved person, who has introduced to him as a CPCG member and colleague with no reason and caused him bodily harm.

The accused person proceeded in contrary to the provision of Art. 8 Sect. 1 Act 171/1993 Coll. on Police Force in execution of the powers of a public official, he did not mind the credit, respect and dignity of the aggrieved person in execution of his service activity and allowed unreasonable occurrence of bodily harm at the aggrieved person by his acting despite the obligation to mind that the intervention in his rights and freedom does not exceed the level necessary to achieve the purpose followed by the service activity. The accused person breached also the provision of the Art. 48 Sect. 3 subsect. e), g), i) Act on Public Service of PF, SIS, CPCG and RP members, according to which a policeman is obliged to meet the rules of service politeness in the execution of public service and to behave politely to public employees and in service contact also to other citizens, both in public service and out of public service to refrain from acting which could breach respect to the Police Force or threaten trust in the Force and to execute the public service without prejudice.

The conduct of the accused person as a public official in conflict with the Act on Police Force and on Public Service of PF Members caused bodily harm of the aggrieved person in consequence and on the other hand it harmed the respect of the Police Force and trust of the citizens in objective execution of the police service. The accused person acted illegally in a manner contrary to law in execution of his powers and he also acted contrary to essential moral principles, which he, as a PF member, himself was obliged to protect and meet. There was causality between the acting of the accused person and a public official and the bodily harm occurred. In order to draw criminal responsibility of the accused person as a public official the conditions required by law were met in accumulation, the accused person was executing the powers of a public official and in connection with that he committed a criminal offence.

The above mentioned proved clearly to the Court that the accused person met all statutory signs of the nature of a crime of abuse of power by a public official in accordance with Art. 326 Sect. 1 subsect. a), Sect. 2 subsect. a) Criminal Code with a reference to Art. 138 subsect. d) Criminal Code in single-action concurrence with the misdemeanour of bodily harm in accordance with Art. 156 Sect. 1 Criminal Code.

Regarding the action of the accused person the Court has come to a conclusion that the accused person committed a criminal offence with a higher level of seriousness by his illegal conduct and he acted with a direct intent according to Art 15 letter a) Criminal Code because he wanted to cause breach or threat to the interest protected by law by his conduct and at the same time he knew that he would cause a consequence of breach and threat to the protected interest by his conduct. This consideration of the Court results from the active action of the accused person against the aggrieved person (the will) and also from his professional position and the knowledge and experience corresponding to it (the knowledge).

In consideration on the kind and length of punishment the Court proceeded in terms of provisions of Art. 34 Sect. 1 through Sect. 4 Criminal Code and took the way of committing of the crime, its consequence, guilt, ground, aggravating circumstances, attenuating circumstances, the accused person and a possibility of correction into account.

27

This is the translation from the Slovak into English language.

6T/97/2010

In imposing the sentence for the accused person **Vladimír Blaško** the Court took his personal situation and the finding that he had not been sentenced by court yet into account, according to the reports on the person no negative signs in his civil life had been found, therefore the Court awarded him the circumstance stated in subsect. j) that he conducted a proper life of the attenuating circumstances stated in Art. 36 Criminal Code. Of the aggravating circumstances stated in Art. 37 Criminal Code the Court found the aggravating circumstance stated in subsect. h) in the accused person, that he had committed more criminal offences. This aggravating circumstance relates also to a single-action concurrence and is a consequence of the absorption principle in sentencing of concurrence. In the process of finding the attenuating and aggravating circumstances in proportion 1:1 the Court applied the principle stated in Art. 38 Sect. 2 Criminal Code. In the application of the principle to impose an aggregate punishment stated in Art. 41 Sect. 1 Criminal Code the Court followed the basic sentencing tariffs stated in Art. 326 Sect. 2 Criminal Code in the range from four years to ten years, having applied Art. 41 Sect. 2 Criminal Code the upper limit of the penal rate of the crime punished in the strictest possible manner increased by one third. The Court has counted the sentencing tarriff for imposing of the punishment in the range from four years to thirteen years and four months this way and imposed him with the imprisonment sentence for 4 years at the lower limit of the calculated penal rate. The Court took any circumstances of the case into consideration when imposing the sentence (execution of powers using violence), the consequence (bodily harm and abuse of powers), but also the approach of the accused person to the committed crime, who had described the aggrieved person non-critically and contrary to the fact as an aggressor in order to legalize his illegal conduct. The accused person abused also his position of a commander of the patrol for this purpose too and he engaged also his colleague to the action. The Court did not find any facts in the circumstances of the case or in the accused person which would justify the use of extraordinary mitigating provision in Art. 39 Criminal Code. The accused person has been classified for the imprisonment in the institution for punishment execution with a minimum level of guarding respecting the provision of Art. 48 Sect. 2 subsect. a) Criminal Code, since the accused person has not been imprisoned for an intentional crime yet.

The Court has come to conclusion that the purpose of the sentence according to Art. 34 Criminal Code in the area of general and individual prevention will be achieved in the proceeded matter in the accused person regarding any circumstances by imposing of the above mentioned sentence believing that the sentence imposed this way is legal, just and adequate, fulfils educational function towards the accused person and his correction and also a protection function towards the society.

In connection with the criminal offence damage was caused to the aggrieved person and to the health insurance company. The Court has referred the aggrieved person Boris Kozma to the civil trial with his claim for compensation of damage in accordance with Art. 288 Sect. 1 Criminal Procedure Code, since the aggrieved person made the claim for compensation of damage in the pre-trial proceeding, but he did not specify the amount. The Court has ordered the accused person to pay the caused damage in the amount of EUR 874.51, containing the cost on medical care for the aggrieved person, to the aggrieved company Dôvera Health Insurance Company in accordance with Art. 287 Sect. 1 Criminal Procedure Code. This amount of damage was applied properly and on time and was also proved by documentary evidence without any doubts.

**Instruction:**

This Judgement may be appealed against within 15 days after the notification at the Court against whose decision it is intended (the District Court Nitra). The Regional Court in Nitra shall decide on the appeal. The notification of the Judgement means declaration of it at the presence of the person the Judgement should be served to. If the judgment is declared in absentia of such a person, serving of the Judgement shall be the notification. A written appeal should contain which statements it is intended against and whether it is intended also against the action preceding the Judgement. The

28

This is the translation from the Slovak into English language.

6T/97/2010

appeal should be reasoned so that it is obvious in which part the Judgment is being objected and what faults are being reproached to the Judgement or acting preceding the Judgement. The appeal may be grounded on new facts and evidence. The person who has waived the right to appeal shall not have the right to bring an appeal.

**In Nitra on 15 April 2013**

**LLD Mária Ondrejová**
**Chairman of the Panel**

a blue round seal of the district Court Nitra 18

For the correctness:
Jaroslava Svoreňová
*an illegible signature*

29

EXT BLASKO 069

PREKLADATEĽSKÁ DOLOŽKA

Preklad som vypracovala ako prekladateľka zapísaná v zozname znalcov, tlmočníkov a prekladateľov, ktorý vedie Ministerstvo Spravodlivosti Slovenskej republiky v odbore slovenský jazyk – anglický jazyk, evidenčné číslo prekladateľky 970859.

Prekladateľský úkon je zapísaný pod poradovým číslom $029/2017$ prekladateľského denníka č. 1/2014.

V Nitre dňa 10. 4. 2017

TRANSLATOR'S CLAUSE

I have made this translation as the translator recorded in the Register of Experts, Interpreters and Translators administered by the Ministry of Justice of the Slovak Republic in the specialization Slovak language – English language, translator's registration number 970859.

This translation act has been recorded under the sequence number $029/2017$ of the Translator's Record Book No. 1/2014.

In Nitra on 10 April 2017

# EXHIBIT B

EXT BLASKO 071

| Preklad zo slovenského do anglického jazyka. | The translation from the Slovak into English language. |
|---|---|

| Prekladateľ: | Mgr. Anna Havranová<br>Ďumbierska 9, Nitra<br>Tel. č.: (+421) 0903 220 184 | Translator: | Mgr. Anna Havranová<br>Ďumbierska 9, Nitra<br>Tel. No.: (+421) 0903 220 184 |
|---|---|---|---|
| Zadávateľ: | Okresný súd Nitra<br>Štúrova 9,<br>949 68  Nitra | Customer: | District Court Nitra<br>9 Štúrova Str.<br>949 68  Nitra |

**Názov:  Rozsudok 4To/97/2013**

**Title: Judgement 4To/97/2013**

Počet strán: 7
Evidenčné číslo prekladu: 030/2014
Dátum: 10.4.2014

Pages: 7
Translation Registration No: 030/2014
Date: 10 April 2014

EXT BLASKO 072

**4To/97/2013-803**
**4110010689**

# ROZSUDOK

## V MENE SLOVENSKEJ REPUBLIKY

Krajský súd v Nitre, v senáte zloženom z predsedníčky senátu JUDr. Zity Matyóovej a členov senátu Mgr. Adriany Némethovej a JUDr. Jána Bernáta, v trestnej veci **obžalovaného Vladimíra    B l a š k a ,** pre zločin zneužívania právomoci verejného činiteľa podľa § 326 odsek 1 písmeno a/, odsek 2  písmeno a/ (§ 138 písmeno d/) Trestného zákona a iný prečin, **o odvolaní obhajcu obžalovaného Vladimíra Blaška** proti rozsudku Okresného súdu Nitra (ďalej len „súd prvého stupňa") z 15.04.2013, sp. zn. 6T/97/2010 (ďalej len „napadnutý rozsudok"), na verejnom zasadnutí konanom v Nitre 07. novembra 2013  takto

**r o z h o d o l :**

Podľa § 321 odsek 1 písmeno d/, písmeno f/, odsek 2 Trestného poriadku **z r u š u j e    s a napadnutý rozsudok vo výroku o treste a vo výrokoch o náhrade škody.**

Podľa § 322 odsek 3 Trestného poriadku  **s a**

**obžalovaný**
**Vladimír  B l a š k o ,** narodený  10.01.1983 v  Nitre,   trvale   bytom  Nitra, Martinská dolina číslo 1,

**o d s u d z u j e :**

Podľa § 326 odsek 2 Trestného zákona, s použitím § 38 odsek 2 Trestného zákona (po zistení poľahčujúcej okolnosti uvedenej v § 36 písmeno j/ Trestného zákona a priťažujúcej okolnosti uvedenej v § 37 písmeno h/ Trestného zákona) a § 41 odsek 1 Trestného zákona **na trest úhrnný odňatia slobody 4 (štyri) roky.**

EXT BLASKO 073

Podľa § 48 odsek 2 písmeno a/ Trestného zákona **s a** na výkon trestu odňatia slobody **z a r a ď u je do ústavu na výkon trestu s minimálnym stupňom stráženia.**

## O d ô v o d n e n i e

Súd prvého stupňa konajúci podľa ustanovení § 358 a nasl. Trestného poriadku proti ušlému a v senáte, napadnutým rozsudkom uznal obžalovaného Vladimíra Blaška (ďalej len „obžalovaný") vinným zo spáchania (evidentne v jednočinnom súbehu) zločinu zneužívania právomoci verejného činiteľa podľa § 326 odsek 1 písmeno a/, odsek 2 písmeno a/ (§ 138 písmeno d/) Trestného zákona a prečinu ublíženia na zdraví podľa § 156 odsek 1 Trestného zákona na tom skutkom základe, že:

v rozpore najmä s § 8 odsek 1 zákona číslo 171/1993 Z.z. o policajnom zbore v znení neskorších predpisov ako aj s § 48 odsek 3 písmeno e/, písmeno g/, písmeno i/ zákona číslo 73/1998 o štátnej službe príslušníkov Policajného zboru, Slovenskej informačnej služby, Zboru väzenskej a justičnej stráže a Železničnej polície v znení neskorších predpisov v čase výkonu služby, ako verejný činiteľ, v úmysle spôsobiť škodu na zdraví poškodenému Borisovi Kozmovi (ďalej len „poškodený"), dňa 13.07.2007 v čase približne o 21.45 hodine v obci Štitáre, na Jeleneckej ulici v bare Relax, pritom, ako mal preveriť telefonické oznámenie o priestupku, fyzicky napadol poškodeného po tom, ako tento predložil preukaz príslušníka Zboru väzenskej a justičnej stráže Slovenskej republiky a predstavil sa ako ich kolega a dotazoval sa, prečo chcú odviesť jeho spolu sediaceho priateľa a to takým spôsobom, že ho obžalovaný udrel päsťou do oblasti krku, následne ho stiahol na zem, kde pokračoval v úderoch päsťou do oblasti hlavy aj napriek tomu, že tento nekládol žiadny odpor, potom ho spútal putami na rukách a následne po predvedení poškodeného na Obvodné oddelenie Policajného zboru v Nitre obžalovaný tohto znovu bez adekvátneho dôvodu fyzicky napadol úderom do tváre a po páde poškodeného na zem aj následnými údermi do oblasti hlavy a kopmi do trupu, čím poškodenému spôsobil otras mozgu, zlomeninu nosových kostičiek, pomliaždenie tváre v oblasti ľavého oka, podvrtnutie krčnej chrbtice, pomliaždenie prednej brušnej steny vľavo, pomliaždenie oboch zápästí a čiastočné poškodenie senzitívnych nervových vlákien pravého vretenného nervu v oblasti predlaktia s dobou liečenia a prácaneschopnosti v trvaní 31 dní.

