# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF VLADIMIR BLASKO TO THE SLOVAK REPUBLIC, | Case No. 1:17-mc-00067-DAD-SAB<br><br>MEMORANDUM AND ORDER CERTIFYING EXTRADITABILITY OF VLADIMIR BLASKO AND SETTING BRIEFING SCHEDULE FOR MOTION FOR RECONSIDERATION OF ORDER GRANTING BAIL<br><br>(ECF Nos. 43, 50, 52) |

The United States of America ("the Government") filed a complaint in this matter seeking the extradition of Vladimir Blasko at the request of the Government of the Slovak Republic pursuant to a treaty between the United States of America and the European Union. The Court finds that the Government has satisfied its burden under 18 U.S.C. § 3184, et seq. and has established that Blasko is eligible to be extradited to the Slovak Republic.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

On July 13, 2007, Blasko and Michal Krajmer, working as police officers, responded to a call about a disturbance in a bar. (Judgement in the Name of the Slovak Republic, ECF No. 1 at 51.[1])  As the officers approached a table in the bar, Boris Kozma and Blasko got into an altercation. (Id. at 51-52.)  Kozma and a friend were arrested and taken to the police station. (Id. at 52.)  Several witnesses went to the police station to report what they had observed, but the police would not take their statements. (Id. at 53.)  After arriving at the police station, Kozma called his wife and asked her for help because he had been beaten by the policemen. (Id. at 54.)  Kozma's wife went to the police station where she saw that her husband had been beaten, he was covered in blood, and his face was so swollen on the left side that you could not see his left eye. (Id.)  A police officer came and grabbed his arms, lifted him by the foot and kicked him back behind the bars. (Id.)  The police refused to call an ambulance so she called the ambulance herself. (Id. at 54.)  Kozma was examined at the hospital and had a concussion, facial contusion in the area of the left eye, fracture of the small nose bones, cervical spine sprain, contusion of the front abdominal wall on the left, contusion of both wrists, and partial damage of the sensitive nerve fibers of the right radial nerve in the area of the forearm. (Id. at 66.)  Kozma's injuries were caused by blunt force trauma. (Id.)  On October 20, 2009, Blasko was discharged from police service with the conclusion "incapable of execution of any position in public service[.]" (Id. at 71.)

On June 3, 2010, an indictment was submitted to the District Court of Nitra in the case. (Supplemental Declaration in Support of the Request for the Extradition of Vladimir Blasko, ECF No. 52-1 at 4; Charging Document, ECF No. 52-1 at 13-20.)  An international arrest warrant was issued for Blasko on October 29, 2010 in the District Court Nitra. (ECF No. 1 at 71.)  Charges were brought against Krajmer due to the kicks that he delivered to Kozma in the bar. (Id. at 73.)  However, the charges were suspended because it was determined that he was

---

[1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

acting at the instruction of his superior officer, Blasko.  (Id.)

A three-judge panel conducted a trial *in absentia* in the District Court Nitra and a judgment issued on April 15, 2013.  (ECF No. 1 at 48-76.)  A lawyer was present to represent Blasko.  (Id. at 49.)  The panel found that on July 13, 2007, at about 9:45 p.m. in the village of Stitare in the bar Relax, while performing his duties as a public official, Blasko attacked Boris Kozma.  (Id. at 48.)  Blasko was responding to a phone report of a minor crime.  (Id.)  Kozma showed his identification card of a Corps of Prison and Court Guard of the Slovak Republic, introduced himself as a colleague, and asked why the officers were taking his friend away.  (Id.)  Blasko used his fist to hit Kozma in the neck area, then pulled Kozma down on the ground, and continued hitting him in the head despite the fact that Kozma did not put up any resistance.  (Id.)  Blasko then handcuffed Kozma and took him to the police station where he attacked Kozma again with no adequate reason.  (Id.)  Blasko hit Kozma in the face and after Kozma fell to the ground, Blasko hit him in the head area and kicked him in the trunk.  (Id.)  Kozma suffered a concussion, fracture of the small nose bones, a facial contusion in the area of the left eye, a cervical spine sprain, contusion of the abdominal wall on the left, contusion of both wrists and partial damage of sensitive nerve fibers in the right radial nerve of the forearm, and took thirty-one days of sick leave which was caused by Blasko.  (Id.)  Blasko was found to have committed the criminal offense of abuse of power by a public official and a misdemeanor of bodily harm.  (Id. at 49.)  The court sentenced Blasko to four years imprisonment.  (Id.)

Blasko's attorney filed an appeal challenging the sentence imposed.  (Id. at 89-95.)  On appeal, the court found errors in the sentencing but affirmed the sentence of four years of imprisonment on November 7, 2013.  (Id.)  On January 21, 2014, an international arrest warrant issued for Blasko.  (Id. at 104-108.)

On February 14, 2017, the Ministry of Justice of the Slovak Republic requested the extradition of Vladimir Blasko pursuant to an agreement of extradition between the United States of America and the European Union.  (ECF No. 1 at 8-12.)

On October 2, 2017, the Government filed this action seeking the extradition of Blasko to the Slovak Republic.  (ECF No. 1.)  Blasko appeared on October 6, 2017, and was ordered

detained.  (ECF No. 9, 10.)  Blasko filed a request for bail, which was denied by the undersigned on February 16, 2018.  (ECF Nos. 22.)  Blasko appealed the denial of bail; and, on August 1, 2018, District Judge Dale A. Drodz granted the motion for bail pending the extradition hearing. (ECF No. 45.)

The Government filed an opening brief on July 19, 2018.  (ECF No. 43.)  Blasko filed a response on August 25, 2018.  (ECF No. 50.)  The Government filed a reply on September 14, 2018.  (ECF No. 52.)

An extradition hearing was held on October 30, 2018.  Counsel Vincenza Rabenn appeared for the Government and Reed Grantham appeared with Blasko at the hearing.  The Government submitted the originals of the documents which were admitted into the record. Having considered the moving, opposition, and reply papers, as well as the Court record and the arguments presented at the October 30, 2018 hearing, the Court issues the following order.

## II.

## LEGAL STANDARD

"Extradition from the United States is a diplomatic process that is initiated by a request from the nation seeking extradition directly to the Department of State."  Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir. 2005).  Extradition requests are evaluated by the State Department to determine whether the request falls within scope of the relevant extradition treaty.  Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016); Prasoprat, 421 F.3d at 1012.  If the request falls within the treaty, a United States Attorney files a complaint in the district court seeking an arrest warrant for the person sought to be extradited.  Santos, 830 F.3d at 991; Prasoprat, 421 F.3d at 1012.

"Extradition from the United States is governed by 18 U.S.C. section 3184, which confers jurisdiction on 'any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States' to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation, and to issue a certification of extraditability to the Secretary of State.' "  In re Extradition of Santos, 795 F.Supp.2d 966, 969 (C.D. Cal. 2011); accord Santos, 830 F.3d at 991-992.  The judge or

magistrate is to hold a hearing to determine "whether (1) the crime is extraditable; and (2) there is probable cause to sustain the charge." Prasoprat, 421 F.3d at 1012.

The court has limited authority in the overall process of extradition as "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir. 2006) (quoting Lopez-Smith v. Hood, 121 F.3d 1322, 1326 (9th Cir.1997)). The court is not considering whether the extraditee is guilty, but merely whether there is competent legal evidence which would justify holding the individual for trial. Collins v. Loisel, 259 U.S. 309, 315-16 (1922). Competent evidence to establish probable cause is not necessarily evidence competent to convict. Fernandez v. Phillips, 268 U.S. 311, 312 (1925).

In the extradition hearing, there are no discretionary decisions for the magistrate judge to make. Prasoprat, 421 F.3d at 1012. If the judge or magistrate "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him. . .." 18 U.S.C. § 3184; see Santos, 830 F.3d at 992 ("So long as "the judicial officer determines that there is probable cause, he 'is required to certify the individual as extraditable to the Secretary of State.' "). It is within the discretion of the Secretary of State to determine whether the individual will be surrendered. Prasoprat, 421 F.3d at 1012.

"[T]he principles of international law recognize no right to extradition apart from treaty." Factor v. Laubenheimer, 290 U.S. 276, 287 (1933). "The right of a foreign sovereign to demand and obtain extradition of an accused criminal is created by treaty." Quinn v. Robinson, 783 F.2d 776, 782 (9th Cir. 1986). To determine the right to demand extradition and the correlative duty to surrender, the court looks to the treaty that created the right. Factor, 290 U.S. at 287. "Treaties must receive a fair interpretation, according to the intention of the contracting parties, and so as to carry out their manifest purpose." Wright v. Henkel, 190 U.S. 40, 57 (1903). "Extradition treaties are to be liberally construed so as to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses." In re Extradition of Santos, 795 F.Supp.2d at 970 (quoting Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 14 (1936)).

# III.

## EVIDENCE IN SUPPORT OF AND IN OPPOSITION TO EXTRADITION

"The admissibility of evidence in an extradition proceeding is governed by 'the general extradition law of the United States and the provisions of the Extradition Treaty.' " In re Extradition of Mathison, 974 F.Supp.2d 1296, 1304 (D. Or. 2013) (quoting In re Extradition of Santos, 795 F.Supp.2d at 970). Evidence presented by the Government must be "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof of the same[.]" 18 U.S.C. § 3190.

### A.     Government's Evidence in Support of Extradition

1.     Embassy of Slovak Republic Request for Extradition of Vladimir Blasko, dated June 6, 2017. (ECF No. 1 at 7.)

2.     Ministry of Justice of the Slovak Republic's request for extradition of Vladimir Blasko pursuant to the Agreement on Extradition between the European Union and the United States of America signed in Washington, D.C. on June 25, 2003. (ECF No. 1 at 8.)

3.     Declaration in Support of the Request for the Extradition of Vladimir Blasko by Maria Ondrejova, Judge of the District Court of Nitra. (ECF No. 1 at 11-12.[2])

4.     Judgement in the Name of the Slovak Republic in the criminal matter of Vladimir Blasko, dated April 15, 2013. (ECF No. 1 at 48-76.)

5.     Judgement in the Name of the Slovak Republic in the criminal matter of Vladimir Blasko, dated November 7, 2013. (ECF No. 1 at 89-95.)

6.     International Warrant of Arrest of Vladimir Blasko, dated January 21, 2014. (ECF No. 1 at 104-108.)

7.     Slovakian Penal Code Articles 87, 90, 138, 156 and 326. (ECF No. 1 at 111-114.)

8.     Photograph of Vladimir Blasko. (ECF No. 1 at 116.)

---

[2] The Court cites to the English translation of all documents which have also been submitted in the Slovak language.

9.     Declaration of Elizabeth Kiingi, Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C.  (ECF No. 1 at 117-119.)

10.     Treaty Between the United States of America and the Slovak Republic, as amended February 6, 2006.  (ECF No. 1 at 121-133.)

11.     Supplemental Declaration in Support of the Request for the Extradition of Vladimir Blasko by Maria Ondrejova, dated September 6, 2018.  (ECF No. 52-1 at 4.)

12.     Charging Document, dated June 3, 2010.  (ECF No. 52-1 at 13-20.)

**B.     Defendant's Evidence in Opposition to Extradition**

1.     Confirmation of Employment of Vladimir Blasko by the Regional directorate of Police Forces.  (ECF No. 50-1 at 1-2.)

2.     Current Evaluation, dated January 9, 2009.  (ECF No. 50-2 at 1-2.)

3.     Ongoing Evaluation, dated April 5, 2009.  (ECF No. 50-2 at 4.)

4.     Ongoing Evaluation, dated July 8, 2009.  (ECF No. 50-2 at 7.)

5.     Ongoing Evaluation, dated October 9, 2009.  (ECF No. 50-2 at 10.)

6.     Certificate of Marriage, dated December 28, 2009.  (ECF No. 50-3 at 1.)

7.     Letter verifying that Martina Gregusova is attending Fresno Pacific University in Fresno, California, dated February 17, 2012.  (ECF No. 50-4.)

8.     Passport of Vladimir Blasko.  (ECF No. 50-5.)

9.     Visa for Vladimir Blasko.  (ECF No. 50-6.)

10.     Letter of Admission to Fresno Pacific University, dated January 27, 2010.  (ECF No. 50-7.)

11.     Fresno Pacific University identification card and Social Security card for Vladimir Blasko.  (ECF No. 50-8.)

12.     Affidavit of Jennifer L. Doerrie.  (ECF No. 50-9.)

13.     Vladimir Blasko's I-589 Application Pleading (ECF No. 50-10.)

14.     Order of the Immigration Judge with Respect to Custody in removal proceedings.  (ECF No. 50-11 at 1.)

15.     Release on bond.  (ECF No. 50-11 at 2.)

16.     Declaration of Maria Marianna Blaskova and Vladimir Blasko. (ECF No. 50-12.)

17.     Contractors State License. (ECF No. 50-13.)

18.     Construction Insurance Bond and business card. (ECF No. 50-14 at 1.)

19.     Letter from Employment Development Department. (ECF No. 50-14 at 2.)

20.     Invoices. (ECF No. 50-14 at 3-4.)

## IV.

## DISCUSSION

"Foreign states requesting extradition are not required to litigate their criminal cases in American courts[;] and therefore, "the scope of the extradition court's review 'is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered.' " Santos, 830 F.3d at 991. "The larger assessment of extradition and its consequences is committed to the Secretary of State." Id. (quoting United States v. Kin–Hong, 110 F.3d 103, 110 (1st Cir.1997).