Za tento zločin a prečin súd prvého stupňa  napadnutým rozsudkom obžalovanému uložil podľa § 326 odsek 2 Trestného zákona, s použitím § 38 odsek 2 Trestného zákona (po zistení v ustanovení § 36 písmeno j/ Trestného zákona uvedenej poľahčujúcej okolnosti a v ustanovení § 37 písmeno h/ Trestného zákona uvedenej priťažujúcej okolnosti) a „podľa zásady uvedenej v

§ 41 odsek 1, odsek 2 Trestného zákona" úhrnný trest odňatia slobody vo výmere štyri roky, na výkon ktorého ho podľa § 48 odsek 2 písmeno a/ Trestného zákona zaradil do ústavu na výkon trestu s minimálnym stupňom stráženia.

Ďalšími samostatnými výrokmi napadnutého rozsudku súd prvého stupňa jednak podľa § 287 odsek 1 Trestného poriadku obžalovanému uložil povinnosť nahradiť poškodenej právnickej osobe Dôvera, zdravotná poisťovňa so sídlom v Bratislave, Eisteinova ulica číslo 25 (ďalej len „poškodená právnická osoba") škodu vo výške 874,51 eur, jednak podľa § 288 odsek 1 Trestného poriadku poškodeného s ním uplatneným nárokom na náhradu škody odkázal na občianske súdne konanie.

Napadnutý rozsudok bol obhajcovi obžalovanému a prokurátorovi oznámený vyhlásením v ich prítomnosti na hlavnom pojednávaní súdu prvého stupňa uskutočnenom 15.04.2013; poškodenému bol napadnutý rozsudok oznámený doručením jeho rovnopisu 18.09.2013.

Obhajca obžalovaného písomným podaním doručeným súdu prvého stupňa 23.04.2013, teda včas podal odvolanie smerujúce výlučne proti výroku o treste napadnutého rozsudku, ktoré odôvodnil ďalším písomným podaním doručeným súdu prvého stupňa 16.09.2013 nestotožnením sa s názorom súdu prvého stupňa o odôvodnenosti a primeranosti obžalovanému uloženého nepodmienečného trestu odňatia slobody vo výmere štyroch rokov, ktorý je síce na úplnej spodnej hranici trestnej sadzby, nezodpovedá však potrebám individuálnej a generálnej prevencie a skôr javí známky exemplárnosti potrestania obžalovaného, ktorý doposiaľ nebol súdne trestaný ani postihnutý za priestupok, v dôsledku čoho mu súd prvého stupňa opodstatnene priznal poľahčujúcu okolnosť uvedenú v § 36 písmeno j/ Trestného zákona. Pokiaľ ide o prihliadnutie na v § 37 písmeno h/ Trestného zákona uvedenú priťažujúcu okolnosť, s týmto sa nestotožnil, pretože ide o neprípustné dvojité započítanie tej istej okolnosti, v ktorej súvislosti jednak poukázal na „judikát" trestnoprávneho kolégia Krajského súdu v Žiline prijatý 14.09.2010 pod číslo 13/2010, jednak mal za otázne samotné použitie ustanovenia § 41 odsek 2 Trestného zákona, keďže sám súd prvého stupňa deklaroval v prejednávanej veci jednočinnosť súbehu trestných činov, zo spáchania ktorých uznal obžalovaného napadnutým rozsudkom vinným súčasne tvrdiac, že za takéhoto stavu pomeru jednej poľahčujúcej okolnosti pri absencii priťažujúcej okolnosti by nič nebránilo zvoleniu „zhovievavejšieho" postupu pri ukladaní trestu obžalovanému. Obhajca obžalovaného sa nestotožnil ani s názorom súdu prvého stupňa o nezistení žiadnych skutočností majúcich spočívať v okolnostiach prípadu alebo v osobe páchateľa a odôvodňujúcich použitie mimoriadneho zmierovacieho ustanovenia uvedeného v § 39 odsek 1 Trestného zákona. V súvislosti s okolnosťami prípadu tvrdil, že postup súdu

prvého stupňa poukazujúci na to, že obžalovaný spáchal trestný čin pri výkone právomoci verejného činiteľa a s použitím násilia, na následok spočívajúci v poškodení zdravia a zneužití právomoci, na nekritický postoj obžalovaného k spáchanej trestnej činnosti (majúci spočívať aj v rozpore so skutočnosťou označení poškodeného za agresora v snahe takto zlegalizovať svoje protiprávne konanie), je v rozpore s ustanovením § 38 odsek 1 Trestného zákona, pretože (s výnimkou postoja obžalovaného k spáchanej trestnej činnosti) ide tiež o dvojité započítanie tých istých skutočností a okolností, ktoré napĺňajú skutkovú podstatu oboch trestných činov, zo spáchania ktorých bol obžalovaný uznaný vinným. Pokiaľ ide o postoj obžalovaného k spáchanej trestnej činnosti jeho obhajca poukázal na to, že z odôvodnenia napadnutého rozsudku vyplýva, že v konaní vedenom proti ušlému bola súdom prvého stupňa prečítaná výpoveď obžalovaného z prípravného konania, v ktorej využil svoje právo a odmietol vypovedať. Obhajca obžalovaného sa „dotkol" aj dĺžky trestného konania v prejednávanej veci majúc za to, že túto, presahujúcu šesť rokov, je vzhľadom na rozhodovaciu prax Európskeho súdu pre ľudské práva potrebné považovať za výnimočnú a v prípade absencie významných dôvodov nie je možné prekročenie tejto hranice tolerovať. V tejto súvislosti dôvodil tiež znížením záujmu spoločnosti na potrestaní páchateľa, slabnutím potreby individuálnej a generálnej prevencie, vytrácaním sa základného vzťahu medzi protiprávnym konaním páchateľa a ukladaným trestom, majúc za to, že práve zmiernenie trestu (ako to vyplýva aj z už existujúcej judikatúry súdov Slovenskej republiky) je preto určitou kompenzáciou za dĺžku trestného konania. S poukazom na všetky tieto skutočnosti obhajca obžalovaného Krajskému súdu v Nitre (ďalej len „odvolací súd") navrhol, aby zrušil napadnutý rozsudok vo výroku o treste a s použitím ustanovenia § 39 odsek 1 Trestného zákona uložil obžalovanému podmienečný trest odňatia slobody vo výmere podľa úvahy odvolacieho súdu.

Zástupkyňa krajského prokurátora na verejnom zasadnutí odvolacieho súdu považujúc napadnutý rozsudok za vecne správny a zákonný vo všetkých jeho výrokoch, v konečnom návrhu odvolaciemu súdu navrhla odvolanie obhajcu obžalovaného ako nedôvodné zamietnuť.

Obhajca obžalovaného na verejnom zasadnutí odvolacieho súdu pridržiac sa písomných dôvodov podaného odvolania, v konečnom návrhu odvolaciemu súdu navrhol rozhodnúť v súlade s návrhom v ňom obsiahnutým.

Podľa § 317 odsek 1 Trestného poriadku ak nezamietne odvolací súd odvolanie podľa § 316 odsek 1 alebo nezruší rozsudok podľa § 316 odsek 3 Trestného poriadku, preskúma zákonnosť a odôvodnenosť napadnutých výrokov rozsudku, proti ktorým odvolateľ podal odvolanie, ako aj správnosť postupu konania, ktoré im predchádzalo. Na chyby, ktoré neboli odvolaním vytýkané,

prihliadne len vtedy, ak by odôvodňovali podanie dovolania podľa § 371 odsek 1 Trestného poriadku.

Odvolací súd plnením svojej prieskumnej povinnosti v prejednávanej veci (v ktorej bola obžaloba podaná 03.06.2010 a ktorá bola odvolaciemu súdu predložená na rozhodnutie 03.10.2013) v rozsahu vyplývajúcom mu z ustanovenia § 317 odsek 1 Trestného poriadku, na podklade odvolania podaného obhajcom obžalovaného preskúmal výrok o treste napadnutého rozsudku, iba proti ktorému odvolanie smerovalo a správnosť postupu konania, ktoré tomuto výroku napadnutého rozsudku predchádzalo; ostané výroky napadnutého rozsudku a konanie im predchádzajúce, odvolací súd preskúmal iba v rozsahu zistenia prípadného výskytu takých chýb, ktoré by mohli odôvodniť podanie dovolania z niektorého z dôvodov uvedených v § 371 odsek 1 Trestného poriadku (zistiac v oboch výrokoch o škode aj takéto, ďalej uvedené chyby).

Plnením z dôvodov vyššie uvedených na výrok o treste napadnutého rozsudku uloženom obžalovanému obmedzenej prieskumnej povinnosti odvolací súd následne zistil, že už orgánmi činnými v trestnom konaní bol v prejednávanej veci zadovážený dostatok dostupných dôkazov nevyhnutne potrebných na objasnenie všetkých skutočností dôležitých pre určenie druhu trestu a jeho výmery tak, ako to vyplýva z ustanovenia § 119 odsek 1 písmeno d/ Trestného poriadku, ktoré dôkazy súd prvého stupňa ako potrebné pre svoje rozhodnutie o treste ukladanom napadnutým rozsudkom obžalovanému na hlavnom pojednávaní v prejednávanej veci aj vykonal (§ 321 odsek 1 písmeno c/ Trestného poriadku).

Súd prvého stupňa pri vykonávaní dôkazov zameraných na objasnenie skutočností dôležitých pre určenie druhu trestu a jeho výmery na hlavnom pojednávaní tiež postupoval podľa príslušných ustanovení Trestného poriadku upravujúcich spôsob vykonania dôkazov, pričom sa nedopustil žiadnych takých závažných chýb (§ 321 odsek 1 písmeno a/ Trestného poriadku), ktoré by boli porušením ustanovení majúcich zabezpečiť v hore uvedenom smere objasnenie veci alebo právo obhajoby.

Zistenia súdu prvého stupňa dôležité pre určenie druhu trestu a jeho výmery, ktoré mohol mať za preukázané, tak mohli vychádzať a napokon aj vychádzali z výsledkov z vyššie uvedených hľadísk úplného a zákonným spôsobom vykonaného dokazovania, zodpovedajúceho všetkým kritériám uvedeným v § 2 odsek 10 Trestného poriadku, pričom súd prvého stupňa pri hodnotení všetkých týchto vykonaných dôkazov podľa názoru odvolacieho súdu dôsledne postupoval aj podľa ďalšej zásady trestného konania uvedenej v § 2 odsek 12 Trestného poriadku (§ 321 odsek 1 písmeno b/ Trestného poriadku).

**6**

Plnením z dôvodov vyššie uvedených na výrok o treste napadnutého rozsudku uloženom obžalovanému obmedzenej prieskumnej povinnosti odvolací súd súčasne zistil, že súd prvého stupňa v prejednávanej veci všetky, v tomto smere zistené a dokázané skutočnosti právne neposúdil podľa všetkých, do úvahy prichádzajúcich ustanovení zákona na strane jednej iba (a výlučne) v otázke úhrnného trestu, uloženie ktorého v prejednávanej veci podľa § 41 odsek 1 (teda nie aj podľa odseku 2) Trestného zákona obžalovanému prichádzalo do úvahy, pretože (ako na to napokon opodstatnene poukázal v odôvodnení podaného odvolania obhajca obžalovaného), napadnutým rozsudkom ukladal obžalovanému trest za dva trestné činy (jeden zločin a jeden prečin) spáchané v prejednávanej veci nepochybne jedným skutkom, teda v jednočinnom súbehu (§ 321 odsek 1 písmeno d/ Trestného poriadku).

Na strane druhej táto, nepochybne vo výroku o treste napadnutého rozsudku sa vyskytnuvšia chyba evidentne nemala žiadny vplyv a význam na zákonnosť výmery trestu odňatia slobody, ktorý bol napadnutým rozsudkom obžalovanému uložený úplne na dolnej hranici trestnej sadzby ustanovenej v odseku 2 § 326 Trestného zákona, ktorá nepochybne v prejednávanej veci mala byť a bola jedinou zákonom ustanovenou trestnou sadzbou.

Z dôvodov vyššie uvedených odôvodnenie napadnutého rozsudku v časti týkajúcej sa výroku o treste uloženom obžalovanému s výnimkou absencie relevantných a zákonu zodpovedajúcich právnych úvah súvisiacich s úhrnným trestom, uloženie ktorého obžalovanému za dva trestné činy spáchané v jednočinnom (teda nie vo viacčinnom) súbehu prichádzalo prejednávanej veci do úvahy, je inak v súlade s požiadavkami ustanovenými v § 168 odsek 1 Trestného poriadku, pretože súd prvého stupňa v ňom úplne a správne uviedol všetky zistené skutočnosti, o ktoré oprel u obžalovaného zistenie jednej, v ustanovení § 36 písmeno j/ Trestného zákona uvedenej poľahčujúcej okolnosti, zistenie jednej, v ustanovení § 37 písmeno h/ Trestného zákona uvedenej priťažujúcej okolnosti (prihliadnutiu na ktorú v dôsledku zákonu zodpovedajúceho použitia § 41 odsek 1 Trestného zákona pri ukladaní úhrnného trestu nemôže ustanovenie § 38 odsek 1 Trestného zákona brániť), prihliadnutie na ich z týchto dôvodov vzniknutý pomer podľa § 38 odsek 2 Trestného zákona, zaradenie obžalovaného na výkon uloženého mu trestu do podľa § 48 odsek 2 písmeno a/ Trestného zákona do ústavu na výkon trestu s minimálnym stupňom stráženia, nezistenie splnenia podmienok a predpokladov mimoriadneho zníženia trestu ukladaného obžalovanému podľa § 39 odsek 1 Trestného zákona, napokon aj tie, ktoré súd prvého stupňa považoval za zistené a dôležité z ostatných hľadísk a zásad ukladania trestu ustanovených v § 34 odsek 1, odsek 3 a odsek 4 Trestného zákona a tiež zo všetkých týchto hľadísk relevantné právne úvahy,

7

ktorými sa posudzujúc všetky tieto dokázané skutočnosti a okolnosti podľa príslušných ustanovení zákona spravoval (§ 321 odsek 1 písmeno b/ Trestného zákona), a to (a zvlášť) vrátane primeranosti druhu a výmery obžalovanému uloženého trestu (§ 321 odsek 1 písmeno e/ Trestného poriadku).