> To obtain a certification of extraditability on behalf of a requesting state, the United States has the burden of demonstrating each of the following elements: (1) the court possesses subject matter jurisdiction to conduct extradition proceedings; (2) the court possesses personal jurisdiction over the person named in the extradition request; (3) a valid extradition treaty exists between the requesting state and the United States; (4) the extradition treaty between the requesting state and the United States is, and at all relevant times has been, in full force and effect; (5) the person named in the extradition request is charged with having committed a criminal offense within the jurisdiction of the requesting state; (6) the charged offense is extraditable under the relevant extradition treaty (that is, the offense charged falls within the terms of the relevant extradition treaty); (7) the person named in the extradition request is the person arrested and brought before the court; and (8) there is competent evidence establishing probable cause to believe that the person named in the extradition request committed the charged offense.

In re Extradition of Santos, 795 F.Supp.2d at 969-70.

This Court has jurisdiction pursuant to 18 U.S.C. § 3184 to entertain and rule on the request for extradition under the treaty between the United States of America and the Republic of Slovakia. "A district court has jurisdiction over a fugitive found within its jurisdictional boundaries." In re Extradition of Camelo-Grillo, No. CV 16-9026 JVS (SS), 2017 WL 2945715, at *5 (C.D. Cal. July 10, 2017). Blasko is subject to personal jurisdiction as he resides in and has been found in this judicial district. Further, the Court finds that Blasko has been charged with

and convicted of committing a crime within the requesting state and is the person arrested and brought before the Court.

## A.    A Valid Treaty Exists

"The advice and consent of the Senate is a constitutional prerequisite to a valid treaty, and the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty." Then v. Melendez, 92 F.3d 851, 853 (9th Cir. 1996). In 1925, the United States of America and the Czechoslovak Republic signed an Extradition Treaty. (Decl. of Elizabeth M. Kiingi ¶ 3, ECF No. 1 at 117.) A Supplemental Extradition Treaty between the United States of America and the Czechoslovak Republic was signed on April 29, 1935. (Id.) The Instrument on Extradition was signed on February 6, 2006, with the Annex to the Instrument reflecting the integrated text of the 1925 Treaty, the 1935 Supplementary Treaty, and the Instrument on Extradition being signed on February 6, 2006. (Id.; Extradition Treaty, ECF No. 1 at 121-33.) The Court finds that a valid extradition treaty between the United States of America and the Slovak Republic has been in full force and effect during the relevant time period.

## B.    Extraditable Offense

The Government must prove that the offense charged is an extraditable offense covered under the Treaty and that the offense would be criminal in both the United States and Slovakia. Emami v. U.S. Dist. Court for N. Dist. of California, 834 F.2d 1444, 1450 (9th Cir. 1987). Blasko has been charged with and convicted of Abuse of Power of a Public Official in a Serious Manner in violation of Article 326(a)(1) and (2)(a) and Article 138(d) of the Slovakian Penal Code and Intentionally Doing Bodily Harm to Another in violation of section 156(1) of the Slovakian Penal Code. (Charging Document, ECF No. 52-1 at 13-20; ECF No. 1 at 113-114; Judgement dated April 15, 2013, ECF No. 1 at 48-49; Judgement dated November 7, 2013, ECF No. 1 at 89.)

Pursuant to Article II of the Annex, "[a] criminal offense shall be an extraditable criminal offense if it is punishable under the laws of the requesting and requested States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." (ECF No. 1 at 127.) The Government contends that the offenses at issue here meet that requirement. Under

Slovakian Law, Abuse of Power of a Public Official in a Serious Manner in violation of Article 326(a)(1) and (2)(a) would be punishable by imprisonment of four to ten years. (ECF No. 1 at 114.) Article 138(d) of the Slovakian Penal Code and Intentionally Doing Bodily Harm to Another in violation of section 156(1) of the Slovakian Penal Code provides that a perpetrator shall be punished by imprisonment for six months to two years. (<u>Id.</u> at 113.) The crimes charged are extraditable offenses under the Treaty.

The Government contends that the conduct at issue here would be subject to prosecution under 18 U.S.C. § 242 (deprivation of rights under color of law); Cal. Penal Code § 243 (battery); and Cal. Penal Code § 245 (assault likely to produce great bodily injury). Blasko does not address whether the offenses themselves would be extraditable under the Treaty.

Under the principle of dual criminality, "no offense is extraditable unless it is a crime in both jurisdictions." <u>Emami</u>, 834 F.2d at 1449 (quoting <u>Caplan v. Vokes</u>, 649 F.2d 1336, 1343 (9th Cir. 1981)). "It is well established that all the principle of dual criminality requires is that the particular acts alleged constitute a crime in both jurisdictions." <u>Emami</u>, 834 F.2d at 1450. Neither the name of the crime nor the scope of liability are required to be coextensive or the same in both countries. <u>Id.</u> In determining if the conduct would be a crime in the United States, courts are to look to "similar criminal provisions of federal law or, if none, the law of the place where the fugitive is found or, if none, the law of the preponderance of the states." <u>Cucuzzella v. Keliikoa</u>, 638 F.2d 105, 107 (9th Cir. 1981).

Pursuant to 18 U.S.C. § 242 it is unlawful for any person who is acting under color of law to willfully deprive someone "of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States[.]" A law enforcement officer who brutally beats a criminal suspect could be guilty of depriving the individual of his right to be free of excessive force. <u>United States v. Gonzalez</u>, __ F.3d. __, 2018 WL 4904767, at *3 (9th Cir. Oct. 10, 2018); <u>Koon v. United States</u>, 518 U.S. 81, 88 (1996).

California law provides that "[a] battery is any willful and unlawful use of force or violence upon the person of another." Cal. Pen. Code § 242. "[B]attery is punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail not exceeding

six months, or by both that fine and imprisonment." Cal. Pen. Code § 243(a). Under California law, it is unlawful for any person to commit an assault upon the person of another by any means of force likely to produce great bodily injury. Cal. Pen. Code § 245(a)(4). "Any person who commits an assault upon the person of another by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment." Cal. Pen. Code § 245(a)(4). The conduct here, Blasko hitting Kozma in the face with his fists and kicking him, could be charged as violations of sections 242 and 245 of the California Penal Code. People v. Aguilar, 16 Cal.4th 1023, 1028 (1997) (It is well established that the use of hands or fists alone is sufficient to support a conviction of assault by means likely to produce great bodily injury.).

The conduct alleged here would be criminal under the laws of the United States, so the principle of dual criminality is satisfied and the conduct constitutes an extraditable offense under the terms of the Treaty.

### C. Probable Cause

A hearing must be held to determine whether there is probable cause to believe the individual committed the crime charged. Santos, 830 F.3d at 991. The Supreme Court has described the extradition hearing to determine probable cause as akin to a grand jury investigation or a preliminary hearing. Id. "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." Id. at 991–92 (quoting Collins, 259 U.S. at 316).

#### 1. Evidence Submitted to Support Probable Cause

Blasko contends that Article XII(5) of the treaty requires the Government to produce duly authenticated documents as part of or in support of the extradition request. Blasko argues that since he has been convicted *in absentia*, the Government must present independent proof of probable cause. Blasko states that pursuant to the treaty, the Government must produce "a duly authenticated copy of the warrant of arrest in the State where the crime was committed, and of

the depositions upon which such warrant may have been issued . . . with such other evidence or proof as may be deemed competent in the case." (Def.'s Opp. to Gov.'s Request for Extradition 23, ECF No. 50.) Blasko argues that the declaration of the trial judge, the judgment in the case, the appellate decision, and the international arrest warrant are insufficient to meet the obligations under the treaty. Blasko also contends that the documentation presented is not sufficient to establish probable cause because the Government has relied primarily on the April 15, 2013 judgment issued by the Nitra District Court. Blasko states that the statements of the eye witnesses have not been provided and there is nothing to indicate that these individuals gave statements under oath or penalty of perjury. Blasko acknowledges that hearsay evidence can be considered but contends that there is not sufficient indicia of reliability to establish probable cause.

The Government replies that the argument that the documents presented in support of extradition are insufficient to find probable cause are meritless. The Government contends that the judgment unambiguously meets the requirements of the Treaty by producing an authenticated copy of the judgment of the Nitra District Court that convicted Blasko and sentenced him to four years' imprisonment. The Government argues that Blasko is seeking to place additional documentary requirements when the conviction has been obtained *in absentia*, but the Supreme Court has made it clear that the Court cannot alter or amend the Treaty.

The argument that actual evidence is required to support a finding of probable cause in an extradition hearing has been rejected by the federal courts. In considering a similar argument, the Fourth Circuit first considered the actual language of the Treaty to determine if it required that an extradition request based on an *in absentia* conviction be supported by actual evidence establishing a reasonable basis believe that the individual had committed the crime for which he was sought. Haxhiaj v. Hackman, 528 F.3d 282, 288 (4th Cir. 2008). In Haxhiaj, the treaty at issue specifically addressed *in absentia* convictions and required more than just proof of the *in absentia* conviction. Id. at 289. While the treaty required more than mere proof of the fact of conviction, it did not require actual evidence of such as trial testimony or transcripts and a summary of the facts and relevant evidence was found to be sufficient to provide a reasonable

basis to believe that the individual had committed the offense.  Id.  The certified copy of the

appellate opinion satisfied the required showing and afforded a reasonable basis upon which to

find probable cause.  Id.

The Haxhiaj court further disagreed that the extradition statute required the requesting

nation to submit underlying evidence in support of an *in absentia* conviction.  Id. at 290.

> A foreign conviction entered after a trial at which the defendant was present suffices, in and of itself, to establish probable cause. See, e.g., Spatola v. United States, 925 F.2d 615, 618 (2nd Cir.1991); Restatement (Third) of Foreign Relations Law of the United States § 476 comment b (1987) ("With respect to persons whose extradition is sought after conviction in the requesting state, the [probable cause] requirement is met by proof of the judgment of conviction and, where applicable, of sentence.").  The extradition court need not "mak[e] an independent assessment of the facts surrounding [the] offenses" and may rely solely on a certified copy of the foreign conviction.  Spatola, 925 F.2d at 618. Haxhiaj does not challenge this premise, which appears to be widely accepted among the federal courts that have considered the issue.  See, e.g., Sidali, 107 F.3d at 196; Spatola, 925 F.2d at 618; Germany v. United States, 2007 WL 2581894, at *7 (E.D.N.Y. Sept.5, 2007); United States v. Clark, 470 F.Supp. 976, 978 (D.Vt.1979).
>
> The principle that foreign convictions generally constitute probable cause under § 3184 is rooted in comity.  The duty to extradite internationally arises solely as a matter of treaty, see United States v. Alvarez–Machain, 504 U.S. 655, 664, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), and the decision to extradite is ultimately an executive function, see Martin v. Warden, 993 F.2d 824, 828 (11th Cir.1993). "Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the security of United States courts."  Koskotas v. Roche, 931 F.2d 169, 174 (1st Cir.1991).  To this end, "[q]uestions about the procedural fairness of another sovereign's justice system . . . are within the purview of the executive branch," as are questions about "whether the requesting nation is sincere in its demand for extradition or is merely using the process as a subterfuge."  Ordinola, 478 F.3d at 607 (Traxler, J., concurring).  Therefore, we refrain "from delving into and assessing the competence of the requesting government's system of justice."  Id.  To then conclude that foreign convictions "do not constitute probable cause in the United States would require United States judicial officers to review trial records and, consequently, substitute their judgment for that of foreign judges and juries.  Such an inquiry would be inconsistent with principles of comity."  Spatola, 925 F.2d at 618.  The primary tenet of comity is "that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations."  Id.

Haxhiaj, 528 F.3d at 290-91.

Blasko relies on In re Ribaudo, No. 00 CRIM.MISC.1PG. (KN), 2004 WL 213021

(S.D.N.Y. Feb. 3, 2004), for the proposition that more than just the judgment is required where

there is an *in absentia* conviction.  In re Ribaudo, addressed an extradition request by the Government of Italy based on a conviction that was obtained *in absentia*.  2004 WL 213021, at *1.  As in this case, the treaty itself distinguished between persons who had been convicted and those who had not, but unlike the treaty here it also specifically addressed convictions obtained *in absentia*.  Id. at *3-4.  For those who had been convicted *in absentia*, the treaty required that the sovereign must show probable cause in order to extradite.  Id. at *4.  The court found that the treaty provisions indicated "that, under ordinary circumstances, a judgment of conviction entered in a foreign court is sufficient to establish probable cause to extradite a person who has been convicted by that court; however, when a person has been convicted *in absentia*, a judgment of conviction, while pertinent to an analysis of the sufficiency of the evidence, is not conclusive proof of probable cause to extradite.  Consequently, when a person has been convicted *in absentia*, an inquiry conducted pursuant to section 3184 must include an independent determination of probable cause based upon evidence which provides, in the words of the Treaty, 'a reasonable basis to believe that the person sought committed the offense for which extradition is requested.' "  Id., at *4.