Na všetky tieto hodnotenia a právne úvahy preto odvolací súd ako na úplné a správne, iba poukazuje, nepovažujúc za potrebné ich ani doplniť a ani zmeniť, o a to ani vzhľadom k zjavne v tomto smere k podľa jeho názoru nerelevantným odvolacím námietkam obhajcu obžalovaného, pozornosti ktorého zrejme ušlo, že na dĺžku konania súdu prvého stupňa v prejednávanej veci mal nepochybne podstatný vplyv a význam jeho útek a skrývanie sa s úmyslom takto sa vyhnúť trestnému stíhaniu a hroziacemu trestu.

Plnením svojej prieskumnej povinnosti v rozsahu vyplývajúcom mu z ustanovenia § 317 odsek 1 veta posledná Trestného poriadku odvolací súd súčasne zistil v oboch výrokoch o škode napadnutého rozsudku chybu, ktorej sa súd prvého stupňa dopustil, keď v zjavnom rozpore s ustanovením § 420 odsek 2 Občianskeho zákonníka (obžalovaný škodu súvisiacu s ujmou na zdraví poškodeného spôsobil ako policajt pri plnení služobných úloh a preto bola spôsobená Policajným zborom a obžalovaný za ňu sám, s výnimkou prípadného následného regresného vzťahu k tomuto svojmu zamestnávateľovi, nezodpovedá), poškodenej právnickej osobe a poškodenému uplatnenie ich nárokov na náhradu škody spôsobenej im trestným činom adhéznom trestnom konaní v prejednávanej veci voči obžalovanému podľa § 46 odsek 3 Trestného poriadku umožnil a napadnutým rozsudkom dokonca o oboch týchto nárokoch rozhodol (v prípade poškodeného podľa § 288 odsek 1 Trestného poriadku a v prípade poškodenej právnickej osoby dokonca podľa § 287 odsek 1 Trestného poriadku) a to napriek tejto evidentnej absencii hmotnoprávnej pasívnej legitimácie obžalovaného rozhodol. Túto nezákonnosť pri použití hmotnoprávnych ustanovení Občianskeho zákonníka bolo potrebné odstrániť (§ 321 odsek 1 písmeno f/ Trestného poriadku) a to napriek tomu, že odvolanie obžalovaného smerovalo iba proti výroku o treste napadnutého rozsudku, pretože by zrejme mohla odôvodňovať podanie dovolania podľa § 371 odsek 1 písmeno i/ Trestného poriadku.

Odvolací súd podľa § 321 odsek 1 Trestného poriadku zruší napadnutý rozsudok aj:
- ak bolo napadnutým rozsudkom porušené ustanovenie Trestného zákona (písmeno d/);

- ak je rozhodnutie o uplatnenom nároku poškodeného na náhradu škody v rozpore so zákonom (písmeno f/).

Podľa § 321 odsek 2 Trestného poriadku ak bolo odvolanie obmedzené podľa § 317 odsek 1 alebo odsek 2 Trestného poriadku, odvolací súd z dôvodu uvedeného v odseku 1 zruší len napadnutý výrok rozsudku. Ak však odvolací súd zruší hoci len sčasti výrok o vine, zruší vždy súčasne celý výrok o treste, ako aj ďalšie výroky, ktoré majú vo výroku o vine svoj podklad.

Podľa § 322 odsek 3 Trestného poriadku odvolací súd rozhodne sám rozsudkom vo veci, ak možno nové rozhodnutie urobiť na podklade skutkového stavu, ktorý bol v napadnutom rozsudku správne zistený alebo doplnený dôkazmi vykonanými pred odvolacím súdom. V neprospech obžalovaného môže odvolací súd zmeniť napadnutý rozsudok len na základe odvolania prokurátora, ktoré bolo podané v neprospech obžalovaného, vo výroku o náhrade škody tak môže urobiť aj na podklade odvolania poškodeného, ktorý uplatnil nárok na náhradu škody.

Keďže odvolací súd zistil vyššie uvedené dôvody, podľa § 321 odsek 1 písmeno d/, písmeno f/ odsek 2 Trestného poriadku na podklade odvolania obhajcu obžalovaného, zrušil napadnutý rozsudok súdu prvého stupňa vo výroku o uloženom treste a v oboch výrokoch o náhradu škody.

Po splnení podmienok ustanovených v § 322 odsek 3 Trestného poriadku odvolací súd rozhodol sám rozsudkom tak, že na podklade súdom prvého stupňa správne a úplne zistených skutočností a okolností majúcich vplyv a význam pre určenie druhu trestu a jeho výmery, avšak po ich v celom rozsahu zákonu zodpovedajúcom právnom posúdení obžalovanému uložil podľa zákonnej trestnej sadzby ustanovenej v § 326 odsek 2 Trestného zákona, s použitím § 38 odsek 2 Trestného zákona (teda po opodstatnenom a zákonu zodpovedajúcom zistení jednej, v § 36 písmeno j/ Trestného zákona uvedenej poľahčujúcej a jednej, v § 37 písmeno h/ Trestného zákona uvedenej priťažujúcej okolnosti) a § 41 odsek 1 Trestného zákona (teda za dva trestné činy spáchané jedným skutkom) úhrnný trest odňatia slobody vo výmere štyroch rokov, na výkon ktorého ho podľa § 48 odsek 2 písmeno a/ Trestného zákona zaradil do ústavu na výkon trestu s minimálnym stupňom stráženia (pretože v posledných desiatich rokoch pred spáchaním trestných činov v prejednávanej veci nebol vo výkone trestu odňatia slobody uloženého mu za úmyselný trestný činu).

Bez zásadných výhrad sa stotožniac so súdom prvého stupňa aj odvolací súd mal za to, že (a iba) tento druh (odňatia slobody nepodmienečný) a výmera (bezprostredne na dolnej hranici zákonom ustanovenej trestnej sadzby) obžalovanému v prejednávanej veci aj odvolacím súdom uloženého trestu zodpovedá všetkým kritériám ustanoveným pre ukladanie trestu v § 34 odsek 4 Trestného zákona (spôsob spáchania činu, jeho následok, zavinenie, pohnútka,

zistená jedna poľahčujúca a jedna priťažujúca okolnosť, osoba páchateľa, jeho pomery a možnosti jeho nápravy) a preto je spôsobilý aj na dosiahnutie účelu trestu podľa § 34 odsek 1 Trestného zákona a to tak v oblasti individuálnej ako aj v oblasti generálnej prevencie, lebo zabezpečí ochranu spoločnosti pred obžalovaným tak, že mu zabráni v páchaní ďalšej trestnej činnosti, vytvorí podmienky na jeho výchovu k tomu, aby viedol riadny život, súčasne aj iných odradí od páchania trestných činov a zároveň dostatočne vyjadrí aj morálne odsúdenie obžalovaného spoločnosťou.

**P o u č e n i e :** Proti tomuto rozsudku nie je prípustný ďalší riadny opravný prostriedok.

**V Nitre, 07. novembra 2013**

**JUDr. Zita   M a t y ó o v á**
**predsedníčka senátu**

Za správnosť vyhotovenia:
Mária Mikulcová

This is the translation from the Slovak into English language.

**4To/97/2013-803**
**4110010689**

State symbol

## JUDGEMENT
## IN THE NAME OF THE SLOVAK REPUBLIC

The Regional Court Nitra, by the Panel of Judges consisting of the Chairman of the Panel LLD Zita Matyóová and co-judges MA Adriana Némethová and LLD Ján Bernát, in the criminal matter of **the accused person Vladimír Blaško,** for a criminal offence of abuse of power by a public official in accordance with Art. 326 Sect. 1 subsect. a), Sect. 2 subsect. a) (Art. 138 subsect. d) Criminal Code and another misdemeanour, **on the appeal of the barrister of the accused person Vladimír Blaško** against the judgement of the District Court Nitra (hereinafter referred to as the "Court of First Instance") dated 15 April 2013, file ref. 6T/97/2010 (hereinafter referred to as the "appealed judgement"), at the open court held in Nitra on 7 November 2013

### has decided as follows:

In accordance with Art. 321 Sect. 1 subsect. d), subsect. f), Sect. 2 Criminal Procedure Code **the appealed judgement has been cancelled in the statement on the sentence and in the statements on compensation of damage.**

In accordance with Art. 322 Sect. 3 Criminal Procedure Code

**the accused person**
**Vladimír Blaško:**

born on 10 January 1983 in Nitra, permanent address Nitra, Martinská dolina No. 1

### has been sentenced:

In accordance with Art. 326 Sect. 2 Criminal Code, applying Art. 38 Sect. 2 Criminal Code (having found the attenuating circumstance stated in Art. 36 subsect. j) Criminal Code and the aggravating circumstance stated in Art. 37 subsect. h) Criminal Code) and Art. 41 Sect. 1 Criminal Code **for the aggregate imprisonment sentence of 4 (four) years.**

1

This is the translation from the Slovak into English language.

In accordance with Art. 48 Sect. 2 subsect. a) Criminal Code **he has been classified for the imprisonment in the institution for punishment execution with a minimum level of guarding.**

### Reasoning

By the appealed judgement the Court of First Instance, acting in accordance with the provisions of Art. 358 et seq. Criminal Procedure Code against the person in absentia and in the Panel, found the accused person Vladimír Blaško (hereinafter referred to as the "accused person") guilty of committing (obviously in a single-action concurrence) a criminal offence of abuse of power of a public official in accordance with Art. 326 Sect. 1 subsect. a), Sect. 2 subsect. a) (Art. 138 subsect. d) Criminal Code and a misdemeanour of bodily harm in accordance with Art. 156 Sect. 1 Criminal Code based of the facts that:

contrary to especially Art. 8 Sect. 1 Act No. 171/1993 Coll. on Police Force as amended as well as to Art. 48 Sect. 3 subsect. e/, subsect. g/, subsect. i/ Act No. 73/1998 Coll. on Public Service of the Police Force Members, of the Slovak Information Service, the Corps of Prison and Court Guard and the Railway Police as amended, during the performance of his duty, as a public official, with the intent to cause bodily harm to the aggrieved person Boris Kozma (hereinafter referred to as the "aggrieved person"), on 13 July 2007 at about 9.45 pm in the village Štitáre in Jelenecká Street in the bar Relax, he attacked the aggrieved person physically when he was to verify the telephone notification of a minor offence, after he had submitted the service ID card of a Corps of Prison and Court Guard of the Slovak Republic member and he had introduced himself as their colleague and enquired them why they wanted to take his friend sitting with him away in such a way that the accused person hit him with his fist in the neck area, then he pulled him down on the ground, where he went on hitting him in the head area also despite the fact that he did not put up any resistance, than he handcuffed his hands and subsequently, after having the accused person brought to the District Department of the Police Force in Nitra, the accused person attacked him again with no adequate reason physically hitting him in his face and after he fell down also hitting him in the head area and kicking him in the trunk subsequently, by which he caused concussion, fracture of the small nose bones, face contusion in the area of the left eye, cervical spine sprain, contusion of the front abdominal wall on the left, contusion of both wrists and partial damage of sensitive nerve fibres of the right radial nerve in the area of the forearm with the treatment period and sickness leave of 31 days to the aggrieved person.

The Court of First Instance imposed an aggregate imprisonment sentence with the length of four years on the accused person for this criminal offence and misdemeanour by the appealed judgement in accordance with Art. 326 Sect. 2 Criminal Code, applying Art. 38 Sect. 2 Criminal Code (having found the attenuating circumstance stated in the provision of Art. 36 subsect. j) Criminal Code and the aggravating circumstance stated in the provision of Art. 37 subsect. h) Criminal Code) and "according to the principle stated in Art. 41 Sect. 1, Sect. 2 Criminal Code" for serving of which he was classified in the institution for punishment execution with a minimum level of guarding in accordance with Art. 48 Sect. 2 subsect. a) Criminal Code.

2

Case 1:17-mc-00067-DAD-SAB  Document 1  Filed 10/02/17  Page 91 of 133

This is the translation from the Slovak into English language.

By the next separate statements of the appealed judgement the Court of First instance imposed the obligation to compensate the damage in the amount of EUR 874.51 to the aggrieved legal entity Dôvera, Health Insurance Company, having the registered office in Einsteinova Street No. 25 (hereinafter referred to as the "aggrieved legal entity") on the accused person in accordance with Art. 287 Sect. 1 Criminal Procedure Code and it referred the aggrieved person to the civil trial with his claim for compensation of damage in accordance with Art. 288 Sect. 1 Criminal Procedure Code.