However, In re Ribaudo is distinguishable from the instant action as the Treaty in this instance does not distinguish between a conviction obtained where the individual was present and a conviction *in absentia*.  Here, the Treaty provides that the United States and the Slovak Republic have agreed to deliver up to justice any person who has been charged with or convicted of any criminal offense specified in the Treaty.  Annex, Art. I, ECF No. 1 at 127.)  Article XII(5) of the Treaty provides,

> If the criminal offender shall have been convicted of the criminal offense for which his extradition is asked, a copy of the sentence of the court before which such conviction took place, duly authenticated, shall be produced.  If, however, the criminal offender is merely charged with crime, a duly authenticated copy of the warrant of arrest in the State where the crime was committed, and of the depositions upon which such warrant may have been issued, shall be produced, with such other evidence or proof as may be deemed competent in the case.

(ECF No. 1 at 131.)  The Treaty itself provides that a copy of the sentence of the court before which the conviction took place is all that is required to be produced.

Blasko further relies on In Matter of Extradition of Ernst, No. 97 CRIM.MISC.1 PG.22,

1998 WL 395267 (S.D.N.Y. July 14, 1998), to argue that additional evidence is needed because the judgment itself is not sufficient to meet the probable cause standard.  In Ernst, the requesting state provided a decision rendered by the Zurich Supreme Court that did not describe the evidence upon which the decision was based.  In Matter of Extradition of Ernst, 1998 WL 395267, at *10.  Because the decision did not describe the evidence that the decision relied on, the court found it impossible to determine the veracity and bases of knowledge upon which the decision was based.  Id.  However, that is not the case here, where as addressed below, the court set out a detailed summary of the evidence relied upon in coming to judgment.

Similarly, Blasko argues that In re Extradition of Platko, 213 F.Supp.2d 1229 (S.D. Cal. 2002), found that documents in addition to the judgment are required to support probable cause.  In In re Extradition of Platko, the court was considering what was required by the treaty to find probable cause.  213 F.3d at 1231.  The requesting state had provided an arrest warrant that was based on the statements of two co-defendants that had implicated Platko in fraud and embezzlement.  Id.  The treaty at issue required more than the "duly authenticated copy of the warrant of arrest in the county where the crime was committed[;]" the treaty also required sworn authentication of the underlying allegations.  Id. at 1237-38.  The court found that the documents submitted did not include any declaration under oath that the contents of the supporting statements were true representations of the investigation results.  Id. at 1238.  Because the treaty required that when an individual was charged with a crime depositions upon which the warrant was issued were required, the absence of sworn declarations did not comply with the treaty requirements.  Id. at 1239.  Unlike in Plako, the treaty here only requires the judgment and the trial judge has submitted declarations authenticating the documents provided in support of extradition.

Further, the Court finds no merit to the argument that the judgment itself is insufficient to establish probable cause.  While courts have denied extradition where the requesting country's submissions are merely conclusory, unsupported by underlying documentation, or were otherwise unreliable, United States v. Pena-Bencosme, No. 05-M-1518 (SMG), 2006 WL 3290361, at *7 (E.D.N.Y. Nov. 13, 2006), the question to be addressed is whether there is

competent legal evidence that "demonstrate[s] probable cause to believe that the accused committed the crime charged" by the requesting nation. Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008). Here, unlike the wholly conclusory judgment provided in In re Ribaudo, the requesting nation has provided more than the mere fact of conviction and the sentence that was imposed. The judgment itself is an extensive recitation of the evidence that was considered and contains the testimony and statements of twenty witnesses and other documentary evidence that was considered during the trial of the matter.

Blasko argues that the Government was required to submit depositions supporting the Slovakian arrest warrant, but the Ninth Circuit rejected this argument in Manta. In Manta, the language in the treaty was substantially similar to that here, stating "a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and of the depositions upon which such warrant may have been issued, shall be produced, with such other evidence or proof as may be deemed competent in the case." Id. at 1146. The Ninth Circuit found that the plain language of the treaty defeated the argument that depositions had to be produced because the only requirement under the treaty was that the documents be authenticated and the plain language of the statute does not require that depositions be produced. Id. at 1146-47. In Manta, the Ninth Circuit found that the fact that the witnesses' statements were summarized by the prosecutor was not significant because hearsay evidence is admissible to support probable cause for extradition. Id. at 1147.

Blasko also points to the fact that the documentation contains several references to 2014 which he argues indicates that the judgment was edited without notice, however, the Government has provided a supplemental declaration from Maria Ondrejova stating that these were typographical errors in the English translation of the judgment and the Slovak version contains the correct dates. (ECF No. 52-1 at 4.)

Furthermore, the Court finds that the documentation provided itself is sufficient to establish probable cause to believe that Blasko committed the crime for which he is sought. As discussed below, the judgment itself discusses the evidence that was considered in delivering the court's judgment. The majority of the witnesses' testimony from a separate hearing was read

into the record during the trial by the consent of the parties.

Blasko argues that these are unsworn hearsay statements which were not given under oath and are not competent evidence to support probable cause. However, it is well established that unsworn statements of absent witnesses are sufficient for extradition proceedings. Zanazanian v. United States, 729 F.2d 624, 626 (9th Cir. 1984) (citing Collins, 259 U.S. at 317). The treaty here requires that the Slovak Republic must provide a duly authenticated copy of the sentence of the court in which the conviction took place. (ECF No. 1 at 131.) Even where there is not a conviction and extradition is based on a charge the requesting state is to provide "a duly authenticated copy of the warrant of arrest in the State where the crime was committed, and of the depositions upon which such warrant may have been issued, shall be produced, with such other evidence or proof as may be deemed competent in the case." (Id.) In Zanazanian, the Ninth Circuit considered a treaty that required "the depositions, record of investigation, or other evidence upon which such warrant or order for arrest may have been issued and such other evidence or proof as may be deemed competent in the case." Zanazanian, 729 F.2d at 627. The Circuit held that the provision did not require that the submitted documents contain only statements sworn under oath. Id. To the extent that Blasko relies on cases holding otherwise, the Court finds that they are not persuasive authority.

Similar to Zanazanian, the summaries of the witness statements here are abundant in detail, containing the specifics of the incident. The statements considered were from the victim himself, witnesses who were present in the bar and seated or standing in close proximity to the incident describing what they observed and their relationship to the individuals involved. Review of the statements demonstrates that they were based on the observations by the witnesses of the incident itself and the witnesses had personal knowledge of the facts stated. The trial record itself demonstrates that the witnesses gave the statements near the time of the incident and confirmed the statements at the pretrial proceeding.

### a. Statement of the victim, Kozma

Pursuant to Art. 263 Sect. 1 of the Criminal Code, the trial court considered the pretrial statement of the victim, Kozma. Kozma provided a statement to the police on July 17, 2007. On

July 13, 2007, at about 8:00 p.m., Kozma went to Zoltan Peli's (hereafter "Peli") house to repair his roof. Kozma went with Peli and two of his friends to a bar, arriving there about 8:30 p.m. They sat on the terrace drinking and an argument started between the men and two women who were also drinking on the terrace. He later learned that Peli slapped the dark-haired woman who told him that he would regret what had happened. The dark-haired woman insulted Kozma, his family, and his wife and he started to chase her around the car. Csulakova told them that she had sent someone to prison and she would send another to prison. The girls called the police to report the incident. Kozma called a friend that worked for the police and told him what had happened. (ECF No. 1 at 50.)

After a time, policemen arrived wearing black camouflage uniforms with side handle batons in their hands. The taller policeman came first and told Peli to come with him. Kozma asked the policeman where they were taking Peli and the policeman shouted it was not his business. Kozma asked him again where they were taking Peli and stated his full name, that he was a prison warder, and produced his identification badge. The policeman stated that a prison warder was not a policeman and told Peli to come with him. Kozma asked again why they were taking Peli and as he asked he was hit in the nose. After he was hit in the face, the policeman pulled him over the bench, hit him, and threw him on the ground over the bench. While Kozma was lying on the ground on his stomach, the policeman told him to put his arms back and Kozma was being hit in the head. When he turned to the policeman, Kozma was hit in the face and he could feel someone kicking him in his left side. The policeman released his left hand and handcuffed Kozma's hands above his head. When Kozma stood up he was bleeding from his nose and mouth, had swelling above his eye, and could hear a loud roaring in his ears. The policeman shouted that Kozma would lose his service identification card and that Kozma had offended him. (Id.)

Kozma asked to see a doctor because he felt sick. The policeman took Kozma and Peli to the police car and drove them to the police station. On the way, Kozma asked several times for medical help and repeated that he was a member of the force. He only received foul abuse. The taller policeman, who had hit him in the face first, was driving. The shorter policeman was

quiet.  When they arrived at the police station, the taller policeman pulled him out of the car and led him into the building by holding him around the neck.  As he was standing in the corridor, the light was switched off and the taller policeman began cursing at Kozma and hit him in the face again.  Kozma fell to the ground and he was beaten in the head and kicked a few times.  The policeman stepped on Kozma's head and said, "You have finished, I will take care about that." (Id.)  The policeman closed the door to the cage.

Kozma had his cell phone with him and called his wife and number 158 telling them that he had been beaten at the District Department and needed medical care.  The officer at 158 told Kozma to wait.  The taller policeman came back, leaned Kozma against the wall and inspected him.  Kozma was handcuffed at the wrist and as he was turned around he had horrible pain in his wrists.  Kozma heard his wife's voice and rolled into the corridor and told her to call an ambulance.  The policeman ran in, swearing at Kozma.  He opened the door and kicked Kozma back.  Kozma heard a horrible roar in his head and everything hurt, his legs were shaking and he was unable to think or respond.  (Id.)  The shorter policeman was with Peli in the back of the station and the taller policeman called him Young.  (Id.)

In testimony during the pretrial proceeding on April 24, 2009, Kozma persisted in his previous testimony.  He stated that the policeman attacked him first while he was in the bar.  (Id. at 50-51.)

**b.    Witness Vladimir Chovanec**

Vladimir Chovanec testified during the trial that he was working night duty at the time of the incident.  He was in the changing room with another officer when they heard a noise in the corridor.  Krajmer and Blasko were putting Kozma in a cage for preventive detention.  Peli was sitting in a chair closer to the changing room.  After he went on duty, he was told to take Kozma to the hospital for examination.  Kozma was squirming on the ground in the cage where he had been beaten.  He did not ask Kozma who had beaten him.  He had known Kozma for fifteen years as a member of the Metropolitan Police Force and later as a member of the CPCG.  Kozma was unable to talk, he was only sighing.  Kozma had some abrasions and was covered in blood. (ECF No. 1 at 51.)

Kozma was taken for a medical examination and his wife accompanied them to the hospital and participated in the examination. The doctor examined Kozma to see if he had a concussion and he was kept for monitoring. Kozma was lying in the room sighing but did not communicate at all. He did not know how Kozma got his injuries because he only saw Kozma after he left the changing room and Kozma was squirming in the cage. (Id.)

### c. Witness Michal Krajmer

Michal Krajmer testified at the trial that he was an officer of unit 5 PMJ of the Regional Head Office of the Police Force Nitra, and had been the same since 2007, when he worked as an inspector of the district Department of Police of the Police Force Nitra. In 2007, he was sent to a bar in the village Stitare with Blasko where a lady who had been attacked was waiting. They talked to the woman who said that Peli had slapped her and threw her dog to the ground. She told them where Peli was sitting. Kozma was shouting. Blasko went to the table while Krajmer told the girls how to go about filing a complaint. (ECF No. 1 at 51.)

When Krajmer went to the table, Blasko was talking to Kozma and they were arguing. Blasko asked Peli to identify himself, but he did not react and was sitting passively. Kozma told them to let Peli be and that he knew their rights. Blasko took Peli by the arm and wanted him to stand up. Kozma grabbed Blasko's hand, Blasko put up his hands, and Kozma jumped up. They fell to the ground. Krajmer tried to catch them, but he hit the table and was trapped. Kozma fell with his face to the ground and Blasko tried to get his hands behind his back to handcuff him. (Id. at 51.) Blasko shouted for Krajmer to help, so Krajmer jumped on Kozma's legs and held his feet as he kicked Kozma. (Id. at 51-52.)

Blasko handcuffed Kozma and they took him out to the police car. Blasko inspected Kozma and told him that he was being arrested for attacking a public official. Kozma was placed in the police car. They went back into the bar and got Peli, placing him in the car next to Kozma. The woman stopped to say that Kozma had attacked her, stating he wanted to kill her, and that she was going to file charges against them. Kozma came to and offered her money saying that he had messed up and that he was going to be fired from his job. Kozma and Peli were driven to the police station where Kozma was put in a cage for detained persons. Peli was

put in a place for detained persons and Krajmer went to prepare the official record.  (<u>Id.</u> at 52.)

He asked Kozma and Peli if they would take a breath test and Kozma refused.  Krajmer did not know how Kozma sustained his injuries.  Neither Blasko nor Krajmer had contact with him.  Krajmer asked Kozma if he wanted medical attention.  (<u>Id.</u>)

While they were in the bar he did not see Blasko beating Kozma.  Krajmer was only holding Kozma's feet while Blasko was kneeling on Kozma.  Kozma went for a medical evaluation because the ambulance was called, but Krajmer did not know how he got his injuries.  Krajmar and Blako did not know that Kozma was a member of the CPC.  During the argument in the bar he had thrown a wallet at them stating that he was a colleague, but they did not verify that.  Blasko addressed the situation by stating that if he was a colleague he should not behave as he was.  Krajmer was not present when Kozma states that he was attacked at the police station because he was in the back preparing the papers.  (<u>Id.</u> at 52.)