The appealed judgement was notified to the accused person's barrister and the prosecutor in their presence at the main trial of the Court of First Instance held on 15 April 2013. The aggrieved person was notified of the appealed judgement by servicing of its copy on 18 September 2013.

The accused person's barrister brought an appeal solely against the statement on the sentence of the appealed judgement in form of a written filing delivered to the Court of First Instance on 23 April 2013, i.e. on time, which he justified by another written filing delivered to the Court of First Instance on 16 September 2013, by not identifying himself with the opinion of the Court of First Instance on reasonability and adequacy of the unconditional imprisonment sentence in the length of four years imposed on the accused person, which is at the very low limit of the sentencing tariff though, however, it does not correspond with the needs of individual and general prevention and it has rather signs of exemplary nature of sentencing of an accused person, who has not been sentenced yet and has not been sanctioned for a minor offence, due to which the Court of First Instance awarded him the attenuating circumstance stated in Art. 36 letter j) Criminal Code. With regard to taking the aggravating circumstance stated in Art. 37 subsect. h) Criminal Code into consideration, he has not identified himself with it, because it is an impermissible double inclusion of the same circumstance, in connection of which he pointed out the judicial act of the Criminal-Law Council of the Regional Court in Žilina adopted on 14 September 2010 number 13/2010. The use of the provision of Art. 41 Sect. 2 Criminal Code itself was questionable for him, since the Court of First Instance declared a single-action of concurrence of criminal acts in the tried matter, of committing of which it found the accused person guilty by the appealed judgement claiming at the same time that on such a state of proportion of one attenuating circumstance with the absence of an aggravating circumstance nothing would prevent from a "more lenient" procedure in imposing the sentence on the accused person. The barrister of the accused person has not identified himself also with the opinion of the Court of First Instance on not finding any facts, which are assumed to consist in the circumstances of the case or in the person of an offender and justifying the use of an extraordinary mitigating provision stated in Art. 39 Sect. 1 Criminal Code. In connection with the circumstances of the case he claimed that the proceeding of the Court of First Instance pointing out that the accused person committed the crime while executing the power of a public official and applying violence, pointing out the consequence consisting in bodily harm and abuse of power, the non-critical approach of the accused person to the committed criminal activity (which was assumed to consist also in describing the aggrieved person as an aggressor contrary to the fact in order to legalize his illegal acting) is in contrary to the provision of Art. 38 Sect. 1 Criminal Code, because (with the exception of the approach of the accused person to the committed criminal offence) it is a double inclusion of the same facts and circumstances, which fulfil the nature of both criminal acts, the committing of which the accused person was found guilty of. With regard to the approach of the accused person to the committed criminal offence his barrister pointed out that the reasoning of the appealed judgement states that in the proceeding conducted against the person in absentia the accused person's testimony from the pre-trial proceeding was read by the Court of First Instance, in which he used his right and remained silent. The barrister of the accused person "touched" also the length of the criminal proceeding in the tried case assuming that it, exceeding six years, should be considered to be exceptional regarding the decision making practice of the European Court of Human Rights and in case of absence of significant reasons exceeding of the limit should not be tolerated. In connection with that he gave reasons in decreasing of interest of the society to punish an offender, weakening need of individual and general prevention, disappearing of a basic relationship between illegal action of an offender and the sentence being imposed, assuming that mitigation of the sentence (as it follows also the already existing jurisdiction of the Courts of the Slovak Republic) is therefore some kind of

3

EXT BLASKO 084

This is the translation from the Slovak into English language.

compensation for the length of the criminal proceeding. With reference to all the facts the barrister of the accused person proposed the Regional Court in Nitra (hereinafter referred to as the "Court of Appeal") to cancel the appealed judgement in the statement on the sentence and applying the provision of Art. 39 Sect. 1 Criminal Code to impose a suspended imprisonment sentence with the length upon the discretion of the Court of Appeal.

The Attorney of the Regional Prosecutor at the open court of the Court of Appeal, finding the appealed judgement objectively correct and legitimate in all its statements, proposed cancelling of the appeal of the accused person's barrister as unreasonable in the final proposal to the Court of Appeal.

The accused person's barrister proposed at the open court of the Court of Appeal, adhering to he written reasons of the brought appeal, that the Court of Appeal should decide in line with the proposal contained therein.

In accordance with Art. 317 Sect. 1 Criminal Procedure Code if the Court of Appeal does not reject the appeal in accordance with Art. 316 Sect. 1 or does not cancel the judgement in accordance with Art. 316 Sect. 3 Criminal Procedure Code, it shall review the legitimacy and reasonability of appealed statements of the judgement which the appellant has brought the appeal against and the correctness of the proceeding which preceded them. The faults which are not objected by the appeal, will be taken into consideration only if they justify bringing an appeal in accordance with Art. 371 Sect. 1 Criminal Procedure Code.

Fulfilling its obligation to review the tried matter (in which the indictment was filed on 3 June 2010 and with was submitted to the Court of Appeal for decision on 3 October 2013) the Court of Appeal has reviewed the statement on the sentence of the appealed judgement to the extent resulting from the provision of Art. 317 Sect. 1 Criminal Procedure Code, based on the appeal brought by the accused person's barrister, only against which the appeal was intended, and the correctness of the proceeding which preceded the statement of the appealed judgement; the Court of Appeal has reviewed the remaining statements only to the extent of finding potential occurrence of such faults, which could justify bringing an appeal due some of the reasons stated in Art. 371 Sect. 1 Criminal Procedure Code (finding also such, below mentioned faults in both statements on damage).

Fulfilling the above mentioned reasons for the obligation to review limited to the statement on the sentence of the appealed judgement imposed on the accused person the Court of Appeal found out subsequently that sufficient available evidence required to clarify any facts important to determine the kind of the sentence and its length as per the provision of Art. 119 Sect. 1 subsect. d) Criminal Procedure Code have already been provided by the criminal proceeding authorities in the tried matter, which the Court of First Instance also took as required for making a decision on the sentence imposed on the accused person by the appealed judgement at the main trial in the tried matter (Art. 321 Sect. 1 subsect. c) Criminal Procedure Code).

In taking the evidence focused on the clarification of the facts important to determine the kind of the sentence and its length the Court of First Instance followed also the relevant provisions of the Criminal Procedure Code, governing the way of taking evidence, and it did not make any such serious faults (Art. 321 Sect. 1 subsect. a) Criminal Procedure Code), which would breach the provisions, which should provide clarification of the matter mentioned above or the right of defence.

The findings of the Court of First Instance important for determination of the kind of the sentence and its length, which could have been assumed to have been proved, could follow and also followed the results of the above mentioned aspects of complete and legitimate taking of evidence, corresponding to any criteria stated in Art. 2 Sect. 10 Criminal Procedure Code, and the Court of First Instance, in evaluating of all evidence taken that way, followed also another principle of a criminal proceeding stated in Art. 2 sect. 12 Criminal Procedure Code (Art. 321 Sect. 1 Subsect. b) Criminal Procedure Code) thoroughly according to the Court of Appeal.

4

EXT BLASKO 085

This is the translation from the Slovak into English language.

Fulfilling the above mentioned reasons for the obligation to review limited to the statement on the sentence of the appealed judgement imposed on the accused person the Court of Appeal also found out that the Court of First Instance did not assess all matters found and proved in this direction from the legal point of view according to all applicable provisions of the Act on one hand solely (and exclusively) in the matter of the aggregate sentence, imposing of which on the accused person could have been taken into account in the tried matter in accordance with Art. 41 Sect. 1 (thus not also according to Sect. 2) of the Criminal Act, because (as it was reasonably proved in the reasoning of the brought appeal by the accused person's barrister), it imposed a sentence for two criminal acts (one criminal offence and one misdemeanour) on the accused person by the appealed judgement committed undoubtedly by a single act in the tried matter, thus in single-action concurrence (Art. 321 Sect. 1 subsect. d) Criminal Procedure Code).

On the other hand, this fault undoubtedly occurring in the statement on the sentence of the appealed judgement did obviously not have any impact and significance on the legitimacy of the length of the imprisonment sentence, which was imposed on the accused person at the lower level of the sentencing tariff stated in Sect. 2 Art. 326 Criminal Code by the appealed judgement, which should have been and which was the only statutory sentencing tariff in the tried matter undoubtedly.

Due to the above mentioned reasons the reasoning of the appealed judgement in section related to the statement on the sentence imposed on the accused person, except for the absence of relevant legal considerations corresponding with law related to the aggregate sentence, imposing of which on the accused person for two criminal acts committed in a single-action (thus not multiple-action) concurrence could have been taken into account in the tried matter, is otherwise in compliance with the requirements stated in Art. 168 Sect. 1 Criminal Procedure Code, because the Court of the First Instance stated all found facts fully and correctly in it, on which he grounded finding of one attenuating circumstance stated in the provision of Art. 36 subsect. j) Criminal Code, finding of one aggravating circumstance stated in the provision of Art. 37 subsect. h) Criminal Code (taking into account of which the provision of Art. 38 Sect. 1 Criminal Code cannot prevent from due to legitimate application of Art. 41 Sect. 1 Criminal Code when imposing the aggregate sentence), taking the proportion resulting from reasons in accordance with Art. 38 Sect. 2 Criminal Code into account, classification of the accused person for the serving the sentence imposed on him to the institution for punishment execution with a minimum level of guarding, not finding meeting of the conditions and prerequisites of extraordinary decrease of the sentence imposed on the accused person in accordance with Art. 39 Sect. 1 Criminal Code and also those ones which the Court of First Instance considered to be found and important in other aspects and principles for imposing a sentence stated in Art. 34 Sect. 1, Sect. 3 and Sect. 4 of the Criminal Code and also relevant legal considerations of all such aspects, which it followed assessing all such proved facts and circumstances according to the relevant provisions of law (Art. 321 Sect. 1 subsect. b) Criminal Code, (especially) including the adequacy of the kind and length of the sentence imposed on the accused person (Art. 321 Sect. 1 subsect. e) Criminal Procedure Code).

The Court of Appeal only refers to all such assessments and legal consideration as to complete and correct ones, not considering to be necessary to add or change them, even regarding the, in its opinion, obviously irrelevant objections of appeal of the accused person's barrister, who obviously did not notice that the length of the proceeding of the Court of First Instance in the tried matter was significantly undoubtedly affected and influenced by his escape and hiding with the intent to avoid criminal prosecution and threat of punishment that way.

Fulfilling its obligation to review to the extent resulting from the provision Art. 317 Sect. 1 last sentence of the Criminal Procedure Code the Court of Appeal also found a mistake in both statements on damage of the appealed judgement, which the Court of First Instance made when, obviously in conflict with the provision of Art. 420 Sect. 2 Civil Code (the accused person caused the damage related to bodily harm of the aggrieved person as a policeman during fulfilment of his service tasks and therefore it was caused by the Police Force and the accused person shall not be liable for it except for potential subsequent regression relationship to his employee), it enabled the aggrieved legal entity and the aggrieved person to make their claims for

5

Case 1:17-mc-00067-DAD-SAB Document 1 Filed 10/02/17 Page 94 of 133

This is the translation from the Slovak into English language.

compensation of the damage caused to them by the criminal act of the adhesion criminal proceeding in the tried matter against the accused person in accordance with Art. 46 Sect. 3 Criminal Code and it even decided on both such claims by the appealed judgement (in case of the aggrieved person in accordance with Art. 288 Sect. 1 Criminal Procedure Code and in case of the aggrieved legal entity even in accordance with Art. 287 Sect. 1 Criminal Procedure Code) even despite the obvious absence of material legal passive capacity of the accused person. It was necessary to eliminate this illegitimacy in application of material legal provisions of the Civil Code (Art. 321 Sect. 1 subsect. f) Criminal Procedure Code) Despite the fact that the appeal of the accused person was directed only against the statement on the sentence of the appealed judgement, because it could justify bringing of an appeal in accordance with Arz. 371 Sect. 1 subsect. i) Criminal Procedure Code.

In accordance with Art. 321 Sect. 1 Criminal Procedure Code the Court of Appeal shall cancel the appealed judgement also:

- If a provision of the Criminal Code was breached by the appealed judgement (subsect. d));

- If the decision on the filed claim of the aggrieved person for compensation of damage is in contrary to law (subsec. f)).

In accordance with Art. 321 Sect. 2 Criminal Procedure Code if the appeal is limited in accordance with Art. 317 Sect. 1 or Sect. 2 Criminal Procedure Code, the Court of Appeal shall cancel only the appealed statement of the judgement due to the reason stated in Sect. 1. However, if the Court of Appeal cancels, even only partially, the statement on guilt, it cancels also the entire statement on the sentence as well as other statements grounded on the statement on guilt.

In accordance with Art. 322 Sect. 3 Criminal Procedure Code the Court of Appeal shall decide by a judgement on its own in the matter, if a new decision may be made based on the facts found in the appealed judgement correctly or added by evidence taken before the Court of Appeal. The Court of Appeal may change the appealed judgement to the detriment of the accused person only based on the appeal of a prosecutor, brought to the detriment of the accused person; in the statement on compensation of damage it may do so also based on the appeal of the aggrieved person who has claimed for compensation of damage.

As the Court of Appeal has found the above mentioned reasons, in accordance with Art. 321 Sect. 1 subsect. d), subsect. f) Sect. 2 Criminal Procedure Code based on the appeal of the accused person's barrister, it has cancelled the appealed judgement of the Court of First Instance in the statement on the imposed sentence and in both statements on compensation of damage.