### d.    Witness Denisa Lacova

Denisa Lacova testified at the trial that she called the police to the bar because Peli physically attacked her and Maria Csulakova over a dog that they had with them at the bar.  Peli had slapped her twice and Csulakova once.  Kozma verbally attacked her regarding the dog and the fact that she was not local and chased her around the table and the car.  She called the police.  When the police arrived, she showed them who the men were that were involved in the conflict.  She saw Blasko approach the table where Kozma was sitting.  She saw Kozma put something on the table and heard him say, "Indeed we are colleagues."  She saw Kozma raise his hand but the policeman was able to duck and caught Kozma's hand.  The policeman tried to get Kozma's hand behind his back, but Kozma fell to the ground.  Kozma tried to resist the policeman.  She saw that Kozma had cut himself and the policeman took him out to the car.  Lacova did not know Kozma or Peli, but Blasko was a former classmate from secondary school.  (ECF No. 1 at 52.)

### e.    Witness Maria Csulakova

Maria Csulakova testified at the trial that she knew Kozma from the village.  She was in the pub with Denise Lacova and some friends when the argument with Kozma started.  Based on that incident, the police were called.  The policeman asked Kozma, who was sitting next to Peli

to identify himself by his identification card.  Kozma said that he did not have to identify himself because they were colleagues.  An argument about the documents started.  She saw Kozma raise his hand and the policeman caught it and tried to put it behind his back to handcuff him.  The other policeman joined him and they put him on the table.  They fell to the ground where Kozma cut his face on broken glass.  The policeman fell on top of him.  Kozma had a cut on his right cheek.  The policeman handcuffed him and took him to the police car.  After being confronted with pictures of Kozma she corrected herself that she only thought that Kozma had gotten cut because she had seen blood.  She did not see the policeman apply violence to Kozma.  She cannot describe the policemen but knows that they were not aggressive.  (ECF No. 1 at 53.)

### f.  Witness Jana Balkova

Jana Balkova testified at the trial that she was in the pub with a group of friends.  Kozma, who her husband knew, was sitting at the table in front of them.  Kozma had an argument with some girls and then the police arrived.  Kozma was beaten by the police and taken to the police station.  They followed them to the police station because they wanted to make a statement of what they had seen but the police refused to take their statement.  Kozma's wife was at the police station also.  The ambulance came and take Kozma away.  There were eight or nine of them in two to three cars that went to the police station because they wanted to make a statement.  They went to the police station because it seemed reasonable to them to do so when they had seen the police beat someone.  (ECF No. 1 at 53.)

Two policemen came into the bar.  One of them was just standing there.  The policeman had a baton in his hand.  Kozma fell down off the bench onto the ground.  She saw how the policeman were holding him, how they took him to the car and pushed him in.  She does not remember the details, but she was sitting quite close to Kozma and he was acting in a normal manner toward the police officer.  She did not see Kozma attack the policeman.  (Id.)

### g.  Witness Ing. Martina Kozmova

Ing. Martina Kozmoza is the wife of Kozma and testified at the pretrial proceedings.  Kozma called her about 9:50 p.m. on July 13, 2007 and asked her for help because they were beating him, he was completely covered in blood, he was losing consciousness, and could not

stand on his legs. He told her the policeman had beaten him in a bar and that she should call his work for help. The phone was disconnected so she went to the bar to find out what had happened. At the bar, she was told that the policemen had beaten Kozma and that they had probably taken him to the doctor because that was what he was requesting. She called her husband's work to let them know what had happened. (ECF No. 1 at 54.)

She went to the police department and was told that her husband was there but that she could not see him. She was told to leave, but she told the officer that her husband was injured and told her that he needed help. The officer said that he would contact the interrogator who would give her more information. As she stayed at the counter waiting, Kozma shouted asking if it was her. She said yes and he leaned out of the door behind the bars on his knees. He fell on the floor on the left side and crawled about a half meter out. He was horribly beaten. His hands were cuffed behind his back, his clothes and face were covered in blood, his face was swollen on the left side so that she could not see his left eye. He shouted at her to call an ambulance because he could not see and could not stand up. (Id.)

In a moment, a policeman in black camouflage uniform came and grabbed Kozma by his arms with both hands. He lifted Kozma with his foot and kicked him behind the doors with the bars. She told the policeman that he could not treat her husband like that, that he was a man and that he should be human. The officer responded that he did not care, that her husband was a prison warder, and had almost broken his lower back on the table. The informant came out and pushed the officer into the other room and tried to calm him down. She told the informant that she wanted a medical examination for her husband. He responded that he would not call the ambulance, but if her husband requested they would take him to the hospital in a patrol car. Another officer came out and she asked him to provide medical care for her husband, but he said that Kozma had refused medical care. They went to the cell and asked Kozma if he wanted medical attention and he told them of course he did. (Id.)

The informant came back and told her that they would have a different patrol take him to the hospital other than the one that had arrested him. A patrol from Klokocina was supposed to come. As she was waiting in the entrance hall nothing was happening. She got nervous and

called an ambulance.  The ambulance came and the police told her to leave the building.  When she saw her husband in the ambulance he did not recognize her but stated that he had not done anything.  The attendant said that he required a medical examination and they took him to the hospital.  (Id.)

During a June 22, 2009 hearing, the witness described the officer who she saw attack her husband as a rather tall sporty figure, rather dark completion, an oval face, dark eyes, complete short haircut, no moustache or beard and dressed in black camouflage.

### h.     Witness Patrik Foldesi

Patrik Foldesi testified at the pretrial proceeding that he was sitting at a rear table in the bar with some friends on July 13, 2007.  The policemen stopped at their table and one of them pointed out where Peli was sitting.  The taller bald police officer approached Peli who was sitting at the next table and asked him to get up and go with him.  Kozma, who was sitting next to Peli, told him not to go anywhere and asked the policeman why they wanted to take him away.  He asked the question about three times.  The policeman got nervous and attacked Kozma throwing him to the ground.  The policeman started to beat Kozma, hitting him about five times in the head with his fist, and then he told the other policeman to start kicking Kozma.  The other policeman started kicking Kozma in the ribs, but he could not say how many times.  The policeman lifted Kozma off the ground and Foldesi could see blood.  They took Kozma to the car and threw him in.  One of the policemen came back and took Peli.  When the incident occurred, he was sitting so that he could see everything and when the officer started beating Kozma he stood up so he could see it.  (Id. at 56.)

After Kozma stood up for Peli, the taller policeman had a conflict with Kozma asking him who he thought he was and that he was not his colleague.  Then suddenly the policeman got very angry and attacked Kozma who was sitting on the bench.  The policeman grabbed Kozma by the shoulders and pulled him off the bench onto the ground.  Kozma was asking for a doctor because he had cut himself on the glass.  Kozma fell between the bench and the fence and that is where the officer beat him.  The officer hit Kozma in the face with his fist about four to five times, and the other policeman kicked Kozma in the ribs about three times at the order of the first

policeman.  Kozma did not defend himself.  He was lying on his stomach, hiding his face, and could raise his hands because the policemen were holding him on the ground by the knee.  (Id.)

Foldesi did not hear Kozma introduce himself, he just noticed that Kozma was telling the officer that there were documents and to have a look.  Kozma had his hands on the table during the entire discussion.  The policeman was arrogant and shouted at Kozma, but he did not see Kozma raise his hand or speaking up at him.  Kozma and Peli were slightly drunk.  He knows Kozma from the village, but they are not friends and they do not meet each other.  They just say hello.  (Id.)

### i.  Witness Ladislav Peli

Ladislav Peli testified at the pretrial proceeding that he was at the bar on the terrace and there were ten to twelve of them there.  He was sitting behind Kozma, Zoltan Peli, and Marek Puchovsky.  He noticed an argument between Kozma's group and some girls.  The policemen came in a hurry and ran to the girls.  They were dressed in black and he noticed that the first officer was holding a side handle baton in his right hand.  The officer approached him and asked the girl if it was him, but she replied no it was farther back.  The officer approached Zoltan Peli and grabbed his hand telling him that he was going to take him to the police station.  (ECF No. 1 at 56.)  Kozma calmly asked the officer why they wanted to take Peli away and the officer became very aggressive.  (Id. at 56-57.)  The officer shouted at Kozma telling him that if he was not quiet they would take him away also.  Kozma asked the question again and the officer shouted at him.  Kozma took out his wallet, put it on the table and told him his name and that he worked in the prison.  The officer told him that he was not interested and asked again if he should take Kozma in also.  Kozma said to take him in then.  (Id. at 57.)

Suddenly the policeman ran amok and attacked Kozma.  He dropped the baton on the ground and hit Kozma in the neck with his right hand.  He tumbled on Kozma trying to twist his arm.  As he was tumbling, they rolled to the other side of the table and Kozma stated that he cut himself on some glass and needed a doctor.  When the policeman heard that, he started hitting Kozma in the head with his fist about four to five times.  Then he ordered the other policeman, who was just watching, to kick Kozma.  The other policeman kicked Kozma in the ribs about

four times.  Then they handcuffed Kozma and took him out to the police car where the officer shoved him into the car causing a dent in the mudguard.  (Id.)

The policeman ordered the other policeman to get Peli and they put him in the car also and took them away.  About half an hour later, Kozma's wife arrived.  (Id.)

The conflict between Kozma and the policeman started because Kozma had told Peli that according to the law he did not need to be brought in.  Peli sat back down and did not say anything.  Kozma asked the officer several times why there were taking Peli in, but he did not cause any trouble.  The policeman was mad and asked Kozma three times if he should take him in also.  Kozma calmly answered here are my documents, introduced himself and stated that he worked at the prison.  When Kozma said take me away the officer attacked him.  Kozma did not raise his hand to the officer and had his hands on the table.  Kozma did not resist the officer, even when he was being beaten.  The whole fight took about twenty-five seconds and there was a puddle of blood on the stones when they left.  The policemen did not appear to have any injuries. He did not believe that Kozma was drunk.  (Id.)

Ladislav Peli only knows Kozma on sight from the village and they are not friends or related.  He knows the taller policeman as Boris because he worked with him at the Regional Office and they chatted at times.  (Id.)

### j.    Ivan Brath

Ivan Brath testified at the pretrial proceeding that he was at the bar with a group of friends.  A verbal argument started between the table with Masia Csulakoba and the table with Kozma.  (ECF No. 1 at 57.)  The policemen came to the bar about 9:30 p.m.  Two policemen got out of the car carrying side handle batons and came to the terrace of the bar.  They went to Kozma's table and asked him to go with them.  Kozma asked what they wanted to do with the side handle batons and the officers hid them.  Kozma asked why they wanted him to go with them but they did not tell him, just stating for him to go with them.  The policeman asked Kozma who he was and Kozma took out his service identification and a case with documents and placed them on the table.  The policeman asked him where he worked and Kozma told him his name and that he worked at the prison.  The policeman turned to Peli and told him to go with them

also.  Kozma asked the officer repeatedly why they wanted to bring them in.  (Id. at 58.)

Kozma was sitting with his hands on the table and the policeman grabbed him by the right arm pit to lift him up and pull Kozma to him.  Kozma pushed himself away and they fell together down over the bench.  Kozma landed on his belly on the ground and the policeman pushed him to the ground and told him to put his hands behind his back.  Kozma asked repeatedly why they were bringing him in and the police officer hit him in the face with his fist.  Kozma curled up on the ground and asked to be taken to the doctor.  The policeman told the other officer to kick Kozma.  The other officer kicked Kozma in the ribs three to four times.  Kozma did not defend himself but was lying on his belly on the ground.  The policeman handcuffed Kozma and took him to the car.  Kozma was bleeding from his nose or mouth.  There was blood at the table, on the road, and on the police car.  The policemen were not injured.  (Id.)

After Kozma was put in the police car, the other policeman came and got Peli who went without any resistance.  Kozma did not resist the officers either.  They took them both away.  Brath was able to clearly see and hear the incident because he was sitting at the next table.  Kozma was sitting calmly at the table, he was only asking and answering questions, and did not raise his hand to the policeman.  (Id.)

### k.    Witness Jana Kasolova

Jana Kasolova testified at the pretrial that she was at the bar with her friend Ladislav Peli and other friends.  Kozma was sitting at the next table.  She did not know him or the other men that were at the table with him.  She heard an argument between Kozma's table and some girls.  Sometime later, policemen entered the bar and one of the girls pointed her finger at someone.  The policeman went to her friend, but the girl said it was not him but the other one.  The policeman went to Zolo Peli and grabbed his arm and told him to come with him.  Kozma asked why Peli should go and the officer told him "shut up."  Kozma repeatedly asked why they wanted to take Peli.  The policeman came closer and started the shout at Kozma asking who he was.  Kozma told him his name, gave him the documents that he took out of his pocket, and said that he was a prison warder.  The policeman asked if Kozma was his colleague and Kozma replied no, he just wanted to know why they were taking Peli away.  (ECF No. 1 at 58.)