Having met the conditions stated in Art. 222 Sect. 3 Criminal Procedure Code the Court of Appeal decided by the judgement on its own so that based on the facts correctly a fully found by the Court of First Instance and based on the circumstances having the impact and importance for determination of the kind of the sentence and its length, however, having assessed them legally to the full extent corresponding to law it has imposed, in accordance with the legal sentencing tariff stated in Art. 326 Sect. 2 Criminal Code, applying Art. 38 Sect. 2 Criminal Code (thus upon a reasonable finding of one attenuating circumstance stated in Art. 36 subsect. j) Criminal Code and one aggravating circumstance stated in Art. 37 subcsect. h) Criminal Code) corresponding to the law, the aggregate imprisonment sentence in length of four years on the accused person, for serving of which he has been classified in the institution for punishment execution with a minimum level of guarding in accordance with Art. 48 Sect. 2 subsect. a) Criminal Code (because he did not serve an imprisonment sentence imposed on him for an intentional criminal offence in last ten years before the criminal acts committed in the tried matter).

With no essential reservations identifying itself with the Court of First Instance also the Court of Appeal assumed that (and only) this kind (unconditional imprisonment) and length (immediately at the lower level of the statutory penal rate) of the sentence imposed on the accused person in the tried matter also by the Court of Appeal corresponds to all criteria set for imposing of sentences in Art. 34 Sect. 4 Criminal Code (way of

6

committing of the act, its consequence, guilt, ground, one aggravating circumstance found and one attenuating circumstance found, the person of the offender, his situation and a possibility of his correction) and therefore it is capable to achieve the purpose of the sentence in accordance with Art. 34 Sect. 1 Criminal Code both in the area of individual and general prevention, because it will provide protection of the society against the accused person so that it will prevent from committing of other criminal activity, it will make conditions for his education to good conduct and it will also discourage others from committing of criminal offences and also it will express moral condemnation of the accused person by the society sufficiently.

**Instruction:**    No further regular legal remedy is permissible against this Judgement.

**In Nitra on 7 November 2013**                              **LLD Zita Matyóová**
                                                             **Chairman of the Panel**

a blue round seal of the Regional Court Nitra 31

For the correctness:
Mária Mikulcová
        *an illegible signature*

7

## PREKLADATEĽSKÁ DOLOŽKA

Preklad som vypracovala ako prekladateľka zapísaná v zozname znalcov, tlmočníkov a prekladateľov, ktorý vedie Ministerstvo Spravodlivosti Slovenskej republiky v odbore slovenský jazyk – anglický jazyk, evidenčné číslo prekladateľky 970859.

Prekladateľský úkon je zapísaný pod poradovým číslom .....030/2017..... prekladateľského denníka č. 1/2014.

V Nitre dňa .....10. 4. 2017.....

## TRANSLATOR'S CLAUSE

I have made this translation as the translator recorded in the Register of Experts, Interpreters and Translators administered by the Ministry of Justice of the Slovak Republic in the specialization Slovak language – English language, translator's registration number 970859.

This translation act has been recorded under the sequence number .....030/2017..... of the Translator's Record Book No. 1/2014.

In Nitra on .....10 April 2017.....

# EXHIBIT C

EXT BLASKO 090

Preklad zo slovenského do anglického jazyka.

The translation from the Slovak into English language.

Prekladateľ:   Mgr. Anna Havranová
Ďumbierska 9, Nitra
Tel. č.: (+421) 0903 220 184

Translator:   Mgr. Anna Havranová
Ďumbierska 9, Nitra
Tel. No.: (+421) 0903 220 184

Zadávateľ:   Okresný súd Nitra
Štúrova 9,
949 68  Nitra

Customer:   District Court Nitra
9 Štúrova Str.
949 68  Nitra

**Názov:  Medzinárodný zatýkací rozkaz**

**Title:  International Warrant of Arrest**

Počet strán: 5
Evidenčné číslo prekladu: 031/2014
Dátum: 10.4.2014

Pages: 5
Translation Registration No: 031/2014
Date: 10 April 2014

# Medzinárodný zatýkací rozkaz

6T/97/2010

Okresný súd Nitra, predsedníčkou senátu JUDr. Máriou Ondrejovou prikazuje, aby podľa § 490 odsek 1, odsek 2 písmeno b/ Trestného poriadku bol zatknutý odsúdený:

**Vladimír Blaško,**      **nar. 10. januára 1983 v Nitre, naposledy trvale bytom Nitra, Martinská dolina č. 1, naposledy prechodne bytom Nitra, Na Hôrke 26,**

národnosť: slovenská
štátna príslušnosť: Slovenská republika
zamestnanie: nezamestnaný
rodné číslo: 830110/6781
rodičia: Vladimír Blaško, Mária, Marianna Blašková, rodená Godárová
posledné známe miesto pobytu: USA, Fresno, California, 1717 South Chestnut Avenue

odsúdený je stíhaný: pre zločin zneužívania právomoci verejného činiteľa podľa § 326 odsek 1 písmeno a/, odsek 2 písmeno a/ Trestného zákona, ktorý mal spáchať tak, že:

v rozpore najmä s § 8 odsek 1 zákona č. 171/1993 Z.z. o Policajnom zbore v znení neskorších predpisov ako aj s § 48 odsek 3 písmeno e), g), i) zákona č. 73/1998 Z.z. o štátnej službe príslušníkov Policajného zboru, Slovenskej informačnej služby, Zboru väzenskej a justičnej stráže Slovenskej republiky a Železničnej polície v znení neskorších predpisov v čase výkonu služby, ako verejný činiteľ, v úmysle spôsobiť škodu na zdraví poškodenému Borisovi Kozmovi, dňa 13.07.2007 v čase približne o 21.45 hod. v obci Štitáre na Jeleneckej ulici v bare Relax pritom, ako mal preveriť telefonické oznámenie o priestupku, fyzicky napadol poškodeného Borisa Kozmu, nar. 24.04.1974 po tom, ako tento predložil preukaz príslušníka Zboru väzenskej a justičnej stráže Slovenskej republiky a predstavil sa ako ich kolega a dotazoval sa prečo chcú odviesť jeho spolusediaceho priateľa a to takým spôsobom, že ho obvinený Blaško udrel päsťou do oblasti krku, následne ho stiahol na zem, kde pokračoval v úderoch päsťou do oblasti hlavy aj napriek tomu, že tento nekládol žiaden odpor, potom ho spútal putami na rukách a následne po predvedení poškodeného na Obvodné oddelenie Policajného zboru v Nitre obvinený Blaško tohto znovu bez adekvátneho dôvodu fyzicky napadol úderom do tváre a po páde poškodeného na zem aj následnými údermi do oblasti hlavy a kopmi do trupu, čím poškodenému spôsobil otras mozgu, zlomeninu nosových kostičiek, pomliaždenie tváre v oblasti ľavého oka, podvrtnutie krčnej chrbtice, pomliaždenie prednej brušnej steny vľavo, pomliaždenie oboch zápästí a čiastočné poškodenie senzitívnych nervových vlákien pravého vretenného nervu v oblasti predlaktia s dobou liečenia a prácenecschopnosti v trvaní 31 dní.

**D ô v o d y :**

Vyšetrovateľ Ministerstva vnútra SR, Úradu inšpekčnej ·služby PZ, Inšpekčný odbor Západ pod sp. zn. ČVS:UIS-176/IOZ-V-2007, dňa 17.07.2007 začal trestné stíhanie, a následne dňa 08.01.2008 vzniesol obvinenie podľa § 206 odsek 1 Trestného poriadku Vladimírovi Blaškovi, nar. 10.01.1983 v Nitre, trvale bytom Nitra, Martinská dolina č. 1 a Michalovi Krajmerovi, nar. 03.04.1980 v Nitre, trvale bytom Nitra, Kodályova 54  pre zločin zneužívania právomoci verejného činiteľa podľa § 326 odsek 1 písmeno a/, odsek 2 písmeno a/ Trestného zákona.

Vojenská obvodná prokuratúra v Bratislave podala na obvineného Vladimíra Blaška dňa 03.06.2010 pod č. OPv 279/07 obžalobu pre zločin zneužívania právomoci verejného činiteľa podľa § 326 odsek 1 písmeno a/, odsek 2 písmeno a/ Trestného zákona s poukazom na § 138 písmeno d/ Trestného zákona v jednočinnom súbehu s prečinom ublíženia na zdraví podľa § 156 odsek 1 Trestného zákona.

Okresný súd Nitra nariadil na deň 03.09.2010 verejné zasadnutie, predmetom ktorého bolo predbežné prejednanie obžaloby, avšak predvolanie na tento termín verejného zasadnutia sa nepodarilo obvinenému Blaškovi doručiť prostredníctvom pošty a na tomto verejnom zasadnutí právny zástupca obvineného uviedol, že jeho prítomnosť nevie zabezpečiť, nakoľko sa s ním neskontaktoval a má informácie že sa zdržiava v zahraničí, v USA. Následne bolo Okresné riaditeľstvo PZ, ÚJaKP požiadané o vypátranie pobytu obvineného, ktorí dňa 07.10.2010 písomne súdu oznámili, že menovaný sa má zdržiavať v USA, San Fracisco, kam priletel 26.02.2010 a tam údajne študuje v Kalifornii na univerzite, kde má študentské vízum F1. Následne bolo za spolupráce Vojenskej obvodnej prokuratúry zistené, že obvinený sa od 26.02.2010 zdržiava na adrese Fresno, California, 1717 South Chestnut Avenue, čo je pravdepodobne adresa Pacifickej univerzity vo Fresne, a k 30.09.2010 neexistoval žiaden záznam o tom, že by obvinený opustil Spojené štáty americké. Keďže obvineného nebolo možné predvolať, predviesť a ani zadržať a tak zabezpečiť jeho účasť na vyšetrovacích úkonoch a bola dôvodná obava, že obvinený sa skrýva, aby sa tak vyhol trestnému stíhaniu a tak bol daný dôvod väzby podľa § 71 odsek 1 písmeno a/ Trestného poriadku.

Trestnosť činu, ktorý sa kládla obvinenému za vinu nezanikla, skutok sa stal 13.07.2007, trestné stíhanie bolo začaté dňa 17.07.2007, vznesené obvinenie bolo 08.01.2008. Trestnosť činu by zanikla v zmysle § 87 odsek 1 písmeno b/ Trestného zákona uplynutím premlčacej doby dvadsať rokov, avšak od spáchania skutku uplynulo necelých 7 rokov a premlčanie bolo prerušené vznesením obvinenia v zmysle § 87 odsek 3 písmeno a/ Trestného zákona.

Rozsudkom Okresného súdu Nitra sp.zn. 6T/97/2010 zo dňa 15.04.2013 právoplatným v spojení s rozsudkom Krajského súdu v Nitre dňa 07.11.2013 bol obžalovaný na hlavnom pojednávaní uznaný vinným zo zločinu zneužívania právomoci verejného činiteľa podľa § 326 odsek 1 písmeno a/, odsek 2 písmeno a/ Trestného zákona s poukazom na § 138 písmeno d) Trestného zákona v jednočinnom súbehu s prečinom ublíženia na zdraví podľa § 156 odsek 1 Trestného zákona a bol mu uložený úhrnný trest odňatia slobody na 4 (štyri) roky, na výkon ktorého bol zaradený do ústavu na výkon trestu odňatia slobody s minimálnym stupňom stráženia. Krajský súd v Nitre dňa 07.11.2013 vydal príkaz na dodanie odsúdeného Vladimíra Blaška do výkonu trestu odňatia slobody, ktorý však nebol doposiaľ zrealizovaný. Vzhľadom na skutočnosť, že odsúdený sa pobytom v cudzine vyhýba výkonu právoplatne uloženého

trestu odňatia slobody, vznikol dôvod na jeho vyžiadanie z cudziny podľa § 490 odsek 2 písmeno b/ Trestného poriadku.

### Ustanovenia Trestného zákona č. 300/2005 Z. z. v znení neskorších predpisov

### § 326
### Zneužívanie právomoci verejného činiteľa

(1) Verejný činiteľ, ktorý v úmysle spôsobiť inému škodu alebo zadovážiť sebe alebo inému neoprávnený prospech,
a) vykonáva svoju právomoc spôsobom odporujúcim zákonu,
b) prekročí svoju právomoc, alebo
c) nesplní povinnosť vyplývajúcu z jeho právomoci alebo z rozhodnutia súdu,
potrestá sa odňatím slobody na dva roky až päť rokov.

(2) Odňatím slobody na štyri roky až desať rokov sa páchateľ potrestá, ak spácha čin uvedený v odseku 1
a) závažnejším spôsobom konania,
b) na chránenej osobe, alebo
c) z osobitného motívu.

(3) Odňatím slobody na sedem rokov až dvanásť rokov sa páchateľ potrestá, ak spácha čin uvedený v odseku 1
a) a spôsobí ním ťažkú ujmu na zdraví alebo smrť,
b) a spôsobí ním značnú škodu, alebo
c) preto, aby inému zmaril alebo sťažil uplatnenie jeho základných práv a slobôd.

(4) Odňatím slobody na desať rokov až dvadsať rokov sa páchateľ potrestá, ak spácha čin uvedený v odseku 1
a) a spôsobí ním ťažkú ujmu na zdraví viacerým osobám alebo smrť viacerých osôb,
b) a spôsobí ním škodu veľkého rozsahu, alebo
c) za krízovej situácie.