The policeman twisted Kozma's arm and pulled him down on the ground over the table. Kozma shouted that he cut himself and needed a doctor. As the policeman pulled Kozma onto the ground he began hitting him with his fist in the face or neck. The policeman told Kozma to put his hands behind his back. Kozma had his hands in front of his face and the police officer that was beating him told the other officer to kick Kozma. The other officer kicked Kozma three or four times in the ribs. The policeman handcuffed Kozma and took him to the police car. Kozma was bleeding and there was blood on the back door of the police car, at the place where the beating took place, and on the road. The other officer came to take Peli who went voluntarily. (Id. at 59.)

The shorter policeman was standing further away and the taller policeman was the one who tried to get Peli to go with him. The taller officer behaved in an aggressive way and had arrived like that. The policemen attacked Kozma because he asked them the reason to take Peli away. The policeman twisted Kozma's hand, pulled him down on the ground and started hitting Kozma in the head with his fist several times. The other policeman was only watching until, directed by the first policeman, he began kicking Kozma. Kozma did not defend himself in any way. He only put his hand in front of his face. He did not offer any resistance. Kozma did not appear to be drunk to her and the policeman attacked him for no reason. (Id.)

**l.    Witness Marian Barcsa**

Marian Barcsa testified at the pretrial hearing that he was at the bar with friends on July 13, 2007, at about 9:00 p.m. He was sitting on the terrace with friends. Kozma was with some friends at the next table. He saw that Kozma was talking to some girls but did not know what had happened. He saw the police car arrive and one of the girls ran out to the policemen. The policemen came to their table and asked Laco Peli if it was him, but the girl said not him but the next table. The policemen went to Kozma's table and told one of Kozma's friends to go with them. Kozma asked why they wanted to take him away but the policeman did not answer. Kozma wanted to show them his documents and put them in front of the officer. He told them his full name and that he was a prison warder. The policeman responded, "Are you a colleague of mine or what?" and screamed at Kozma. He is not sure what happened next, but Kozma was

on the ground and the policeman hit Kozma in the head with his fist at least twice.  One-time Kozma was hit in the back of the head and then when he turned the officer hit him in the face. Kozma asked for a medical examination.  The shorter policeman that was standing aside started to kick Kozma in this ribs or stomach and kicked him at least three times.  They lifted Kozma up from the ground and took him to the police car.  (ECF No. 1 at 59.)

The taller policeman was one who talked to Kozma.  The shorter policeman did not communicate.  It all started when Kozma questioned why they were taking his friend away. Kozma did not attack the policeman.  He had his hands resting on the table.  He was beaten while he was on the ground and did not fight back, he was just lying there.  Barcsa was sitting facing Kozma's table and was about two meters away.  He could see the entire incident and no one was blocking his view.  It did not seem to him the Kozma and Peli were drunk.  He only knows Kozma from seeing him in the village.  (Id. at 60.)

### m.    Witness Jozef Ment

Joseph Ment testified at the pretrial proceeding that he was in the bar on July 13, 2007, at about 9:15 p.m.  He was sitting with friends at the table next to Kozma.  The policemen with side handle batons came to the table and asked if it was them and a girl ran up and pointed at Peli. Kozma asked the policeman why he was bringing Peli in.  The policeman told him it was not his business and Kozma asked the question again.  The policeman lost his temper and asked Kozma who he thought he was.  Kozma told him his name and put out his documents.  The policeman did not look at the documents but started shouting at Kozma and knocked him off the bench that he was sitting on.  Kozma cut his hand on some glass on the floor and told the officer that he was injured and asked them to take him to the hospital.  The officer told him to shut up and hit Kozma in the head three times with his fist.  He told the other policeman to kick Kozma.  The other policeman kicked Kozma four times in his ribs.  They handcuffed Kozma and took him to the police car.  (ECF No. 1 at 60.)

About half an hour later, he went with some others to the police station to make a statement, but was not allowed to make a statement.  A police car arrived and it was the officer who had beat Kozma.  The officer was not injured.  In about 10 minutes, an ambulance arrived

and took Kozma away.  (Id.)

Upon questioning, Ment stated that Kozma did not provoke the officers in any way.  He behaved calmly toward them and did not raise his hand to the officer.  He does not know why the policeman attacked Kozma.  During the attack, the policeman hit Kozma's neck, pulled him down on the ground by grabbing his clothes and pushing him in front of the bench onto the ground.  The policeman ordered Kozma to put his hands to the back while kneeling on Kozma's back.  Kozma was lying on the grounds with his hands in front of him and did not defend himself in any manner or respond to the physical attack.  The policeman hit Kozma in the face.  The first hit happened as Kozma turned toward the policeman.  Kozma put up his hands to protect his face, then the other policeman started to kick Kozma in the ribs at the instruction from the first officer.  (Id.)

The witness was seated about 2.5 to 3 meters from the incident and was standing at all times.  He had a good view.  He did not know if Kozma and Peli were drunk.  Kozma was bleeding from the nose and mouth, his hand was injured and bleeding also.  As the ambulance was taking Kozma away, Kozma was bleeding from his mouth, his eyes were swollen, and his face and head were swollen, he was not responsive.  (Id.)

**n.      Witness Boris Skolak**

Boris Skolak testified at the pretrial proceeding that he was sitting in the terrace with friends on July 13, 2007 about 9:00 p.m.  He saw the police car arrive and two officers get out of the car with batons in their hands.  The officers approached their table and asked who it was that had attacked the girls and they responded they did not know anything about it.  Then a girl told the officers that it was not them and pointed to the next table.  She pointed to Peli who was sitting at a table with Kozma.  The policeman grabbed Peli and told him to go with them.  Kozma asked the policeman what the basis was for them to take Peli.  The policeman asked in an irritated and louder voice who he was.  Kozma pulled out his documents and told them to look.  The policeman told Peli to go with them again, and Kozma again asked what the basis was for them to take Peli.  Then the policeman attacked Kozma hitting him in the neck with his fist.  They tumbled and the policeman pulled Kozma on the table and they slid down.  Kozma cut his

hand on broken glass.  He told the policemen that he was injured and they needed to take him for a medical examination.  The policeman beat Kozma three to four more times in the face with his fist and ordered the other officer to kick Kozma.  The other officer kicked Kozma about four times in the belly.  They handcuffed Kozma and took him to the patrol car.  Kozma kept repeating that he needed to be taken to the doctor because he was injured.  They came back and got Peli, loaded both Kozma and Peli in the car, and drove away.  (ECF No. 1 at 61.)

He went to the police station with friends to report what he had observed.  The police would not take a report.  They were waiting outside with Kozma's wife when the ambulance arrived.  About ten to fifteen minutes later, Kozma was brought out in a wheelchair.  He was completely beaten with a swollen face and torn T-shirt, his eyes were swollen, and he was telling his wife he could not see anything.  (Id.)

During the incident he was at the next table, about two to three meters away.  Kozma was sitting calmly at the table during the communication with the policeman.  When the policeman started to be aggressive, Kozma spoke up slightly asking the same question, why they were taking Peli in.  The policeman responded by asking Kozma who he was.  The policeman attacked Kozma by hitting him with his fist and Kozma did not attack the policeman in any manner even after being hit by the policeman.  The policeman was aggressive, beating Kozma in the face.  Kozma only protected his face with his hands.  The policeman was still shouting at him and the other officer came and kicked Kozma at the direction of the first officer.  Kozma remained lying on the ground with no movement.  Then the officers lifted him up and he asked again for medical examination because he was injured.  (Id.)

He did not know Kozma personally but had met him in Stitare.  They were not friends.  He barely knew Peli, having only seen him in the bar.  He did not know the policemen.  The policeman who attacked Kozma was rather chubby, with completely short hair and was taller than them.  The other policeman, who kicked Kozma, was rather short.  (Id.)  The taller policeman was more aggressive, communicated with Kozma, and started to beat him.  (Id. at 61-62.)  The other policeman was only watching the incident until the first policeman told him to kick Kozma.  He kicked Kozma without any comments and did not otherwise join in.  (Id. at 62.)

1          o.      **Witness Zoltan Peli**

2          Zoltan Peli testified at the pretrial proceeding that he was sitting on the terrace of the bar

3   on July 13, 2007, at about 9:00 p.m. with Kozma and Puchovsky.  He was drunk.  Two girls

4   provoked them and he slapped them.  One of the girls called the police.  Two policemen arrived

5   and came to their table and wanted to see their identification.  Kozma took out his identification

6   and put it on the table and the officers started to beat him.  They beat Kozma and took them both

7   to the police station in Nitra.  When Kozma asked for a medical examination, they swore at him

8   and told him he was finished.  They secured Peli to a heater and turned off the lights in the

9   corridor.  Then they brought him to the corridor and he was placed about five to six meters from

10  where Kozma was.  He called number 150 for an ambulance for Kozma about 11:05.  He was

11  placed in a cage and he saw Kozma being wheeled out.  (ECF No. 1 at 62.)

12         As to the incident in the bar, Peli stated that he did not know why the policeman attacked

13  Kozma when Kozma gave them his identification.  The policeman attacked Kozma, threw him

14  over the bench, and started beating him.  Kozma was calm when the policeman arrived and did

15  not say anything to provoke the attack.  He did not raise his hand to them or gesture.  The only

16  movement Kozma did was to take his identification card out of his pocket, otherwise his hands

17  were on the table.  At the time that the policemen arrived, everything was calm and quiet in the

18  bar and the incident with the girls had been settled.  (Id.)

19         The policeman beat Kozma everywhere he hit him.  Kozma's nose was bleeding and the

20  policeman did not have any injuries.  After one policeman pulled Kozma over the bench onto the

21  ground, Kozma was lying on his belly or side and did not defend himself or hit back in any

22  manner.  The policeman was kneeling on Kozma and beating him with his fists.  The other

23  policeman first helped by holding Kozma on the ground and perhaps kicked him in the ribs.  He

24  cannot describe what the policemen looked like and he did not know them.  The incident ended

25  by Kozma being handcuffed and taken to the patrol car.  After the policemen took Kozma to the

26  car, they came back and got him.  (Id.)

27         Kozma had not been drinking prior to coming to the bar because he was driving.  At the

28  bar, Kozma had two cognacs and two small beers.  Kozma was not drunk.  When they were in

the police car, Kozma asked for medical attention.  The policeman who was driving, the one who had beaten Kozma, cursed at Kozma and told him to shut up.  When they got to the station, the policemen took both of them from the car into the station.  Peli was secured to a heater in the corridor and the light was turned off.  He did not know where they took Kozma but about five to ten minutes later they brought Kozma into the corridor and secured him about five to six meters from Peli.  (Id.)  When they brought Kozma into the corridor he looked like he had been beaten.  He was covered in blood from the nose.  Kozma did not resist the policemen when they were at the station.  He did not know what happened to Kozma because they placed him in the cage.  (Id. at 63.)

Regarding the incident at the bar, Csulakova said that she had sent one to prison she could get another one there also.  He did not know if the statement was directed at him or Kozma.  This provoked him and he slapped them.  Kozma got involved in the incident because they offended his wife.  (Id.)

### p. Witness Frantisek Barnas

Frantisek Branas testified at the pretrial hearing that he was working the night of the incident from 10:00 p.m until the following morning.  He came into the station about 9:45 p.m. and Kozma was already in the cage. He left on patrol.  Blasko had a pocket on his uniform torn and both Blasko and "Miso" went to the hospital because one of them had complained about some ribs or belly injury and the other had a hand injury.  Barnas guarded Kozma at the hospital.  Kozma acted a "dead bug" at the hospital.  (ECF No. 1 at 63.)

### q. Witness Milos Gasparovic

Milos Gasparovic, M.D., testified in the pretrial proceeding that he was working the night shift in urgent medical assistance.  He was sent by dispatch to the police station in Nitra.  Upon arriving, Kozma was half sitting on the floor in the corridor.  He was leaned against the wall in the presence of a policeman.  He had blood "suffusion" under his eye with swelling, he complained of pain in his stomach and lower limb.  His vital signs were checked and he was given an infusion and some pain killers.  (ECF No. 1 at 63.)

Kozma was transferred to the hospital, accompanied by a policeman, to the trauma

33

department.  While he was being treated, Kozma stated that he been attacked and beaten and had identified himself as a CPCG member.  The policeman did not interfere with the examination in any manner or speak rudely to Kozma.  Kozma's wife ran in and there was a large group of people and Kozma told his wife where his cell phone and keys were.  Kozma was transported to the hospital with suspicion of an eye injury and head contusion and an intra-abdominal injury that could not be determined by external examination.  (Id.)

Kozma was lifted into a chair to be transported.  He explained that he had been attacked by the policeman.  He did not identify the policeman who had attacked him.  (Id. at 63.)  He did not mention being attacked at the police station but stated that he had been attacked in a bar by the policemen who came there.  (Id. at 63-64.)  The swelling around Kozma's eye was new and could have been caused by a blunt item, such as a hit.  The eye was not bleeding, but was swollen.  (Id. at 64.)