### Premlčanie trestného stíhania

### § 87

(1) Trestnosť činu zaniká uplynutím premlčacej doby, ktorá je
a) tridsať rokov, ak ide o zločin, za ktorý tento zákon dovoľuje uložiť trest odňatia slobody na doživotie,
b) dvadsať rokov, ak ide o zločin, za ktorý tento zákon v osobitnej časti dovoľuje uložiť trest odňatia slobody s hornou hranicou trestnej sadzby najmenej desať rokov,
c) desať rokov, ak ide o ostatné zločiny,
d) päť rokov, ak ide o prečin, za ktorý tento zákon v osobitnej časti dovoľuje uložiť trest odňatia slobody s hornou hranicou trestnej sadzby najmenej tri roky,
e) tri roky pri ostatných prečinoch.

(2) Do premlčacej doby sa nezapočítava

a) doba, po ktorú nebolo možné páchateľa postaviť pred súd pre zákonnú prekážku,
b) doba, po ktorú sa páchateľ zdržiaval v cudzine s úmyslom vyhnúť sa trestnému stíhaniu,
c) skúšobná doba podmienečného zastavenia trestného stíhania,
d) doba, po ktorú bolo dočasne odložené vznesenie obvinenia, alebo
e) doba, po ktorú bolo prerušené trestné stíhanie.

(3) Premlčanie trestného stíhania sa prerušuje
a) vznesením obvinenia pre trestný čin, o ktorého premlčanie ide, ako aj po ňom nasledujúcimi úkonmi orgánu činného v trestnom konaní, sudcu pre prípravné konanie alebo súdu smerujúcimi k trestnému stíhaniu páchateľa, alebo
b) ak páchateľ spáchal v premlčacej dobe úmyselný trestný čin.

(4) Prerušením premlčania sa začína nová premlčacia doba.

### § 88

Uplynutím premlčacej doby nezaniká trestnosť trestných činov uvedených v dvanástej hlave osobitnej časti tohto zákona okrem trestného činu podpory a propagácie skupín smerujúcich k potlačeniu základných práv a slobôd podľa § 421 a § 422, trestného činu hanobenia národa, rasy a presvedčenia podľa § 423 a trestného činu podnecovania k národnostnej, rasovej a etnickej nenávisti podľa § 424.

Podľa § 87 Trestného zákona trestnosť činu, pre ktorý je obvinený Vladimír Blaško stíhaný nezanikla.

### Ustanovenia Trestného poriadku, zákona č. 301/ 2005 Z. z. v znení neskorších predpisov

### § 490 odsek 1, odsek 2 písmeno b/

(1) Ak sa obvinený zdržiava v cudzine a ak je potrebné ho vyžiadať, vydá proti nemu predseda senátu príslušného súdu zatýkací rozkaz (ďalej len "medzinárodný zatýkací rozkaz"). V prípravnom konaní vydá sudca pre prípravné konanie medzinárodný zatýkací rozkaz na návrh prokurátora. Medzinárodný zatýkací rozkaz má na území Slovenskej republiky rovnaké účinky ako príkaz na zatknutie.

(2) Súd vydá medzinárodný zatýkací rozkaz najmä, ak
b) odsúdený sa zdržiava v cudzine a výkon nariadeného trestu odňatia slobody nenastúpil napriek tomu, že mu bola riadne doručená výzva na nástup tohto trestu, alebo ak sa pobytom v cudzine vyhýba výkonu právoplatne uloženého trestu odňatia slobody alebo jeho zvyšku.

### § 491

(1) Medzinárodný zatýkací rozkaz stráca platnosť

a) odovzdaním vydanej osoby súdu podľa § 494 ods. 1 alebo súdu, ktorý vydal príkaz na zatknutie podľa § 73 ods. 1,
b) odvolaním; súd, ktorý medzinárodný zatýkací rozkaz vydal, ho odvolá, ak zanikli dôvody,

pre ktoré bol vydaný, alebo ak následne zistí, že také dôvody neexistovali; ak bol medzinárodný zatýkací rozkaz vydaný na návrh prokurátora, súd ho odvolá na jeho návrh, **c) vydaním nového medzinárodného zatýkacieho rozkazu v tej istej trestnej veci.**

(2) Po podaní obžaloby v trestnej veci, v ktorej bol vydaný medzinárodný zatýkací rozkaz v prípravnom konaní, vydá súd, ktorému napadla obžaloba, nový medzinárodný zatýkací rozkaz, ak naďalej trvajú dôvody na jeho vydanie. Inak zatýkací rozkaz vydaný v prípravnom konaní odvolá. Rovnako sa postupuje v prípade, ak počas trestného konania dôjde k zmene vecnej alebo miestnej príslušnosti súdu.

(3) Odvolanie medzinárodného zatýkacieho rozkazu nevylučuje vydanie nového zatýkacieho rozkazu v tej istej trestnej veci.

(4) Súd o odvolaní alebo o vydaní nového medzinárodného zatýkacieho rozkazu ihneď informuje ministerstvo spravodlivosti a prokuratúru.

**V Nitre, dňa 21. januára 2014**

**JUDr. Mária Ondrejová**

**predsedníčka senátu**

This is the translation from the Slovak into English language.

6T/97/2010

## **International Warrant of Arrest**

6T/97/2010

The District Court Nitra, by the chairman of the Senate LLD Mária Ondrejová, orders to arrest the following accused person in accordance with the Art. 490 Sect. 1, Sect. 2 subsect. a/Criminal Code:

**Vladimír Blaško,**     **born on 10 January 1983 in Nitra, last permanent address Nitra, No. 1 Martinská dolina St., last temporary address Nitra, 26, Na Hôrke St.**

Nationality: Slovak
State citizenship: Slovak Republic
Occupation: unemployed
Birth identification number: 830110/6781
Parents: Vladimír Blaško, Mária, Marianna Blašková, neé Godárová
Last known place of stay: USA, Fresno, California, 1717 South Chestnut Avenue

The accused is prosecuted: for a crime of abuse of power by a public official in accordance with Art. 326 Sect. 1 Subsect. a/, Sect. 2 subsect. a/ Criminal Code which he was to commit as follows:

Contrary to Art. 8 Sect. 1 Act No. 171/1993 Coll. on Police Force as amended as well as to Art. 48 Sect. 3 subsect. e/, g/, i/ Act No. 73/1998 Coll. on Public Service of the Police Force Members, of the Slovak Information Service, the Corps of Prison and Court Guard of the Slovak Republic and Railway Police as amended, during the performance of his duty on 13 July 2007 at about 9.45 pm  he attacked the aggrieved person Boris Kozma, born on 24 April 1974 in the village Štitáre in Jelenecká Street in the bar Relax physically when he was to verify the telephone notification of a minor offence, after he submitted the ID card of a Corps of Prison and Court Guard of the Slovak Republic member, he introduced himself as their colleague and enquired them why they wanted to take his friend sitting with him away in such a way that the accused person Blaško hit him with his fist in the neck area, then he pulled him down on the ground where he went on hitting him in the head area also despite the fact that he did not put up any resistance, than he handcuffed his hands and subsequently, after having the accused brought to the District Department of the Police Force in Nitra, the accused Blaško hit him again with no adequate reason physically hitting him in his face and after he fell down also hitting him in the head area and kicking him in the trunk subsequently, by which he caused concussion, fracture of the small nose bones, face contusion in the area of the left eye, cervical spine sprain, contusion of the front abdominal wall on the left, contusion of both wrists and partial damage of sensitive nerve fibers of the right radial nerve in the area of the forearm with the treatment period and sick leave of 31 days to the aggrieved person.

1

EXT BLASKO 097

This is the translation from the Slovak into English language.

6T/97/2010

**Reasons:**

The Interrogator of the Ministry of Interior of the Slovak Republic, the Police Force Inspection Service Office, the Inspection Department West under the file ref. ČVS:UIS-176/IOZ-V-2007 on 17 July 2007 started the criminal prosecution and subsequently on 8 January2008 brought a charge in accordance with Art 206 Sect. 1 Criminal Code against Vladimír Blaško, born on 10 January 1983 in Nitra, permanent address Nitra, No. 1 Martinská dolina and Michal Krajmer, born on 3 April 1980 in Nitra, permanent address Nitra, 54 Kodályova Str., because of the crime of abuse of power by a public official in accordance with Art. 326 Sect. 1 Subsect. a/, Sect. 2 subsect. a/ Criminal Code.

The Military District Prosecution in Bratislava brought a charge against the accused Vladimír Blaško 3 June 2010 under OPv 279/07 for the crime of abuse of power by a public official in accordance with Art. 326 Sect 1 subsect. a/, Sect. 2 Subsect. a/ Criminal Code with a reference to the Art. 138 Subsect. d/ Criminal Code in single-action concurrence with the misdemeanor of bodily harm in accordance with Art. 156 Sect. 1 Criminal Code.

The District Court Nitra ordered a public session for 3 September 2010 with the subject of preliminary discussion of the indictment, however, it was impossible to deliver the summons for this date of the public session to the accused Blaško via the post and at this public session the legal representative of the accused stated that he was not able to ensure his appearance since he had not been able to contact him and that he had the information that he was staying abroad, in the USA. Then the District Headquarters of the Police Forces, Justice and Criminal Police Office was requested to detect the accused person's stay and on 7 October 2010 they notified the court of the fact that the above mentioned person was assumed to stay in the USA, San Francisco, where he arrived on 26 February 2010 and there he was supposed to study in California at a university, where he had F1 student visa. Subsequently if was found out, with the cooperation of the Military District Prosecution, that the accused person had stayed at the address Fresno, California, 1717 South Chestnut Avenue which is probably the address of the Pacific University in Fresno since 26 February 2010 and as of 30 September 2010 there was no evidence that the accused person would have left the United States of America. Since it was impossible to summon, bring into court and detain the accused person and thus to ensure his appearance at the investigation acts and there was a reasonable doubt that the accused person was hiding in order to avoid the criminal proceeding, there was a ground for detention in accordance with Act. 71 Sect. 1 subsect. a/ Criminal Code.

Punishability of the offence which the accused person was charged with has not become statute-barred, the act happened on 13 July 2007, the criminal proceeding was commenced on 17 July 2007, and the indictment was brought on 8 January 2008. The punishability of the offence would become statute-barred in accordance with Art. 87 Sect. 1 Subsect. b/ Criminal Code on the expiry of the limitation period of twenty years, however it has been less than 7 years since the committing of the act and limitation was interrupted by the bringing of an indictment in accordance with Art. 87 Sect. 3 subsect. a/ Criminal Code.

By the Judgment of the District Court Nitra, file No. 6T/97/2010 dated 15 April 2013 enforceable together with the Judgment of the Regional Court in Nitra dated 7 November 2013 the accused person was found guilty of the criminal offence of abuse of power by a public official in accordance with Art. 326 Sect. 1 subsect. a), Sect. 2 subsect. a) Criminal Code with a reference to Art. 138 subsect. d) Criminal Code in single-action

2

6T/97/2010

concurrence with the misdemeanour of bodily harm in accordance with Art. 156 Sect. 1 Criminal Code at the main trial and he was imposed an aggregate imprisonment sentence with the length of 4 (four) years, for serving of which he has been classified in the institution for punishment execution with a minimum level of guarding. The Regional Court in Nitra issued an Order to Deliver the Convict Vladimír Blaško to Serve the Imprisonment Sentence on 7 November 2013, which has not been executed yet. With regard to the fact that the convict avoids the execution of finally imposed imprisonment sentence by his stay abroad, a reason for request for extradition from abroad in accordance with Art. 490 Sect. 2 subsect. b) Criminal Procedure Code arose.

### Provisions of the Criminal Code No. 300/2005 Coll. as amended

### Art. 326
### Abuse of Power by a Public Official

(1) A public official who, with the intention of causing damage to another or obtaining undue benefit for himself or another,

a) exercises his powers in an unlawful manner,

b) exceeds his legal authority, or

c) fails to fulfill a duty resulting from his legal authority or from a court decision,

shall be liable to a term of imprisonment of two to five years.

(2) The offender shall be liable to a term of imprisonment of four to ten years if he commits the offence referred to in paragraph 1

a) acting in a more serious manner,

b) against a protected person, or

c) by reason of specific motivation.

(3) The offender shall be liable to a term of imprisonment of seven to twelve years if he commits the offence referred to in paragraph 1,

a) and causes grievous bodily harm or death through its commission,

b) and causes substantial damage through its commission, or

c) with the intention of preventing or obstructing the exercise of fundamental rights and freedoms by another.

(4) The offender shall be liable to a term of imprisonment of ten to twenty years if he commits the offence referred to in paragraph 1,

a) and causes grievous bodily harm or death to several persons through its commission,

b) and causes large-scale damage through its commission,

c) under a crisis situation.

### Limitation of Criminal Proceedings
### Art. 87

(1) Punishability of an act shall become statute-barred on the expiry of the limitation period, which is

a) thirty years in case of a felony, for which this Act allows life imprisonment,

b) twenty years in case of a felony, for which the Special Part of this Act allows a maximum custodial penalty of at least ten years,

c) ten years in case of other felonies,

d) five years in case of a minor offence, for which the Special Part of this Act allows a maximum custodial penalty of at least three years,

3

This is the translation from the Slovak into English language.

6T/97/2010

e) three years in case of other minor offences.