**r.    Witness Marian Sovis**

Marian Sovis testified in the pretrial proceeding that he was in the bar when the argument started between the girls and Kozma and Peli.  It was an argument and he did not see anyone fighting.  One of the girls called the police and he remembered that one of the girls said that she had already got one man in prison and she could get him there too.  The policemen arrived about five to ten minutes later.  The policemen talked to the girls who pointed to their table.  He remembered the taller policeman standing at their table, with the shorter policeman next to him, telling Kozma to go with them.  Kozma tried to find out what the basis of the request was and threw some documents on the table.  The policemen did not look at the documents.  The policeman stated a few times for Kozma to go with them and Kozma questioned why several times.  Then the fight started.  He did not see how it started, but they tumbled over the table onto the ground.  The taller policeman was above Kozma who was on the ground.  It looked as if the policeman was kneeing Kozma.  The policeman hit Kozma in the head with his fist a few times.  Kozma stated that he had cut himself.  Then the taller policeman tried to handcuff Kozma and told the shorter policeman to kick Kozma.  The policeman kicked Kozma more than once in the ribs.  The policemen picked Kozma up off the ground and took him to the police car where he

1  was standing leaning for a while. There were prints of blood on the car. The policeman

2  handcuffed Peli and loaded him in the car and left. (ECF No. 1 at 64.)

3        He did not know how the altercation started or how they fell, he only saw them once they

4  were on the ground. He did not remember the policeman giving any orders before they fell and

5  Kozma was communicating calmly with the policeman and was not aggressive. The policeman

6  gave an aggressive impression. He was sitting with his back to Kozma and only turned to look at

7  them at times. After they tumbled to the ground, he stood up and watched the whole incident.

8  When they fell, Kozma was on his belly and protected his head with his hands. The policeman

9  immediately started hitting Kozma in the head. Kozma only covered himself and did not

10  otherwise defend himself. Then the policeman ordered the shorter policeman to kick Kozma.

11  He obeyed the order and kicked Kozma in the ribs. Then Kozma was handcuffed, lifted up, and

12  taken to the police car. The taller policeman was more aggressive while the shorter policeman

13  just watched and then kicked Kozma upon the order of the other policeman. The taller one was

14  younger, about thirty years old. Sovis knew Kozma from the bar, but did not know him

15  personally. It did not appear that the policeman had any injuries or torn uniforms. (Id.)

16        **s.**    **Witness Reina Balkova**

17        Regina Balkova was sitting in front of the bar and did not see the argument that started

18  the incident between Kozma and Lacova. She saw Lacova run out of the bar with her phone in

19  her hand making a phone call. She did not hear what Lacova was saying. In fifteen to twenty

20  minutes, a police car arrived. Lacova ran to them immediately and went with them back to the

21  terrace. After the policemen arrived, Balkova became interested in what was happening. So, she

22  stood up and went to look at the terrace. (ECF No. 1 at 64.)

23        There were two policemen, one taller and one shorter. The policemen went to Brath and

24  grabbed his shoulder, but Lacova screamed it was not him, it was the one at the farther table.

25  The policemen moved to the table where Kozma and Peli were sitting. There were two or three

26  older men there but she did not know who they were. The taller policeman told Peli to go with

27  them. Peli stood up to go, but Kozma asked what the basis was for them to take him. The taller

28  policeman asked Kozma who he was; so, Kozma took out his wallet with documents and told

him that he belonged to the Court Guard.  The taller policeman started to shout at him asking if he was a colleague three or four times.  Then, the policeman hit Kozma in the face.  Kozma did not defend himself in any manner, neither verbally or physically.  The policeman thrust Kozma so the glasses fell from the table and broke.  (Id.)  He thrust Kozma until Kozma was on the ground.  (Id. at 64-65.)  When Kozma was on the ground, he was on his side.  The taller policeman squatted down over Kozma and started hitting him in the face with his fist.  Then, the policeman stood up and while Kozma was still on the ground told the shorter policeman to kick Kozma.  The shorter one said no and the taller policeman told him to do what he said so the shorter policeman kicked Kozma in the ribs a few times.  They lifted Kozma up off the ground and took him to the car.  Kozma was covered in blood.  At the car, they kicked Kozma's legs to straddle them.  The rear door of the car had blood on it.  They put Kozma in the car and went back to get Peli who went with them voluntarily.  (Id. at 65.)

When the policemen came to the table where Kozma was sitting, they told Peli to go with them.  Kozma only asked what the reason was they were bringing him in.  He was speaking in a normal voice.  Kozma did not do anything to cause the policeman to attack him.  The policeman beat Kozma in the face and on his head with his fist a few times.  The other policeman did not do anything, until the other one told him to kick Kozma.  The policemen, especially the taller one, were aggressive when they arrived.  Kozma was calm, he was only talking to the policemen, and did not attack them verbally or physically.  She did not know the policemen and had never seen them before.  She knew Kozma, but not well.  She did not see any injuries to Kozma's face as they took him to the car.  (Id.)

  **t.**  **Witness Katarina Ottingerova**

Katarina Ottingerova testified at the pretrial proceeding that she observed them taking Kozma away after the incident, although she did not know it was him at the time.  She saw that Kozma was covered in blood.  The policemen were taking Kozma to the car normally and Kozma was with the taller policeman.  Kozma and the taller policeman shouted something at each other, but the shorter policeman did not join the discussion.  (ECF No. 1 at 65.)

  **u.**  **Witness Marek Puchovsky**

Marek Puchovsky testified at the pretrial proceeding that he was sitting outside on the bench when the incident between Kozma and Csulakova occurred. After it had calmed down, he went inside to get some beer and talked to the barmaid. As he looked out, he saw the policemen taking Kozma away, but he did not know what happened. (ECF No. 1 at 65.)

### v. Witness Jan Zelenak, Expert Opinion

The court read the expert's opinion into the trial record pursuant to Art. 268 Sec 8 of the Criminal Procedure Code. Jan Zelenak, a doctor specializing in health care and pharmacy prepared an expert opinion. The opinion stated that Kozma sustained a concussion of the brain, facial contusion in the area of the left eye with subcutaneous bleeding, fracture of the small nose bones, cervical spine sprain, contusion of the front abdominal wall on the left, contusion of both wrists, and partial damage of the sensitive nerve fibers of the right radial nerve in the area of the forearm. The injuries were caused by a blunt injury item using pressure, pulling and stroke. The expert stated that the injuries could have been caused by the conduct described by Kozma. The injuries to the sensitive nerve fibers of the right radial never in the area of the forearm may have been caused by using the enforcement tools. (ECF No. 1 at 66.)

Whether the injuries caused permanent damage could be determined only after a year post injury. After the injury, Kozma suffered from a headache for four weeks for which he took painkillers. He could not remember the events for three weeks. He could not focus on any activity. He suffered from insomnia, nausea, and dizziness. He had pain in his neck, in his front abdominal wall, and wrists for two weeks. He suffered from problems emptying his bowels. He had skin sensitivity failure on the back side of the right hand. He was treated from July 14, 2007, to August 14, 2007. (Id.)

### w. Documentary Evidence

The court also considered the following documentary evidence.

On July 16, 2007, Milan Varga of the Inspection Service Office of the Police Department completed an inspection of Kozma in the Trauma Department at the Faculty Hospital in Nitra. Kozma had hematomas of the head under both eyes and a dried wound size 0.5 cm x 0.3 cm with a drop shape. The internal wrist of the left hand had a would size 0.1 cm x 2 cm., on the right

had a pressure mark and a scab on the external wrist, on the internal side above the wrist there were three lines 1.5 cm to 3 cm long, 0.1 cm wide. No injuries were seen on the belly, the back or the lower ribs. (ECF No. 1 at 68.)

Arrest record of Kozma and Peli and duty record of Krajmer and Blasko. (Id.)

Medical report of examination of Krajmer dated July 13, 2007 showing a contusion and hematoma in the right elbow area. Examination of Blasko on the same date showing a contusion and hematoma in the right elbow area. Both were minor injuries with an expected sick leave period of eight days. (Id. at 68-69.)

Criminal prosecution of Peli, charged with misdemeanor disorderly conduct and assault on a public official. Criminal prosecution of Kozma for misdemeanor disorderly conduct, and criminal assault on a public official. (Id. at 69.)

Transcripts of the phone call from Lacova to the police department, and dispatch transcripts. (Id.)

Photo lineup on June 23, 2009, by Martina Kozmova. (Id.)

Military District Prosecution dated July 22, 2009 of Krajmer charging him with the criminal offense of misuse of powers of a public office in concurrence with the misdemeanor of bodily harm, committed in the form of joint participation. The prosecution was suspended. (Id.) Complaint filed against Krajmer on August 4, 2009 which was rejected by Resolution of the Supreme Military Prosecution. (Id. at 69-70.)

Criminal complaint against Peli for misdemeanor disorderly conduct. Peli was found guilty on October 9, 2009, and was imposed a fine of EUR 200. (Id. at 70.)

Service record of Blasko. Blasko was seated at the District Department of the Police Force-Nitra and had been employed since July 1, 2004 after graduating from the Secondary Vocational School of the Police Force in Pezincok. From July 1, 2005, he was a senior inspector with the territorial and structural responsibility. On April 1, 2006, he was moved to the District Department of Police Forces of Nitra in the position of inspector. He had the required knowledge of legal and other operations and improved his personal and local knowledge himself. He was impulsive at times, and was less popular in the team of colleagues. He was financially

awarded a few times and also committed disciplinary misconduct several times during a short period. On January 19, 2005, his service pay was lowered by 15 percent for 3 months; on October 20, 2005, his service pay was lowered 5 percent for 1 month; on April 6, 2007, he received a written reprimand which was expunged; on July 17, 2008, his service pay was lowered 5 percent for 2 months. On October 20, 2009, Blasko was discharged with the conclusion "incapable of execution of any position in the public service[.]" (ECF No. 1 at 70.)

Blasko did not have any criminal record nor was he receiving public benefits. (Id. at 70-71.)

An international arrest warrant was issued for Blasko on October 29, 2010. (Id. at 71; 104-08.)

After considering the evidence, the court found that Blasko was guilty of committing the criminal offense of abuse of power by a public official and misdemeanor bodily harm and was sentenced to four years. (Id. at 71-75.)

2. Judgment on Appeal

The judgment of the trial court was appealed and the sentence was affirmed on appeal on November 7, 2013. (ECF No. 1 at 89-95.)

3. Charging Document

On July 3, 2010 the charging document was filed alleging that:

> while on duty, on July 13, 2007, at about 21:45, in the locality named Stitare, on the Jelenecka Street, in the Relax bar, while tasked with investigating a crime that was reported telephonically, physically attacked the victim Boris Kozma, born on April 24, 1974, after (the victim) showed his identification as a member of The Prison and Judicial Guards Corps of the Slovak Republic, introduced himself as a fellow Prison and Judicial Guard officer and asked them why they wanted to apprehend his friend, who was sitting next to him, whereas the defendant Blasko hit him with his fist on his neck area, proceeded to pull him down to the floor, where he continued hitting him with his fist in the head area even though (the victim) was not resisting at all; he then proceeded to handcuff his hands and after taking the victim to the Local police station in Nitra, the defendant Blasko, having no apparent or justifiable reason, attacked the victim again by striking his face, and after the victim fell to the ground he kept on hitting him in the head and kicking his torso, by which the victim sustained a brain concussion, fractured nasal bones, face bruising around the left eye, spraining the cervical spine, bruising on the left side of the front torso, bruising of both wrists, and partial damage of the sensitive nerve endings of the radial nerve in the area of his forearm, [resulting in] recovery and time off work of thirty one days[.]

(ECF No. 52-1 at 13.) Blasko was charged with the crime of abuse of power in public office in violation of Art. 326, section 1(a)(2)(a) and violation of Art. 156, section 1 of the Criminal Law. (Id.)

The following factual basis (which was established "mainly on the basis of the witness interviews, the investigative witness confrontation, a police lineup, an expert testimony, examination of the body, several documents . . . that were secured for the purpose of verifying sufficient factual basis for this accusation") is set forth in the charging document." (Id. at 14.)

> The victim, Boris Kozma, described how on July 13, 2007, at approximately 21:45, in the locality of Stitare, on the Jelenecka Street, inside of the Relax bar, he was physically attacked, for no reason, by blows to the head, by the taller officer from a responding patrol, Blasko. [The victim] was merely verbally inquiring as to the reasons why the officers wanted to apprehend (the man) who was sitting at the table with him, Zoltan Peli, and he told them that he is an officer himself, a prison guard, and that his name was Kozma. The victim's work ID was inside a leather wallet that was on the table, and he pushed it towards the police officer. The officer was arrogant towards him, yelled at him and turned back to Peli, whom he was asking to leave with them. When the witness Kozma asked the officer again what was the reason they were asking him to come along with them, he received a blow to the face from the officer, to the nose. After the blow to the face they started pulling him over the bench and hit him. He remembered being hit in the face, and then a police officer pushed him off the bench to the floor, face down, where he was pulling his left arm up and kept yelling at him to put his arm behind him. He felt being hit on the head, to the back of the head, the neck, and when he turned to face the officer he was hit in the face again. He could also feel that someone was kicking him on the left side. Afterwards they handcuffed his hands over the head. The witness Kozma further denied having attempted to threaten the officer; even if (it was to be) by body language or a gesture. He was simply sitting on a bench, he spoke to him calmly and his hands were loosely by his body. The officers did not ask him to do anything either. They were only speaking to Peli who was not responding. Kozma was not defending himself from the blows he received from the police officers since he did not even have time for that. After being handcuffed by the police officers he was taken by car to the local station. The taller officer, who had attacked him, was at the wheel. The taller officer later escorted him into the building. Inside the station that same officer hit him again several times in the face, he kicked him, he stepped on his head and put him against the wall and handcuffed his hands behind him. The victim was the entire time saying nothing to him; he was only asking to be seen and treated by a doctor and he kept repeating he is a fellow officer. This police officer finally locked him up in a cage with his hands handcuffed up front. The victim consequently realized he had a cell phone on him, so he called his wife, his work and also [the emergency number] 158. Later that same taller officer came back to see him; he yelled at him and he searched him and handcuffed his hands in the back. After that he remembers how his hands were in a horrible pain at the wrist and he could hear his wife's voice. He also remembers rolling out of the cage and telling his wife to call an ambulance. Right there some officer showed up and (kept on) kicking him so he would go back to the hallway. He then lost his recollection; he would only remember being in pain, his head buzzing, some voices and lights. The victim doesn't recall if he was hit by the shorter officer; he

only remembers being repeatedly hit by the taller one.