(2) The limitation period shall not include
a) the period, during which the offender could not be made to stand trial because of legal impediments,
b) the period, during which the offender stayed abroad with the intention to avoid criminal prosecution,
c) the probationary period, in case of a conditional stay of criminal prosecution,
d) the period, during which the bringing of indictment was temporarily postponed,
e) the period, during which the criminal prosecution was interrupted.

(3) Limitation of criminal prosecution shall be interrupted
a) by the bringing of an indictment for the criminal offence, which is subject to the limitation, and by the subsequent acts of criminal procedure authorities, a judge for pre-trial proceedings, or the court connected with the criminal prosecution of the offender, or
b) when the offender commits an intentional criminal offence in the course of the limitation period.

(4) A new period of limitation shall commence to run as from the date of interruption of the initial limitation period.

**Art. 88**

The expiry of the limitation period shall not result in the extinction of punishability for criminal offences set out in Chapter XII of the Special Part of this Act, except for the criminal offence of supporting and promoting groups leading to the suppression of fundamental rights and freedoms pursuant to Art. 421 and 422, criminal offence of defamation of a nation, race and conviction pursuant to Art.423, and the criminal offence of incitement of national, racial or ethnic hatred pursuant to Art.424.

In accordance with Art. 87 Criminal Code the punishability of the act Vladimír Blaško has been charged with has not expired.

**Provisions of the Criminal Code No. 301/2005 Coll. as amended**

**Art. 490 Section 1, Section 2 Subsect. a/**

(1) If the accused stays abroad and if his extradition is necessary, the presiding judge of the competent court shall issue a warrant of arrest (hereinafter referred to as the "international warrant of arrest"). In the pre-trial, the judge for preparatory proceedings shall issue the international warrant of arrest upon a motion by the prosecutor. The international warrant of arrest has, on the territory of the Slovak Republic, the same effects as a warrant of arrest.

(2) The court shall issue an international warrant of arrest in particular if:
a) it is not possible to secure the personal appearance of the accused in the criminal proceeding by any other means.

4

6T/97/2010

### Art. 491

An international warrant of arrest shall become null and void by

a) the surrender of the extradited person to the court under Art. 494 paragraph 1 or to the court which issued the warrant of arrest under Art. 73 Sect. 1,

b) revocation; the court which issued the international warrant of arrest shall revoke it if the reasons for which it was issued no longer exist or if consequently finds out that the reasons did not exist; if the international warrant of arrest was issued upon the motion by the prosecutor, the court shall revoke it upon his motion,

c) issuing of the new international warrant of arrest in the same criminal matter.

(2) After filing an indictment in the criminal matter in which an international warrant of arrest was issued, the court which the indictment was filed with, shall issue a new international warrant of arrest, if the reasons for its issuing remain. Otherwise it shall revoke the warrant of arrest issued in pre-trial proceedings. The same procedure shall be followed if during the criminal proceedings the subject matter jurisdiction or territorial jurisdiction of the court changes.

(3) Revocation of the international warrant of arrest does not exclude issuing of a new warrant of arrest in the same criminal matter.

(4) The court shall immediately inform the Ministry of Justice and prosecution office of a revocation or issuing of a new international warrant of arrest.

In Nitra on 21 January 2014

*an illegible signature*
**LLD Mária Ondrejová**
**Chairman of the Panel**

A blue round seal of the
District Court Nitra
18

5

EXT BLASKO 101

PREKLADATEĽSKÁ DOLOŽKA

Preklad som vypracovala ako prekladateľka zapísaná v zozname znalcov, tlmočníkov a prekladateľov, ktorý vedie Ministerstvo Spravodlivosti Slovenskej republiky v odbore slovenský jazyk – anglický jazyk, evidenčné číslo prekladateľky 970859.

Prekladateľský úkon je zapísaný pod poradovým číslom .*031/2014.* prekladateľského denníka č. 1/2014.

V Nitre dňa *10. 4. 2014*

TRANSLATOR'S CLAUSE

I have made this translation as the translator recorded in the Register of Experts, Interpreters and Translators administered by the Ministry of Justice of the Slovak Republic in the specialization Slovak language – English language, translator's registration number 970859.

This translation act has been recorded under the sequence number *031/2014* of the Translator's Record Book No. 1/2014.

In Nitra on *10. Apr. / 2014*

# EXHIBIT D

EXT BLASKO 103

## Art. 87

### Limitations of criminal prosecution

(1) Liability to   punishment shall expire by breaking of term of limitation, which is

a) thirty years if it concerns a crime for which this law allows imposition of life imprisonment,

b) twenty years if it concerns a crime for which this law, in a separate section, allows imposition of custodial sentence with a maximum penalty of at least ten years,

c) ten years if it concerns other crimes,

d) five years if it concerns a criminal offence for which this law allows in a separate section to impose imprisonment with a maximum penalty of at least three years,

e) three years in other misdemeanors,

(2) The limitation period shall not include:

a) the period for which the offender could be brought before the court for legal impediment,

b) the period for which the offender resided abroad with the intention to avoid criminal prosecution,

c) the probationary period of a conditional suspension of criminal prosecution,

d) the period for which criminal prosecution was suspended.

(3) Limitation of the criminal prosecution shall be suspended:

a) by bringing a charge of a criminal offence for which the limitation is concerned, as well as after the following   acts   by prosecuting authority, an investigating judge or court seeking prosecution of the offender, or

b) if the offender has committed a wilful criminal offence in the limitation period

(4) By suspending the limitations a new limitation period shall begin.

EXT BLASKO 104

**Limitation of the Execution of Punishment**

Article 90

(1) The imposed punishment may not be enforced after the expiry of the limitation period, which is

a) twenty years if it is a conviction of a life prison sentence,

b) fifteen years if it is a conviction of a prison sentence exceeding ten years,

c) ten years if it is a conviction of a prison sentence of at least five years,

d) five years in convictions of other punishments.

(2) The limitation period begins upon the validity of the judgment; in a conditional conviction, conditional conviction with supervision, conditional release or conditional release with supervision, the limitation period starts with the validity of the decision that the punishment shall be enforced.

(3) The limitation period shall not include the period during which the punishment could not be enforced because the convicted sojourned abroad with the intent to avoid the punishment, or they were serving punishment by prison sentence during it.

(4) Limitation of the execution of the punishment shall be suspended if

a) the court ordered a measure directed toward the serving of the punishment, which the limitation refers to, or

b) the convicted committed an intentional criminal offence during the limitation period.

(5) The new limitation period begins by the suspension of the initial limitation.

EXT BLASKO 105

## Art. 138

### Serious manner of action

A serious manner of action means the commission of a crime:

a) with a gun except for crimes of premeditated murder under the provision of Art. 144, under the provision of Art. 45, homicide under the provision of Art. 147 and Art. 148, manslaughter under the provision of Art. 149, bodily under the provision of Art. 155, Art. 156 and Art. 157,

b) for a longer time

c) in a brutal and agonizing way

d) by violence, by threats of imminent violence or threat of other severe injury,

e) by burglary,

f) by trickery,

g) by using distress, inexperience, dependency or subordination,

h) by breaking the obligation arising from the perpetrator's employment, his position or function, or imposed on him by law,

i) by an organized group, or

j) on several persons

### Provisions of Art. 156 of the Penal Code read:

(1) A person who is intentionally doing another bodily harm, shall be punished by imprisonment for six months to two years.

A perpetrator shall be punished by imprisonment for one to three years, if he has committed an act cited in Sect. 1

on a protected person, or

for a special theme.

A perpetrator shall be punished by imprisonment for two to five years, if he has committed an act cited in Sect. 1

a) by a severe method of action, or

b) during a crisis situation.

## Art. 326

### Abuse of powers of a public official

(1) A public official who, with intention to cause damage to another or provide for himself or for another unjustified benefits,

a) executes his power in a way contrary to law,

b) exceeds his power, or

c) fails to fulfill an obligation resulting from his power or a court decision, shall be punished by imprisonment of two to five years.

(2) A perpetrator shall be punished by imprisonment for four to ten years, if he has committed an act cited in Sect 1

a) by a more serious method of action,

b) on a protected person, or

c) from a special motive.

(3) A perpetrator shall be punished by imprisonment for seven to ten years, if he has committed an act cited in Sect. 1

a) and has caused bodily harm or death,

b) and has caused by such act a considerable damage, or

c) for a reason to obstruct and deteriorate the exercising of his fundamental rights and freedoms.

(4) A perpetrator shall be punished by imprisonment for ten to twenty years, if he has committed an act cited in Sect. 1

a) and has caused by such act a severe injury to health or death of several persons ,

b) and has caused by such act an extensive damage, or

c) during a crisis situation.

Provisions of Art. 138 of the Penal Code read:

# EXHIBIT E

EXT BLASKO 108



EXT BLASKO 109



DISTRICT OF COLUMBIA, ss:

### DECLARATION OF ELIZABETH M. KIINGI

I, Elizabeth M. Kiingi, declare and say as follows:

1. I am an Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Vladimir Blaško. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. In accordance with the provisions of the extradition treaties in full force and effect between the United States and the Slovak Republic, the Embassy of the Slovak Republic submitted Diplomatic Note number 009401/2017-USKU-0076139, dated June 6, 2017, requesting the extradition of Vladimir Blaško. A copy of the diplomatic note is attached to this declaration.

3. The relevant and applicable treaty provisions in full force and effect between the United States and the Slovak Republic are found in the Extradition Treaty between the United States of America and Czechoslovak Republic, signed July 2, 1925 (the "1925 Treaty"), the Supplementary Extradition Treaty between the United States of America and Czechoslovakia, signed April 29, 1935 (the "1935 Supplementary Treaty"), and the Instrument on Extradition between the United States of America and the Slovak Republic, as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003, with Annex, signed at Bratislava on February 6, 2006. The Annex to the Instrument (the "Annex") reflects the integrated text of the provisions of the 1925 Treaty, the 1935

17043865-1

# United States of America



## DEPARTMENT OF STATE

## *To all to whom these presents shall come, Greetings:*

I  ...fy That Elizabeth M. Kiingi, whose name is subscribed to the document hereunto annexed,
...  ... time of subscribing the same Assistant Legal Adviser, Office of the Legal Adviser,
...  ... t of State, United States of America, and that full faith and credit are due to her acts as
...  ...h.

*This certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, Rex W. Tillerson, Secretary of State , have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this thirteenth day of July, 2017.

Secretary of State

By

Assistant Authentication Officer,
Department of State

Issue... ...uant to CHXIV, ...
Sept. ... 789, 1 Stat. 68...
USC ... 22USC 2651a;
301; ... C 1733 et. seq.; ...
1443... ...LE 44 Federal Ru...
Civil ... ...ure.

Supplementary Treaty, and the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003. A copy of the Instrument with Annex is attached to this declaration.

4. In accordance with Article XVI of the Annex, the Government of the United States provides legal representation in U.S. courts for the Slovak Republic in its extradition requests, and the Slovak Republic provides legal representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are covered by Article II of the Annex.

6. Under Article XII of the Annex, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy U.S. authentication requirements without the need for certification by the U.S. Embassy in Bratislava. The Slovak Republic, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Justice, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 1?, 2017.

ELIZABETH M. KIINGI

Attachments:
1. A copy of the diplomatic note
2. Copy of Instrument with Annex.



**EMBASSY**
OF THE SLOVAK REPUBLIC

**L/LEI**

**NOTE VERBALE**

2017 JUN 15  P 2: 57

DEPARTMENT OF STATE

009401/2017-USKU-0076139

The Embassy of the Slovak Republic in Washington, D.C. presents its compliments to the United States Department of State and in accordance with the Instrument on Extradition between the Slovak Republic and the United States of America, as contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America, signed in Washington, D.C. on June 25, 2003 (Bratislava, 6 February 2006) has the honour to deliver the request for extradition of the Slovak national Vladimír BLAŠKO, born on January 10, 1983, residing at Nitra, Slovak Republic, currently in the United States of America.

The Embassy of the Slovak Republic avails itself of this opportunity to renew to the United States Department of State assurances of its highest consideration.