The following witnesses described in detail the incriminating police action in question against the victim Kozma inside the Relax bar: Jana Mihalcinova, Patrik Foldesi, Ladislav Peli, Ivan Brath, Jana Kasalova, Marian Baresa, Jozef Ment, Boris Skolak, Zoltan Peli, Marian Sovis, Regina Balkova, Jozef Szorad. The witness testimonies concurred in their statements (by saying) that the whole time the only officer who was communicating with the victim Kozma and Zoltan Peli was the taller officer of the two patrolmen, and he was the same one asking Peli to come along with them. While communicating verbally, said taller officer suddenly attacked the victim Kozma by hitting his head with his fist, and he pulled him off the bench to the floor, where he tried to handcuff him while hitting him with his fists in the head, face and body. Since he would not manage to handcuff Kozma, who was on the floor face down, he asked his colleague, the shorter officer, who had been so far passively standing by, to kick him. He obeyed the order and he kicked the victim Kozma several times in the rib area. They then put Kozma in the handcuffs and took Kozma and Peli away by a car. The witnesses all stated that victim Kozma did not attack the officers verbally or physically, he didn't even attempt anything towards them and he peacefully communicated with the taller patrol officer, while, besides asking why they would want to apprehend Zola Peli, who was sitting next to him, he also told him his (own) name, occupation, and he pushed his credentials inside a wallet towards him. While he was on the floor, being beaten by the officer, he would not defend himself at all, he would just lie there on the floor. Afterwards, after his wife went over to the bar, some witnesses found out from her that victim Kozma was taken to the police station, they are beating him there, and they are refusing medical assistance for him. After coming over to the police station they could see the victim being taken away by ambulance, and he was in a bad state.

The witness Ing. Martina Kozmova stated that on July 13, 2007, at about 21:50, she received a phone call from her husband, where he was asking her for help saying he was beaten up on by the police. She proceeded to go the police station on Nabrezie mladeze in Nitra. As she was waiting for her husband, the victim Kozma, at the hallway of 00 PZ, her husband rolled out of a cell and asked her to call a physician, while a police officer dressed in a black camo uniform came out running and brutally started kicking her husband (in order for him) to get back in the cell, and after she started screaming he started verbally abusing her. He was alluding to her husband attacking him, from which she deduced he must have been one of the patrol officers. He was rather tall, with darker skin, darker eyes, short hair, no facial hair. He kicked her husband twice in his stomach or torso saying how dare he, and he dragged him back into the cell.

The witness Ing. Martina Kozmova, through a police lineup, did not identify at 100% the person, who, in front of her eyes, attacked her husband, the victim Kozma, because of the time that had passed, but she identified the defendant Blasko as the person who most resembled the attacker.

The witness Vladimir Chovanec confirmed that on July 13, 2007, he saw his colleagues bring in to the station Boris Kozma, while his colleague, Blasko, was placing him in a cell. The other colleague brought in the second man who was taken to the station along with Blasko. Kozma had a bloody nose and he was calm. He did not witness the victim being beaten at the station.

. . .

The senior Police Constable Michal Krajmer, having been accused of a crime, denied having committed the acts cited in the decision in regards to the filing criminal charges. He stated that he was dispatched, along with his colleague, Blasko, to respond to a conflict in a pub in the location of Stitare, and after his colleague Blasko communicated with two suspects sitting at a table, he was paying attention to the females who had called them to the event. He had previously noticed that Blasko was asking Peli to come along with him and he placed his hands on him. The man sitting opposite, Kozma, grabbed his hands and resisted Blasko, saying to leave him alone; that he would not be going anywhere. His colleague, Blasko, escaped his grip and Kozma attempted to go at Blasko or (he) made a furtive move. The defendant Krajmer could not recall the instant in detail because at the time he was paying attention to the females and when he looked back he could already see his colleague Blasko together with Kozma flying over the table [SIC] and falling to the floor. Consequently, he leaped over to them only after Blasko asked him to, while he was attempting to put handcuffs on Kozma, so he leaped over to Kozma's legs so that he could stabilize them since Kozma was flailing them. After a while Blasko managed to put handcuffs on Kozma and both suspects, Kozma along with Peli, were taken by car to 00 PZ. After arriving at the station he would only inquire of Kozma if he needed medical help; otherwise he would take care of Peli.

The witness Denisa Lacova stated that on July 13, 2007, in the evening hours, she would find herself on the terrace of the Relax bar in the locality of Stitare, together with her (female) friend, Maria Csulakova. Because of Csulakova's dog there was a conflict between them and the men sitting at the nearby table; one of them was called Boris, the other was Zoltan Peli. They would argue with them, then would cuss them out and Peli also slapped their faces. The witness then proceeded to use her cell phone to call the police. After that Boris verbally attacked the witness, and after cussing her out and threatening her he started chasing her around the table. He then calmed down and sat down at his table. After some time two officers arrived at the scene. As the officers approached the table with the two men with whom she and her friend Csulakova had a conflict, an argument ensued and the said Kozma raised his right hand and attempted to hit the police officer. However, the officer grabbed his hand and put it behind his back. Kozma was meanwhile defending himself and somehow he leaned against the table, which tilted, and the cups fell off. This witness does not know how they ended up on the floor, where the police officer was attempting to handcuff Kozma. Kozma was meanwhile defending himself. The witness only saw afterwards how they put the handcuffs on him and took him to the police car. They also picked up the other one, who had slapped her face, and they left in a car. The witness denied the police officer would hit Boris; he was only using (his skill to) grab and grip (him) and he put the handcuffs on him.

At a preparatory hearing the witness Lacova presented her testimony again, and there she stated that the prison guard lifted a hand at the police officer in the beginning, and it looked like he wanted to hit the taller officer. The officer managed to grab that hand and twist it behind his back.

The transcription of the interview of the witness Lacova, which took place on July 14, 20017, part of the documentary evidence, in a criminal action at the Office for Justice and Criminal Police OR PZ in Nitra, file number ORP-922/OVK-V-NR-2007 shows, besides other (facts), that she saw how the younger, bald man, the victim Kozma, all of a sudden swung his hand at the police officer, who dodged (the blow) and grabbed the hand.

The witness Maria Csulakova declared essentially the same as witness Denisa Lacova, and she also stated that after the patrol officers showed up at the place where the conflict with Boris Kozma took place, while speaking with the police officers, Kozma raised his hand at one of them. She could not state exactly how he did it, but she knew he raised his right hand. After that the witness turned her back, so she could not tell if Kozma attempted to hit the officer as well. When she turned back she saw both of them falling to the floor, where Kozma ended up face down and the officer was on top of him. Kozma kept somehow flailing (his body). He was then handcuffed and taken away.

The transcription of the interview of the witness Maria Csulakova, which took place on July 14, 20017, part of the documentary evidence, in a criminal action at the Office for Justice and Criminal Police OR PZ in Nitra, file number ORP-922/1-0VK-V-NR-2007 shows, besides other (facts), that she saw how the police officers were standing next to Boris and Zoltan and how Boris all of a sudden raised his hand at an officer, who dodged it and grabbed Boris' hand. They hit the table while at it and the cups fell down. The witness turned around and she saw Boris on the floor, one of the officers was standing over him telling him to put his hand behind his back. After that the police officers handcuffed Boris.

The defendant, Senior Constable Vladimir Blasko, exercised his right to remained silent as a person accused of a crime and refused to comment on the matter.

The expert testimony by MUDr. Jan Zelenak, MD, No. 17/2007, showed that in the evening hours on July 13, 2007, the victim Kozma suffered a brain concussion, nasal bones fractures, bruising in the area of the left eye and in the face, sprain in the cervical spine, bruising on the left front torso, bruising on both wrists and partial damage to the nerve endings of the right distal nerve in the area of the forearm. These injuries were caused by a blunt injuring force, meaning with a blunt object that would have caused the injuries, which was affecting the tissues by pressure, pulling and impact. Since during the injury there was a fracture, the force and intensity of the act of violence was strong. The expert admitted that the injuries were sustained in the manner described by the victim. The victim was suffering from pain for four weeks; he could not recall some of the events for three weeks, he would suffer from sleeplessness, nausea, vertigo, and for two weeks his neck, the front torso and both wrists were in pain. The healing and sick time off work, where he was unable to return to work, lasted thirty one days. At his testimony, the expert specified that the repeated kicking by a leg in boots in the stomach and torso area, especially in the rib area, may cause bruising, rib fractures, or injuries to the internal organs. The expert stated that the injuries found on the victim in the stomach area —the bruising on the right front torso/stomach area might have been caused either by a fall on a hard surface, or by a blunt object blow (by a leg or a hand.)

An expert in the field of health care, pharmacology, surgery and traumatology, MUDr. Ervin Chomca, MD, in his expert testimony No. 7/2008, in the criminal proceedings at the Office for Justice and Criminal Police OR PZ in Nitra, file number ORP-922/1-0VK-V-NR-2007 shows that Michal Krajnner in the incriminating event suffered bruising on the right elbow, where his bruise measured 2 x 3cm, and bruising on the right front stomach, close to the belly button. The right elbow bruising and the bruising on the right side of the stomach area was in this case caused by a blunt force acting upon the right elbow and the front stomach wall, in the belly button area. It is therefore possible that the injuries in question were sustained during a fall, while Krajmer might have hit a bench with his right elbow and a table with his stomach, but it is also possible that

the bruising on the stomach wall was caused by kicking, but in this case the expert would expect bruising at more sites. In the underlying matter, according to the available medical documentation, Vladimir Blasko sustained bruising on his right elbow with a bruise measuring 2 x 2 cm, and in connection with this injury it is unequivocally possible that this injury is directly related to the illness. The right elbow bruising in this matter was caused by exerting blunt force on the right elbow. It is therefore possible that the underlying injury was sustained during a fall while Blasko might have hit his right elbow on the floor, as he fell next to his attacker.

MUDr. Stefan Kona, MD, of the FN hospital in Nitra states in his medical findings — report from July 13, 2007, that Michal Krajmer was said during his examination that during police action he was attacked by a person known to him, and he fell over a table and hit his right elbow and stomach. The same facts can be found in the medical report of MUDr. Bacova, MD, an adult general practitioner at the NsP MV SR medical clinic, dated July 16, 2007.

MUDr. Stefan Kona, MD, of the FN hospital in Nitra states in his medical findings—report from July 13, 2007, that Vladimir Blasko stated during his examination that during the police action, he had been attacked by a person known to him, and that he had hit his right elbow.

According to employment evaluations of the defendant Blasko, he was employed as a police officer from July 01, 2004, and on October 20, 2009 he was declared unfit to fulfill the duties of a public service officer and he was dismissed from employment. His supervisor has stated that he has an explosive character and he committed several infractions during a short period of time, for which he was disciplined. Blasko has not been investigated, charged or found guilty in association with any crime at his place of residence or by any courts.

(Id. at 14-18.)

Blasko argues that the summaries of the witness statements are not competent evidence by which the Court can find probable cause. However, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. See Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3) (with the exception of the rules of privilege). The Ninth Circuit has "repeatedly held that hearsay evidence that would be inadmissible for other purposes is admissible in extradition proceedings." Emami, 834 F.2d at 1451. Therefore, "hearsay evidence and unsigned or unsworn translations of witness statements, for example, are admissible to support probable cause for the charges against the fugitive," "and the district court's determination need not even be based upon evidence that would be admissible at a preliminary hearing or in a grand jury proceeding in the United States." In re Extradition of Mathison, 974 F.Supp.2d at 1305. Therefore, the statements of the witnesses as set forth in the judgment and the charging document are sufficient evidence by which the Court can find

probable cause.

Blakso also argues that there were procedural irregularities during the trial, but it is not the business of the federal courts to pass judgment on foreign justice systems and such arguments can be raised with the Secretary of State. Santos, 830 F.3d at 1039-40.

Here, the documents provided contain the statements of the victim himself and numerous witnesses who were present, observed the incident involving Blasko and Kozma, and gave consistent statements that Kozma was sitting with his hands on the table at the time that Blasko attacked him and had done nothing to warrant the attack. Kozma himself stated that he was merely questioning why they were taking Peli away and offered his identification documents at which time Blasko hit him in the face and knocked him to the ground. Kozma stated that Blasko continued to hit him in the head and face while Kozma was on the ground.

Peli, who was sitting at the same table as Kozma, stated that Kozma was calm when the policeman arrived and did not say anything to provoke the attack. He stated that Kozma did not raise his hand or gesture to the officers. The only movement by Kozma was to remove his identification card from his pocket and that his hands otherwise stayed on the table. Peli stated that after the policeman pulled Kozma onto the ground he was kneeling on Kozma and beating him with his fists.