Washington, D.C., June  6  , 2017

Enclosure: 7



United States Department of State
Office of the Legal Adviser
Washington, D.C. 20520

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201.19

# EXTRADITION

**Instrument Amending the**

**Treaty of July 2, 1925,**

**as Amended by the Supplementary**

**Treaty of April 29, 1935**

**Between the**

**UNITED STATES OF AMERICA**

**and the SLOVAK REPUBLIC**

Signed at Bratislava February 6, 2006

with

Annex



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

## SLOVAK REPUBLIC

### Extradition

*Instrument amending the treaty of*
 *July 2, 1925, as amended by*
 *the supplementary treaty of April 29, 1935.*
*Signed at Bratislava February 6, 2006;*
*Transmitted by the President of the United States of America*
 *to the Senate September 28, 2006 (Treaty Doc. 109-14,*
 *109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
 *July 29, 2008 (Senate Executive Report No. 110-12,*
 *110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
 *September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Instruments of Ratification*
 *at Washington May 5, 2009;*
*Entered into force February 1, 2010.*
*With annex.*

**Instrument on Extradition between the United States of America and the Slovak Republic, as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003**

1.　　As contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the U. S.-EU Extradition Agreement"), the United States of America and the Slovak Republic acknowledge that, in accordance with the provisions of this Instrument, the U. S.-EU Extradition Agreement is applied in relation to the bilateral Treaty between the United States and Czechoslovakia Concerning the Mutual Extradition of Fugitive Criminals signed 2 July 1925 and the Supplementary Extradition Treaty between the United States of America and Czechoslovakia signed 29 April 1935 (hereafter collectively referred to as "the bilateral extradition treaty") under the following terms:

(a)　Article 4 of the U. S.-EU Extradition Agreement as set forth in Articles I and II of the Annex to this Instrument shall govern the scope of extraditable offenses;

(b)　Articles 5(1) and 7(1) of the U. S.-EU Extradition Agreement as set forth in Article XII(2) of the Annex to this Instrument shall govern the mode of transmission of the extradition request and supporting documents and shall provide an alternative method for transmission of the request for extradition and supporting documents following provisional arrest;

(c)　Article 5(2) of the U. S.-EU Extradition Agreement as set forth in Article XII(6) of the Annex to this Instrument shall govern the requirements concerning certification, authentication or legalization of the extradition request and supporting documents;

(d)　Article 6 of the U. S.-EU Extradition Agreement as set forth in Article XII(3) of the Annex to this Instrument shall authorize an alternative channel of transmission of requests for provisional arrest;

(e)　Article 8 of the U. S.-EU Extradition Agreement as set forth in Article XIII of the Annex to this Instrument shall govern the submission of supplementary information;

(f)　Article 9 of the U. S.-EU Extradition Agreement as set forth in Article VII of the Annex to this Instrument shall govern the temporary surrender of a person being proceeded against or serving a sentence in the requested State;

(g)　Article 10 of the U. S.-EU Extradition Agreement as set forth in Article VIII of the Annex to this Instrument shall govern the decision on requests made by several States for the extradition or surrender of the same person;

(h)　Article 11 of the U. S.-EU Extradition Agreement as set forth in Article XV of the Annex to this Instrument shall govern the use of simplified extradition procedures;

1

(i)   Article 12 of the U. S.-EU Extradition Agreement as set forth in Article XVII of the Annex to this Instrument shall govern requests for transit of persons in custody;

(j)   Article 13 of the U. S.-EU Extradition Agreement as set forth in Article XVIII of the Annex to this Instrument shall govern extradition with respect to conduct punishable by death in the requesting State; and

(k) . Article 14 of the U. S.-EU Extradition Agreement as set forth in Article XIV of the Annex to this Instrument shall govern consultations where the requesting State contemplates the submission of particularly sensitive information in support of a request for extradition.

2.    The Annex, which is an integral part of this Instrument, reflects the integrated text of the provisions of the bilateral extradition treaty and the U. S.-EU Extradition Agreement that shall apply upon entry into force of this Instrument.

3.    In accordance with Article 16 of the U. S.-EU Extradition Agreement, this Instrument shall apply to offenses committed before as well as after it enters into force.

4.    This Instrument shall not apply to requests for extradition made prior to its entry into force; except that, in accordance with Article 16 of the U. S.-EU Extradition Agreement, Articles II, VI and VII of the Annex shall be applicable to requests made prior to such entry into force.

5.(a)  This Instrument shall be subject to the completion by the United States of America and the Slovak Republic of their respective applicable internal procedures for entry into force. The United States of America and the Slovak Republic shall thereupon exchange instruments indicating that such measures have been completed. This Instrument shall enter into force on the date of entry into force of the U. S.-EU Extradition Agreement.

  (b) In the event of termination of the U. S.-EU Extradition Agreement, this Instrument shall be terminated and the bilateral extradition treaty shall be applied. The United States of America and the Slovak Republic nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

  (c) The United States of America or the Slovak Republic may also terminate this Instrument if the bilateral extradition treaty is terminated at the same time in accordance with the terms thereof.

2

IN WITNESS WHEREOF, the undersigned, being duly authorized for this purpose, have signed this Instrument.

Done at Bratislava, in duplicate, this 6ᵗʰ day of February, 2006, each in the English and Slovakian languages, both texts being equally authentic.

FOR THE UNITED STATES OF AMERICA:     FOR THE SLOVAK REPUBLIC:

3

Annex

Treaty between the United States of America and the Slovak Republic Concerning the Mutual Extradition of Criminal Offenders

Article I

It is agreed that the United States of America and the Slovak Republic shall, upon requisition duly made as herein provided, deliver up to justice any person, who may be charged with, or may have been convicted of any of the criminal offenses specified in Article II of this Treaty, and who shall seek an asylum or shall be found within their respective territories; provided that such surrender shall take place only upon such evidence of criminality, as according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the criminal offense had been there committed.

Article II

1.      A criminal offense shall be an extraditable criminal offense if it is punishable under the laws of the requesting and requested States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty.   A criminal offense shall also be an extraditable criminal offense if it consists of an attempt or conspiracy to commit, or participation in the commission of, an extraditable criminal offense.  Where the request is for enforcement of the sentence of a person convicted of an extraditable criminal offense, the deprivation of liberty remaining to be served must be at least four months.

2.      If extradition is granted for an extraditable criminal offense, it shall also be granted for any other criminal offense specified in the request if the latter criminal offense is punishable by one year's deprivation of liberty or less, provided that all other requirements for extradition are met.

3.      For purposes of this Article, a criminal offense shall be considered an extraditable criminal offense:

        (a) regardless of whether the laws in the requesting and requested States place the criminal offense within the same category of criminal offenses or describe the criminal offense by the same terminology;

        (b) regardless of whether the criminal offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court; and

4

(c) in criminal cases relating to taxes, customs duties, currency control and the import or export of commodities, regardless of whether the laws of the requesting and requested States provide for the same kinds of taxes, customs duties, or controls on currency or on the import or export of the same kinds of commodities.

4.      If the criminal offense has been committed outside the territory of the requesting State, extradition shall be granted, subject to the other applicable requirements for extradition, if the laws of the requested State provide for the punishment of a criminal offense committed outside its territory in similar circumstances. If the laws of the requested State do not provide for the punishment of a criminal offense committed outside its territory in similar circumstances, the executive authority of the requested State, at its discretion, may grant extradition provided that all other applicable requirements for extradition are met.

### Article III

1.      The provisions of this Treaty shall not import a claim of extradition for any criminal offense of a political character, nor for acts connected with such criminal offenses; and no persons surrendered by or to either of the Contracting Parties in virtue of this Treaty shall be tried or punished for a political offense committed before his extradition.

2.      The State applied to or Courts of that State shall decide whether the criminal offense is of a political character or not.

3.      When the criminal offense charged comprises the act either of murder or assassination or of poisoning, either consummated or attempted, the fact that the criminal offense was committed or attempted against the life of the Sovereign or Head of any State or against the life of any member of his family, shall not be deemed sufficient to sustain that such criminal offense was of a political character, or was an act connected with criminal offenses of a political character.

### Article IV

No person shall be tried for any criminal offense committed before his extradition other than that for which he was surrendered or be extradited to another State, unless the executive authority of the surrendering State consents thereto, or unless he shall have been allowed one month to leave the State after having been set at liberty as a result of the disposition of the charges upon which he was extradited.

### Article V

A criminal offender shall not be surrendered under the provisions hereof, when, from lapse of time or other lawful cause, according to the laws of either of the States within the jurisdiction of which the criminal offense was committed, the criminal offender is exempt from prosecution or punishment for the offense for which the surrender is asked.

5

### Article VI

1.    If the person claimed should be under examination or under punishment in the State applied to for other criminal offenses, his extradition may be deferred until the conclusion of the trial or, in case of his conviction, until the full execution of any punishment imposed upon him.

2.    Yet this circumstance shall not be a hindrance to deciding the request for the extradition in the shortest time possible.

### Article VII

1.    If a request for extradition is granted in the case of a person who is being proceeded against or is serving a sentence in the requested State, the requested State may temporarily surrender the person sought to the requesting State for the purpose of prosecution.

2.    The person so surrendered shall be kept in custody in the requesting State and shall be returned to the requested State at the conclusion of the proceedings against that person, in accordance with the conditions to be determined by mutual agreement of the requesting and requested States. The time spent in custody in the territory of the requesting State pending prosecution in that State may be deducted from the time remaining to be served in the requested State.

### Article VIII

1.    If the requested State receives requests from the requesting State and from any other State or States for the extradition of the same person, either for the same criminal offense or for different criminal offenses, the executive authority of the requested State shall determine to which State, if any, it will surrender the person.

2.    If the Slovak Republic receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same criminal offense or for different criminal offenses, the Minister of Justice of the Slovak Republic shall determine to which State, if any, it will surrender the person.

3.    In making its decision under paragraphs 1 and 2 of this Article, the requested State shall consider all of the relevant factors, including, but not limited to, the following:

    (a)    whether the requests were made pursuant to a treaty;

    (b)    the places where each of the criminal offenses was committed;

    (c)    the respective interests of the requesting States;

6

 (d) the seriousness of the criminal offenses;

 (e) the nationality of the victim;

 (f) the possibility of any subsequent extradition between the requesting States; and

 (g) the chronological order in which the requests were received from the requesting States.

Article IX

Under the stipulations of this Treaty, neither of the Contracting Parties shall be bound to deliver up its own citizens.

Article X

The requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered. The requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

Article XI

Everything found in the possession of the criminal offender at the time of his arrest, whether being the proceeds of the criminal offense, or which may be material as evidence in making proof of the crime, shall so far as practicable according to the laws of either of the Contracting Parties, be delivered up with his person at the time of surrender. Nevertheless, the rights of a third party with regard to the articles referred to, shall be duly respected.

Article XII

1. The stipulations of this treaty shall be applicable to all territory wherever situated, belonging to either of the Contracting Parties or in the occupancy and under the control of either of them, during such occupancy or control.

2. Requests for extradition and supporting documents shall be transmitted through the diplomatic channel. If the person whose extradition is sought is held under provisional arrest by the requested State, the requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel by submitting the request and documents to the Embassy of the requested State located in the requesting State. In that case, the date of receipt of such request by the Embassy shall be considered to be the date of receipt by the requested State for purposes of applying the time limit that must be met under paragraph 4 of this Article to enable the person's continued detention.

7

3.      Requests for provisional arrest may be made directly between the United States Department of Justice and the Ministry of Justice of the Slovak Republic, as an alternative to the diplomatic channel. The facilities of the International Criminal Police Organization (Interpol) may also be used to transmit such a request.

4.      The person provisionally arrested shall be released, unless within two months from the date of commitment in the United States, or from the date of arrest in the Slovak Republic, the formal requisition for surrender, with the documentary proofs hereinafter described, be made as aforesaid through the diplomatic channel.

5.      If the criminal offender shall have been convicted of the criminal offense for which his extradition is asked, a copy of the sentence of the court before which such conviction took place, duly authenticated, shall be produced. If, however, the criminal offender is merely charged with crime, a duly authenticated copy of the warrant of arrest in the State where the crime was committed, and of the depositions upon which such warrant may have been issued, shall be produced, with such other evidence or proof as may be deemed competent in the case.

6.      Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the requesting State shall be admissible in extradition proceedings in the requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall, for the United States of America, mean the United States Department of Justice; and, for the Slovak Republic, the Ministry of Justice of the Slovak Republic.

Article XIII

1.      The requested State may require the requesting State to furnish additional information within such reasonable length of time as it specifies, if it considers that the information furnished in support of the request for extradition is not sufficient to fulfill the requirements of this Treaty.

2.      Such supplementary information may be requested and furnished directly between the United States Department of Justice and the Ministry of Justice of the Slovak Republic.

Article XIV

Where the requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the requested State to determine the extent to which the information can be protected by the requested State. If the requested State cannot protect the information in the manner sought by the requesting State, the requesting State shall determine whether the information shall nonetheless be submitted.

8

## Article XV

If the person sought consents to be surrendered to the requesting State, the requested State may, in accordance with the principles and procedures provided for under its legal system, surrender the person as expeditiously as possible without further proceedings. The consent of the person sought may include agreement to waiver of protection of the rule of specialty.

## Article XVI

In every case of a request made by either of the Contracting Parties, for the arrest, detention or extradition of criminal offenders, the appropriate legal officers of the State where the proceedings of extradition are had, shall assist the State demanding the extradition before the respective judges and magistrates, by every legal means within their power.

## Article XVII

1.      The United States of America may authorize transportation through its territory of a person surrendered to the Slovak Republic by a third State, or by the Slovak Republic to a third State.  The Slovak Republic may authorize transportation through its territory of a person surrendered to the United States of America by a third State, or by the United States of America to a third State.

2.      A request for transit shall be made through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the Slovak Republic.  The facilities of Interpol may also be used to transmit such a request. The request shall contain a description of the person being transported and a brief statement of the facts of the case.  A person in transit shall be detained in custody during the period of transit.

3.      Authorization is not required when air transportation is used and no landing is scheduled on the territory of the transit State.  If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 2.  All measures necessary to prevent the person from absconding shall be taken until transit is effected, as long as the request for transit is received within 96 hours of the unscheduled landing.

## Article XVIII

Where the criminal offense for which extradition is sought is punishable by death under the laws in the requesting State and not punishable by death under the laws in the requested State, the requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the requesting State, on condition that the death penalty if imposed shall not be carried out.  If the requesting State accepts extradition

9

subject to conditions pursuant to this Article, it shall comply with the conditions. If the requesting State does not accept the conditions, the request for extradition may be denied.

Article XIX

This Treaty shall continue in force until the expiration of one year from the date on which notice of termination shall be given by either of the Contracting Parties.

10