There are also the statements of the other individuals sitting at the tables on the terrace or who were in the vicinity when the alleged beating occurred. Foldesi, Ladislav Peli, Brath, Kasolova, Barcsa, Ment, Skolak stated that they were sitting at the next table and could see what was occurring. Sovis testified that he saw the officers at Kozma's table and Kozma was calmly communicating with the officer. Foldesi and Ment were standing and had an unobstructed view of the incident. Ldislav Peli was sitting behind Kozma's table. Balkova stated that she was in front of the bar and became interested when the policemen arrived so she stood up and went to look at the terrace.

Foldesi, Ldislav Peli, Brath, Kaslova, Barcsa, Ment, Skolak, and Balkova stated that Kozma was calmly asking the officer why he wanted to take Peli away. Sovis thought the policeman was trying to get Kozma to go with him. Foldesi, Ldislav Peli, Brath, Kasolova,

Ment, Skolak, and Balkova stated that Kozma had put his identification documents on the table and did not raise his hand to the officer. Foldesi, Ldislav Peli, Brath, Kasolovam, Barcsa, Ment, Skolak, Sovis, and Balkova stated that they saw the policeman hitting Kozma in the head and face with his fist. Foldesi, Ldislav Peli, Brath, Kasolova, Barcsa, Skolak, and Balkova stated that Kozma did not resist the office nor was he trying to defend himself but was covering his face during the beating.

Jana Balkova testified at the trial that after the Kozma was beaten by the police, she and a group of others went to the police statement to make a statement because that is what you do when you see the police beat someone.

Once they were at the police station, Kozma stated that Blasko hit him the face again and after Kozma fell to the ground he was beaten in the head and kicked. Then, Blasko stepped on his head and said it was finished. Peli stated that they took Kozma to a different room and when they brought him back to the corridor Kozma looked like he had been beaten.

Ing. Martina Kozmova stated in the pretrial proceeding that when she went to the police station she saw that Kozma had been beaten. As he was speaking to her, a policeman came up and grabbed Kozma by the clothing, lifted Kozma up with his foot and kicked him back into the cage. Based on the officer's statement that her husband was a prison warder and that he had almost broken his back on a table she later determined that he was the officer involved in beating Kozma at the bar.

Vladimir Chovanec testified during the trial that he was working that night and that he was told to take Kozma to the hospital for examination. Kozma was squirming on the ground in the cage where he had been beaten.

Additionally, Foldesi, Ladislav Peli, Barcsa, Skolak, Sovis, Balkova stated that they knew Kozma from the village or bar but they are not friends.

Finally, the medical evidence demonstrates that Kozma had injuries consistent with blunt force trauma and that the injuries could have resulted from the conduct that he described.

Blasko notes that three eyewitnesses exculpated him during the court trial. However, it is not for the district court to weigh conflicting evidence in making the probable cause

determination.  <u>Santos</u>, 830 F.3d at 992.

Blasko has submitted evidence in support of his opposition to extradition.  The accused may submit "explain[s] matters referred to by the witnesses for the government[,]" but evidence that merely contradicts the testimony of the prosecution may be excluded.  <u>Santos</u>, 830 F.3d at 992 (citations omitted).  Blasko has not submitted any evidence to explain matters that are in regards to the witnesses to the incident.  He does seek to admit evidence that he had satisfactory performance reviews to contradict the testimony that he was discharged from police service as being unfit.  However, the performance evaluations only pose an issue of credibility and do not explain away or obliterate the government's evidence.  <u>Santos</u>, 830 F.3d at 992.  The Court finds that the Government has submitted sufficient evidence to establish probable cause that Blasko committed the offenses for which extradition is sought.

### D.    Blasko's Defenses

Blasko argues that extradition is barred because he is exempt from prosecution or punishment from the offense because the limitations period for the offense has expired.  Blasko contends that since the court imposed a sentence of four years, the limitations period would be five years and expired on April 15, 2018.

The Government responds that the limitations period for the offenses under Slovakian law has not expired as stated in the declaration by Judge Maria Ondrejova.  The Government also submits a copy of the underlying indictment to demonstrate that charges were brought within the limitations period.  Further, the Government argues that under Slovakian law the limitations period has been tolled and the Court should defer to Slovakia's interpretation of its own law.

Article V of the Annex to the Treaty states,

> A criminal offender shall not be surrendered under the provisions hereof, when, from lapse of time or other lawful cause, according to the laws of either of the States within the jurisdiction of which the criminal offense was committed, the criminal offender is exempt from prosecution or punishment for the offense for which the surrender is asked.

(Annex to Treaty between the United States of America and the Slovak Republic concerning the Mutual Extradition of Criminal Offenders, Art. V, ECF No. 1 at 128.)  Blasko was charged and

convicted *in absentia* of Abuse of Power of a Public Official in a Serious Manner in violation of Article 326(a)(1) and (2)(a) and Article 138(d) of the Slovakian Penal Code and Intentionally Doing Bodily Harm to Another in violation of section 156(1) of the Slovakian Penal Code. (Charging Document, ECF No. 52-1 at 13-20; ECF No. 1 at 113-114; Judgement dated April 15, 2013, ECF No. 1 at 48-49; Judgement dated November 7, 2013, ECF No. 1 at 89.) Violation of Article 326(a)(1) by a serious method would be punishable by four to ten years. (ECF No. 1 at 114.) He was sentenced to the lower limit of the calculated penal range to four years imprisonment. (ECF No. 1 at 49, 75, 90-91.)

1. Misdemeanor of Bodily Harm in Violation of Article 156(1) of Slovakian Penal Code

Blasko first argues that the statute of limitations on the misdemeanor bodily injury charge was three years and has run. The Government does not address the specific argument that the limitations period on the misdemeanor offense had run prior to any charges being filed, but argues that the Court should accept the conclusion in the declaration submitted by Judge Ondrejova that the statute of limitations has not run. At the October 30, 2018 hearing, Blasko conceded that the Government has now submitted the charging document and has that is no longer an issue in the case.

Judge Ondrejova stated in her original declaration that the enforcement of the four-year sentence was not barred by the applicable statute of limitations because Blasko sojourned abroad with intent to avoid punishment. (Decl. Ondrejova, ECF No. 1 at 12.) In her supplemental declaration, Judge Onedrejova stated that the statute of limitations on the four-year sentence was not barred because the fact that Blasko has been fighting extradition after being arrested in October 2017 confirms that he knew about the judgment and that he had sojourned abroad with the intent to avoid punishment. (Suppl. Decl. Ondrejova ¶ 2, ECF No. 52-1 at 4.)

The fact that Blasko knew of the conviction in October 2017, prior to the expiration of the statute of limitations for the conviction, does not address whether the misdemeanor charges were filed within the statute of limitations. Pursuant to Article 87 of the Slovakian Penal Code, the limitations period for misdemeanor offenses is three years. (ECF No. 1 at 111.) As relevant

here, the limitations period does not include any time period for which the offender resided abroad with the intent to avoid criminal prosecution, and the limitations period for prosecution is suspended upon the bringing of a charge for a criminal offense or by a prosecuting authority, investigating judge or court seeking prosecution of the offender. (Id.) According to the International Arrest Warrant, issued January 21, 2014, the Interrogator of the Ministry of the Interior of the Slovak Republic, the Police Force Inspection Service Officer, started a criminal prosecution of Blasko on July 17, 2007, and on January 8, 2008, a charge was brought against Blasko. (International Arrest Warrant, ECF No. 1 at 105.) The Military Prosecution brought a charge against Blakso on June 3, 2010. (Id.)

The offense at issue here occurred on July 13, 2007. The prosecutor filed the charging document on June 3, 2010, just short of the expiration of the limitations period. (ECF No. 51-1 at 13-20.) Therefore, the Court finds that the misdemeanor charges were filed within the limitations period and the filing of the charges suspended the limitations period. The statute of limitations had not run on the misdemeanor charge.

### 2. Limitations Period for Imposition of Punishment

Blasko also argues that extradition is barred as to both charges because the statute of limitations for the execution of punishment has expired. Blasko contends that, because he has presented evidence that he did not leave Slovakia to avoid punishment, the limitations period has not been tolled and he cannot face punishment for the crimes for which he was convicted.

The Government replies that the record is more than sufficient to support Judge Ondrejova's conclusion that the limitations period in which Blasko must serve his sentence has not expired. The Government contends that Blasko's arguments regarding the time period prior to his arrest are irrelevant since he was arrested on October 6, 2017, has been fighting extradition, and is actively seeking to avoid his punishment. Judge Ondrejova stated that under Slovakian law this is sojourning abroad with the intent to avoid prosecution.

Pursuant to Article 90(d) of the Slovakian Penal Code, the limitations period for a sentence of four years would be five years after conviction. (ECF No. 1 at 112.) The limitations period is tolled when the "convicted sojourned abroad with the intent to avoid the punishment. .

..." (Id.)  Blasko seeks to admit evidence that he did not know about the pending charges when he left Slovakia and argues that he therefore did not sojourn abroad with the intent to avoid prosecution.  However, under Slovakian law, the fact that Blasko knew about the charges and has been fighting extradition within the limitations period would toll the limitations period under Article 90.  (Suppl. Decl. of Maria Ondrejova ¶ 2, ECF No. 52-1 at 4.)

Blasko was convicted on April 15, 2013, and the parties agree that the limitations period for serving his sentence would expire on April 15, 2018.  This action was filed on October 2, 2017, and Blasko appeared on October 6, 2017.  (ECF Nos. 1, 9.)  Under Slovakian law, the fact that Blasko was aware of the charges and fought extradition would toll the statute of limitations.  (Suppl. Decl. of Maria Ondrejova ¶ 2, ECF No. 52-1 at 4.)  While Blasko argues for a different result, the district court should refrain from interpreting the requirements of another country's criminal procedure both out of respect for a country's sovereignty and because there the chance of erroneous interpretation of their law is much greater when the Court is construing the law of a country whose legal system is not based on common law principles.  Emami, 834 F.2d at 1449; see also Fejfar v. United States, 724 F. App'x 621, 622 (9th Cir. 2018), cert. denied, No. 18-5642, 2018 WL 3972821 (U.S. Oct. 1, 2018) ("Judicial inquiry into foreign criminal procedural issues is limited in the extradition context."); Sainez v. Venables, 588 F.3d 713, 717 (9th Cir. 2009) (rejecting statute of limitations defense in extradition by "adhering to our established approach of giving credence to foreign proceedings").

Further, although Blasko argues that he did not flee to avoid prosecution and has been living opening in the United States, the fact that Blasko could have taken steps to conceal his whereabouts does not mean that he was not sojourning aboard to avoid prosecution under Slovakian law.  Upon questioning during the hearing, Blasko responded that whether he intended to sojourn abroad to avoid punishment would be triggered when the Court finds that Blasko was aware of the punishment and sought to avoid prosecution.  Blasko's evidence establishes that he was aware since 2012 that there was an international warrant for his arrest and Blasko "may have felt safe enough being thousands of miles away from the government that was seeking to prosecute him[,]" Man-Seok Choe v. Torres, 525 F.3d 733, 741 (9th Cir. 2008).  Blasko sought

asylum when he became aware that there was an international warrant for his arrest, and, as discussed, has been actively fighting extradition within the limitations period. Therefore, Blasko was aware during the limitations period that there was an international arrest warrant issued by Slovakia, has been residing in the United States, and sought asylum when he learned of the warrant. Along with his seeking to avoid extradition within the limitations period, this is circumstantial evidence that would support Judge Onedrejova's finding that Blasko has been sojourning abroad to avoid prosecution and serving the sentence in Slovakia.[3]

The Court finds that the limitations period for Blasko to serve his sentence has not run as it has been tolled under Slovakian law where he was arrested within the limitations period and has been fighting extradition.

## V.

## FINDINGS AND CERTIFICATION

The Court makes the following findings:

1. There is a valid extradition treaty between the United States of America and the Slovak Republic that has been in full force and effect.

2. Vladimir Blasko is the person named in the arrest warrant issued dated January 21, 2014.

3. The offense for which Vladimir Blasko is charged is listed in the Treaty and is punishable in both the United States and the Slovak Republic for a period of more than one year.

4. Article 326(a)(1) of the Slovakian Penal Code and 18 U.S.C. § 242 (deprivation of rights under color of law); Cal. Penal Code § 242 (battery); and Cal. Penal Code § 245 (assault likely to produce great bodily injury) are substantially analogous.

5. There is probable cause to believe that Vladimir Blasko committed the charged offense.

6. The documents required have been presented in accordance with the laws of the

---

[3] The Court also notes that to find that the statute of limitations ran during the time in which Blasko has been continuing the case to fight extradition would result in an incongruous result. Due process requires that Blasko have the opportunity to contest the extradition and based on his argument any defendant could merely continue an extradition hearing until the applicable statute of limitations had run to avoid extradition.

United States of America and the Treaty, and have been translated and duly authenticated by United States of America consul.

The Court will certify the above findings, and the transcripts of the extradition hearings held in this case, to the Secretary of State, pursuant to 18 U.S.C. § 3184.

IT IS SO ORDERED.

Dated:   **November 19, 2018**

_____
UNITED STATES MAGISTRATE JUDGE